```
1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                    MARSHALL DIVISION

4  KAIST IP US LLC,            )(
        PLAINTIFF              )(    CASE NO.
5                              )(    2:16-CV-1314-JRG-RSP
   VS.                         )(
6                              )(
   SAMSUNG ELECTRONICS CO., LTD; )(   MARSHALL, TEXAS
7  SAMSUNG ELECTRONICS AMERICA, )(
   INC.; SAMSUNG SEMICONDUCTOR, )(
8  INC; SAMSUNG AUSTIN         )(
   SEMICONDUCTOR, LLC;,        )(
9  GLOBALFOUNDRIES, INC.;      )(
   GLOBALFOUNDRIES U.S., INC.; )(
10 AND QUALCOMM, INC.,         )(    JUNE 11, 2018
        DEFENDANTS             )(    9:30  A.M.
11

12            TRIAL TRANSCRIPT OF JURY TRIAL

13       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14         UNITED STATES CHIEF DISTRICT JUDGE

15 APPEARANCES:

16 FOR THE PLAINTIFF:      Mr. Andrew Y. Choung
                           Mr. Guy M. Rodgers
17                         Mr. S. Desmond Jui
                           GLASER WEIL FINK HOWARD
18                         AVCHEN & SHAPIRO LLP
                           10250 Constellation Boulevard
19                         19th Floor
                           Los Angeles, California 90067
20
   THE COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
21                         Official Court Reporter
                           United States District Court
22                         Eastern District of Texas
                           Marshall Division
23                         100 E. Houston
                           Marshall, Texas  75670
24                         (903) 923-7464

25 (Proceedings recorded by mechanical stenography, transcript
   produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:        Mr. Jason Sheasby
                               Ms. Charlotte Wen
 2                             IRELL & MANELLA LLP
                               1800 Avenue of the Stars
 3                             Los Angeles, California 90067

 4                             Mr. Christopher Bunt
                               Mr. Charles Ainsworth
 5                             PARKER BUNT & AINSWORTH PC
                               100 E. Ferguson Street
 6                             Suite 1114
                               Tyler, Texas 75702
 7
     FOR THE DEFENDANTS:       Mr. Blair M. Jacobs
 8                             Mr. Allan M. Soobert
                               PAUL HASTINGS LLP
 9                             875 15th Street, N.W.
                               Washington, DC 20005
10
                               Ms. Melissa R. Smith
11                             GILLAM & SMITH LLP
                               303 S. Washington Avenue
12                             Marshall, Texas 75670

13                             Mr. Christopher W. Kennerly
                               PAUL HASTINGS LLP
14                             1117 S. California Avenue
                               Palo Alto, California 94304
15
                               Mr. Jeffrey D. Comeau
16                             PAUL HASTINGS LLP
                               4747 Executive Drive
17                             12th Floor
                               San Diego, California 92121
18
                               Mr. Joseph J. Rumpler, II
19                             PAUL HASTINGS LLP
                               1117 S. California Avenue
20                             Palo Alto, California 94304

21                             Ms. Soyoung Jung
                               PAUL HASTINGS LLP
22                             515 South Flower Street
                               25th Floor
23                             Los Angeles, California 90071

24

25
```

```
 1   FOR DEFENDANTS:           Mr. Grant N. Margeson
                               PAUL HASTINGS LLP
 2                             101 California Street
                               48th Floor
 3                             San Francisco, California 94111

 4                             Ms. Ariell Bratton
                               PAUL HASTINGS LLP
 5                             4747 Executive Drive
                               12th Floor
 6                             San Diego, California 92121

 7

 8         _____

 9                      P R O C E E D I N G S

10

11   (Venire panel in.)

12         COURT SECURITY OFFICER:  All rise.

13         THE COURT:  Thank you.  Be seated.

14         Good morning, ladies and gentlemen.  Thank you for

15   being here.

16         My name is Rodney Gilstrap, and I'm the resident

17   United States District Judge here in the Marshall Division

18   of the Eastern District of Texas.

19         I have lived in Marshall since 1981.  I practiced

20   law here and in this general area for 30 years.  And I was

21   then appointed by the President to become a United States

22   District Judge in 2011.

23         I have a confession to make.  I was not born in

24   Texas.  But I got here as quickly as I could.  I was born in

25   Florida.  But I came to Texas to go to college and stayed to
```

1    go to law school at Baylor University in Waco.

2          I'm married, I have two grown children, and my wife

3    owns and operates a retail floral business here in Marshall.

4          Now, I tell you all these things about myself

5    because in a few minutes, I'm going to ask each one of you

6    to tell me the same kind of information about yourselves.

7    And I think you're entitled to know -- to know as much about

8    me as I'm about to find out from each one of you all.

9          We're about to engage in the selection of a jury in

10   a civil case involving allegations of patent infringement.

11   But before we go any further, I want to briefly review with

12   you how we came to have a jury trial system for civil

13   disputes like this one.

14         If you go back in history and if you look at the

15   first five books in the Old Testament, the Pentateuch,

16   you'll find that the ancient Jewish nation empaneled juries

17   for the purposes of deciding issues related to property

18   ownership and property value.

19         The ancient Greeks began using a jury system in

20   about 1500 BC.  The Romans, as they did with many other

21   things, adopted the jury system from the ancient Greeks.

22   And it was the Romans that brought the concept of trial by

23   jury to what is today the British Isles when they conquered

24   that island in the 4th century AD.

25         Now, by the 12th century AD jury trials had been a

1  part of the judicial system in England for over 800 years.

2  But in the 12 century AD, a tyrannical king came to the

3  throne of England who was known as King John.  And one of

4  the things King John did was attempt to do away with the

5  right to trial by jury.

6        King John became embroiled with many disputes

7  between himself and his -- his -- his nobles, and that led

8  to the verge of a civil war.  That civil war was averted by

9  a resolution of their disputes that took place at a location

10  called Runnymede.  And the document that resolved the

11  disputes between King John and his nobles is something that

12  you should all know when I refer to it as the Magna Carta.

13        And in the Magna Carta, the right to trial by jury

14  was addressed and guaranteed to Englishmen in writing.  As a

15  matter of fact, 28 of the 50 United States have adopted in

16  their own state constitutions the exact language from the

17  Magna Carta addressing the right to trial by jury.

18        So you can see from this that when our founding

19  fathers came to these shores as British colonists, the right

20  to trial by jury was an established and traditional right

21  from England.  And that right to trial by jury flourished

22  here in the United States or with the British colonies that

23  would become the United States for over a hundred years

24  until another somewhat tyrannical king came to the throne of

25  Great Britain.  This time his name was King George, III.

1   And King George, III, like King John, ended up embroiled in

2   controversy between himself and those British subjects here

3   in America.

4           As a matter of fact, Thomas Jefferson in writing

5   the Declaration of Independence, which sets forth in detail

6   the various disputes and controversies that led the American

7   colonies to believe that they were forced to seek an

8   independent separation from England, that Declaration of

9   Independence spells out specifically one of the reasons

10  leading to the decision to separate and declare independence

11  was the attempt by King George, III to restrict and do away

12  with the right to trial by jury.

13          So the right to trial by jury is an important

14  historical right recognized in the United States.  As a

15  matter of fact, when our constitution was adopted, it was

16  adopted on the premise that there would immediately be added

17  to it 10 important amendments.  Many of the states would not

18  have voted to ratify the constitution without the implicit

19  promise that it would be followed by those 10 amendments.

20  And those 10 amendments were promptly added after

21  ratification to our constitution.

22          And you all should know each one of those 10

23  amendments as what we call the Bill of Rights.

24          And among those 10 amendments in the Bill of Rights

25  is the Seventh Amendment to the United States Constitution

```
 1   which guarantees the right to trial by jury in a civil case
 2   such as this.
 3          And the Seventh Amendment to the constitution was
 4   ratified in 1791.  So since 1791, every American citizen has
 5   had a constitutionally guaranteed right to seek a trial by
 6   jury in a civil dispute.
 7          So by being here this morning, ladies and
 8   gentlemen, I want you to understand historically and in
 9   context that you're part of a very, very long and storied
10   tradition by the right to trial by jury in the United
11   States.  And by being here and presenting yourself for jury
12   service this morning, you are in a very real way doing your
13   part as American citizens to preserve and protect and defend
14   that constitutional right guaranteed to all of our citizens.
15          I always tell prospective jurors who present
16   themselves for jury service that in my personal opinion,
17   jury service is the second highest form of public service
18   that any American can render.  It's my opinion that the
19   highest form of public service are those young men and women
20   who serve in the armed forces of our country.
21          Now, the lawyers for both of the parties in this
22   case are going to address you in a few minutes, and they're
23   going to ask various questions of the members of the -- of
24   the venire panel.  And I want you to understand when they
25   ask you questions as part of this process, they're not
```

seeking to pry unduly into your personal affairs.  They're simply seeking to obtain proper information for the purposes of securing a fair and an impartial jury to hear the facts and the evidence in this dispute.

I don't know if it will happen today, it usually doesn't.  This is a rarity.  But it is possible that at some point one or more of you may be asked a question that you believe is so personal and so private in your own life that you're not comfortable answering it in front of everyone else.  If that happens, you have the option to simply say, I'd like to discuss that with Judge Gilstrap.  And if you do, I'll make -- I'll provide an opportunity for you to answer -- for you to answer that question outside of the presence of everyone else on the panel.  But, again, ladies and gentlemen, that doesn't come up very often, but I want you to know if that should occur, you do have that option.

The important thing, when we get to the point of the process where the lawyers begin to ask you questions, the important thing for each of you to know is that you should give full, complete, and truthful answers to the questions that are asked.  There are no wrong answers as long as your answers are full, complete, and truthful.

Now, the trial in this case is going to begin later today, and it's going to continue probably through the end of this week.  There is an outside chance it could go into

1   Monday of next week.  I do not expect under any circumstance

2   it will go longer than that, but those of you who are going

3   to be selected will need to be available to serve each of

4   the remaining days of this week and possibly through Monday

5   of next week.

6          Now, with that in mind, I need to know from

7   everyone on the panel if you have a surgical procedure

8   scheduled for you during that time period or an immediate

9   member of your family or if you have prepaid nonrefundable

10  tickets to someplace you cannot get out of, if you have a

11  serious -- a serious conflict that would keep you from being

12  available during that entire time period if you were

13  selected, then I need to know about that at this point.  If

14  that applies to any of you, would you -- would you raise

15  your hands and let me make a note of it.

16         I see nobody in the jury box.

17         I see No. 18.

18         And, sir, I can't see your number.

19         24, 25, and 27.

20         Okay.  24, 25, 27.

21         Anybody else?

22         18, 24, 25, and 27.

23  All right.

24         COURT SECURITY OFFICER:  We've got one in the jury

25  box.

1            THE COURT:  One?  Okay.  No. 6, okay.  No. 6, as

2    well.  Thank you.

3            All right.  At this time, I'm going to call for

4    announcements in the case of KAIST IP US LLC versus Samsung

5    Electronics, et al.  This is civil Case No. 2:16-CV-1314.

6            Counsel, as you make your announcements on the

7    record, would you please identify yourselves, identify each

8    member of your trial team, and identify any corporate

9    representatives that you have present with you this morning.

10           We'll begin with the Plaintiff.  What says the

11   Plaintiff?

12           MR. BUNT:  Thank you, Your Honor.

13           Chris Bunt here on behalf of KAIST IP US.

14           And with me in the gallery, Mr. In-Gyoo Kang, who

15   is our corporate representative, he is the principal

16   director at KAIST IP, which is the parent corporation for

17   KAIST IP US.

18           Seated beside him is Mr. Yong-Ho Son.

19           If you could stand?

20           Thank you, sir.

21           He is the director of KAIST IP US.

22           And then seated on the other side of Mr. Kang is

23   Professor Jong-Ho Lee.  He is the inventor of the patent in

24   this case.

25           Then seated -- thank you, sir.

1          And then at the counsel table, we've got Mr. Jason

2    Sheasby, Mr. Andrew Choung, Ms. Charlotte Wen, Ms. Tara

3    Trask, and Mr. Desmond Jui.

4          And we're ready to proceed, Your Honor.

5          THE COURT:   All right.  What's the announcement

6    for Defendants?

7          MR. JACOBS:  May it please the Court.  Thank you,

8    Your Honor.

9          Blair Jacobs.  I'm from the law firm of Paul

10   Hastings, and I represent the Defendants in this matter.

11         Our corporate representatives include Dongwan Kim

12   from Samsung.  He is a master, which is a vice president

13   level within Samsung.

14         We have David Bennett from GlobalFoundries.

15   Mr. Bennett is a vice president of strategic agreements and

16   alliances at GlobalFoundries.

17         Mr. Kim, you can sit down.

18         And we have Matt Dobbins from Qualcomm here, as

19   well.  He is the corporate representative from Qualcomm.

20         And then Brian Kim, as well, who is the head of IP

21   legal at Samsung Electronics, senior vice president is here,

22   and he will be here this week, as well.

23         The lawyers who you'll be hearing from this week

24   include Allan Soobert, my partner at Paul Hastings.

25         Melissa Smith is a local.  She will be -- handling

1  voir dire today.

2        And Chris Kennerly is a partner from Paul Hastings,

3  as well.  And you'll be hearing from him as well this week.

4        Your Honor, with that, we are ready to proceed.

5        THE COURT:  All right.  Thank you, counsel.

6        Ladies and gentlemen, as I've told you, this is a

7  patent case arising under the patent laws of the United

8  States.

9        What the Plaintiff is claiming in this case is that

10 its patents were infringed by the Defendants, and it is

11 seeking money damages because of that alleged infringement.

12       The Defendants deny that they infringe the

13 Plaintiff's patents, and they contend that the patents are

14 invalid.

15       Now, what I've just told you is a very informal way

16 of describing the case in layman's terms.  I know the

17 members of the panel have seen the patent video produced by

18 the Federal Judicial Center.  Having seen that you know more

19 about this process than most people do when they appear for

20 jury duty.

21       Now, as I said the lawyers are going to address the

22 panel in a few minutes from each side.  They're going to ask

23 questions as a part of gathering useful information to

24 exercise their peremptory challenges to complete the process

25 of selecting the jurors, the eight jurors from among you

1   that will serve as our jury in this case.

2          Again, ladies and gentlemen, there are no wrong

3   answers to the questions you'll be asked as long as those

4   responses are full, complete, and truthful.

5          One thing I want to call your attention to before

6   the lawyers address the panel, because they may ask you as

7   part of their questioning about it, is the burden of proof.

8   In a patent case, the jury may be called upon to apply two

9   different burdens of proof.

10          The jury may apply the burden of proof known as the

11   preponderance of the evidence.  I'll say that again, the

12   preponderance of the evidence, as well as a different burden

13   of proof known as clear and convincing evidence.  And I'll

14   say that again, clear and convincing evidence.

15          When responding to lawyers' questions about the

16   burden of proof, I need to instruct you that when a party

17   has the burden of proof on any claim or defense by a

18   preponderance of the evidence, it means that you, the jury,

19   must be persuaded by the credible or believable evidence

20   that that claim or defense is more probably true than not

21   true.  I'll say that again.  More probably true than not

22   true.  Sometimes this is talked about as being the greater

23   weight and degree of credible testimony.

24          Let me give you an example that I hope will be

25   helpful to you.  I think all of you on the panel can see in

 1    front of me and in front of our court reporter the statue of

 2    the Lady of Justice.  She has her eyes blindfolded.  She has

 3    what's called the sword of justice in her right hand lowered

 4    by her side, and she has the Scales of Justice raised in her

 5    left hand.  And those scales start off exactly balanced and

 6    equal.

 7           And it is those scales I want you to focus on in

 8    this example.  Throughout the course of the trial, both

 9    sides are going to be putting forward evidence.  Consider

10    that evidence as something that goes on one side of those

11    scales or the other side of those scales, depending on who

12    offers it and presents it.

13           When all the evidence is in, the jury is going to

14    be asked to answer certain questions.  And when answering

15    those questions, if you determine that the party who has the

16    burden of proof by a preponderance of the evidence has those

17    scales tipping in their favor, even if they tip ever so

18    slightly, then that party has met its burden by a

19    preponderance of the evidence.

20           If a majority of the evidence, even if it's a

21    slight majority, tips the scales in favor of the party

22    having the burden of proof by a preponderance of the

23    evidence, then the preponderance of the evidence standard

24    has been met.

25           On the other hand, when a party has the burden of

proof on any defense by clear and convincing evidence, that

means that the jury must have an abiding conviction that the

truth of the party's factual contentions are highly

probable.  I'll say that again.  An abiding conviction that

the truth of the party's factual contentions are highly

probable.  That's a higher standard of proof, a higher

burden of proof than the preponderance of the evidence

standard.

         If we think about the same example, those scales

that receive the evidence over the course of the trial, when

all the evidence is in and the jury's answering the

questions they'll be asked to answer, if the party who has

the burden of proof by clear and convincing evidence has

those scales tip in their favor and they tip more than

slightly, they definitely tip in their favor, then that

party has met the burden of proof by clear and convincing

evidence.  It must be more than a slight majority of the

evidence.  The scales must definitely tip in that party's

favor.  And if they do, then the clear and convincing

evidence standard has been met.

         Now, ladies and gentlemen, neither of these two

burdens of proof should be confused with a third and a

completely different burden of proof that I'm sure you've

all heard about in the movies and in television and in the

media called beyond a reasonable doubt.

1          Beyond a reasonable doubt is the burden of proof

2     applied in a criminal case.  It has absolutely no

3     application whatsoever in a civil case such as this.  You

4     should not confuse clear and convincing evidence with

5     evidence beyond a reasonable doubt.  It is not as high as

6     beyond a reasonable doubt, but it is a higher standard of

7     proof than the preponderance of the evidence standard.

8          Now, I give you these instructions in case you are

9     asked questions by the lawyers about your ability, if you're

10    selected to serve on this jury, to apply both of those

11    different burdens of proof to the evidence that you'll hear.

12         Now, before the lawyers address the panel as a

13    whole, I'm going to ask each one of you to give me the same

14    kind of information about each of yourselves that I gave you

15    when we began a few minutes ago.

16         Each of you should find that there are nine

17    questions.  You have a printed copy of them.  You have them

18    on the screens that you can see.  And we're going to start

19    one at a time and let each member of the panel answer those

20    nine questions for us.

21         This is how we're going to do it.  Our Court

22    Security Officer is going to bring a handheld microphone to

23    Panel Member No. 1, and we'll start with Panel Member No. 1.

24    When you get the handheld microphone, I'm going to ask you

25    to stand, and then once you've stood, answer those nine

 1   questions.  Then we'll pass the microphone to Panel Member

 2   No. 2, and Panel Member No. 2 will go through the same

 3   process.  And we'll go numerically through the panel all the

 4   way to the end.

 5        Also, ladies and gentlemen, when the lawyers are at

 6   the podium and they're asking specific questions of you, I'm

 7   going to ask that we follow the very same procedure, and

 8   that is that you wait until the handheld microphone is

 9   brought to you by the Court Security Officer, and then when

10   you get that microphone, if you'll stand and then answer the

11   question that you've been asked.  It's a large courtroom.

12   There are a lot of people present.  And it's important that

13   the lawyers and the Court hear your answers.  So if you'll

14   wait until you receive the microphone, stand, and then

15   answer the question that's asked, that will help ensure that

16   everyone hears the answers to those questions.  That's the

17   process that we're going to follow.

18        All right.  With that, we will begin with Panel

19   Member No. 1.

20        Mr. Nance, if you'll take the handheld microphone

21   to Ms. Fields.

22        Ms. Fields, when you get this, if you'll stand and

23   answer those nine questions for us, please, ma'am.

24        JUROR FIELDS:  Good morning.  My name is Lydia

25   Fields.  I'm from Marshall, Texas.  That's where I live.  I

1  don't have any children.  My place of employment is Marshall

2  ISD.  I am currently an instructional coach for both math

3  and English.  So all the high school math and English

4  teachers, that's who I held instruction with to go over

5  instructions for our students here in Marshall.  I've worked

6  there for one year.  My educational background, I graduated

7  from Marshall High top of my class.  I'm a summa cum laude

8  graduate of Wiley College.  I'm also a summa cum laude

9  graduate from Texas Southern University, Houston, Texas,

10  with a Master's in educational administration.  My spouse's

11  name is Lavon Fields, Jr.  He works at Waskom ISD as a

12  technology director.  He's worked there for 16 years.  And I

13  do not have any prior jury service.

14          THE COURT:  Ms. Fields, you said that you've worked

15  for Marshall ISD for one year.  Where did you work before

16  that?

17          JUROR FIELDS:  I worked in Karnack, Texas, as the

18  principal of the Head Start through 8th grade school.  And

19  that's where I was.  I had Head Start through 8th grade.

20          THE COURT:  And how long were you at Karnack?

21          JUROR FIELDS:  Two years.

22          THE COURT:  Okay.  Thank you, ma'am.  If you'll

23  hand the microphone to Ms. Clepper, Panel Member No. 2.

24          JUROR CLEPPER:  Hi.  My name is Sherron Clepper.  I

25  live in Hallsville, Texas.  I have two children.  One of my

```
 1    daughters passed away two years ago.  My place of
 2    employment -- I'm retired.  I had worked at Blue Cross Blue
 3    Shield of Texas for 15 years.  Part of it provided service,
 4    part of it member concierge.  My educational background, I
 5    majored in accounting and finance with a minor in
 6    psychology.  I went into my third year.  I had a -- also a
 7    degree or a certificate for EMT.  My spouse's name is Colton
 8    Wayne Clepper.  He works for American Gold & Diamond.  He's
 9    a manager there.  He works in coins, diamonds, gold, stamps.
10    He's been there eight years.  And I have no prior jury.
11         THE COURT:  All right, ma'am.  Thank you.  If
12    you'll hand the microphone to Mr. Dickey, Panel Member No.
13    3.
14         JUROR DICKEY:  Good morning.  My name is John
15    Dickey.  I live in Longview, Texas.  I have six children.  I
16    work at Alsco Linen Service.  I provide linen for like Red
17    Lobster and -- and -- and places like that.  I've worked
18    there for seven years.  I'm a high school graduate from
19    Robert E. Lee High School in Tyler.  My spouse's name is
20    Jennifer.  She works for Mobberly Baptist Church as the
21    administrative assistant to Thrive Ministries.  She's worked
22    there for three years.  And I have no prior jury services.
23         THE COURT:  All right, sir.  Thank you.  If you'll
24    hand the microphone to Panel Member No. 4, Mr. Humphrey.
25         JUROR HUMPHREY:  Steven Humphrey.  I have one son.
```

```
 1  I've worked at Graphic Packaging International for the last
 2  22 years as a paper maker.  Graduated high school.  I've
 3  been married for 26 years to LeeAnn.  She is a housewife.
 4  And I've been on one criminal case.
 5          THE COURT:  And where was that, Mr. Humphrey, the
 6  criminal case?
 7          JUROR HUMPHREY:  Cass County.
 8          THE COURT:  And how long ago?
 9          JUROR HUMPHREY:  About a year and a half.
10          THE COURT:  All right, sir.  Thank you very much.
11  If you'll hand the microphone to Panel Member No. 5, Ms.
12  Mobley.
13          JUROR MOBLEY:  Hi.  My name is Taylor Mobley.  I
14  am from Gilmer, Texas.  I have no children.
15          I'm currently a customer service representative for
16  Best Buy.  I've worked there for two years.
17          I graduated from Gilmer High School in 2014, and I
18  graduated from TJC with an Associate of Arts of degree.  And
19  I will be graduating this December from UT Tyler with a
20  psychology degree.
21          I am not married.
22          And I have no prior jury services.
23          THE COURT:  Thank you.
24          Panel Member No. 6, Mr. Brady.
25          JUROR BRADY:  Okay.  My name is John Brady.
```

```
 1                THE COURT:  Hold the microphone a little closer,
 2     Mr. Brady.  Thank you.
 3                JUROR BRADY:  This close enough?
 4                THE COURT:  That will work.
 5                JUROR BRADY:  I don't do these things.
 6                I've got two children.  I'm an electrician, Union
 7     Electrician.  Been an electrician about 18 years.
 8                Graduated from high school.
 9                Spouse's name is Michelle.  Place she works is she
10     stays at home, takes care of my oldest son.  He's a Type 1
11     diabetic like I am.
12                And --
13                THE COURT:  Have you had any prior jury service?
14                JUROR BRADY:  No, I've been -- got to this far --
15                THE COURT:  But never selected?
16                JUROR BRADY:  Never selected.
17                THE COURT:  Thank you, sir.  If you'll hand the
18     microphone to Mr. Gray, Panel Member No. 7.
19                JUROR GRAY:  My name is James Gray.  I live in Ore
20     City, Texas.  I have three children.
21                I'm a pastor at First Baptist Church there in Ore
22     City.  We've been there five years.
23                Graduated with a Master of Arts degree in Christian
24     studies here at ETBU.  Loved it.
25                My wife's name is Cristi.  She is a stay-at-home
```

 1    mom.

 2            And I have no prior jury duty service.

 3            THE COURT:  All right, sir.  Thank you.

 4    If you'll hand the microphone to the Court Security Officer

 5    behind you, he's going to take it around to Panel Member No.

 6    8 and we'll proceed from there.

 7            JUROR BYERLEY:  My name is David Byerley.  I'm from

 8    McLeod, Texas.  I have two daughters that live in Colorado

 9    Springs, Colorado.

10            I work for Boehringer Ingelheim Pharmaceutical as a

11    sales representative.  Work primarily in the Shreveport,

12    south -- south Louisiana area.

13            THE COURT:  And let me ask you to hold the mic a

14    little closer.

15            JUROR BYERLEY:  I'm sorry.

16            THE COURT:  Thank you.

17            JUROR BYERLEY:  I've been there for 20 years.

18            Graduated from North Caddo High School in Vivian,

19    Louisiana and Northeast Louisiana University in Monroe,

20    Louisiana.

21            My wife's name is Angie.  She works part time for

22    the United Methodist Church in Vivian, Louisiana.  Hadn't

23    been there but about a year.

24            And I have not had any prior jury service.

25            THE COURT:  No prior jury service?

```
1              JUROR BYERLEY:  No, sir.

2              THE COURT:  Okay.  Thank you.

3              Panel Member No. 9, Ms. Owens.

4              JUROR OWENS:  My name is Katie Owens.  I live in

5    Gilmer, Texas.  I have three children.  I currently work at

6    Veterinary Services of Gladewater in Gladewater, Texas.

7    I've been there four years.

8              I graduated from Harmony High School.

9              And I'm not married.

10             And I have not had any jury service.

11             THE COURT:  Thank you, ma'am.  If you'll hand the

12   microphone to Panel Member No. 10, Mr. Fitzgerald.

13             JUROR FITZGERALD:  My name is James Fitzgerald.  I

14   live in Gilmer, Texas.  I've got three kids.

15             I work at Etex Telephone.  I've been there about

16   23 years.  I work in the plant department.

17             Went to Gilmer High School.  Continued Kilgore

18   College.

19             My wife's name is Rhonda.  She's a housewife.

20             And I've had one criminal case back in Upshur

21   County about five or six years ago.

22             THE COURT:  All right, sir.  Thank you very much.

23             Next is Panel Member No. 11, Mr. House.

24             JUROR HOUSE:  Randy House.  I live in Longview,

25   Texas.
```

1          I'm self-employed.  Civil engineer and own my own

2   firm, have been open about 22 years in business.

3          I have a Bachelor of Science in civil engineering

4   from Texas A&M.

5          My spouse's name is Brenda.  Oh, second question, I

6   got -- between my wife and I, we've got seven children.  And

7   Brenda works at Water Cut Services in Kilgore, Texas.

8   They're a computer-aided precision cutting business, cutting

9   metal primarily.  And she's been there seven years.

10          And I've been on a grand jury.

11          THE COURT:  All right.  Thank you, sir.

12          No. 12 is next, Ms. Hood.

13          JUROR HOOD:  My name is Noelle Hood.  I live

14   between Pittsburg and Simpsonville in Camp County.  I have

15   five living children and one who died.

16          I am currently retired.  Previously, I worked for

17   25 years for the Northern Trust Corporation out of Chicago.

18   I ran via telephone switching equipment in Dallas, Austin,

19   and Houston, and did all the electrics -- electronics

20   purchasing for the subsidiaries west of the Mississippi

21   River.

22          I graduated from Walnut Hills High School in

23   Cincinnati, Ohio.  And I attended Brigham Young University

24   for three years with an almost degree in anthropology and

25   archaeology.

1          My husband's name is Lawrence Hood.  He is retired.

2   He was a -- the director of Dallas County law library system

3   for many years.  I don't know how many.  And -- but his most

4   recent employment was for the defense intelligence agency in

5   Washington D.C., and I'm not sure what he did.  And he -- he

6   did that for five or six years before he became so old that

7   they made him retire.

8          I had a jury service one time.  I do not remember

9   how long ago, but probably at least 10 years, in Arlington,

10  Texas.  And I believe it was a civil case.  They were trying

11  to evict somebody from an apartment.

12         THE COURT:  All right.  Ms. Hood, thank you very

13  much.

14         Next is No. 13, Mr. Weir.

15         JUROR WEIR:  My name is Casey Weir.  I live in

16  Marshall.  I do not have any children.

17         And I've been an employee of Southwestern Electric

18  Power Company for 10 years as a system operator.  We receive

19  the transfer load on main line distribution, overhead lines,

20  substation switching.  I've been there 10 years.

21         I have an Associates of Science degree from Kilgore

22  College.

23         I'm not married at this time.

24         And I have no prior jury service experience.

25         THE COURT:  All right.  Thank you, sir.

```
 1              No. 14 is next, Mr. Ramsey.

 2              JUROR RAMSEY:  My name is William Ramsey.  I'm from

 3    Bivins, Texas.  I have no children.

 4              I am an industrial maintenance technician at a

 5    place called Eagle Cutting & Supply in Nash, Texas.  I've

 6    been there six years.

 7              I graduated from Atlanta High School.

 8              And I'm not married.

 9              And I've never had prior jury services.

10              THE COURT:  All right, sir.  Thank you very much.

11              No. 15 is next, Ms. Nelson.

12              JUROR NELSON:  Thank you.  My name is Pam Nelson.

13    I live in Karnack, Texas.  I have three children.

14              I worked for Time-DC Freight Company in Lubbock,

15    Texas in the claims department for five years.  And Marshall

16    News Messenger for about three years.

17              I went to Denver City High School and Levelland

18    Junior College for two years.

19              My husband's name is Duane Nelson.  He's a

20    building -- he's a retired building contractor, and he

21    worked for 30, 40 years.

22              And no prior jury.

23              THE COURT:  All right.  Now, Ms. Nelson, are you

24    working anywhere right now?

25              JUROR NELSON:  No, sir.
```

1          THE COURT:  Okay.  Thank you.

2          Next is No. 16, Mr. Bartley.

3          JUROR BARTLEY:  Hi.  My name is Ted Bartley.  I've

4   got one adult son.  Excuse me.

5          I'm a retired firefighter for the City of Marshall.

6   Worked there 35 years, I believe.

7          Marshall High School.  Kilgore College.  And some

8   college through Texas A&M extension.

9          My wife's name is Sandra.  She's also retired from

10  CVS Pharmacy.  I don't recall how long she worked there.

11         And as far as prior service, I've served on, I

12  think, two criminal cases over in Harrison County and one

13  civil that I can remember.  It's been quite some time ago.

14         THE COURT:  Good.  Thank you, Mr. Bartley.

15         No. 17 is next, Ms. Cothren.

16         JUROR COTHREN:  Ember Cothren.  I live in

17  Daingerfield, Texas.  I have one grown daughter and two

18  grown step-daughters.  My grown daughter is here from Dallas

19  for two more weeks, and then she's going to New York for the

20  rest of the summer.

21         The place of employment I work -- I'm not working

22  right now.  The last place I worked was at the Morris County

23  appraisal district, and I was a personal property appraiser.

24  And before that, I worked for Department of Human Services

25  with the State of Texas.  Each for about seven years.

1          I went to Daingerfield High School and graduated

2     from BMI School of Business.

3          My spouse's name is Sammy Cothren.  He works for

4     U.S. Steel, and he's been there for like 35 years.

5          And I've been on one criminal case in Morris

6     County, and it was a while back, long time ago.

7          THE COURT:  Thank you, ma'am.

8          No. 18 is next, Ms. Anderson.

9          JUROR ANDERSON:  My name is Myra Anderson.  And I'm

10    from Naples, Texas.  I have four children.  I am -- I don't

11    work.  I have a high school diploma.  My spouse's name is

12    Timothy Anderson, and he works at Top Hat Industries and

13    bi-vocational; he is the preacher at Daniel's Chapel

14    Methodist Church.  He's been at those two jobs for about 15

15    years.  And I do not have any prior jury service.

16         THE COURT:  Where did you go to high school?

17         JUROR ANDERSON:  At Pewitt -- Paul Pewitt.

18         THE COURT:  Okay.  Thank you, ma'am.

19         No. 19 is next, Mr. Stanley.

20         JUROR STANLEY:  My name is Timothy Stanley.  I have

21    two grown children.  I'm the executive director of

22    Behavioral Tech Institute out of southwest Arkansas.  I've

23    been there about 27 years.  I've got a Master's degree in

24    counselling and psychology --

25         THE COURT:  Mr. Stanley, let me ask you to hold the

1  mic a little closer.  I'm having trouble hearing you.

2          JUROR STANLEY:  Okay.  My wife's name is Lee.

3  She's a retired educator.  And she's worked there in Atlanta

4  at Atlanta ISD for some 35 years.  And I've been on one

5  criminal jury, and that's been about 20 years ago.

6          THE COURT:  All right, sir.  Thank you.

7          Next is No. 20, Ms. Smith.

8          JUROR SMITH:  Hello.  My name is Paula Smith.  I

9  have three boys, 27, 25, and 15 years old.  I'm from

10  Pittsburg, Texas.  I work at UT Health in the emergency

11  department.  I'm a registered nurse.  I have been for 20

12  years.  I've worked in Pittsburg nine of those.  I have an

13  Associates of Applied Science in nursing from Northeast

14  Texas Community College.  My spouse's name is Curtis.  He

15  works in Fairfield, Texas, at Calpine Progressions, a power

16  plant.  And he is a -- works in the control room there.

17  He's been there for about 16 years now.  And I've had no

18  prior jury service.

19          THE COURT:  Thank you, ma'am.  Next is Panel Member

20  No. 21.

21          JUROR VOELKEL:  Hi.  My name is Doyle Voelkel.  I

22  live here in Marshall.

23          THE COURT:  I'm going to ask you to hold the mic

24  closer, please, sir.

25          JUROR VOELKEL:  I live here in Marshall, Texas,

1  have been for about 25 years.  And I have four children,

2  four grown boys.  And I worked for International Paper for

3  20 years as a press operator.  I have a high school

4  education.  My wife's name is Sherry.  And she works at

5  Hospitality ER in Longview.  She's an RN, and has been for

6  about 15 years now.  And I have no prior jury services.

7           THE COURT:  Where was the location for IP where you

8  worked as a press operator?

9           JUROR VOELKEL:  Shreveport.

10          THE COURT:  Shreveport.  Thank you, sir.

11          If you'll hand the mic to 22.

12          Ms. Redfearn, you are our next panel member.

13          JUROR REDFEARN:  My name is Susan Redfearn, and I

14  live in Hallsville, Texas.  I don't have any children.  I'm

15  basically mostly retired.  I still tutor adults in ESL,

16  English as a second language.  Formerly, I worked teaching

17  ESL for the East Texas Literacy Council for about 10 years.

18  And I've also taught at Kilgore College in the workforce

19  development program teaching ESL to factory workers and also

20  in their international program.  Let's see, I have a

21  Bachelor's degree from the University of Illinois and a

22  Master's degree in counseling from the University of

23  Memphis.  And I'm not currently married.  And I have one --

24  I believe it's one -- I served as a juror in a criminal case

25  in Harrison County.  I believe it was over 10 years ago,

 1  quite awhile back.

 2        THE COURT:  Thank you.  If you'll hand the mic to

 3  No. 23, Ms. Holmes.

 4        JUROR HOLMES:  My name is Holly Holmes.  And I live

 5  in Atlanta, Texas.  I have two children.  I work for Queen

 6  City ISD, and I work in human resources.  I do human

 7  resource stuff, payroll, benefits, that sort of thing.  And

 8  I've been there for 16 years.  I have a Bachelor's degree in

 9  business administration.  My spouse's name is Steve.  And he

10  works for Queen City ISD, also.  And he is the high school

11  principal.  He started that this year.  Prior to that, he

12  was the middle school principal.  And he has been there for

13  16 years.  And I have no prior jury duty service.

14        THE COURT:  All right.  If you'll hand the mic to

15  Mr. Nance, he will pass it to our next panel member, Mr.

16  Cornelius.

17        JUROR CORNELIUS:  I'm Reggie Cornelius.  I live

18  here in Marshall.  My wife and I have five children and 14

19  grandchildren.  We are self-employed.  We have S&R Auto and

20  S&R RV Sales here in Marshall.  We've had that for 16 years.

21  Attended high school in Houston, and three years at East

22  Texas Baptist College, not university.  Your spouse -- my

23  spouse's name is Sharon.  And like I said, we own S&R Auto,

24  and have for the last 16 years.  And no prior service.

25        THE COURT:  All right, sir.  Thank you.

1            Panel Member No. 25, Mr. Lindsay.

2            JUROR LINDSAY:  My name is John Lindsay.  I have

3    two boys, grown.  My place of employment is Cumberland

4    Presbyterian Church, Pine Tree -- Pine Tree in Longview.  I

5    have been a minster for 41 years.  Educational background,

6    graduated from Marshall High School.  Went to Bethel

7    University where I received a liberal arts degree.  Went to

8    Memphis Theological Seminary, received a Master's of

9    divinity degree.  My spouse's name is Becky.  We've been

10   married three weeks and two days.  Spouse's place of

11   employment, she worked in the oil industry in the office

12   work, and also in medical records for doctors' offices for

13   about 30 years.  She is retired now and takes care of our

14   grandchild.  No prior jury service.

15           THE COURT:  Okay.  Thank you.

16           Next is 26, Ms. Kroll.

17           JUROR KROLL:  Hello.  My name is Kim Kroll.  I live

18   in Atlanta, Texas.  I have no children.  I work for the

19   United States Postal Service as a letter carrier.  I have

20   been there for five years.  I graduated high school in

21   Houston, Texas.  I am not married.  And I have served on a

22   civil jury, probably 25 years ago in Houston.

23           THE COURT:  Is that in state court or federal

24   court?

25           JUROR KROLL:  State court.

```
 1              THE COURT:  All right.  Thank you very much, ma'am.
 2         No. 27, Ms. Collins.
 3              JUROR COLLINS:  Good morning.  I'm Tara Collins
 4    from Queen City, Texas.  I have two children.  I previously
 5    retired from -- as an educator for 30 years.  I have a
 6    college degree.  It's in education.  My husband's name is
 7    Clay Collins.  We just newly bought Bob's Printing in
 8    Atlanta, Texas.  He's worked there for about eight years.
 9    And I was on a criminal case in Cass County about 10 years
10    ago.
11              THE COURT:  Thank you, ma'am.  If you'll hand the
12    microphone to No. 28, Ms. Aiken.
13              JUROR AIKEN:  My name is Melanie Aiken.  And I live
14    in Gladewater, Texas.  And we have four girls.  I am a
15    petroleum land man, and I do surface, mineral, and leasehold
16    titles for oil and gas companies.  And I've done that full
17    time about 13 years.  I have two years of college
18    experience.  My husband's name is Aaron Aiken, and he works
19    for Eastman Chemical Company.  He is a process operator
20    there and has been there about seven years.  And I have no
21    prior jury services.
22              THE COURT:  All right.  Thank you, ma'am.
23              If you'll hand the microphone back to Mr. Nance.
24              Thank you, ladies and gentlemen.  I now need to say
25    a couple things additionally to you before I turn the
```

1  questioning over to the lawyers in this case.

2       The jurors that are selected in this case will

3  actually serve in the role of the judges of the facts.  And

4  the jurors selected in this case will make the sole

5  determination about what the facts are in this case.

6       Now, my job as the Judge is to rule on questions of

7  law, evidence, and procedure, to oversee the flow of the

8  trial, and to maintain the decorum of the courtroom.

9       Also, I want to say a couple things to you about

10  our judicial system that I hope will put things in a proper

11  perspective for you.

12       In any jury trial, such as this, besides the

13  parties themselves, there are always three participants, the

14  jury, the Judge, and the lawyers.

15       With regard to the lawyers, it's important for each

16  of you to understand that our judicial system is an

17  adversary system, which simply means that during the course

18  of a trial, the parties through their counsel will seek to

19  present their respective cases to the jury in the very best

20  light possible.

21     Now, it should be no surprise to any of you that

22  lawyers are sometimes categorically criticized in the press

23  and in the media, and the Court is of the opinion and has

24  observed that this often comes from a basic misunderstanding

25  of our adversary system in which the lawyers act as

1    advocates for the competing parties.  As an advocate, a

2    lawyer is ethically and legally obligated to zealously

3    assert his or her client's positions under the rules of our

4    adversary system.  And by presenting the best case possible

5    on behalf of their clients, the lawyers hopefully will

6    enable the jury to better weigh the relevant evidence, to

7    determine the truth, and to arrive at a just verdict based

8    on that evidence.

9          This system of justice, this adversary system of

10   justice has served our nation well for more than two

11   centuries, and America's lawyers have been and continue to

12   be an indispensable part of the process.  So as we go

13   forward with the trial in this case, even though it's

14   possible that from time to time I may frown or growl at the

15   lawyers in the case, it's simply because I'm trying to make

16   sure that their advocacy doesn't get outside the boundaries

17   of our adversary system and our rules of evidence and

18   procedure.

19         But please keep in mind, those of you that are

20   selected on the jury, the lawyers in this case are simply

21   doing their jobs, and it's important for all of you to be

22   aware of that as we go forward.

23         Also, ladies and gentlemen, during the course of

24   the trial, I want you to understand that I am going to do my

25   very best to make sure that none of the members of the jury

1    have any idea about what I think about the evidence in the

2    case because evaluating the evidence during the course of

3    the trial and determining the facts from that evidence is

4    the job of the jury.  It is not my job.  So the members of

5    the jury selected from this panel should not take anything

6    they see or they think they see as coming from me as

7    something to consider about making a decision as to the

8    ultimate facts in this case.

9           All right.  At this time, the counsel for both

10   sides in the case will address the panel.  I've allowed them

11   to give up to three minutes of a very high-level overview of

12   the case, and then to proceed with specific questions from

13   the members of the panel.

14          We'll begin with the Plaintiff.  Mr. Bunt, you

15   may address the panel on behalf of the Plaintiff.

16          Would you like a warning on your time?

17          MR. BUNT:  Yes, Your Honor.  May I have five

18   minutes, please, sir?

19          THE COURT:  I will warn you at five minutes

20   remaining.  You may proceed.

21          MR. BUNT:  Thank you.

22          Good morning, ladies and gentlemen.  My name is

23   Chris Bunt.  And it's my pleasure to be here today

24   representing the Plaintiff, KAIST IP US, in this case.

25          Let me begin by saying that I really appreciate

1    your service on this jury.  And I also want to say how much

2    I appreciate you sending in the jury questionnaire forms.

3    That's been a tremendous help to us.

4           I know a little bit about each of you because you

5    have provided information today, so I'm going to give you

6    the same information about myself.

7           I grew up in Hallsville.  I graduated from high

8    school -- high school there in 1986.  I'm married.  My

9    wife's name is Celia.  And she also graduated from

10   Hallsville in 1986.  We have two kids, Elizabeth and Andrew.

11   And we've lived in Tyler for the last 25 years where I

12   practice law.  And my wife is our office manager at the law

13   firm.

14          And I have been called on a number of occasions for

15   jury service, but I've never been actually picked to be on a

16   jury.

17          So you're going to learn a great deal about this

18   case during opening statement.  But as His Honor pointed

19   out, we're allowed to give you a very high-level overview of

20   the case, and I want to do that.

21          This case concerns intellectual property that's

22   owned by KAIST IP US.  And this property is a United States

23   patent for an invention that pertains to computer chips.

24          Specifically, it deals with the billions of

25   transistors that go in each chip, and then these chips are

1    used in smartphones and tablets.

2           We intend to put on evidence to show that the

3    Defendants, Samsung, GlobalFoundries, and Qualcomm, are

4    using our patented technology in products that they sell

5    without our permission.  And in patent cases, this sort of

6    trespassing on property is called infringement.

7           Now, we plan to show to you that by using our

8    technology, the Defendants have built the transistors that

9    make chips more powerful, that use less battery power, and

10   that cost less to make.  And Defendants have seen more

11   profits and cost savings as a result of our invention.

12          Now, at the end of the case, we're going to ask you

13   to award damages.  And as you will hear and as I think the

14   Court will instruct you, if you find that the Defendants

15   infringe our patent, then we are entitled to no less than a

16   reasonable royalty for the Defendants' use of our property.

17          So with that said, His Honor mentioned that this

18   part of the trial is the time when the lawyers have a chance

19   to actually talk with you to see if this is the right case

20   for you, to see if you have any likes or dislikes or life

21   experiences that may start you out leaning more to one side

22   or the other.

23          So with that in mind, let me ask you my first

24   question, I've found that in patent cases, generally

25   speaking, most people's attitudes fall into two camps.  Camp

```
 1   number one are folks who think that patents are a good

 2   thing.  That patents encourage innovation, innovation helps

 3   makes better products.  And without patent protection a lot

 4   of research and development would not take place.  That's

 5   camp one.

 6           Camp number two, there's other folks who believe

 7   that patents should not be protected by law.  Instead of

 8   protecting patents, we should just have unlimited

 9   competition.  And if you can come up with an idea for a

10   product and you can build it, it should not matter if

11   somebody else had that idea first and got a patent on it.

12           So let me ask a few of you, and I will just

13   start -- let me start at this end.

14           Mr. Gray, if you wouldn't mind standing up, please,

15   sir.

16           Which camp do you think you would fall in, camp

17   number one, pro patent, or camp number two, more

18   competition?

19           JUROR GRAY:  Pro patent.

20           MR. BUNT:  Pro patent.

21           And -- and why is that, sir?

22           JUROR GRAY:  I think that if it's your envision, if

23   it's something that you come up with, it is your property.

24           MR. BUNT:  Thank you, sir.

25           Mr. Brady, how do you feel, do you -- do you feel
```

```
 1    like you'd be in the same camp, or do you think you might be
 2    in camp number two?
 3              JUROR BRADY:  Probably number one.
 4              MR. BUNT:  Okay.  Is there anybody -- thank you,
 5    sir.
 6              Is there anybody on these first two rows who have a
 7    different view, who feel like they might lean more toward
 8    camp number two, pro competition, if you want to call it
 9    that?
10              Don't see any hands.
11              How about over here in the gallery, is there
12    anybody who feels like they just don't fall into camp number
13    one, maybe they're leaning more towards camp number two?
14              Okay.  I'm not seeing any show of hands.
15              My next question to you, the inventor of the patent
16    in this case, I introduced him to you a moment ago, his name
17    is Professor Jong-Ho Lee.  He's a professor at a -- at a
18    South Korean university.  He applied for and obtained a
19    United States patent.  That's the patent you're going to be
20    hearing about throughout this trial.
21              KAIST IP US who owns this patent is a United States
22    company, but it's affiliated with a Korean university.  And
23    I think most of you are probably aware that Samsung, one of
24    the Defendants in this case, it has American companies, but
25    it's also -- has a parent corporation that's Korean.
```

```
 1              So you probably see where I'm going with this
 2   question.  What I'd like to know is how many of you are
 3   thinking to yourself, and let's start over here in the jury
 4   box, how many are thinking to yourself given that this case
 5   involves companies affiliated with Korea, that it shouldn't
 6   really be heard in an American court or it's not something
 7   you ought to be sitting in -- in judgment on.
 8              Does anybody feel like that over here in the jury
 9   box?
10              Ms. Mobley, how -- does that cause you any concern,
11   any reservations?
12              JUROR MOBLEY:  No, sir, that doesn't.
13              MR. BUNT:  Thank you, ma'am.
14              Mr. Humphrey, do you have any reservations about a
15   foreign citizen enforcing a patent here in the United
16   States?
17              JUROR HUMPHREY:  No, sir.
18              MR. BUNT:  Okay.  Thank you, sir.
19              Anybody in the gallery feel that way?  Any problems
20   with that?
21              And I will just let you know up front, the United
22   States Congress has authorized the United States Patent
23   Office to grant patents to foreign citizens and U.S.
24   citizens because we want to encourage people to bring their
25   good ideas to the United States so American companies can
```

1    make -- can learn from them.

2            Anybody have any issue with that?

3            You've already heard, I think -- did everybody see

4    the patent jury video this morning?

5            Okay.  And I believe it talked to you about how

6    patents are property.  And when the Patent Office issues a

7    patent, it's basically like a deed that you would get for a

8    piece of land.

9            And at the back of those patents, you'll hear about

10   claims.  That's the terms that are used that explain what

11   the inventions are of the patent.  And those are sort of

12   like the mete and bounds that you would see in a deed that

13   would tell you what the property lines are.

14           So can I see a show of hands -- since this is

15   involving property -- let me see a show of hands in the jury

16   box, how many folks own land whether it's a pasture or the

17   piece of property your house is located on?  Okay.  Let me

18   ask a few of you questions then.

19           Mr. Dickey, if I could speak with you.  Do you own

20   a piece of property?

21           JUROR DICKEY:  Yes, sir.

22           MR. BUNT:  Let me ask -- let me ask you this

23   question.  Let's say an oil company came out and started

24   drilling a well on your property, they didn't ask your

25   permission, they just came out there and started drilling on

1  the property.  Would you have any second thoughts about

2  going to court to get them off of your property?

3          JUROR DICKEY:  No, I would not.

4          MR. BUNT:  Okay.  Let me ask the same question of

5  Ms. Clepper.

6          JUROR CLEPPER:  Yes.  I own three houses.

7          MR. BUNT:  Okay.  And would you -- let's say an oil

8  company came out there and started drilling where one of

9  your houses was.  Would you have any problem going to court

10  to get them off?

11          JUROR CLEPPER:  Not at all.

12          MR. BUNT:  And let's say that they were getting oil

13  out of the ground on your property, making money off that,

14  would you have any problem asking the Court to give you a

15  royalty for that -- for a portion of those profits they got?

16          JUROR CLEPPER:  Not a problem.

17          MR. BUNT:  Anybody here on the first two rows have

18  any issue about that?

19          Yes, ma'am, I appreciate it.  Ms. Hood?  You said

20  you might have an issue with that?  Can you tell me about

21  that?

22          JUROR HOOD:  Yeah.  I own land, but when you buy

23  the land, you don't own the minerals that are underneath it.

24  And you find that out when you get your deed for your land.

25  So if they own the mineral rights, you can live right on

1  top, but they can come in right next door to you and you

2  have no recourse.  They may get the oil out, and you get

3  nothing.

4         MR. BUNT:  That's a -- that's a very good point,

5  and I appreciate you bringing that up.  I should have made

6  that a little clearer.

7         Let's assume that you own the land and that you

8  also own the mineral rights sitting underneath it.  Given

9  that caveat, is there anybody on the first two rows that

10 would have any trouble at all going to court to get the oil

11 company off your property?

12        How about over here in the gallery?  I'm not seeing

13 a show of hands.

14        The reason I ask this is because -- well, first of

15 all, does anybody feel like intellectual property -- that's

16 like a patent -- that it should be treated differently than

17 land or personal property like a car, a house?  Anybody feel

18 that it ought to be treated differently because it's a piece

19 of paper that oversees an idea?  Not seeing a show of hands.

20        Okay.  The reason I bring this up is because in

21 America, there are no patent police.  There's not anybody

22 you can call to get somebody off of your property to make

23 them quit infringing.  You can't call the Patent Office and

24 say somebody's on my property.  Your only recourse, the only

25 way to enforce a patent is by bringing a lawsuit in a United

1   States Federal District Court.

2          Let me pick on a few other folks.

3          Ms. Fields, did you raise your hand that you owned

4   a piece of land, also?  What -- what kind --

5          JUROR FIELDS:  Yes, I do.  I do own land.

6          MR. BUNT:  Okay.  Let me ask this question.  Let's

7   say you had bought an acre of land, and let's just say you

8   paid $2,000.00 for that piece of land.

9          JUROR FIELDS:  Okay.

10          MR. BUNT:  And you decide a few years later that

11   you want to sell that acre, and it's worth now -- worth more

12   now than it was a few years ago just because of normal

13   appreciation of prices.  With me so far on that one?

14          JUROR FIELDS:  Yes, sir.

15          MR. BUNT:  Would you think there was anything wrong

16   about asking for more than what you paid for it?

17          JUROR FIELDS:  I -- I don't find anything wrong

18   with that.

19          MR. BUNT:  Nothing at all?

20          JUROR FIELDS:  Nothing at all.

21          MR. BUNT:  Because the value of property can change

22   over time?

23          JUROR FIELDS:  Appreciate, right.

24          MR. BUNT:  It can appreciate, or it can go down

25   sometimes, right?

```
 1              JUROR FIELDS:  Right.

 2              MR. BUNT:  Thank you, ma'am.

 3              Let me -- Mr. Byerley, how about you, do you -- you

 4   feel the same way about that question?

 5              JUROR BYERLEY:  Yes, sir.

 6              MR. BUNT:  Anybody disagree with -- with what

 7   Ms. Fields said about that?

 8              How about over here in the gallery, anybody

 9   disagree with that?

10              Let me go back to you again, Mr. Byerley, for just

11   a moment.  Let's -- let's add a wrinkle to that question.

12   Let's say that you have one acre of land, and Amazon moves

13   in next door to that piece of property.  And suddenly the

14   value of your property has sky rocketed.  Do you think that

15   your -- you should be limited to selling that piece of

16   property for what it would have sold based on just normal

17   appreciation or could you ask for more simply because Amazon

18   has come in and the property's gone up?

19              JUROR BYERLEY:  I would want more.

20              MR. BUNT:  You would -- I'm sorry, did you say --

21              JUROR BYERLEY:  I would want more.

22              MR. BUNT:  Okay.  Anybody object to Mr. Byerley

23   thinking that it would be worth more and he could ask for

24   more?

25              Okay.  Ms. Owens, how do you feel about that?
```

1              JUROR OWENS:  I agree.

2              MR. BUNT:  Okay.  Thank you, ma'am.

3              Now, this is a very important case for my client.

4    It's important because we don't want corporations using our

5    property without our permission.  And we're going to put on

6    evidence through our financial expert, Mr. Roy Weinstein.

7    And he's going to explain to you how many millions of

8    products that the Defendants have sold, the extra profits

9    that they have made from using our invention, and also how

10   much money they have saved by using our invention.

11             And if you believe that we have proved infringement

12   at the end of the case, we are going to ask you to award

13   KAIST IP US a small portion of those extra profits and extra

14   cost savings that the three Defendants have made.  I'm not

15   asking for all.  It's a small portion.

16             But I'm going to tell you upfront, that small

17   portion is a large number.  That small portion is going to

18   be $720 million between the three Defendants.

19             Now, Ms. Owens, I saw you gasp or sigh.  Let's

20   bring the microphone back to her if you don't mind,

21   Mr. Nance.

22             I want to ask you a little bit more about that.  I

23   get it.  This is a big number.  And I'm not shirking away

24   from it.  I want to bring it to you right upfront.

25             What I'd like to know is -- and I'll start with

1  you.  How many of you feel that no matter what the evidence

2  shows -- even if you find infringement, there's just no way

3  in the world you would ever, ever write down $700 million

4  for damages?  Do you feel like that?

5          JUROR OWENS:  I think I would have to hear both

6  sides of the story.

7          MR. BUNT:  I completely understand.  And let me

8  make -- make sure I'm clear.  I'm not asking you to tell me

9  right now that you would award $700 million.  I definitely

10  want you to hear our side of the story, and I want you to

11  hear their side of the story, too.  I'm not asking you to

12  commit to the number, but what I'm trying to find out is

13  if -- if you feel like you could never award that number, no

14  matter what, you feel like that.

15          JUROR OWENS:  No, sir, I don't.

16          MR. BUNT:  Okay.  And you can hand the microphone

17  back.  Thank you, ma'am.

18          How about on this row, the first two rows, is there

19  anybody here who's sitting, thinking to themselves, I don't

20  care what evidence Mr. Bunt can bring me, I'm not going to

21  write down $700 million.  There's just no case worth $700

22  million.  Anybody feel that way?  And that's fine if you do.

23  I just need to know.

24          How about over on this side of the -- in the

25  gallery?  Is there anybody who feels like, you know, you'd

1   have to -- there's just not even going to be a way you could

2   bring that kind of evidence to show $700 million?  Not

3   seeing any hands.

4        As His Honor pointed out, we have the burden of

5   proof on infringement, and that preponderance of the

6   evidence, as he pointed out, is by -- the burden is by a

7   preponderance of the evidence where we have to tip the

8   scales slightly in our favor, the Scales of Justice.

9        So if you had 50 BBs in one side and 51 on the

10  other, that would slightly tip the scales.  So anybody here

11  think, you know what, that may be the standard, but if

12  you're coming in here asking for $700 million, you're going

13  to have to do more than tip the scales just slightly?

14       Ms. Owens, I see you nodding your head.  Let's go

15  back to you again.  Do you feel like you might have to have

16  a little more evidence than a preponderance of the evidence

17  to find damages?

18       JUROR OWENS:  Well, sir, I'm a single mother --

19       MR. BUNT:  Yes, ma'am.

20       JUROR OWENS:  -- of three children.  $700 million

21  is a lot.

22       MR. BUNT:  Absolutely.

23       JUROR OWENS:  And I understand that electronics are

24  expensive, but I'm going to have to have some evidence.

25       MR. BUNT:  And I wouldn't come in here and say that

1    I'm not going to give you evidence.  I'm going to give you

2    evidence.  I'm going to tip those scales.  But having said

3    that, are you going to require or hold me to a higher

4    standard of proof than what the Judge has talked about?

5           JUROR OWENS:  Probably.

6           MR. BUNT:  Thank you, ma'am.  I appreciate your

7    candor.  I really do.

8           Is there anybody else here who feels like

9    Ms. Owen -- Ms. Owens?  I'm not seeing any hands.

10          Okay.  Some of you -- and, again, I appreciate the

11   questionnaire forms you filled out.  Some of you expressed

12   some fairly strong feelings about lawsuits.

13          And let me just see a show of hands, how many of

14   you don't like lawsuits?

15          And I bet there's a lot of you.  That's right.

16   That's fine.

17          Some of you had some pretty strong things to say

18   about lawsuits, and I want to pick on a few of you.

19          Mr. Bartley, I -- I believe you said -- I may --

20   may -- may have just paraphrased this, but I think you wrote

21   down "hate lawsuits".

22          JUROR BARTLEY:  I don't know if I used that word or

23   not.

24          MR. BUNT:  Well, maybe I'm paraphrasing.  I'm

25   sorry.

```
 1              JUROR BARTLEY:  I do have a distaste for --

 2              MR. BUNT:  You have a distaste.

 3              JUROR BARTLEY:  -- lawsuits.

 4              MR. BUNT:  Well, you understand that I'm the one

 5    who's brought this lawsuit.  I'm -- I'm suing on behalf of

 6    KAIST IP US, and we're suing these three Defendants.

 7              Given your feelings about lawsuits, are you -- are

 8    you leaning toward the Defendants a little more than you are

 9    about -- toward my side?

10              JUROR BARTLEY:  I don't know if I can answer that

11    without hearing the -- hearing the case.

12              MR. BUNT:  That's exactly right.  And, again, this

13    goes back to you're going to get to hear evidence, and I

14    want you to hear all of that.  But before you've heard any

15    evidence, sitting here right now, before you've heard any

16    evidence, am I starting off a little bit behind the

17    Defendants simply because of the way you feel about

18    lawsuits?

19              JUROR BARTLEY:  No.

20              MR. BUNT:  Okay.  Thank you, sir.  I really

21    appreciate that.

22              Ms. -- Ms. Hood, yes, ma'am, I think you said you

23    had strong feelings about lawsuits, also?

24              JUROR HOOD:  A little bit.

25              MR. BUNT:  Same question to you.  Am -- am I
```

1  starting off a little bit behind the Defendants because of

2  your feelings about lawsuits?

3          JUROR HOOD:  No.

4          MR. BUNT:  Okay.  Am I -- am I going to have to

5  work harder to gain your trust than the Defendants are?

6          JUROR HOOD:  Yes.

7          MR. BUNT:  Okay.  You feel like I'm going to have

8  to work harder to gain your trust because of your feelings

9  about lawsuits?

10          JUROR HOOD:  No, not because of my feelings about

11  lawsuits, but you are going to have to gain my trust.

12          MR. BUNT:  Okay.  Let me -- let me take it like

13  this:  Let's say -- think of a lawsuit kind of like a race.

14          JUROR HOOD:  Like a?

15          MR. BUNT:  Like a race.  I'm sorry, I'll stand here

16  at the microphone.

17          I want to make sure I'm starting off this race on

18  the same footing as the Defendants in this case.  I'm not

19  asking you to put me any further ahead of them, but I don't

20  want to start off behind them either.

21          Am I starting off behind right now?

22          JUROR HOOD:  Well, I don't know if I can trust them

23  yet either.

24          MR. BUNT:  Okay.  Thank you, ma'am.  That's fine.

25  That's good.

```
 1              Ms. -- do we still have Ms. Moseley, or did we lose

 2     her in the panel?  Okay.  Sorry, I have notes.

 3              Mr. Voelkel, did I get your name right?

 4              JUROR VOELKEL:  Voelkel.

 5              MR. BUNT:  Voelkel, I'm sorry.

 6              I believe you said that there were way too many

 7     lawsuits in your questionnaire?

 8              JUROR VOELKEL:  I think there are.

 9              MR. BUNT:  Same question to you, you've -- you've

10     said that you've got a problem with there being too many

11     lawsuits.  Because of those feelings, am I going to have to

12     work harder than the Defendants to gain your trust on this

13     case?

14              JUROR VOELKEL:  I think as long as there's proof,

15     the truth will come out, and people will be rewarded, but I

16     just can't deny the way I feel about lawsuits.

17              MR. BUNT:  That's -- that's understandable.  And

18     I'm not asking you to deny it either, so -- but as far as

19     where we're sitting right here, we're both on even footing?

20              JUROR VOELKEL:  Yes.

21              MR. BUNT:  Okay.  Let -- let me -- well, that's

22     fine.  Thank you, sir.

23              Mr. Brady, where is Mr. Brady, did we -- did we

24     lose Mr. Brady?

25              JUROR BRADY:  Right here.
```

1          THE COURT:  Mr. -- Mr. Bunt, nobody's guess, to

2    answer your question.  So just don't ask questions.

3          MR. BUNT:  Thank you.  I was trying to take notes.

4          THE COURT:   Ask your questions of the panel.

5          MR. BUNT:  Okay.  So the Defendants are represented

6    by the Paul Hastings law firm.  Is there anybody here who

7    knows anybody who works at the Paul Hastings firm?

8          Okay.  The Defendants are also represented by the

9    Gillam & Smith law firm, okay?  And here today on behalf of

10   them is my dear friend, Ms. Melissa Smith.  And her law

11   partner is Gil Gillam.  And they also have a partner named

12   Bobby Lamb.  Is there anybody here who knows any of those

13   individuals?

14         Okay.  I believe Mr. Mike Collins from Tyler is --

15   is assisting them.  Anybody here know Mr. Mike Collins?

16         Okay.  Mr. House, did you mention -- I apologize if

17   I've got this wrong, but did you say that you owned stock in

18   Qualcomm?

19         JUROR HOUSE:  Yes, that's right.

20         MR. BUNT:  Okay.  Is there anybody else here who

21   owns --

22         COURT SECURITY OFFICER:  Stand up, please.

23         THE COURT:  Hang on a minute.

24         MR. BUNT:  I'm sorry.

25         THE COURT:  Let's -- let's get the question asked

1    so everybody can hear it.

2         Ask it again, Mr. Bunt.

3         MR. BUNT:  Yes, sir, sorry.

4         You own stock in Qualcomm; is that correct?

5         JUROR HOUSE:  Yes.

6         MR. BUNT:  Okay.  Do you know if you own stock in

7    Samsung or GlobalFoundries, also?

8         JUROR HOUSE:  No.

9         MR. BUNT:  Thank you, sir.

10        I believe there was somebody who raised their hand?

11        It would be No. --

12        JUROR KROLL:  Kroll.

13        MR. BUNT:  Ms. Kroll.

14        JUROR KROLL:  I --

15        THE COURT:  Wait -- wait a minute, ma'am.  Let's

16   get the microphone, and then when you get the microphone, I

17   want to hear your answer.  That way everybody can hear it.

18        All right.

19        JUROR KROLL:  I believe I own stock in Qualcomm,

20   but I'm not positive.

21        MR. BUNT:  Thank you, ma'am.  I appreciate that.

22        Several of you mentioned that you had very positive

23   feelings about Samsung products.  First of all, can I get a

24   show of hands throughout the whole gallery and the jury box,

25   who owns Samsung products or Qualcomm products?

```
 1              Quite a few of you.

 2              Okay.  Mrs. Fields, you mentioned that you liked

 3   your Samsung products a lot?

 4              JUROR FIELDS:  I do.

 5              MR. BUNT:  Okay.  Probably see where this question

 6   is going.  I've sued Samsung.  Do you feel so positive about

 7   those Samsung products that it's going to be hard to

 8   consider evidence about infringement against that company?

 9              JUROR FIELDS:  No, it will not.

10              MR. BUNT:  Thank you, ma'am.

11              Ms. Clepper, I believe you mentioned you had -- you

12   liked your Samsung products.  What kind of product do you

13   have?

14              JUROR CLEPPER:  Telephone and tablet.

15              MR. BUNT:  Okay.

16              JUROR CLEPPER:  But I've also had LG and other

17   brands, and so -- anything except Apple.

18              MR. BUNT:  Okay.  As long as it's not Apple you're

19   okay?

20              JUROR CLEPPER:  Yes.

21              MR. BUNT:  All right.  So your -- your love for

22   Samsung products is not so much it's going to affect the way

23   you look at this case.

24              JUROR CLEPPER:   No, because I love -- I love LG,

25   too, so...
```

```
 1            MR. BUNT:  Okay.  Thank you, ma'am.

 2            JUROR CLEPPER:  Uh-huh.

 3            MR. BUNT:  Is there anybody here who's ever applied

 4   for a patent on either side, anybody applied for a patent?

 5            Ms. Redfearn, did you say that your brother-in-law

 6   had gotten a patent?

 7            JUROR REDFEARN:  Yes, he had several patents many

 8   years ago in electrical systems, but he had to sign them

 9   over to Bell Research Labs.

10            MR. BUNT:  Okay.  All right.  Anybody else had any

11   dealings with the Patent Office?

12            Could I see -- let me see here.  How many of you

13   have ever been involved in a lawsuit, you or a family member

14   or -- like a spouse or a parent?  Anybody?

15            Okay.  I've got several hands, all right.

16            Let me narrow it down a little bit.  How many of

17   you have ever been sued in a lawsuit?

18            THE COURT:  Five minutes remaining, Mr. Bunt.

19            MR. BUNT:  Thank you, sir.

20            Mr. Dickey, you said you've been sued in a lawsuit?

21            COURT SECURITY OFFICER:  Who?

22            MR. BUNT:  Mr. Dickey, I'm sorry.

23            JUROR DICKEY:  Yes, sir, I -- I hit a lady in the

24   rear, and they -- they took me to court.

25            MR. BUNT:  Okay.  Probably see where this is going.
```

```
 1   I'm -- I've sued somebody, I've sued Samsung and these

 2   Defendants, you've been a defendant in a lawsuit, is that

 3   going to make it difficult for you to sit on this jury?  Are

 4   you going to start out leaning more toward the Defendants?

 5           JUROR DICKEY:  No, it will not.

 6           MR. BUNT:  Okay.  The other folks, who else had

 7   been sued?

 8           Okay.  Ms. Hood, you were sued in a case?

 9           JUROR HOOD:  Yes.

10           MR. BUNT:  And is that going to affect the way you

11   look at this case?

12           JUROR HOOD:  Probably not.

13           MR. BUNT:  Thank you, ma'am.  I appreciate that.

14           Who else on the front row?  Was there somebody

15   else?

16           Okay.  How about over here?

17           Yes, sir, No. 19, Mr. Stanley, you've been involved

18   in a lawsuit before?

19           JUROR STANLEY:  Yes, many years ago, it was a

20   mechanic's lien lawsuit.

21           MR. BUNT:  Would that affect the way you look at

22   this case --

23           JUROR STANLEY:  No.

24           MR. BUNT:  -- in any way?

25           Is your son a lawyer?
```

1              JUROR STANLEY:  Yes, he is.

2              MR. BUNT:  What does he do?

3              JUROR STANLEY:  He's a plaintiff's attorney.

4              MR. BUNT:  Okay.  Doing what, personal injury type

5    work?

6              JUROR STANLEY:  Yes.

7              MR. BUNT:  Okay.  Thank you.

8              Is there anybody here -- well, let me ask, who else

9    said that they'd been involved in a lawsuit as a defendant?

10             Okay.  No other hands.

11             Does anybody here on the panel know one another?

12   Related to or friends with or acquainted with?

13             You'd be surprised we often have that happen.

14             Yes, sir, Mr. Weir, do you know somebody on the

15   panel?  Who's that?

16             JUROR WEIR:  I know Mr. Dickey, I used to work for

17   him at Best Buy.

18             MR. BUNT:  Who's that?

19             JUROR WEIR:  Mr. Dickey.

20             MR. BUNT:  Okay.  All right.  Do y'all still see

21   each other?

22             JUROR WEIR:  No, sir.

23             MR. BUNT:  Okay.  Would that cause you any hardship

24   of you sitting on this jury panel?

25             JUROR WEIR:  No.

```
1            MR. BUNT:  Anybody else know one another?

2            Yes, sir, Mr. Ramsey?

3            JUROR RAMSEY:  I know Ms. Collins back here from

4   Queen City, Texas.

5            MR. BUNT:  Okay.  Would that make it difficult to

6   sit on this jury panel since you know her?

7            JUROR RAMSEY:  No, sir.

8            MR. BUNT:  Do you see her often?

9            JUROR RAMSEY:  Not really.

10            MR. BUNT:  Okay.  All right.  One final question, a

11  catchall.  I try to always ask this.  If I -- I'm sure I

12  have forgotten some question.  And there may be somebody

13  who's saying to yourself I wish he'd ask me this question.

14  He'd really like to know this information.  I'm sure I have

15  missed that.

16            If there's any reason you know of why this is not

17  the right jury for you, this is not the case for you to sit

18  on, you would have difficulty sitting on it, even if it's

19  something you don't want to take up in front of everybody,

20  I'm sure His Honor will allow us to go up to the bench

21  later, but I need to see a show of hands right now if

22  there's something, other than the hardships that everybody

23  already mentioned, is there some other reason that you feel

24  like I really need to talk to y'all?

25            Anybody in the jury box?
```

1          Anybody over on this side of the jury?

2          Thank you so much, ladies and gentlemen.  I

3    appreciate your attention and patience, and we look forward

4    to putting on our case to you.

5          THE COURT:  All right.  Ms. Smith, you may address

6    the panel on behalf of the Defendants.  Would you like a

7    warning on your time?

8          MS. SMITH:  I'd appreciate five minutes, Your

9    Honor.

10         THE COURT:  All right.  You may proceed.

11         MS. SMITH:  Thank you.

12         May it please the Court.

13         Good morning, ladies and gentlemen.  Again, my name

14   is Melissa Smith.  And I am proud to be here to be -- today

15   representing the Defendants, Samsung, Qualcomm, and

16   GlobalFoundries.

17         Earlier, you met representatives on the first row

18   over there of the three Defendants.  And I'll tell you,

19   before -- the last thing they told me right before I came in

20   to talk to you today is that -- and it's probably the most

21   important thing I'll do, it's to thank you.  I know that

22   your time on this case didn't start today.  It started with

23   many of you when you took time out of your schedules coming

24   into court to fill out the questionnaires.  I know many of

25   you had a long drive this morning, probably out of -- a

 1   longer than usual drive.  And I also know that every single

 2   hour that you spend with us in court today and for those of

 3   you that are lucky enough to be chosen to serve over the

 4   next five days, that's time away from your friends, your

 5   family, and your obligations.  And so on behalf of the three

 6   Defendants, we appreciate it.

 7        Now, you all have been generous enough in supplying

 8   at this point loads of personal information.  So I'll --

 9   I'll do the same, as Mr. Bunt did.

10        I, like Judge -- Judge Gilstrap, graduated Baylor

11   Law School.  About -- maybe about two or three days after I

12   graduated Baylor, I moved to Marion County out -- right

13   close to Jefferson, Texas, and I took a job here in the

14   Marshall courthouse square.  That was about 21 years ago.

15   So I've been practicing around this Marshall courthouse

16   square for a little over 20 years.

17        My law firm is called Gillam & Smith.  I'm the

18   Smith.  And I practice with a gentleman named Gil Gillam.

19   He's actually the guy that gave me the first job 21 years

20   ago.  So at some point in the last 21 years, I convinced him

21   that I'd make a good partner.

22        And it's -- it's pretty unusual in this day and age

23   to have that kind of relationship that lasts that long in

24   any business, especially the law.  So that's something --

25   that's something we're proud of.

```
 1              I am -- personally, I'm -- I'm married.  My
 2    husband's name is Stephen.  He's retired law enforcement.
 3    He can't quite retire, so he's a reserve police officer
 4    right now, sometimes on the weekends when I don't have to
 5    work in Jefferson, Texas.  We have a five-year-old girl and
 6    a seven-year-old boy.  And so that's what -- that's what
 7    keeps us -- keeps us busy.
 8              It's an easy task to introduce Samsung today.
 9              Samsung's been involved and been on the cutting
10    edge of technology since the '60s.  They were on the cutting
11    edge when we were talking about black and white TVs.  So
12    they really need no introduction.
13              But what I'll share with you and what you're going
14    to hear a whole bunch about in this courtroom proceeding, if
15    you're lucky enough to be chosen, is that now they're really
16    a leader in the semiconductor industry.  And you'll hear a
17    lot more about that.
18              And as to GlobalFoundries and Qualcomm, they, too,
19    are heavily involved in the semiconductor industry.  And
20    they fit into this puzzle that we're here to talk about
21    today because they, along with Samsung, they make products
22    together with -- and technology with Samsung.
23              Now, Judge Gilstrap gave -- gave Mr. Bunt and he's
24    given me a few minutes to introduce the case to you.  This
25    is what I'll tell you.
```

1              Quite simply, our position is that long ago,

2    Samsung actually welcomed Mr. Lee into Samsung at a time

3    when he asked for help.  He asked for Samsung -- Samsung's

4    help, and he needed it.

5              Samsung trusted him, and they collaborated with him

6    for over a decade, almost 12 years.  And make -- make no

7    mistake, they supported him during that time.

8              But Samsung ultimately had to scrap that

9    technology, that early research idea, and they came up with

10   an entirely different technology.  And they put it in

11   products, and they sold products.  They were the products

12   that customers wanted.

13             But we're here today because after that

14   collaboration, after that 12-year collaboration where Mr.

15   Lee watched Samsung's independent work, Mr. Lee took his

16   original idea, and he sued Samsung.

17             But now I'd like to -- as you might guess, you'll

18   learn more about that story, but -- if you're chosen, but

19   right now I'd like to learn a little more about you all.

20             So Mr. Bunt touched on the subject that I'm also

21   interested in, and that's your experience with Samsung

22   products and your ownership of Samsung products.  And I'd

23   usually start with you, Ms. Fields, but we've heard about

24   your experience with Samsung products.

25             So I'll start with Ms. Clepper.  You said you had a

```
 1   phone and a tablet?  My question --

 2           JUROR CLEPPER:  Correct.

 3           MS. SMITH:  Thank you.  My question is a little bit

 4   different.  Have you been satisfied with those products?

 5   Any type of complaints?

 6           JUROR CLEPPER:  No more than you have on any

 7   product.

 8           MS. SMITH:  Okay.  So that's -- that's a little

 9   tricky answer.  Let me -- let me go down that road because

10   on the questionnaires, there was a question about Samsung

11   products and your experience.  And a lot of people, I think

12   including you, said, well, I'm somewhat -- somewhat

13   satisfied.  And that's -- that's why I'm asking you.  Is

14   there anything about your experience, other than a glitch

15   here and there, that I might need to know about since I'm in

16   court representing Samsung?

17           JUROR CLEPPER:  No.

18           MS. SMITH:  Thank you, Ms. Clepper.

19           JUROR CLEPPER:  Uh-huh.

20           MS. SMITH:  Mr. Dickey and Mr. Humphrey raised your

21   hands that you had owned Samsung products.

22           Mr. Dickey?

23           Thank you, Mr. Humphrey.  Satisfaction level of

24   Samsung products?  Anything I need to worry about or any

25   negative experience?
```

```
 1              JUROR DICKEY:  No, ma'am.

 2              MS. SMITH:  Okay.  Thank you, Mr. Dickey.

 3              Mr. Humphrey, I'm going to talk to you because I

 4  have a little bit different question for you.  Was it an

 5  intentional choice to not buy a Samsung product, or did you

 6  just go to Best Buy and you liked something else better?

 7              JUROR HUMPHREY:  I just never have bought one.  I

 8  don't know -- not for any reason.

 9              MS. SMITH:  Okay.  Thank you.  Thank you, sir.

10              JUROR HUMPHREY:  Just never have purchased one.

11              MS. SMITH:  Thank you, sir.

12              Ms. Mobley, Mr. Brady, and Mr. Gray, of the three

13  of you, did you own Samsung products?  By raising your hand,

14  Mr. Brady did.

15              JUROR GRAY:  I have in the past.

16              MS. SMITH:  Okay.  Mr. Gray.

17              JUROR GRAY:  I have a tablet that was a gift to me.

18  I can't -- I'm trying to think of what they call the tablet.

19  I don't --

20              MS. SMITH:  Okay.

21              JUROR GRAY:  -- what is the name of the tablet --

22              MS. SMITH:  Well --

23              JUROR GRAY:  -- because it may not be Samsung.

24              MS. SMITH:  -- well, my -- well, if you can't

25  remember it, that's -- that's fine.  What I'm looking for is
```

```
 1    really that you had a problem with a product and you

 2    remember the product being a Samsung product, something I'd

 3    want to know about.

 4          JUROR GRAY:  Nothing like that.

 5          MS. SMITH:  Thank you, Mr. Gray.

 6          Mr. -- Mr. Brady, did you have something to say on

 7    that satisfaction level with your Samsung product?

 8          JUROR BRADY:  No.  I got three tablets, two

 9    telephones and --

10          MS. SMITH:  I assume since you're a repeat buyer,

11    you're satisfied with our products?

12          JUROR BRADY:  Yeah.

13          MS. SMITH:  Thank you, sir.

14          And Ms. Mobley, I had the same question for you

15    that I had for Mr. Humphreys (sic).  You don't have Samsung

16    products, correct?

17          JUROR MOBLEY:  No.

18          MS. SMITH:  Okay.  Is that an intentional choice I

19    have to worry about or --

20          JUROR MOBLEY:  I'm an Apple person.

21          MS. SMITH:  You're an Apple person.  Okay.

22          The fact that -- the fact that you're an Apple

23    person, are you going to hold that against us today and in

24    this courtroom because we're -- we obviously represent

25    Samsung?
```

```
 1              JUROR MOBLEY:  No.  Boyfriend has Samsung tablets,
 2   TV, everything, so nothing against y'all.
 3              MS. SMITH:  You ever hear him belly aching about
 4   how he doesn't -- his products aren't working or he doesn't
 5   like his products or anything like that?
 6              JUROR MOBLEY:  No.  But he wants me to switch, but
 7   I refuse to.
 8              MS. SMITH:  I -- I'll help him with that.
 9              All right.  I'm not going after each person on the
10   back row.  I'll call it Mr. Byerley's row with Ms. Owens,
11   Mr. Fitzgerald, Mr. House, Ms. Hood, Mr. Weir, and
12   Mr. Ramsey.   Out of you all, who owns Samsung products?
13   Everybody?  Thank you.
14              Anybody have any negative experience with Samsung
15   products that I should know about?
16              See Ms. Owens is shaking her head no.  Anybody else
17   by a raise of hand have a negative experience with a Samsung
18   product?
19              Okay.  I'll address the gal -- gallery, excuse me,
20   like Mr. Bunt did.  Here's the good news for those of you
21   out there, you're less likely -- the further back you get,
22   you're less likely to get chosen for the jury.  That's just
23   how things work out.  So I'll tend to address Ms. Nelson,
24   Mr. Cornelius, Mr. Stanley as a group.
25              Has anyone in these two rows, by a show of hands,
```

```
 1  have a negative experience with a Samsung product?
 2          All right.  No. 20.  Ms. Smith, tell me about that.
 3          JUROR SMITH:  Telephone, the plug-in where it
 4  charged, I think it was an S7 that I had a problem with it
 5  being faulty.  And I just got it replaced, but I still --
 6          MS. SMITH:  You're still talking about it.  So let
 7  me -- let me -- let me visit with you for a minute.
 8          I'm here and I'm going to -- we're going to talk
 9  about, you know, the great things Samsung does and it being
10  an innovator.  And are you going to sit there throughout the
11  trial and think, by gosh, my plug doesn't work, you know?
12          JUROR SMITH:  No, because I just got another one.
13          MS. SMITH:  Okay.  Thank you, ma'am.  Appreciate
14  it.
15          All right.  You're never going to go to the AT&T
16  store and see a phone that says -- a handset that says
17  GlobalFoundries or Qualcomm.  I know, Mr. House, you're
18  familiar with Qualcomm because you have stock; is that
19  correct?
20          JUROR HOUSE:  I just have stock.  I'm not very
21  familiar with what they do.
22          THE COURT:  Mr. House, you're going to have to
23  stand up and use the mic.  I -- I can tell you're saying
24  something, but I can't hear you.  And if I can't hear you, I
25  know the rest of the people can't.  So let's follow the
```

1   instructions and use the microphone.

2         JUROR HOUSE:  I own Qualcomm stock, and I know very

3   little about what they do.  It's just a recommendation from

4   my girl.

5         MS. SMITH:  Okay.  Mr. House, is there anything

6   about that stock ownership that would, you know, that would

7   cloud your view of a lawsuit?  Can you -- can you set that

8   aside and certainly it wouldn't interfere with anything

9   going on in the courtroom for the next few days?

10        JUROR HOUSE:  Yes.

11        MS. SMITH:  Thank you, sir.

12        All right.  I can't -- I can't go very long, and

13  even if you're strangers, without talking about my kids.

14  And so I'll tell you a quick little story.

15        I've got a seven-year-old boy.  He was in his room

16  one day, and we live in an old house, and the door knob was

17  just kind of hanging on by a thread.  And so what he did is

18  he took it off, and he completely disassembled it.

19        Okay.  I was proud.  I tend to err on the side of

20  being a proud mom anyway.  I thought he was brilliant.  He

21  said:  I just wanted to see how it worked.

22        My husband, on the other hand, said -- he was just

23  miffed.  First of all, he had to put it back together.  And

24  second of all, he said:  Who cares how it works?  We just

25  want it to work, and it's never going to work again.

1          So there's two camps of people.  There's the people

2   that I truly believe that my son's going to grow up to be

3   where he kind of wants to look under the hood.  He wants to

4   know how things work, he'll probably read the manuals.  He's

5   already really good with the Universal Remote.

6          And then there's people like my husband.  They

7   don't care how it works.  They just want it to work.

8          Let's start with Mr. Ramsey's row.

9          On Mr. Ramsey's row, I'm not calling on you yet,

10  Mr. Ramsey, but I'm calling your row.

11         Who's in that group with my son?  You know, if

12  there's a problem in the house, you know, you might be the

13  one that someone goes to and you just generally know a

14  little bit more than the average man or woman about

15  technology?  Does anyone fit in that category?  You know a

16  little bit more -- I'm going to get to you, Ms. Mobley, but

17  I'm going with the second row now.

18         Mr. House, and you have an engineering degree,

19  correct?

20         JUROR HOUSE:  Yes.

21         MS. SMITH:  Tell me -- tell me why you say you know

22  a little bit more about technology?

23         JUROR HOUSE:  Oh, I have just utilized computers

24  for 28 years, and I'm familiar with equipment and machinery

25  and electronics involved in controlling those.

```
 1            MS. SMITH:  So let's -- let's put you in a group.
 2   Let's say you're in a group of, say, eight people.  Would
 3   you feel comfortable -- and it's a technical discussion.
 4   Would you feel comfortable kind of leading that discussion
 5   for others that are more like my husband that don't really
 6   care how things work?  Would you be confident and say, you
 7   know, I can -- I can help you guys, I can tell you how
 8   things work?
 9            JUROR HOUSE:  Not about chips.
10            MS. SMITH:  Okay.
11            JUROR HOUSE:  But --
12            THE COURT:  Hold the microphone closer, Mr. House,
13   please.
14            JUROR HOUSE:  It would depend on what field of
15   technology.
16            MS. SMITH:  Okay.  Thank you, Mr. House.
17            Was there anyone else on the back row, Ms. Owens,
18   Mr. Byerley, Mr. Fitzgerald, Ms. Hood?
19            Did I see a hand from you, Ms. Hood?
20            Anyone that might know more than the average person
21   about technology?
22            JUROR HOOD:  Maybe.
23            MS. SMITH:  Tell me about it, Ms. Hood.  Why do you
24   say maybe?
25            JUROR HOOD:  Well, because I ran telephone
```

1    switching equipment and did electronics purchasing.  But I

2    also know that every 90 days everything is outmoded and

3    you've got to buy new equipment again.  So no matter what

4    you know, in 90 days you don't know it anymore.

5         MS. SMITH:  Fair -- fair enough.  Thank you.  May

6    I -- may I keep you up for one minute?

7         Your son is an attorney, is he not?

8         JUROR HOOD:  Yeah.

9         MS. SMITH:  And -- and what kind of law does he

10   practice?

11        JUROR HOOD:  He's -- he's a string orchestra

12   director.  He was actually a musician, and he fell in love

13   with a girl whose parent did not want her to marry a

14   musician so he went to George Mason law school and became a

15   member of the bar in Dallas.  And he hated it.  And he's a

16   string player, and so now he's a string teacher.  And his

17   in-laws got over it.

18        MS. SMITH:  It's probably a less stressful

19   profession.

20        JUROR HOOD:  Well, yeah.  The guy got an

21   undergraduate degree in music composition, he shouldn't be a

22   lawyer.

23        MS. SMITH:  Thank you, ma'am.

24        Quickly, on the first row.  Ms. Mobley, you tried

25   to raise your hand when I was asking about people who might

1    know a little bit more than the average person about

2    technology?  Tell me why you say that?

3          JUROR MOBLEY:  I have a brother who's a computer

4    technician.

5          MS. SMITH:  Ah.

6          JUROR MOBLEY:  And over the years I've learned from

7    him, asked him questions.  He kind of shows me how to build

8    computers.  I'm not as smart as him, but I can kind of get

9    the gist of what's going on.

10         MS. SMITH:  So if you get in a room with eight

11   people, you're probably confident to the extent you're in a

12   room with people like my husband that really don't care how

13   things work, you kind of take the lead and be the point

14   person on technology?

15         JUROR MOBLEY:  Yes.

16         MS. SMITH:  Thank you.

17         All right.  I'm actually going to steal an idea

18   that -- that Mr. Bunt worked with you on.  He talked about

19   home ownership, and I think, Ms. Clepper, you visited with

20   him.  You know, an oil company comes in and you own your

21   land, and they come in and they drill.

22         I have a question for Ms. Clepper on this.

23         So they put the big rig on your land, and do you

24   wait 10 years to say something about it?

25         JUROR CLEPPER:  No.

```
 1            MS. SMITH:  Does that make any sense at all to you?

 2            JUROR CLEPPER:  No.  But I also own the mineral

 3  rights to it, and that's something you have to know.

 4            MS. SMITH:  So you absolutely have ownership, and

 5  you see someone putting a well out there, you don't wait 12

 6  years to say something?

 7            JUROR CLEPPER:  No.

 8            MS. SMITH:  You don't wait 12 minutes to say

 9  something, do you?

10            JUROR CLEPPER:  Probably not.

11            MS. SMITH:  Okay.  Thank you, Ms. Clepper.

12            Anybody else with that kind of new hypothetical,

13  you own something of value.

14            Mr. Humphrey, let's talk to you.

15            We'll change -- I'll change -- I'll change it a

16  little from Mr. Bunt's analogy.

17            You got a lottery ticket, and it's probably a

18  winner.  Your co-worker steals it so you know who has it.

19  Do you sit on your hands for 10 or 12 years and not say a

20  word?

21            JUROR HUMPHREY:  No.

22            MS. SMITH:  Does that make any sense to you?

23            JUROR HUMPHREY:  No.

24            MS. SMITH:  Does that make sense -- thank you,

25  sorry, Mr. Humphrey.
```

```
 1            Does that make sense to anybody else, you have

 2   something stolen from you, and you know exactly who did it,

 3   and you're just going to sit there for a decade and not say

 4   a word?  Raise your hand if that makes sense to anybody.

 5            All right.  Now -- you guys will like this

 6   question.  Does anybody think -- and, Ms. Kroll, I might --

 7   I might single you out on this one.  Does anybody think the

 8   government can make a mistake?

 9            Ms. Kroll, I'm asking -- you know why I'm asking

10   you, because you work for the government.

11            JUROR KROLL:  Yes.

12            MS. SMITH:  So in this case, I'll tell you, Samsung

13   is going to say, you know what, Mr. Lee's idea wasn't new at

14   all, and the patent shouldn't have issued, and you heard

15   from the patent video that that's completely all right to

16   do.  And that's what juries are for.

17            So working for the government, do you believe the

18   government can make mistakes?

19            JUROR KROLL:  Yes, absolutely.

20            MS. SMITH:  Okay.  Thank you, ma'am.

21            All right.  Who haven't I heard from?

22            Mr. Byerley?

23            JUROR BYERLEY:  Yes.

24            MS. SMITH:  Were you surprised -- you watched the

25   patent video?
```

1          JUROR BYERLEY:  Was I surprised about what?

2          MS. SMITH:  When -- when -- you watched the patent

3    video this morning?

4          JUROR BYERLEY:  Yes, ma'am.

5          MS. SMITH:  All right.  Were you surprised to hear

6    that a jury can invalidate a patent?

7          JUROR BYERLEY:  I was.

8          MS. SMITH:  All right.  Well, how comfortable --

9    now, you didn't raise your hand when I asked for people that

10   knew a little bit more about technology than the average

11   person, did you?

12         JUROR BYERLEY:  No, I did not.

13         MS. SMITH:  Okay.  So I'm putting you in the

14   category of I don't really care, I use technology, I don't

15   really care how it works, but -- but I want it to work.

16         JUROR BYERLEY:  Right.

17         MS. SMITH:  Okay.  So are you comfortable on a case

18   where you're going to have to read not one patent but

19   probably several patents and sit in judgment and say, you

20   know, the PTO got it wrong, if evidence shows that?

21         JUROR BYERLEY:  Well, I guess if the -- if we get

22   plenty of the information and we -- and I feel comfortable

23   with it, I can probably make a decision on that.

24         MS. SMITH:  Thank you, Mr. Byerley.

25         Ms. Owens, are you comfortable doing that?

1              JUROR OWENS:  Yes, ma'am.

2              MS. SMITH:  We're going to talk about damages in

3    a -- in a short minute.  Oh, I may -- I may keep Ms. Owens

4    up.  I'm sorry, Ms. Owens.  Not going to -- thank you.  I'm

5    sorry.

6              I'm going to talk about damages in a minute with

7    the group, but I want to talk to you right now.  I think --

8    because I do a lot of these cases, I think Judge Gilstrap is

9    going to give you some instructions on damages because

10   that's what federal judges -- one of the many things they

11   do.

12             Are you -- you're not saying that you couldn't

13   follow his instructions.  Are you saying that?

14             JUROR OWENS:  No, ma'am.

15             MS. SMITH:  Thank you.

16             Now, this next question is what I'm going to call

17   my David and Goliath question.  So on the questionnaire,

18   some of you were really hesitant when we started asking you

19   questions about an individual or a small company sue --

20   suing a larger company.  And some of you gave answers that

21   caused me to believe that you probably thought that the

22   small guy wouldn't get a fair shake.  Do we all remember

23   that question?

24             All right.  Ms. Hood, I remember your response to

25   that question, so I want to explore it a little bit.

```
 1              JUROR HOOD:  I don't remember my response.

 2              MS. SMITH:  I studied it, so I do.  I really tried

 3    to remember.  But you were a little bit hesitant and

 4    thought, well, if it's a small company against a big -- big

 5    company, you know, the small company might not have as much

 6    opportunity or might not have as good a chance.  Do you --

 7    do you really believe that?

 8              JUROR HOOD:  Maybe.

 9              MS. SMITH:  Do you believe that a big company, like

10    Samsung, can be wrongly accused of doing something just like

11    an individual?

12              JUROR HOOD:  Yeah, I do.

13              MS. SMITH:  Okay.  Thank you, ma'am.

14              Mr. Weir, do you agree with Ms. Hood on that?  Do

15    you think a big company can be wrongly accused just like an

16    individual?

17              JUROR WEIR:  Yes, I do.

18              MS. SMITH:  Okay.  I'm going to keep you up for a

19    minute because I think you've got lawyers in your family; is

20    that correct?

21              JUROR WEIR:  Distant, but yes.

22              MS. SMITH:  I'm sorry?

23              JUROR WEIR:  Distant family, yes.

24              MS. SMITH:  Uncles or --

25              JUROR WEIR:  Through marriage.  My step father's
```

1   uncle.

2            MS. SMITH:  What kind of law do they practice?

3            JUROR WEIR:  He was an oilfield attorney before he

4   passed away.

5            MS. SMITH:  All right.  And then I also -- I want

6   to say that you -- your grandfather, is it, had patents?

7            JUROR WEIR:  He did.

8            MS. SMITH:  Tell me a little bit about those.

9            JUROR WEIR:  I don't know much about them.  It was

10  for a -- for power lines, a wire tie that he invented

11  several years back, traveled the country, sold them,

12  displayed them, but I don't know much beyond that.

13           MS. SMITH:  And you're -- you're in the same

14  business, you're in the electrical business, right?

15           JUROR WEIR:  Correct.

16           MS. SMITH:  And so you're probably pretty close to

17  following the success of your grandfather?

18           JUROR WEIR:  Yes.

19           MS. SMITH:  Okay.  Now, my question for you.  You

20  see where I'm going with this.  I've got an inventor at the

21  opposite table here, and you've got a grandfather that

22  you're pretty close to.  You obviously followed in his foot

23  steps at SWEPCO.  And so do I need to worry that during this

24  case, if you're chosen, that you're going to kind of lean

25  towards the inventor because every time you look at him, it

1  makes you think about your grandfather?

2          JUROR WEIR:  No.

3          MS. SMITH:  Okay.  Thank you, sir.

4          Mr. Ramsey, you know, this case has been going on

5  for a long time.  This is still the big guy/little guy

6  theme.  Do you think that, you know, this -- this individual

7  or small company brought this suit, been going on for a long

8  time, you know, he should get something just for taking it

9  this far.  If you can stand up, Mr. Ramsey.

10          JUROR RAMSEY:  I believe that whatever the evidence

11  shows is what will be done.  I mean, if somebody did

12  something wrong and patents were infringed on and the

13  evidence shows it, then that's -- you know, there should be

14  rewards for it based on a percentage of what was made.

15          MS. SMITH:  Okay.  And when you -- when you say

16  they obviously have to meet their burden.  But is the

17  opposite true?  If they don't meet their burden, will you

18  hesitate at all to give zero at the end of the day?

19          JUROR RAMSEY:  No.

20          MS. SMITH:  Okay.  Thank you, sir.

21          I do want to talk about -- talk about damages

22  beyond Ms. Owens.

23          Anybody remember the McDonald's case?

24          JUROR HOUSE:  Coffee.

25          MS. SMITH:  Hot coffee.  Yeah.

 1              Mr. Gray, you remember that?  Mr. House?  Mr.

 2     Byerley?  I'm seeing people shaking heads.

 3              All right.  These patent cases, they're really

 4     technical, they're really complex, but they're not that

 5     different.  They're kind of a garden variety case.  And so

 6     what's going to happen here -- well, in the McDonald's case,

 7     the lady said -- went through the drive through, spilled hot

 8     coffee on her lap.  She said:  Your coffee's too hot, and

 9     you owe me 20 million bucks, okay?  You remember that,

10     Ms. Hood?

11              So in that case, McDonald's said:  You know what,

12     we don't think our coffee is too hot, but even if our coffee

13     is too hot, we don't owe you 20 million bucks.

14              So what's going to happen here is -- and you've

15     already -- you've already heard a little bit of it.  You

16     heard Mr. Bunt say that they think we infringe, and they're

17     going to ask for 700 and something million dollars.

18              So my question is this -- and I'll ask

19     Ms. Fields -- do you think -- and what's going to happen is

20     Samsung -- we're going to respond to that.  We're going to

21     do just like McDonald's did, and we're going to say, you

22     know what, we didn't infringe, but we also don't owe

23     700,000 -- $700 million.

24              Do you think by Samsung coming in and disputing the

25     damages that somehow they're agreeing or saying -- agreeing

1  that they did something wrong?

2          JUROR FIELDS:  No.

3          MS. SMITH:  Okay.  You seem a little hesitant,

4  Ms. Fields.

5          JUROR FIELDS:  I don't -- I don't think.  No, I'm

6  not hesitant.  I'm just thinking.  I'm a thinker -- I'm a

7  thinker for -- by trade.

8          MS. SMITH:  What were you thinking when Mr. Bunt

9  told you they were going to ask you guys to award $700

10  million?

11          JUROR FIELDS:  For technology, that's -- that's par

12  for the course.  For us educators that don't get paid a lot,

13  that's a lot of money.

14          MS. SMITH:  Okay.

15          JUROR FIELDS:  Even though we educated all these

16  people here -- put that on your list.

17          THE COURT:  Thank you, Ms. Fields.

18          MS. SMITH:  You know what, let's go down that road.

19  You opened a can of worms there.  Professor Lee is a

20  professor.

21          JUROR FIELDS:  Uh-huh.

22          MS. SMITH:  Do you think, you know, you can -- you

23  can kind of relate to him.  He didn't make a lot maybe, and

24  now he wants his $700 million.  Does that cause you to lean

25  a little bit more towards him because you're a fellow

1    educator and you'd like to see a fellow educator --

2            JUROR FIELDS:  No.  I mean, you have to look at the

3    evidence and see -- you know, I respect him just like I

4    respect everyone else here, but we have to look at the

5    evidence.

6            MS. SMITH:  Okay.  Thank you, ma'am.

7            Who haven't I spoken with?

8            THE COURT:  Five minutes remaining, Ms. Smith.

9            MS. SMITH:  All right.  Couple of clean-up

10   questions here.

11           Mr. House, you were -- you were an expert in a

12   case; is that correct?

13           JUROR HOUSE:  (Nods head affirmatively.)

14           MS. SMITH:  And you were an expert on the

15   Plaintiff's side of the case?

16           JUROR HOUSE:  Let's see, I have been a -- a witness

17   on a couple of cases and arbitration.  I think generally

18   have been on the Plaintiff's side.

19           MS. SMITH:  If you have a hard time remembering,

20   that's enough answer for me because you know I would want to

21   know somehow that you were kind of leaning towards the

22   Plaintiff because you had done Plaintiff's work before.

23           JUROR HOUSE:  No.

24           MS. SMITH:  Okay.  Thank you, sir.

25           You all spent some time -- Ms. Fields, again.  I

1  apologize.  You said you had some dealings with the Patent

2  and Trademark Office.  Can you tell me about that?

3          JUROR FIELDS:  I currently -- I forgot to mention

4  this.  I just started my own LLC dealing with seasonings.

5          MS. SMITH:  Okay.

6          JUROR FIELDS:  Just started it -- this past

7  Saturday was our first time actually selling, and I have

8  looked into possibly copyrighting some things.  And I've

9  looked at the online, you know, process for that.  But other

10 than that, no.

11         MS. SMITH:  Okay.  Thank you -- thank you, ma'am.

12         You all spent about a half an hour with Mr. Bunt.

13 Had anyone met or did anyone know Mr. Bunt prior to arriving

14 at the courthouse today?

15         Mr. Bunt is working with a gentleman named Todd

16 Parish.  I see him in the audience right there.  Mr. Parish

17 is from Gilmer.  Does anybody recognize Mr. Parish?

18         Mr. Fitzgerald, how do you know Mr. Parish?

19         JUROR FITZGERALD:  I went to school with him.  He's

20 a couple years behind me.  We attended Gilmer schools

21 together.

22         MS. SMITH:  All right.

23         JUROR FITZGERALD:  He was a couple of years behind

24 me in school.

25         MS. SMITH:  It sounds like you go pretty far back.

1              JUROR FITZGERALD:  And I know his sister is on the

2    federal court up there.

3              MS. SMITH:  Okay.

4              JUROR FITZGERALD:  Or district court, whatever it

5    is.

6              MS. SMITH:  District court.

7              Mr. Fitzgerald, I'm not quite done yet.  I

8    apologize.  Anything about that relationship that would

9    cause you -- he's obviously working with Mr. Bunt -- that

10   would cause you to kind of lean toward that side initially?

11             JUROR FITZGERALD:  No.

12             MS. SMITH:  Thank you, sir.

13             All right.  I am short on time, so I have one

14   initial -- or one additional thought for you, a last

15   thought.

16             It probably comes as no surprise that as a lawyer,

17   I think, you know, jury service is a very, very honorable

18   thing.  And you've heard some about that -- something about

19   that from Judge Gilstrap, as well.

20             But I also think that it's honorable not to serve.

21   And what I mean by that is if you're just not a good fit for

22   a case and it's not a one side fits all situation, it might

23   be the best thing for you to say, you know, I'm not the

24   right fit for this case for whatever reason.

25             So my last question is -- is much like Mr. Bunt's.

```
 1   I don't know all the right questions.  I've tried to visit

 2   with each one of you.  I think I've had a conversation with

 3   just about everyone on the front rows.  But is there anyone

 4   sitting right there thinking, you know what, if Ms. Smith

 5   would have just asked me this, I would have raised my hand

 6   and I would have told her that I am not the right person for

 7   a case like this, whether it be because it's a $700 million

 8   case or because it's a patent case or any other reason.

 9          Anybody on the first row?

10          Second row?

11          And, Ms. Nelson, Mr. Stanley, Mr. Cornelius,

12   anybody back here that just thinks this is just not the case

13   for me?

14          All right.  Mr.  Stanley, tell me about that.

15          JUROR STANLEY:  Just I may have a bias for the

16   Plaintiff.  Just from the relationship with my son.

17          MS. SMITH:  And, Mr. Stanley, I -- I appreciate

18   that, first of all.  And I'll tell you, that is a bias that

19   you have had for a long time, is it not?

20          JUROR STANLEY:  True.

21          MS. SMITH:  And that's a bias that Judge Gilstrap

22   probably can't tell you to stop thinking that way; is that

23   correct?

24          JUROR STANLEY:  That's correct.

25          MS. SMITH:  So there's really nothing anyone can do
```

```
 1   to overcome that bias in this courtroom today?

 2              JUROR STANLEY:  I don't think so.

 3              MS. SMITH:  I appreciate that.  Thank you.

 4              On behalf of Samsung -- oh, Mr. Fitzgerald?

 5              THE COURT:  Your time is up, Mr. Smith, but I'm

 6   going to let you follow up on this one question.

 7              MS. SMITH:  Thank you, Your Honor.

 8              JUROR FITZGERALD:  Me working in telecommunication

 9   business, I've seen, you know, different things go on, you

10   know, with different vendors and stuff, you know.  I know

11   people copyright and, you know, make different parts, you

12   know, to fit right in other chassis and everything things

13   like that.  So I mean, I -- I mean, I don't really know, you

14   know, if -- if I can really sit here and say, you know, that

15   I would -- you know, would be --

16              MS. SMITH:  Which way would it make you lean?

17              JUROR FITZGERALD:  I don't think it would make me

18   lean either direction.  But, I mean, you know, I've seen it

19   happen, you know, over the -- over the years since I've been

20   in the communication business.

21              MS. SMITH:  And does that make you kind of an

22   expert on the subject?

23              JUROR FITZGERALD:  I wouldn't say no expert.

24              MS. SMITH:  Do you feel like --

25              JUROR FITZGERALD:  I mean, I just work with it
```

 1    every day, and, you know, in -- in the field.

 2         MS. SMITH:   Okay.   Thank you, sir.   I appreciate

 3    it.

 4         Thank you all.

 5         THE COURT:   Counsel, approach the bench, please.

 6         (Bench conference.)

 7         THE COURT:   All right.   These are the microphones.

 8    Please don't touch them, but please speak into them.

 9         Mr. Bunt, does Plaintiff have challenges for cause?

10         MR. BUNT:   Yes, Your Honor.

11         No. 9.

12         THE COURT:   Please come around here and speak into

13    the microphone.

14         MR. BUNT:   No. 9, Ms. Owens.   She said that she

15    would hold the Plaintiff to a higher standard for burden of

16    proof.

17         THE COURT:   I just want to know who.

18         MR. BUNT:   Okay.

19         THE COURT:   We'll talk about the specifics later.

20         MR. BUNT:   Yes, Your Honor.

21         Mr. House, No. 11.

22         And No. 12, Ms. Hood.

23         THE COURT:   Mr. House because of his ownership in

24    Qualcomm?

25         MR. BUNT:   Yes, Your Honor.

```
 1              THE COURT:  And Ms. Hood, for what reason?
 2              MR. BUNT:  I think she said that she would start
 3    out the Defendant -- or the Plaintiff behind the
 4    Defendant --
 5              THE COURT:  Just a second.
 6              (Open court.)
 7              THE COURT:  Ladies and gentlemen, I'm going to ask
 8    for silence in the courtroom so I can deal with the lawyers
 9    here at the bench, please.  Please everybody just remain
10    seated -- seated but maintain silence, please.
11              (Bench conference continued.)
12              THE COURT:  What about Ms. Hood?  What's your basis
13    for challenging her for cause?
14              MR. BUNT:  I believe she said that she would have
15    the Plaintiffs starting out behind the Defendant.  I thought
16    I recalled her saying that.
17              THE COURT:  Okay.  Do you have any other challenges
18    for cause?
19              MR. BUNT:  No.
20              THE COURT:  Ms. Smith, does the Defendant have
21    challenges for cause?
22              MS. SMITH:  Your Honor, I have a single challenge.
23    Ms. Stanley, Number -- or Mr. Stanley, No. 19.  He said he's
24    biased towards the Plaintiff due to his son being a
25    plaintiff's lawyer.  And that he couldn't overcome that
```

```
 1   bias.
 2          THE COURT:  Okay.  I also have Mr. Brady,
 3   Mr. Cornelius, Mr. Lindsay, and Mr. Collins (sic) as
 4   indicating they have scheduling problems.
 5          Anybody have anyone else other than that on
 6   scheduling issues?
 7          MR. BUNT:  Did you -- did you say Ms. Anderson,
 8   Your Honor?  I thought I heard her raise her --
 9          THE COURT:  No, I did not.
10          Well, I have Ms. Anderson circled, yes.
11          MR. BUNT:  Okay.
12          THE COURT:  Brady, Anderson -- 6, 18, 24, 25, and
13   27.  I had those five marked as a potential scheduling
14   problem.
15          MR. BUNT:  That's what I heard, as well.
16          THE COURT:  Anybody have anything differently?
17          MS. SMITH:  No, Your Honor.
18          THE COURT:  Okay.  Then I'll keep those five back
19   together with the members who have been challenged -- who
20   have been challenged by cause by Plaintiff and Defendant,
21   and we'll bring them up here one at a time, and I'll review
22   their situations with counsel.
23          If you all will return to your seats, I'm going to
24   recess the rest of the panel, and then we'll bring them up
25   here one at a time.
```

 1          MR. BUNT:  Thank you, Judge.

 2          MS. SMITH:  Thank you.

 3          (Bench conference concluded.)

 4          THE COURT:  All right.  Ladies and gentlemen, I'm

 5    going to excuse the majority of the panel for a recess.

 6    There are a few of you that I'm going to ask to stay in your

 7    seats, and there are issues I will need to visit with you

 8    about here at the bench one at a time.

 9          The folks on the panel that I'm going to ask to

10    remain behind during this recess are Mr. Brady, No. 6;

11    Ms. Owens, No. 9; Mr. House, No. 11; Ms. Hood, No. 12,

12    Ms. Anderson, No. 18; Mr. Stanley, No. 19; Mr. Cornelius,

13    No. 24; Mr. Lindsay, No. 25; and Ms. Collins, No. 27.

14          Everyone else on the panel, I'm about to excuse you

15    for a recess.  During this recess, I want to ask a couple

16    things of you.  First of all, stay in the building.  Don't

17    go outside of the building, please.

18          Also, as you exit through the double doors in the

19    back of the courtroom, if you're so inclined and you take a

20    left, you'll find two very important things, the water

21    fountains and the restrooms.  So you can avail yourselves of

22    the benefits of those during this recess.

23          Also, ladies and gentlemen, while you're on recess,

24    don't discuss anything that's happened in the courtroom.

25    Visit about grandchildren, your kids, visit about the

1   weather, visit about sports, anything you want to talk

2   about, but do not discuss anything that happened in the

3   courtroom.

4          You can talk with Ms. Fields about the important --

5   importance of public education.

6          My mother taught second grade for 38 years,

7   Ms. Fields.

8          So those are all things to talk about, but nothing

9   that happened in the courtroom today should be a part of

10  your discussions.  You have not heard any evidence in this

11  case, whatsoever.

12         All right.  With those instructions, ladies and

13  gentlemen, those of you on the panel, except those that I

14  singled out and called by name, are excused for a recess at

15  this time.

16         COURT SECURITY OFFICER:  All rise.

17         THE COURT:  If you're to stay, then you need -- if

18  you need to get out of the way for somebody else to leave,

19  then go back to where you were seated, please.

20         (Venire panel out.)

21         THE COURT:  All right.  Please be seated.

22         And, counsel, please approach the bench.

23         (Bench conference.)

24         THE COURT:  Just make sure we have room for the

25  members of the panel to get up here.

```
 1              (Open court.)

 2              THE COURT:  Mr. Brady, will you come up, please?

 3    Just come around, please, sir.

 4              (Bench conference continued.)

 5              JUROR BRADY:  Yes, sir.

 6              THE COURT:  Good morning.

 7              JUROR BRADY:  Okay.

 8              THE COURT:  Mr. Brady, these are our microphones.

 9    We're going to talk into them, but we're going to talk

10    quietly, please.

11              JUROR BRADY:  Okay.

12              THE COURT:  You indicated earlier this morning that

13    you might have a scheduling problem being able to be here --

14              JUROR BRADY:  Right.

15              THE COURT:  -- throughout the trial if you were

16    selected.  I need you to tell me about what that is.

17              JUROR BRADY:  I haven't worked for six months.  I

18    just went back to work.  I ain't got time to sit back and

19    take off again.  I'm behind on my bills.  I got to go back

20    to work.  I ain't got time for this.

21              THE COURT:  All right.  When you say you just went

22    back to work, tell me who you're working for now.

23              JUROR BRADY:  I'm a union electrician.  I work for

24    Domtar Paper Mill.  Working for the union, you -- I haven't

25    been working for quite awhile, for six months --
```

```
 1            THE COURT:  Okay.
 2            JUROR BRADY:  -- drawing unemployment.  Got behind
 3  on a few bills and --
 4            THE COURT:  How long have you been back at work?
 5            JUROR BRADY:  One month.
 6            THE COURT:  So you've been back at work one month?
 7            JUROR BRADY:  One month.
 8            THE COURT:  Okay.  Is there any other reason that
 9  we haven't talked about that would interfere with your
10  ability to serve if you were on this jury?
11            JUROR BRADY:  Other than me and my son is a
12  diabetic.  Sitting for long periods of time, it's -- it's
13  hard to do --
14            THE COURT:  Okay.
15            JUROR BRADY:  -- you know, and, I mean, other than
16  that, it's just -- that's it --
17            THE COURT:  All right, sir.
18            JUROR BRADY:  -- you know.
19            THE COURT:  Well, Mr. Bunt, do you have any
20  questions?
21            MR. BUNT:  No, Your Honor.
22            THE COURT:  Ms. Smith?
23            MS. SMITH:  No, Your Honor.
24            THE COURT:  Mr. Brady, I'm going to let you join
25  the rest of the group outside.  Just don't discuss anything
```

 1   that we've talked about in here.

 2            JUROR BRADY:  Gotcha.

 3            THE COURT:  Thank you, sir.

 4            MR. BUNT:  Thank you, sir.

 5            (Juror Brady leaves the courtroom.)

 6            THE COURT:  I certainly sympathize with Mr. Brady,

 7   but I don't see that that's a basis for me to excuse him for

 8   cause.  He's been back at work a month.  There are a lot of

 9   people that may be behind on their bills.  I don't know that

10   that's necessarily a reason to excuse somebody for jury

11   duty.

12            I'm not going to excuse Mr. Brady.  I feel for him.

13   I wish him the best.  But I can't excuse people for jury

14   duty just because they've had ups and downs in their

15   employment.

16            All right.  Next is No. -- No. 9, Ms. Owens.

17            (Open court.)

18            THE COURT:  Ms. Owens, would you come up and join

19   us, please?

20            (Bench conference continued.)

21            THE COURT:  Good morning.

22            JUROR OWENS:  Good morning.

23            THE COURT:  These are our microphones.  If you and

24   I can just talk quietly here.

25            JUROR OWENS:  Yes, sir.

1          THE COURT:  You indicated during some of the

2    questioning that you would probably hold the Plaintiffs to a

3    higher standard than perhaps I described, at least that's

4    the impression that's been raised.

5          And you were asked several questions.

6          JUROR OWENS:  Uh-huh.

7          THE COURT:  What I really need to know, Ms. Owens,

8    is will you listen to the evidence and let the evidence

9    guide you about your decision, and relying on that evidence,

10   if the evidence establishes, at least as you view it, that

11   the Plaintiff should prevail and that they should recover

12   damages, you'll award whatever amount of those damages you

13   believe the evidence supports, whether it's a high number, a

14   low number, or some number -- some number in between?  Can

15   you tell me that you'll do that?

16         JUROR OWENS:  Yes, sir.

17         The COURT:  Nobody doubts it's -- north of $700

18   million is a lot of money.  You are not alone in that.

19         But you're not telling me, I gather, that despite

20   the evidence, no matter what the evidence is, you could

21   never award that money in any circumstance, are you?

22         JUROR OWENS:  No, sir.

23         THE COURT:  Okay.  But, again, what I need to know

24   is that you'll put your personal thoughts and biases aside

25   and you'll let the evidence be the sole guide as to where

```
 1   you end up if you're on this jury.

 2           JUROR OWENS:  Yes, sir.

 3           THE COURT:  Can you do that?  And -- and by that,

 4   you'll -- you'll wait until you've heard both the

 5   Plaintiff's side and the Defendants' side before you start

 6   reaching any conclusions?

 7           JUROR OWENS:  Yes, sir.

 8           THE COURT:  Mr. Bunt, do you have questions of this

 9   witness?

10           MR. BUNT:  Yes, Your Honor.

11           THE COURT:  Excuse me, not witness, venire man.

12           MR. BUNT:  You heard Judge Gilstrap talk a little

13   about the burden of proof and how it's a preponderance of

14   the evidence for the Plaintiff.  Do you -- do you recall him

15   talking about that?

16           JUROR OWENS:  Yes, sir.

17           MR. BUNT:  And I think you probably recall him

18   talking about tipping the scales in favor of the Plaintiff?

19           JUROR OWENS:  Uh-huh.

20           MR. BUNT:  And I asked the question about $700

21   million, and I think I heard you say that you would need us

22   to tip the scales more than a little toward our favor; is

23   that right?

24           JUROR OWENS:  Well, if you're asking for 700

25   million, your facts better be straight.
```

```
 1              MR. BUNT:  And are they going -- are we going to
 2    have to tip the scales heavily in our favor to get $700
 3    million?
 4              JUROR OWENS:  I mean, I would have to listen to
 5    both sides.
 6              MR. BUNT:  Yes, ma'am, I understand.
 7              JUROR OWENS:  I mean, there would -- yes, in my
 8    opinion, 700 million is a lot of money.  And if I'm going to
 9    be -- if it's my decision only and my opinion only, yes,
10    you'd have to meet the facts.  And it can't be -- I'm not
11    going to give you $700 million for just a little bit.
12              MR. BUNT:  Okay.  Thank you, ma'am.  I appreciate
13    it.
14              THE COURT:  Ms. Smith, do you have some questions?
15              MS. SMITH:  Ms. Owens, at the end -- at the
16    conclusion of this case, Judge Gilstrap is going to give the
17    jurors, including you, instructions.  And not surprisingly,
18    there's not going to be a picture of Lady Justice and the
19    scales.  He's going to give you a precise definition of the
20    burden that the Plaintiff has to meet, and you said you
21    could follow his instructions in full, didn't you?
22              JUROR OWENS:  Yes, ma'am.
23              MS. SMITH:  Thank you.
24              THE COURT:  Ms. Owens, the people who are selected
25    to serve on the jury, as I've mentioned, are going to get a
```

1    list of questions when all the evidence is in, and the jury

2    is going to have to answer those questions.

3            JUROR OWENS:  Yes, sir.

4            THE COURT:  And one of those questions may be what

5    amount of money is the Plaintiff entitled to receive.  It

6    may not be.  But it may -- may be, and that's why we're

7    talking about it.

8            JUROR OWENS:  Yes, sir.

9            THE COURT:  That question, like most of the

10   questions on the jury, are not going to be black and white

11   answers or a hundred percent one way or a hundred percent

12   the other way.  You're going to hear evidence from both

13   sides.

14           The Plaintiff is going to put on evidence to try

15   and convince you that that's a reasonable and proper number.

16   Defendants' going to put on evidence to try and convince you

17   that that's not a reasonable and not a proper number.

18           JUROR OWENS:  Yes, sir.

19           THE COURT:  And so the question is probably not

20   going to be as precise as -- is it this one point on a map

21   or is it another point on a map?

22           JUROR OWENS:  Yes, sir.

23           THE COURT:  And you're going to be called to make a

24   judgment based on those competing versions of the facts and

25   the evidence.

1          Now, at that point, you're going to have to put an

2     answer in the blank.  And that answer may be something that

3     you have to at the end of the day say, I'm more comfortable

4     with one side's version than the other side's.

5          JUROR OWENS:  Uh-huh.

6          THE COURT:  And that's where we get back to more

7     probably true than not true.  You're probably not going to

8     ever come away and say I'm a hundred percent sure.  You're

9     going to have to decide who's presented the best case and

10    the most compelling evidence and tip those scales in their

11    favor.  And sometimes they tip a whole lot, and sometimes

12    they tip very little.  But they rarely are 50/50.  They tip

13    one direction or the other.

14         And you're going to be -- the jury is going to have

15    to fill in the blank and answer the question.  And they may

16    have only tipped a little bit one direction or the other.

17         The question is:  Can you answer that question even

18    if it's a close call, even if the evidence is slightly more

19    one direction than the other, and if the question that

20    you're asked to call on calls for a real big dollar amount?

21    And if you can do that and if you can let the evidence be

22    the sole guide in you answering that question, that's one

23    thing.

24         But if you're going to have to have more than it

25    tipping one way or the other a little bit because the number

```
 1    is so big, that's perfectly okay, but that's the answer I
 2    need at this juncture.  Does that make sense?
 3              JUROR OWENS:  Yes, sir.
 4              THE COURT:  So if all the evidence taken together
 5    gives you a result that it's a little bit more one way than
 6    the other and the question is do they or do they not get
 7    $700 million, do you feel like you can answer that question,
 8    or are you telling me it's going to have to be more than a
 9    little bit one way or the other in evaluating that competing
10    evidence?
11              JUROR OWENS:  No, sir, I can't.
12              THE COURT:  You can't answer?  Okay.  That's a fair
13    answer, and that's what we needed to get to the bottom of.
14              Do either of you have other questions for
15    Ms. Owens?
16              MR. BUNT:  No, Your Honor.
17              MS. SMITH:  No, Your Honor.
18              THE COURT:  Ms. Owens, I'm going to let you join
19    the rest of the group outside.  Just don't discuss anything
20    that's happened in here.
21              JUROR OWENS:  Yes, sir.
22              THE COURT:  Thank you.
23              (Juror Owens leaves the courtroom.)
24              THE COURT:  I'm going to excuse Ms. Owens.
25              (Open court.)
```

```
 1              THE COURT:  Mr. House, would you come up, please?
 2              (Bench conference continued.)
 3              THE COURT:  Good morning, sir.
 4              JUROR HOUSE:  Good morning.
 5              THE COURT:  These are our microphones.  We're going
 6      to talk quietly into these.
 7              By the way, I didn't mean to give you a hard time
 8      about the way you were speaking.  You were just awfully
 9      soft.  And one of my jobs is to make sure all the lawyers
10      hear everything --
11              JUROR HOUSE:  Sure.
12              THE COURT:  -- including the court reporter.
13              Okay.  You own stock in Qualcomm?
14              JUROR HOUSE:  Yes.
15              THE COURT:  Do you have any idea the amount of
16      stock that you own in Qualcomm?
17              JUROR HOUSE:  No.  I would think it's probably
18      between 20 and $30,000.00 -- shares.
19              THE COURT:  Okay.  And you understand Qualcomm may
20      well be financially impacted by the result of this case.
21              JUROR HOUSE:  Yes, sir.
22              THE COURT:  And if they're impacted and their stock
23      price is impacted, you may be impacted?
24              JUROR HOUSE:  Yes.
25              THE COURT:  Do you think you can hear the evidence
```

```
 1    and make a decision that is not impacted by that realization

 2    in any way?

 3              JUROR HOUSE:  Yes.

 4              THE COURT:  You think you can?

 5              JUROR HOUSE:  Yes.

 6              THE COURT:  All right.  Mr. Bunt, do you have

 7    questions for Mr. House?

 8              MR. BUNT:  No, Your Honor.

 9              THE COURT:  Ms. Smith?

10              MS. SMITH:  No, Your Honor.

11              THE COURT:  Mr. House, and I don't want to do --

12    know too much of your personal business, but you've told me

13    that your position in Qualcomm may be worth something in the

14    order of $20,000.00.  How does that relate to your overall

15    stock portfolio?  Is that 50 percent of it or 5 percent of

16    it?

17              JUROR HOUSE:  Oh, it's about 5 percent.

18              THE COURT:  Okay.  Okay.  A minority position.

19              All right, sir.  Thank you very much.  I'm going to

20    let you join the rest of the group outside.  Don't discuss

21    anything we've talked about in here.

22              (Juror House leave the courtroom.)

23              MR. BUNT:  Your Honor, I have two -- if you want

24    them, I have two case citations I can grab from my notebook

25    on this issue, on stocks.
```

 1          THE COURT:  I've been looking up here during the

 2    voir dire.  There is some case law from the Seventh Circuit

 3    that's been adopted by the Federal Circuit.

 4          MR. BUNT:  I think there's one by the Fourth

 5    Circuit.

 6          THE COURT:  It says even with a small interest the

 7    venire member should be discharged.

 8          MR. BUNT:  That's the same case that I --

 9          THE COURT:  Ms. Smith, do you have anything that

10    would tell me that's not right?

11          MS. SMITH:  I don't.

12          THE COURT:  I think I don't have any discretion in

13    this matter in light of the precedent.  I'm going to excuse

14    Mr. House.  I don't doubt his answer that he can put it

15    aside, but we have plenty of people on this panel to seat a

16    jury, and there's no reason to take a risk in light of the

17    case law that's out there.

18          Okay.

19          (Open court.)

20          THE COURT:  Ms. Hood, would you come up, please?

21          (Bench conference continued.)

22          THE COURT:  Good morning, Ms. Hood.

23          JUROR HOOD:  Good morning.

24          THE COURT:  These are our microphones.  We're just

25    going to talk quietly up here.

```
 1              Mr. Bunt, do you have any questions for Ms. Hood?

 2              MR. BUNT:  Yes, Your Honor.

 3              Ms. Hood, when we were asking you questions about

 4    your feelings about lawsuits, did you say that because of

 5    your feelings about lawsuits that you might start the

 6    Plaintiff off a little bit behind the Defendant because just

 7    your general feelings about lawsuits?

 8              JUROR HOOD:  Maybe.

 9              MR. BUNT:  Okay.

10              THE COURT:  You're not sure that you could treat

11    both of these sides --

12              JUROR HOOD:  What?

13              THE COURT:  You're not sure you can treat both of

14    these sides as starting at the same place?

15              JUROR HOOD:  Well, I think I probably could treat

16    both sides starting at the same place --

17              THE COURT:  Now, obviously, they don't end up in

18    the same place.

19              JUROR HOOD:  They're not going to end up in the

20    same place.  And --

21              THE COURT:  The question is can they start out at

22    an equal posture or is the Plaintiff going to be -- have to

23    make up ground to even catch up to the Defendant from the

24    beginning, in your mind?

25              JUROR HOOD:  No, I think $700 million is so much
```

 1  money that I don't trust anybody right out of the gate.

 2          THE COURT:  You don't have to trust either side.

 3  You just have to treat them the same from the beginning.

 4          JUROR HOOD:  Okay.  Well, I think I can treat you

 5  the same from the beginning.

 6          MR. BUNT:  Given the money.

 7          JUROR HOOD:  That's pretty phenomenal.

 8          MR. BUNT:  Given the amount of money, you've heard

 9  $700 million.

10          JUROR HOOD:  That's pretty phenomenal.

11          MR. BUNT:  You just said it's a pretty phenomenal

12  amount of money, given that amount of money, are we going to

13  be starting out a little bit behind, or are we going to have

14  to put on more evidence to --

15          JUROR HOOD:  When you explained -- did say there

16  were three kinds of evidence, there's one that the criminal

17  guys use --

18          THE COURT:  There's three different burdens of

19  proof.

20          JUROR HOOD:  And there were two other ones.

21          As this discussion was going on, I thought I

22  understood that there were the first two, one was the

23  preponderance that you didn't have to have -- you know, it

24  looked like yeah, likely, and then there was the one that

25  was a little more exacting.

```
 1              THE COURT:  Clear and convincing.

 2              JUROR HOOD:  And -- and then as the discussion went

 3    on, it sounded to me like this whole thing was going to be

 4    on the preponderance of the evidence, and it confused me as

 5    to what it is we were going to make a decision on.

 6              THE COURT:  Well, as to whether or not the

 7    Defendants have infringed the Plaintiff's patents, the jury

 8    will answer that question based on a preponderance of the

 9    evidence.

10              JUROR HOOD:  Oh.

11              THE COURT:  If they have infringed the Plaintiff's

12    patents, then whether or not those patents are valid or

13    invalid will be answered on clear and convincing evidence.

14              JUROR HOOD:  Oh, I got you.

15              THE COURT:  If they are infringed and they remain

16    valid, they've not been shown to be invalid --

17              JUROR HOOD:  Okay.

18              THE COURT:  -- then the amount of damages to be

19    awarded for that infringement will be determined based on a

20    preponderance of the evidence.

21              JUROR HOOD:  Oh.

22              THE COURT:  That will be the instruction --

23              JUROR HOOD:  Wow.

24              THE COURT:  -- more or less that I'll give the jury

25    toward the end of the trial.
```

```
 1              JUROR HOOD:  Okay.  Okay.  I got you.
 2              THE COURT:  But at this point, Ms. Hood, I just
 3    need to be satisfied, and both of these groups of lawyers
 4    want to be satisfied --
 5              JUROR HOOD:  Uh-huh.
 6              THE COURT:  -- that you won't treat KAIST any
 7    differently than Samsung and the other Defendants in this
 8    case, and that you'll hear all the evidence, and you'll make
 9    a decision based on that evidence.
10              But if you have a bias --
11              JUROR HOOD:  Yeah.
12              THE COURT:  -- if you have a prejudice --
13              JUROR HOOD:  Yeah.
14              THE COURT:  -- and whatever it comes from --
15              JUROR HOOD:  Yeah.
16              THE COURT:  -- that would keep you from letting
17    them start out equally.
18              JUROR HOOD:  Yeah.
19              THE COURT:  And let the evidence decide who ends up
20    ahead and who doesn't.
21              JUROR HOOD:  Yeah.
22              THE COURT:  Then that's what I need to know about.
23              JUROR HOOD:  Yeah.  Oh, boy.  You know, I just
24    don't trust lawyers.  I think they're dishonest.  All of
25    them.  And $700 million.  Who's going to be honest with that
```

1  kind of money at stake?  You know, and I would have to be

2  convinced of the honesty of the people who are arguing.  And

3  I can't know that up front.

4          THE COURT:  I know.  I know that you --

5          JUROR HOOD:  Yeah.

6          THE COURT:  You haven't heard any evidence yet.

7          JUROR HOOD:  I haven't heard anything yet, and so I

8  don't want to -- oh, I don't know if I can commit myself.

9  Maybe I should just back out.

10         THE COURT:  Well, that's not your option.  That's

11 mine.

12         JUROR HOOD:  Okay.

13         THE COURT:  That's why you're talking to me.

14         JUROR HOOD:  That's why I'm talking to you.

15         THE COURT:  And I need to know what you can do and

16 what you can't do.  You just need to be honest --

17         JUROR HOOD:  Yeah.

18         THE COURT:  -- and tell me I can do what the Judge

19 is going to instruct me to do or I can't do that.

20         JUROR HOOD:  Yeah.  Well, I think I can do what you

21 instruct me to do, as long as I understand what it is you

22 want out of me.

23         THE COURT:  Well --

24         JUROR HOOD:  You know.

25         THE COURT:  -- I'm going to give the clearest and

```
 1    most detailed instructions I can give.

 2              JUROR HOOD:  Right.

 3              THE COURT:  But you'll have to listen to them, and

 4    you'll have to follow them, as will anybody else that --

 5              JUROR HOOD:  Right.

 6              THE COURT:  -- ends up on this jury.

 7              JUROR HOOD:  So the first part is going to be

 8    judged on the preponderance of the evidence, and then the

 9    patent itself, whether it's --

10              THE COURT:  Valid or invalid.

11              JUROR HOOD:  Valid.  That's going to be you've got

12    to have more --

13              THE COURT:  Clear and convincing.

14              JUROR HOOD:  Clear and convincing, yeah.

15              THE COURT:  And then if the patent's been infringed

16    and it's still valid, it's not been shown --

17              JUROR HOOD:  Uh-huh.

18              THE COURT:  -- by clear and convincing evidence to

19    be invalid --

20              JUROR HOOD:  Uh-huh.

21              THE COURT:  -- then how much is the Plaintiff

22    entitled to recover for that infringement in dollars and

23    cents.

24              JUROR HOOD:  Oh.

25              THE COURT:  And that number, whatever it is, if you
```

```
 1   get to that number, is going to be based on a preponderance
 2   of the evidence.
 3           JUROR HOOD:  Yeah.
 4           THE COURT:  So --
 5           JUROR HOOD:  Yeah.
 6           THE COURT:  I mean, just cut to the chase and try
 7   to go back to the original question.
 8           JUROR HOOD:  Okay.
 9           THE COURT:  Can you tell me that if you're selected
10   on this jury, both the Plaintiff and the Defendant will
11   start out in an equal position in your mind, and you'll let
12   the evidence and only the evidence dictate where you go from
13   their?
14           JUROR HOOD:  Yeah, I'll let the evidence -- and
15   only the evidence --
16           THE COURT:  They'll start out equal?
17           JUROR HOOD:  We will start out equal.
18           THE COURT:  Okay.  Any other questions, Mr. Bunt?
19           MR. BUNT:  Yes, Your Honor.
20           THE COURT:  Okay.
21           MR. BUNT:  You've heard that the preponderance
22   of -- I'm sorry, that the burden of proof for damages is by
23   a preponderance of the evidence.
24           JUROR HOOD:  Okay.
25           MR. BUNT:  And His Honor mentioned that that's
```

```
 1   tipping the scales in our favor.  It's a different standard

 2   than clear and convincing evidence --

 3          JUROR HOOD:  Okay.

 4          MR. BUNT:  -- as the one for invalidity.

 5          JUROR HOOD:  Okay.  Okay.

 6          MR. BUNT:  Which is tip the scales in our favor.

 7          In the back of your head, you've already said that

 8   $700 million is a phenomenal amount of money, and you have a

 9   distrust of lawyers, anybody coming in and saying that

10   amount.

11          Are you going to --

12          THE COURT:  She said she distrusted all lawyers,

13   that includes the Defendants' counsel, too.

14          MR. BUNT:  Yes, Your Honor.  Sure.  Stipulated.

15          JUROR HOOD:  Keep that in mind.

16          THE COURT:  Probably includes the Judge.

17          JUROR HOOD:  You're right.  You're right.

18          MR. BUNT:  But are you in the back of your head,

19   are you going to be wanting more than a preponderance of the

20   evidence to satisfy the burden of damages, are you going to

21   need more evidence than a tipping of the scales in our

22   favor, are you going to need more evidence than that for

23   $700 million?

24          JUROR HOOD:  No, my understanding of what you said

25   is that $700 million is kind of a number here, but that
```

1  that -- at the end, that it could be a different number; is

2  that correct?

3          THE COURT:  The -- the -- the Plaintiff's going to

4  present evidence, I believe --

5          JUROR HOOD:  Okay.  Uh-huh.

6          THE COURT:  -- that that number is reasonable and

7  fair and appropriate --

8          JUROR HOOD:  Okay.

9          THE COURT:  -- given all the facts.  And the

10  Defendant is going to present evidence, I believe, that

11  given all the facts, that number is highly inflated and

12  improper and way too high.

13          JUROR HOOD:  Uh-huh.  Uh-huh.  Uh-huh.

14          THE COURT:  And if the jury gets to that question,

15  if you get past --

16          JUROR HOOD:  If you get to that --

17          THE COURT:  -- liability, if you get past

18  infringement and validity --

19          JUROR HOOD:  Uh-huh.

20          THE COURT:  -- and you're at a point where you have

21  to fill in that blank and answer that number, the jury's

22  going to have to determine what is the reasonable and fair

23  amount to compensate the Plaintiff for the infringement by

24  the Defendant.  The jury's not going to be asked:  Is it 700

25  million, yes or no?

```
 1                JUROR HOOD:  Okay.

 2                THE COURT:  The jury is going to be asked:  What

 3     amount of money?  And they're going to have to base that

 4     answer between what the Plaintiff has asked for and what the

 5     Defendant said they'd be willing to admit might be due which

 6     is going to be a vastly different number, I promise you --

 7                JUROR HOOD:  Yeah, yeah, oh, yeah.

 8                THE COURT:  -- where the -- where truth lies.

 9                JUROR HOOD:  Yeah.

10                THE COURT:  And that's what the jury's, in essence,

11     going to be called on to do --

12                JUROR HOOD:  Yeah.

13                THE COURT:  -- as regards to the damages question.

14                JUROR HOOD:  I don't want to do something like

15     that.  But if I'm required to do it, I'd do what was

16     required --

17                THE COURT:  And you'll let the evidence guide you

18     in how you do it?

19                JUROR HOOD:  It would have to be.  Yeah, it would

20     have to be.

21                THE COURT:  But even though they've been honest and

22     up front and started the process off by saying we don't want

23     to surprise you, ladies and gentlemen, we want you to know

24     at the end of the day when this trial is done, we're going

25     to ask you for $700 million --
```

```
 1              JUROR HOOD:  Uh-huh.

 2              THE COURT:  -- you're not going to treat the

 3    Defendant -- excuse me, the Plaintiff as being in some kind

 4    of a reduced posture or behind and not in the equal standing

 5    and equal position as the Defendant when we start the

 6    process?

 7              JUROR HOOD:  I thought these guys were the

 8    Defendant --

 9              THE COURT:  They are --

10              JUROR HOOD:  -- and these guys are the Plaintiff.

11              THE COURT:  They are.

12              MS. SMITH:  We are.

13              THE COURT:  You're going to treat both sides the

14    same even though you know the Plaintiff at the end of the

15    day is going to ask for money --

16              JUROR HOOD:  I know up front what he's going to ask

17    for, but as long as that's not set in concrete up front --

18              THE COURT:  It's not a yes or no question.  I can

19    tell you that much.

20              JUROR HOOD:  Yeah, yeah.

21              THE COURT:  So you can treat both sides fairly from

22    the beginning and let the evidence guide your judgment, if

23    you're selected; is that right?

24              JUROR HOOD:  I can do that, yes.

25              THE COURT:  Okay.  Are there any other questions?
```

```
 1            MR. BUNT:  Just one more, Your Honor.  I apologize.
 2   But you -- you made a comment about the damages are going to
 3   be somewhere in that range.  If we put on evidence to prove
 4   $700 million, can you award $700 million, or is that a
 5   number you could just never see yourself awarding?
 6            JUROR HOOD:  No, I worked for a big corporation.  I
 7   don't think that number shocks me as much as other people.
 8   No -- I mean, if there's evidence, go for it.
 9            THE COURT:  You'll let the evidence guide you?
10            JUROR HOOD:  Yeah.
11            THE COURT:  Any other questions?
12            MS. SMITH:  No, Your Honor.
13            THE COURT:  Ms. Hood, I'm going to let you join the
14   rest of the group outside.  Just don't discuss anything
15   we've talked about in here.  Thank you, ma'am.
16            JUROR HOOD:  Thank you.
17            (Juror Hood leaves the courtroom.)
18            THE COURT:  I am not going to excuse Ms. Hood for
19   cause.
20            Next I have Ms. Anderson, with a scheduling issue.
21   Anybody have anything between No. 12 and No. 18?
22            MR. BUNT:  No, Your Honor.
23            MS. SMITH:  No, Your Honor.
24            (Open court.)
25            THE COURT:  Ms. Anderson, you would come up,
```

1   please?

2          (Bench conference continued.)

3          THE COURT:  Good morning, Ms. Anderson.

4          JUROR ANDERSON:  Yes.

5          THE COURT:  It's almost afternoon, but it's still

6   morning.  These are our microphones.  You and I are going to

7   have a little conversation here.  We'll talk quietly to each

8   other.

9          You indicated early this morning that if you were

10  selected to serve on the jury, you might have a scheduling

11  problem with being able to be here all the days that would

12  be necessary.  Can you tell me about that?

13         JUROR ANDERSON:  My son's in the Air Force, and

14  he's scheduled to get to come home Thursday, and he's

15  getting married Saturday.  And I'm pretty much in charge of

16  the wedding.

17         THE COURT:  And when does he come home?

18         JUROR ANDERSON:  He comes home Thursday.

19         THE COURT:  Okay.  There's not any way that this

20  case is going to be finished before he comes home, and this

21  wedding is not going to happen in 24 hours on Saturday if we

22  get through on Friday.  I'm not going to require that you

23  serve on this jury.

24         JUROR ANDERSON:  Thank you.

25         THE COURT:  I'm going to let you join the rest of

1    the group outside.  But don't share that with anybody and

2    don't discuss anything we've talked about.

3            JUROR ANDERSON:  Yes, sir.

4            THE COURT:  Thank you, Ms. Anderson.

5            (Juror Anderson leaves the courtroom.)

6            THE COURT:  I'll excuse Ms. Anderson.

7            (Open court.)

8            THE COURT:  Mr. Stanley, would you come up, please,

9    sir?

10           (Bench conference continued.)

11           THE COURT:  Good morning, sir.

12           JUROR STANLEY:  Good morning.

13           THE COURT:  These are our microphones.  We're just

14   going to talk quietly here at the bench.

15           I think you know why you're up here.  You indicated

16   that you might be biased toward the Plaintiff because of

17   your son and his profession.  What I basically need to know,

18   Mr. Stanley, is can you be fair and impartial to both sides

19   and let the evidence be the sole guide as to where you end

20   up on the questions that the jury will be asked to answer,

21   or is it just the reality that given what you know in your

22   life experience and what your son does, you're not going to

23   be able to be completely fair and impartial?  I just need an

24   answer to that question.

25           JUROR STANLEY:  I don't think I can be completely

1   impartial.

2         THE COURT:  Okay, sir.  I appreciate your honesty

3   and candor.

4         Ms. Smith, do you have any other questions?

5         MS. SMITH:  No further questions.

6         THE COURT:  Mr. Bunt, do you have any questions?

7         MR. BUNT:  No, Your Honor.

8         THE COURT:  Mr. Stanley, I'm going to let you join

9   the rest of the group outside.  Just don't discuss anything

10   that we've talked about in here.

11         JUROR STANLEY:  Okay.

12         THE COURT:  Thank you, sir.

13         (Juror Stanley leaves the courtroom.)

14         THE COURT:  I'm going to excuse Mr. Stanley for

15   cause.

16         MS. SMITH:  Thank you, Your Honor.

17         (Open court.)

18         THE COURT:  Mr. Cornelius, would you come up?

19         (Bench conference continued.)

20         THE COURT:  Good morning, sir.

21         JUROR CORNELIUS:  Hi.

22         THE COURT:  How are you?

23         JUROR CORNELIUS:  All right.

24         THE COURT:  Good.  You indicated early this morning

25   that if you were selected to serve, you might have a problem

1   being here.  Tell me about that.

2        JUROR CORNELIUS:  In our RV business, this is our

3   busy time of the year, just me and my stepson, and it puts a

4   hardship on him, delivering and picking up trailers.  He had

5   to pick up two this morning.  I had to close the office for

6   me to come up here.  He has to deliver another one today.

7   And then Monday I have three trailers going to Mount

8   Enterprise.  It's really going to put a hardship on us.

9        THE COURT:  Okay.  Other than hardship related to

10  your business, is there something else out there that you

11  need to mention to me?

12       JUROR CORNELIUS:  Huh-uh.

13       THE COURT:  I'm not doubting what you're telling

14  me, I just want to make sure I cover everything.

15       JUROR CORNELIUS:  Yeah.  I have a -- I have a -- I

16  don't know if this matters, but my step daughter is an

17  attorney in Dallas, a patent attorney, Jennifer Watkins.

18  Her fiance is a patent attorney.  Don't know if that

19  matters.

20       THE COURT:  Well, it matters if it would keep you

21  from being fair and impartial.  Would it keep you from being

22  fair and impartial?

23       JUROR CORNELIUS:  No.

24       THE COURT:  Okay.

25       JUROR CORNELIUS:  No.

```
 1              And then I have two daughters that work for Carl
 2   Roth here.
 3              THE COURT:  And would any of those matters keep you
 4   from being fair and impartial?
 5              JUROR CORNELIUS:  I don't think so because we never
 6   discussed anything that was involved in those.
 7              THE COURT:  And I understand the -- the business
 8   related problem.  Like I said, I just want to make sure we
 9   cover everything.
10              JUROR CORNELIUS:  Right.
11              THE COURT:  Mr. Bunt, do you have any questions of
12   Mr. Cornelius?
13              MR. BUNT:  No, Your Honor.
14              THE COURT:  Ms. Smith?
15              MS. SMITH:  Mr. Stanley (sic), would it help if
16   you --
17              THE COURT:  Mr. Cornelius.
18              MS. SMITH:  Mr. Cornelius, I'm sorry.  Would it
19   help if you knew that the case would be concluded by Friday?
20   Would that Monday conflict go away?
21              JUROR CORNELIUS:  The Monday conflict, but not the
22   rest of this week.
23              MS. SMITH:  Thank you.
24              THE COURT:  All right.  I'm going to let you join
25   the rest of the group outside, Mr. Cornelius.  Just don't
```

```
 1    discuss anything we've talked about in here.

 2            JUROR CORNELIUS:  Okay.

 3            THE COURT:  Thank you very much.

 4            JUROR CORNELIUS:  Thank y'all.

 5            (Juror Cornelius leaves the courtroom.)

 6            THE COURT:  I can't excuse Mr. Cornelius any more

 7    than I can excuse Mr. Brady, even though I understand the

 8    reality of small business ownership.

 9            (Open court.)

10            THE COURT:  All right.  Mr. Lindsay, would you come

11    up, please?

12            (Bench conference continued.)

13            THE COURT:  Good morning.

14            JUROR LINDSAY:  Good morning.

15            THE COURT:  These are our microphones.  We're to

16    talk quietly into those here at the bench, Mr. Lindsay.

17            JUROR LINDSAY:  Okay.

18            THE COURT:  You indicated early this morning that

19    if you were selected, you might have a scheduling problem

20    that would keep you potentially from being here throughout

21    the trial.

22            JUROR LINDSAY:  Yes.

23            THE COURT:  Can you give me some details about

24    that?

25            JUROR LINDSAY:  Okay.  My brother is a mentally
```

```
 1   handicapped man, 69 years old.  And this weekend he had a
 2   medical condition come up.  And as we speak, he's probably
 3   finished with an MRI that they were doing on him.  And I am
 4   his legal guardian and also his medical Power of Attorney.
 5   And if he has to have surgery this week, I'd like to be
 6   there if there are decisions to be made.
 7           THE COURT:  Okay.
 8           JUROR LINDSAY:  And I'm the only -- I mean, we're
 9   the only two left.  Mom and dad are dead.
10           THE COURT:  Right.  Who's with him this morning?
11           JUROR LINDSAY:  Well, he lives in an assisted
12   facility here in Marshall.
13           THE COURT:  Okay.
14           JUROR LINDSAY:  And, of course, one of their
15   representatives are with him.
16           THE COURT:  Okay.  Do you have any reason at this
17   point, other than it's just within the realm of possibility,
18   to know that he might need some kind of surgery?  Are you
19   just -- is there something that makes you think that's a
20   possibility here other than it's just one of any of the
21   possibilities?
22           JUROR LINDSAY:  It's a big possibility.
23           THE COURT:  How do you know that?
24           JUROR LINDSAY:  Well, he had a big tumor come up
25   under his arm.
```

```
 1           THE COURT:  Okay.

 2           JUROR LINDSAY:  Pretty large.

 3           THE COURT:  Was that what the MRI was for, the

 4   tumor, or was that a different kind of --

 5           JUROR LINDSAY:  Well, they did a sonogram first

 6   earlier, and they had some suspicion, so they wanted to do

 7   the MRI to know more.

 8           THE COURT:  And that's why I'm asking these

 9   questions.  You know a whole lot more about his situation

10   than I do.

11           JUROR LINDSAY:  Yeah.

12           THE COURT:  I'm trying to determine is this just

13   something that came up and he's gone to get checked out and

14   you don't know what's going to happen, or has there been

15   more work done previously that gives you a pretty good

16   idea --

17           JUROR LINDSAY:  Yeah, just the sonogram.  And they

18   said there was something, so they wanted the MRI to tell

19   more.

20           THE COURT:  Okay.  And is he here -- is he here in

21   Marshall at the hospital?

22           JUROR LINDSAY:  Yes, yes.

23           THE COURT:  Okay.  And you've talked -- as a

24   guardian and Power of Attorney, you've talked to his

25   doctors?
```

```
 1              JUROR LINDSAY:  Yes.

 2              THE COURT:  Are they telling you that this tumor

 3    under his arm has got to be removed?  It's a matter of

 4    when --

 5              JUROR LINDSAY:  They haven't said that.  They

 6    haven't said that.

 7              THE COURT:  Okay.  Okay.

 8              JUROR LINDSAY:  Just a possibility.

 9              THE COURT:  All right.  Other than your brother's

10    situation, which I certainly understand, are there other

11    matters that would interfere with you being here if you were

12    selected?

13              JUROR LINDSAY:  No.

14              THE COURT:  Okay.  Mr. Bunt, do you have any

15    questions of Mr. Lindsay?

16              MR. BUNT:  Your brother is in the hospital

17    currently?

18              JUROR LINDSAY:  Yes, having the MRI.

19              MR. BUNT:  And does anybody -- are you the only one

20    who makes medical decisions for him?

21              JUROR LINDSAY:  Yes.

22              MR. BUNT:  Okay.

23              JUROR LINDSAY:  I am his legal guardian and also

24    medical Power of Attorney.

25              MR. SHEASBY:  Your Honor, can I ask a question?
```

```
 1              THE COURT:  No.  We're not going to tag team --
 2              MR. SHEASBY:  That's fine.
 3              THE COURT:  -- these folks with everybody that's up
 4   here.  Each side gets one spokesperson.
 5              MR. BUNT:  Thank you.  That -- that's all I've got.
 6              THE COURT:  Ms. Smith, do you have any questions?
 7              MS. SMITH:  No, Your Honor.
 8              THE COURT:  Okay.  Mr. Lindsay, I'm going to let
 9   you join the rest of the group outside.  Just don't discuss
10   anything that --
11              JUROR LINDSAY:  Okay.
12              THE COURT:  -- we talked about in here.
13              JUROR LINDSAY:  Okay.
14              THE COURT:  Okay.  Thank you, sir.
15              JUROR LINDSAY:  Thank you.
16              (Juror Lindsay leaves the courtroom.)
17              THE COURT:  I'm going to excuse Mr. Lindsay.
18              (Open court.)
19              THE COURT:  Ms. Collins, would you come up, please?
20              (Bench conference continued.)
21              THE COURT:  Good morning.
22              JUROR COLLINS:  Good morning.
23              THE COURT:  These are our microphones.  We're just
24   going to talk quietly up here.
25              Earlier in the process today, Ms. Collins, you
```

1    indicated that you might have a scheduling problem with

2    being here the entire trial if you were selected, and I need

3    some details.  If you could fill me in?

4              JUROR COLLINS:  I have a medical procedure in the

5    morning at 8:30.

6              THE COURT:  Okay.

7              JUROR COLLINS:  I have a doctor's note.  I didn't

8    know about it when I filled out all the information to be

9    here.

10             THE COURT:  Is this an office visit or is this a --

11   a surgical process?

12             JUROR COLLINS:  It's a surgical process.

13             THE COURT:  Okay.  This is a dermatologist?

14             JUROR COLLINS:  Yes, sir.

15             THE COURT:  Okay.  And is -- have they already

16   taken something off --

17             JUROR COLLINS:  Yes, sir.

18             THE COURT:  -- or are they going to take something

19   off more?  What -- what's the situation?

20             JUROR COLLINS:  I've had cancer before, and so

21   they're checking to see if it's that.  And then they're

22   going to remove stitches and get results and stuff.

23             THE COURT:  Okay.  All right.  Any questions for

24   Ms. Collins?

25             MR. BUNT:  No, Your Honor.

```
 1              MS. SMITH:  No, Your Honor.

 2              THE COURT:  All right.  Ms. Collins, I'm not going

 3    to require you to be here for the trial, but I am going to

 4    let you join the rest of the group outside.

 5              JUROR COLLINS:  Okay.

 6              THE COURT:  Just don't discuss anything that we've

 7    talked about in here.

 8              JUROR COLLINS:  Okay.

 9              THE COURT:  Thank you.

10              JUROR COLLINS:  Thank you.

11              (Juror Collins leaves the courtroom.)

12              THE COURT:  I'm going to excuse Ms. Collins based

13    on her scheduled surgical procedure for tomorrow.

14              Okay.  To recap, I have excused No. 9, No. 11,

15    No. 18, No. 19, No. 25, and No. 27.

16              We're going to seat eight jurors.  Each side will

17    get four peremptory challenges.  That means strike

18    through -- is it 22?

19              MS. SMITH:  That's what I get, yes, Your Honor.

20              THE COURT:  It's straight up 12:00 o'clock by the

21    clock in the courtroom.

22              Counsel, I will give you 15 minutes.  Have your

23    peremptory challenges back to the courtroom deputy by a

24    quarter after.

25              MR. BUNT:  Thank you, Your Honor.
```

1          THE COURT:  Okay.

2          MS. SMITH:  Thank you, Your Honor.

3          (Bench conference concluded.)

4          THE COURT:  All right.  While counsel exercises

5    their peremptory challenges, the Court will stand in recess.

6          COURT SECURITY OFFICER:  All rise.

7          (Recess.)

8          COURT SECURITY OFFICER:  All rise.

9          THE COURT:  Be seated, please.

10         All right.  Ladies and gentlemen, if you will

11   listen carefully as your name is called and come forward and

12   take your seat in the jury box, we're going to seat eight

13   jurors in this case.  I'd like to have the first four jurors

14   on the front row of the jury box, the second four jurors

15   behind them on the second row of the jury box.

16         And to ensure that because we have 16 or 17 seats

17   in the jury box, to ensure that our jury of eight people is

18   centered in the jury box, I'm going to ask the first juror

19   who's called to stand in front of the third chair from the

20   end on the first row.  That will leave two vacant chairs

21   past where the first juror will stand when they enter the

22   jury box.  And I'm going to ask that all eight members of

23   the jury remain standing until all of you are in the jury

24   box and I've seated you as a group.

25         So if the first juror will stand with two vacant

1   chairs past them, then Jurors 2, 3, and 4 will follow behind

2   them on the first row.  Then Jurors 5, 6, 7, and 8 will line

3   up behind the front row on the second row of the jury box,

4   and that will that ensure that our eight-member jury is

5   centered in the middle of the jury box.

6          So with those instructions, I'm going to ask our

7   courtroom deputy to call the names of the eight members of

8   the panel that have been selected to serve as jurors in this

9   case.

10          COURTROOM DEPUTY:  Sherron Clepper, John Dickey,

11   Steven Humphrey, Jr., Taylor Mobley, Little Brady, James

12   Gray, David Byerley, and Pam Nelson.

13          THE COURT:  All right.  Ladies and gentlemen,

14   please be seated.

15          Those the rest -- those of the rest of you on the

16   panel who were not selected in this case, I'm about to

17   excuse you, but I want to excuse you with the thanks and

18   appreciation of the Court.

19          Every one of you who appeared here this morning

20   interrupted your daily lives.  You had other places to be

21   and important things to do in your respective situations

22   that you set aside.  And you let reporting for jury duty

23   take precedence over that.  That's something that is

24   important.  That's something that's worthy of appreciation

25   and recognition.  And I want each member of the panel to

```
 1   know, even though you weren't selected in this case, you
 2   have done very important public service by being here this
 3   morning, by presenting yourselves for jury duty, and by --
 4   by being willing to serve, if selected, and be a part of the
 5   jury in this case.
 6           That's something that supports and preserves our
 7   right to trial by jury as American citizens.  It's part of
 8   what our Constitution requires.  And each of you have done
 9   important public service by being here and supporting that
10   right and the right of these parties to resolve their
11   disputes in this manner as provided for by our Constitution.
12           Thank you, each one, for being here.  Even though
13   you weren't selected, thank you for presenting yourselves as
14   called on.
15           If you will see the clerk's office as you leave,
16   they will collect those very valuable badges and numbers
17   that you have.  They'll provide you any work-related
18   memorandum you might need for your place of employment to
19   explain where you've been this morning.  And they'll answer
20   any other questions that you have on your way out.
21           But, ladies and gentlemen of the panel not selected
22   to serve on this jury, thank you for your efforts.  Thank
23   you for your presence and willingness to serve.  With that,
24   you are excused at this time.
25           COURT SECURITY OFFICER:  All rise.
```

1          (Venire panel out.)

2          THE COURT:  All right.  I'm going to ask everyone

3   except the members of the jury to be seated, please.

4          Members of the jury, I'm going to ask the courtroom

5   deputy to administer the oath to you as jurors at this time.

6          (Jurors sworn.)

7          THE COURT:  Please be seated.

8          Ladies and gentlemen, I know that we are into the

9   noon hour now, and I have some additional instructions I

10  have to give you.  I'm going to make them as concise as I

11  can.

12         I also want you to know that the Court has ordered

13  the clerk's office to provide your lunch each day, and your

14  lunch is in the jury room waiting for you.  As soon as I can

15  excuse you for that, I will.  But before that, I have these

16  instructions I need to give you.

17         You can plan for the rest of the trial and the rest

18  of your jury service to have lunch provided for you by the

19  government each day in the jury room so you won't have to

20  leave and you won't have to find a place to find lunch in

21  Marshall, Texas.

22         First instruction:  Do not discuss this case with

23  anyone.  All of my instructions are important.  None of them

24  are more important than this.  It is absolutely essential

25  that when you answer the questions that will be given to you

1   in the verdict form at the end of this trial, that the sole

2   source of the information that you call upon to answer those

3   questions must have come in open court, under oath, subject

4   to cross-examination as a part of this trial.  You must base

5   your answers solely on the evidence that's present -- been

6   presented in this courtroom during this trial.

7         Therefore, you must not communicate with anyone

8   about this case and about the evidence in any way

9   whatsoever.  That is fundamental and foundational to this

10  being the fair and impartial trial that the law requires.

11        Because of that and because it is so fundamental,

12  you're going to hear this same instruction from me just

13  about every time you get up out of those chairs to leave the

14  jury box.  And by the time the trial is over, I promise you,

15  you're going to be tired of hearing me say this over and

16  over, but I will repeat it over and over because it is so

17  vitally important.

18        And when I say don't discuss the case with anyone,

19  that includes the eight of you because until you have heard

20  all the evidence and until I direct you to retire to the

21  jury room and consider your verdict in this case, you must

22  not discuss the case even among the eight of you.

23        However, once all the evidence has been presented

24  and once I instruct you to retire to the jury room and to

25  deliberate on your verdict, then but only then you must

1  discuss the evidence among each other in an attempt to reach

2  a unanimous verdict in this case.  But until that time, you

3  must not discuss the case with anyone in any way.

4        And when I say discuss the case, I mean communicate

5  in any shape, form, or fashion.  That means orally in

6  conversation, that means in writing, that means

7  electronically by e-mail or instant message, that means by

8  public media.

9        If any of you are users of Facebook or Twitter or

10 Instagram, or any of the other various forms of public media

11 out there, you are not to communicate with anyone in any way

12 about this case.

13       Do not post on any public media platform.  Do not

14 e-mail anyone.  Do not talk with anyone.  Do not write and

15 communicate in written form with anyone.  It is essential

16 that the only information you have and upon which you will

17 base the answers to the questions in the verdict form in

18 this case must have come from the trial of this case in open

19 court from the testimony of the witnesses under oath and

20 subject to cross-examination and from the documents that the

21 Court has admitted into evidence.  It's absolutely vital,

22 and that's why you will probably hear about it more than

23 once from me.

24       And in relation to this, ladies and gentlemen, I've

25 instructed you not to attempt to do any research about this

1  case.  Do not get on the Internet.  Do not go to the public

2  library.  Do not pull a book off the shelf in your home and

3  try to look up anything that you hear about in this case,

4  any of the lawyers, any of the parties, any of the issues.

5  You are not to do any research of any kind.

6       Again, the sole source of the information that you

7  will rely upon to answer the questions in the verdict form

8  must come through the evidence offered in open court during

9  this trial.

10      Also, ladies and gentlemen, I don't think this is

11  likely, but this is an important case, and there's a lot at

12  stake between the parties here.  It is possible that over

13  the course of the trial some outside third party might

14  attempt to contact you, might attempt to influence your

15  decision in this case in one way or the other.  If at any

16  time you receive any overtures of any kind or any

17  communication from anybody that you believe is improper or

18  not quite right or isn't what it should be, if you have any

19  hesitation, whatsoever, about any overture that you've

20  received from anybody, then you should report it immediately

21  to Ms. -- Ms. Clendening, our clerk, she'll make me aware of

22  it, and the Court will deal with it.

23      I don't think it's likely, but it is not outside

24  the realm of possibility, and you need to at least be on

25  notice that it is possible.  Again, not likely, but it is

1    possible.

2           Also, ladies and gentlemen, during the course of

3    this trial, as you come each morning and as we take recesses

4    during the day, as you leave in the evenings, you're

5    invariably going to pass in this small courthouse, and by

6    federal standards, this is a small courthouse, you're going

7    to pass one or more of the lawyers in this case, one or more

8    of the representatives of the parties in this case, one or

9    more of the witnesses in this case.

10          When that happens, and one of the reasons you wear

11   those badges that say juror on them, is when that happens,

12   they're not going to talk with you, they're not going to

13   speak, they're not even going to say good morning or hello

14   or how are you doing.  They're not going to be friendly and

15   hospitable as we're used to in East Texas, and that's not

16   because they're rude, and it's not because they're

17   unfriendly, it's because I've instructed them not to.

18          And it all goes back to that same premise, the sole

19   source of any information you draw upon to answer the

20   questions in the verdict form must come from what's

21   presented in open court and nowhere else.  So when you pass

22   one of these folks related to either of the sides in this

23   trial and they walk right by you and don't smile and don't

24   speak, don't hold it against them.  Don't think they're

25   being rude or unfriendly.  They're simply doing what the

1    Court requires.

2            Also, ladies and gentlemen, so that you will have a

3    general idea of what the Court expects through the course of

4    the trial, I'm going to -- I'm going to try to move the case

5    along as fast as is possible and feasible.  And it's been my

6    experience since I've been on the bench that jurors in East

7    Texas would rather work longer each day but be away from

8    their homes and their families and their work a shorter

9    number of days than if we had shorter days but that we had a

10   greater number of days during the course of the trial.

11           So with that in mind, each day, starting after I

12   dismiss you for the day this evening, starting tomorrow

13   morning, I need you in the jury room assembled and ready to

14   start by 8:30, which means you need to get here about 8:15.

15           And we're probably going to recess for the day each

16   day somewhere in the very general neighborhood of 6:00

17   o'clock.  We're not going to quit at 4:00 o'clock or 4:30 or

18   5:00.  And if we have a witness who's an important witness

19   who has to be somewhere else and it takes us to 6:30 or 6:45

20   to get all their testimony in, we'll probably go to that

21   length of time.

22           Again, the Court's intent is to work a longer day

23   each day so that you're away from your homes and your jobs a

24   fewer total number of days.

25           But I want to give you that information for

1  planning purposes.  Just like you need -- just like you need

2  to know that you don't need to worry about your lunches,

3  they'll be provided, you need to know that you won't be

4  leaving here at 5:00 o'clock each day.  And I'll need you

5  here ready to go by 8:30 each morning.

6        All right.  I have other instructions that I'll

7  give you after lunch, but at this point, ladies and

8  gentlemen, your lunch is awaiting you in the jury room.

9  Follow all the instructions I've given you.

10       And with that, you're excused for lunch at this

11  time.

12       COURT SECURITY OFFICER:  All rise for the jury.

13       (Jury out.)

14       THE COURT:  Be seated, please.

15       Counsel, we met this morning in chambers and

16  reviewed various demonstratives that the parties proposed to

17  use in opening statements, and specifically focused on any

18  of those demonstratives where the other party had an

19  objection.

20       I think I've given you detailed guidance on all

21  those matters that we discussed this morning in chambers

22  except with regard to the Plaintiff's objections to

23  Defendants' opening slides, particularly Slides 37 through

24  40 and 44.  Those are the ones you'll recall that have to do

25  with the issue of formed on and other language from the

1    claims that have been inserted.

2            The parties argued the merits and issues with

3    regard to those various demonstrative slides this morning.

4    I told you in chambers, I would carry that.

5            I've looked at it in the intervening period of

6    time.  And I've heard the arguments that you've presented.

7    I've heard the arguments about the motion for summary

8    judgment dealt with by the magistrate judge, and I've heard

9    the arguments about whether or not this raises an issue of

10   claim construction that requires a precise construction or

11   guidance from the Court.

12           Here's the guidance I'm going to give you on this

13   issue.  I am going to overrule the objections to these

14   demonstrative slides based on the Court's opinion that the

15   morning of jury selection is as a very practical matter too

16   late to reopen claim construction.  And I'm not pro -- I'm

17   not prepared to reopen claim construction at this late date.

18   And I do not -- I do not find that argument as to the plain

19   and ordinary meaning of the claim language itself as

20   compared to the accused products is improper.

21           However, the witnesses in this case are going to

22   testify limited by their personal knowledge, if they're fact

23   witnesses.  And the expert witnesses in this case are going

24   to testify as limited by the scope of their written reports

25   that have been filed.

1           And we are not going to go outside of the scope of

2  any expert's reports, and we are going not going to have to

3  have fact witnesses who give information and testimony not

4  based upon their own personal knowledge.

5           But with that, the issue of the precise language in

6  the claims applying its plain and ordinary meaning and

7  applying that to the accused products with regard to the

8  ultimate issues in the case seems to me to be the fair and

9  proper approach to follow.

10          And quite honestly, these are not matters that the

11  Plaintiff did not know about many weeks, if not months, ago.

12  They're not matters that could not have been raised prior to

13  jury selection, if not during the claim construction process

14  itself.  And I do not, as a practical matter, without

15  totally disrupting this trial or ordering a continuance see

16  how I can address what Plaintiff has raised with regard to

17  these slides.  So rather than limit my guidance as to the

18  demonstrative slides itself, I felt compelled to give you a

19  higher level of guidance on this issue going forward.

20          But the parties are not going to go outside of the

21  scope of their expert's reports.  That testimony is there,

22  but it is not going to be expanded upon regardless of what

23  one side or the other now thinks is an interesting or

24  persuasive argument.

25          We have the evidence from the experts that we're

1   going to have.  And as those of you that have practiced

2   before me know, an objection from opposing party that the

3   witness is attempting to testify outside of the scope of

4   their report when it's an expert witness is a highly

5   disruptive and problematic objection for the Court to deal

6   with.  I cannot deal with that without sending the jury out,

7   breaking the trial, getting the expert's reports out in

8   front of me, and hearing the argument from the parties.

9        There may be times when it becomes necessary.  But

10   if I am persuaded during the course of the trial that there

11   are objections raised that a witness -- an expert witness is

12   going outside the scope of their report, and after going

13   through that disruptive process I find that the objection

14   lacks any merit and probably there was no reasonable basis

15   to raise it, I will assume that it was done for strategic

16   reasons, and I will probably penalize or sanction the party

17   that's done so.

18        If you have a reasonable basis for it and you feel

19   like that representation of your client requires you to do

20   it, by all means make that objection.  But be sure you're on

21   solid footing before you make that objection, because by its

22   nature, those objections, really apart from any other

23   objection that might be raised during the trial, are highly

24   disruptive and highly problematic.  And I think it's only

25   fair for you to know the Court's view on that in advance of

1    the first witness being called.

2           Also, I did not have the privilege of handling the

3    pretrial with the parties in this case.  It was ably handled

4    by the magistrate judge for this division, Judge Payne.  But

5    just so that you know a couple of the idiosyncrasies of the

6    presiding officer in this trial, I do not want any counsel,

7    witnesses, or parties referring on the record before the

8    jury to any individual by first name only.

9           I know Mr. Bunt and Ms. Smith know that.  They've

10   practiced before me before.  The rest of the counsel present

11   probably don't know that.

12          I think that that opens the door to almost certain

13   confusion in the trial record, and I think it's very

14   inconsistent with the necessary and appropriate decorum for

15   a United States District Court.

16          So talk about John Smith, talk about Dr. Smith, but

17   don't talk about John.  And make sure your witnesses know

18   that.  And if your witnesses don't follow that, I'll hold

19   you responsible because you're the one that prepared them

20   before they testified.

21          Also, the Court does not welcome overt sign

22   posting.  I do not like lawyers at the podium to say:  And

23   now, Mr. Jones, I'd like to talk to you about A, B, C, D,

24   and E.

25          That is, in my view, an attempt by counsel to

communicate directly with the jury.  It's an attempt to

bypass the witness.  Ask the witness about A, B, C, and D.

Don't tell the witness in front of the jury what you're

about to go into.

It can be done with some nuance effectively in some

cases, but by and large, it borders, if not crosses the

line, on counsel testifying.  And you will probably get

called down by me for that if you do that during the course

of the trial.

So, again, forewarned is forearmed, and I want to

share that particular viewpoint of the Court with you in

advance of the first witness being called, again, because I

didn't have the benefit of pre-trying the case with you.

Now, it's 10 minutes until 1:00.  The jury will

probably finish lunch about 1:30.  And given that we had a

late start today, primarily because we had problems with the

disputes that came in this morning, which I hopefully have

addressed with counsel in chambers so that that won't

replicate itself tomorrow, we're a little bit behind where I

would like to be time wise.

Accordingly, we're going to recess until 1:30.  And

at 1:30, I'm going to begin my preliminary instructions, and

we'll proceed with opening statements, after which we'll

proceed with the Plaintiff's first witness.

Before we recess for the next 35 or 40 minutes, are

1   there issues or questions from either side before we do

2   that?

3          Does the Plaintiff have any questions of the Court?

4          MR. BUNT:  No, Your Honor.

5          THE COURT:  Defendants?

6          MR. JACOBS:  No, Your Honor.  Thanks.

7          THE COURT:  We stand in recess until 1:30.

8          COURT SECURITY OFFICER:  All rise.

9          MR. SHEASBY:  Thank you, Your Honor.

10         (Recess.)

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes                        6/11/18
     SHELLY HOLMES, CSR, TCRR                   Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25