1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF TEXAS

3              MARSHALL DIVISION

4  KAIST IP US LLC,         )(
       PLAINTIFF        )(   CASE NO.

5                     )(   2:16-CV-1314-JRG-RSP
  VS.                 )(

6                     )(
  SAMSUNG ELECTRONICS CO., LTD;)(   MARSHALL, TEXAS

7  SAMSUNG ELECTRONICS AMERICA, )(
  INC.; SAMSUNG SEMICONDUCTOR, )(

8  INC; SAMSUNG AUSTIN      )(
  SEMICONDUCTOR, LLC;,     )(

9  GLOBALFOUNDRIES, INC.;    )(
  GLOBALFOUNDRIES U.S., INC.;  )(

10 AND QUALCOMM, INC.,      )(   JUNE 12, 2018
       DEFENDANTS      )(   12:37 P.M.

11

12           TRIAL TRANSCRIPT OF JURY TRIAL

13      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14       UNITED STATES CHIEF DISTRICT JUDGE

15  APPEARANCES:

16  FOR THE PLAINTIFF:     Mr. Andrew Y. Choung
                     Mr. Guy M. Rodgers

17                  Mr. S. Desmond Jui
                  GLASER WEIL FINK HOWARD

18                  AVCHEN & SHAPIRO LLP
                  10250 Constellation Boulevard

19                  19th Floor
                  Los Angeles, California 90067

20

21  THE COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                  Official Court Reporter

(Proceedings recorded by mechanical stenography, transcript
produced on a CAT system.)

```
 1   FOR THE PLAINTIFF:        Mr. Jason Sheasby
                               Ms. Charlotte Wen
 2                             IRELL & MANELLA LLP
                               1800 Avenue of the Stars
 3                             Los Angeles, California 90067

 4                             Mr. Christopher Bunt
                               Mr. Charles Ainsworth
 5                             PARKER BUNT & AINSWORTH PC
                               100 E. Ferguson Street
 6                             Suite 1114
                               Tyler, Texas 75702
 7
     FOR THE DEFENDANTS:       Mr. Blair M. Jacobs
 8                             Mr. Allan M. Soobert
                               Mr. Stephen B. Kinnaird
 9                             PAUL HASTINGS LLP
                               875 15th Street, N.W.
10                             Washington, DC 20005

11                             Ms. Melissa R. Smith
                               GILLAM & SMITH LLP
12                             303 S. Washington Avenue
                               Marshall, Texas 75670
13
                               Mr. Christopher W. Kennerly
14                             PAUL HASTINGS LLP
                               1117 S. California Avenue
15                             Palo Alto, California 94304

16                             Mr. Jeffrey D. Comeau
                               PAUL HASTINGS LLP
17                             4747 Executive Drive
                               12th Floor
18                             San Diego, California 92121

19                             Mr. Joseph J. Rumpler, II
                               PAUL HASTINGS LLP
20                             1117 S. California Avenue
                               Palo Alto, California 94304
21
                               Ms. Soyoung Jung
22                             PAUL HASTINGS LLP
                               515 South Flower Street
23                             25th Floor
                               Los Angeles, California 90071
24

25
```

```
 1
    FOR DEFENDANTS:          Mr. Grant N. Margeson
 2                           PAUL HASTINGS LLP
                             101 California Street
 3                           48th Floor
                             San Francisco, California 94111
 4
                             Ms. Ariell Bratton
 5                           PAUL HASTINGS LLP
                             4747 Executive Drive
 6                           12th Floor
                             San Diego, California 92121
 7
```

 8      _____

 9                     P R O C E E D I N G S

10

11          (Jury out.)

12          COURT SECURITY OFFICER:  All rise.

13          THE COURT:  Be seated, please.

14          MR. SOOBERT:  Your Honor, may I address the sealing

15  of the courtroom?

16          THE COURT:  You may, counsel.

17          MR. SOOBERT:  Thank you, Your Honor.

18          We -- the Defendants have taken a look at the

19  remaining demonstratives that are in the materials, and it

20  appears to us that there's no need to seal the courtroom any

21  further, as long as we stay at that level of detail with the

22  demonstratives.

23          Of course, the underlying technical documents

24  remain subject to the protective order.  And they're AEO

25  materials, and I've spoken with counsel for Plaintiff, and

they'll speak for themselves, but we've reached an accommodation that he doesn't expect to get in the underlying technical information at this time. And I think with that representation, there's no need to seal the courtroom any further on Dr. Kuhn's examination.

THE COURT: All right. Thank you for that indication of things.

What does Plaintiff say in response?

MR. CHOUNG: Your Honor, it's true for the demonstratives, the content of what's being displayed is exactly what's in the demonstratives. I won't be going any further in terms of any other pages of the cited exhibits, and Dr. Kuhn's testimony will reflect what's on the slides.

THE COURT: All right. Then based on those representations, I unsealed the courtroom just before we broke for lunch. And unless either side moves the Court to seal the courtroom going forward, we'll leave it unsealed as it is.

MR. SOOBERT: Thank you, Your Honor.

THE COURT: Is there anything else we need to take up before we bring the jury back in?

MR. CHOUNG: Not from us, Your Honor.

THE COURT: All right. Mr. Choung, you may go to the podium and prepare to continue your direct examination.

And if you would, please try to speak up. I may be

1  getting hard of hearing, but the Plaintiff's counsel seems

2  to be talking awfully soft in this trial to me.

3          MR. CHOUNG:  Yes, Your Honor.

4          THE COURT:  The affliction does not seem to have

5  spread to the Defendants' table, though.

6          All right.  Let's bring in the jury.

7          COURT SECURITY OFFICER:  Rise for the jury.

8          (Jury in.)

9          THE COURT:  Welcome back from lunch, ladies and

10 gentlemen.  Please have a seat.

11         We will continue where we left off just before

12 lunch with the Plaintiff's direct examination of Dr. Kuhn.

13         And Mr. Choung, you may continue with your

14 examination.

15         MR. CHOUNG:  Thank you, Your Honor.

16         KELIN KUHN, PH.D., PLAINTIFF'S WITNESS, SWORN

17              DIRECT EXAMINATION (CONTINUED)

18 BY MR. CHOUNG:

19 Q.  Welcome back, Dr. Kuhn.

20         So we left off with -- I believe we went through

21 Claims 1 through 5?

22 A.  That's correct, sir.

23 Q.  All right.  So now we're starting on Claim 6?

24 A.  Yes, sir.

25 Q.  All right.  And so let's look at your analysis for

1   Claim 6?

2   A.  So Claim 6 is another dependent claim.  It has all the

3   elements we talked about in Claim 1.  And it's another of

4   these two-part claims where we're talking about an

5   electrical parameter, the contact resistance, and then we're

6   talking about the relation and size of the contact region to

7   the metal layer.  So there's some size parameters.  And

8   we're going to be talking about the contact resistance being

9   reduced, and we're going to be talking about some

10  relationships in size between the contact region and the Fin

11  and the gate links.

12  Q.  Dr. Kuhn, is the size specification met by the accused

13  devices?

14  A.  Yes.  And I'm going to set up the model here for the

15  jury.

16          Recall the source/drain regions, I'm going to put

17  them back on.

18          You'll notice the triangular shape, the contact is

19  going to drop right on top like that.  And the region where

20  the metal contact hits the source/drain region is the

21  contact region.

22          So that's the metal, that's the contact region, and

23  that's the source/drain region.

24          And you can see here just in the model the Fin for

25  sizing.

1          Now, if you look to the Defendants' documents and

2     look first to see PX-0208, what we have is you see that same

3     triangular region that I've shown in the model here.  And

4     then there's the metal layer up here.  And then that red

5     line is the contact region, and the model is flat just as

6     representative, but that's the real thing in the picture.

7          And so here's the contact region.  And then in the

8     background, the way the TEMs are made is there's a shadowing

9     effect so that you can actually see the width of the TEM in

10    relation to the contact region in this picture.  So it's

11    very much like the model shows.

12         And then you can just see visually that the contact

13    region is larger than the width of the Fin.

14         On the bottom are some written specifications, the

15    bottom is for Samsung; top is for GlobalFoundries.

16         And you can see the dimension here, which is the

17    same dimension we're showing this dimension right here

18    that's in red.  They have the number for this dimension of

19    17.

20         Now, I'm going to stay this once verbally, and then

21    I'll show you the numbers.  17 happens to be larger than

22    either the top or the bottom width of the Fin.  So, again,

23    we see the -- we have a situation where the contact region

24    is larger than the Fin.

25         And if I can have the next slide, I'll run through

1  the numbers.

2  Q.  And those numbers are coming from PX-265?

3  A.  Yes, they are.

4  Q.  All right.

5  A.  Thank you, sir.

6       And so as I said, the size of the contact region is

7  17, the width of the Fin in that particular image varies

8  from 4 to about -- sorry, from 7.5 to about 14.  And so 17

9  is greater than 7.5 or 14, so the size of the contact region

10 does meet this claim.

11 Q.  Now, Dr. Kuhn, in this portion of your slide, how did

12 Professor Lee achieve these features?

13 A.  These features were done by what's called selective

14 epitaxy.

15 Q.  And does that account for the shape of the contact --

16 the contact region -- the source/drain in the -- in the

17 figures there?

18 A.  Yes.  Dr. Lee specifies the possibility of using

19 different materials for the epitaxy.  And in particular, he

20 specifies the possibility of using a material called

21 silicon-germanium.  Silicon-germanium has the interesting

22 property that when you grow it, it's kind of like a crystal

23 that you have in salt or something.  It makes this faceted

24 shape, and so you can see very clearly that there's

25 epitaxial growth under that material.

1  Q.  Now, this -- the size of the contact region, this is

2  your calculation that you did, Dr. Kuhn?

3  A.  Yes, sir.

4  Q.  All right.  Now, do the Defendants also meet the contact

5  resistance portion of the limitation?

6  A.  Yes, sir.  I did some simulation for this, and on the

7  vertical axis is the resistance, and on the horizontal axis

8  is the length of the contact region.  And I have two plots

9  for two different widths.

10       Remember, the spec talks both about length and

11  width.  So I did the plot both ways.  We have length here

12  and two different widths.

13       And what you can see is as the length is increased

14  for a constant width, the resistance improves.  And as the

15  width is increased for a constant length, the resistance is

16  improved.  And the combination is improved as well.

17       Now, of course, you can read this plot backwards,

18  too, that if the length is decreased or the width is

19  decreased, the contact resistance degrades.

20  Q.  And is this confirmed by Defendants' engineers?

21  A.  Yes.  Dr. Samavedam confirms this, and he confirms it in

22  the form of as you decrease the size of the contact region

23  in the devices, it would increase the contact resistance.

24  Q.  And so what is your conclusion on this Claim 6?

25  A.  The Defendants have this element in their devices, and

1  they infringe this claim.  They infringe both parts, so I'm

2  checking both parts off, and I'm turning the claim green and

3  checking it off.

4  Q.  Now, what are the next claims that you looked at?

5  A.  I looked at Claim 11 and 12 together, and I'm going to

6  spend a moment -- I want the jury to notice this above spec

7  and below spec, above the reference level and below the

8  reference level.  And I'm going to show this to the jury,

9  and then we'll come back and talk through this.

10        So what this is going to be talking about is that

11  this source/drain region, the bottom of the source/drain

12  region you're going to want to look at.  And it will either

13  be above this top of the second oxide region or below the

14  second oxide region.  And one claim is one way, and one

15  claim is the other.  And so you'll notice Claim 11 is the

16  one above, and Claim 12 is the one that's below.

17        In each case, it's a goodly distance.  It's 15

18  nanometers in the model.  It's that much either way, so it's

19  a large distance.

20  Q.  And what does your analysis for Claim 11 show?

21  A.  So for Claim 11, I looked at some of the Defendants'

22  documents, and in particular this is Samsung Document

23  PX-0864.  And I looked at it for the NMOS device.  That's

24  the NMOS part of the CMOS circuit.  And I computed two

25  numbers.

1    It turns out the LPE process and LPP are a little

2  bit different.  So for NMOS, it's -- for LPE, it's about 3

3  nanometers above the second oxide layer.  And for LPP, it's

4  about 5 nanometers above.

5    So for the jury, what's going on in Claim 11 in the

6  Defendants' devices, it's above but by a small amount, not a

7  very big amount.

8  Q.  And the measurements you -- you -- the measurements you

9  made and calculated, they fall within the 50-nanometer

10 range?

11 A.  Yes, they do.  The spec is from 0 to 50, and 3 and 5.5

12 fall in that range.

13 Q.  And what did your analysis show for Claim 12?

14 A.  It turns out in Claim 12, the PMOS component of the CMOS

15 circuit infringes.  This is, again, from PX-0864.  In this

16 case, LPE and LPP are slightly different.  LPE is about 9

17 nanometers below, and LPP is about 7 and a half nanometers

18 below.  And that's well within the 0 to 50-nanometer spec.

19 In this case, for the jury, it's below by, you know, a small

20 amount, not a huge amount, small amount, but well within the

21 spec.

22 Q.  And is your analysis here representative of all of the

23 14-nanometer transistors and the devices based on those that

24 you're analyzing in this case?

25 A.  Yes.  This is one of the few claims for which the

1  difference between LPE and LPP makes a difference.  Turns
2  out the Fin height is slightly different between the two
3  technologies, and I've taken that into account in this --
4  these two calculations.
5  Q.  So even with that difference, it still infringes?
6  A.  Yes.
7  Q.  So what's your conclusion on these two claims, 11 and
8  12?
9  A.  For both these claims, the Defendants' devices infringe,
10 in one case for NMOS and one case for PMOS.  I'm checking
11 both of them off, and I'm turning both of them green as
12 infringed.
13 Q.  What's the next claim that you analyzed, Dr. Kuhn?
14 A.  The next claim is Claim 15.  This is the devices claimed
15 in Claim 1, and this has the two top corners of the Fin
16 active region being chamfered through an oxidation and
17 etching or, parentheses, an annealing process.  I will speak
18 to both the word "chamfering" and -- "or (and)" here for the
19 Court's decision.
20 Q.  Would you remind us of how the Court defined this claim?
21 A.  Yes.  For the word "chamfering," the Court has said
22 beveled or rounded.  And for the "or (and)" construction,
23 the Court has said and/or.
24 Q.  So based on the constructions provided by the Court,
25 what's your conclusion on -- is the element satisfied by the

1  Defendants' accused devices?

2  A.  Yes.  And I show here a Samsung Document PX-0867.  This

3  document is a progression through the flow of the Fin.  So

4  it starts out right after its first etch being quite square,

5  and then as it moves through the flow, there are certain

6  etch steps and certain oxidation steps that will round the

7  Fin through an etching oxidation process.

8  Q.  And is this confirmed by the -- the Defendants' own

9  engineers?

10  A.  Yes, sir.  Dr. Dong-won Kim confirms that the Fins are

11  rounded through an oxidation etching process.  And Mr. Jeong

12  confirms that the tops of the Fins are chamfered.

13  Q.  And so what is your conclusion on Claim 15?

14  A.  My conclusion on Claim 15 is that the two requirements

15  are met.  The top two corners are chamfered -- that is,

16  bevelled or rounded -- and it is done through an oxidation

17  and etching and/or annealing process in a hydrogen

18  atmosphere.  And just keep in mind with regards to my first

19  comments, it's still a wall-shape Fin after this exercise.

20  Q.  And what are the next claims that you analyzed?

21  A.  I next analyze Claim 16.  This is another one of these

22  dependent claims that references earlier claims.  This one

23  references Claim 2.  And remember for the jury, Claim 2

24  turns around and references Claim 1.

25          And this is another one of these height specs

1  between 10 and a thousand nanometers.  I'm going to remind
2  the jury of where that one is.
3          This is the one from the bottom here to the top
4  there.  And it's 10 to a thousand nanometers, and it turns
5  out, the reasons familiar to the jury, is we've seen that
6  before in Claim 3.
7  Q.  And is this size limitation met in the accused devices?
8  A.  Yes.  For the same reasons it was met in Claim 3, it's
9  met here.  So we can check this one off and mark it
10 infringed.
11 Q.  And what about the next claim, 17?
12 A.  Claim 17, the jury is going to get on the pattern here.
13 Claim 17 is just like Claim 16.  And this time -- you've
14 seen this one before.  This one is from the top here to
15 there.  And you'll recognize the numbers as being between 5
16 nanometers and 300 nanometers, and that's the same height
17 you saw in Claim 4.
18 Q.  And so what's your conclusion on Claim 17?
19 A.  This one infringes for the same reasons Claim 4
20 infringes, so we'll check it off.
21 Q.  Dr. Kuhn, can you summarize your conclusions so far with
22 respect to the claims that you've looked at?
23 A.  So far, we've demonstrated that Claim 1 is infringed,
24 and we've demonstrated that all of the dependent claims that
25 hook into Claim 1 are infringed, as well.

1   Q.  And so now what's the final claim you'll be looking at?

2   A.  We'll look at Claim 13 now.

3   Q.  And is Claim 13 an independent claim?

4   A.  Claim 13 is an independent claim, that's correct, sir.

5   Q.  And how does it compare to Claim 1?

6   A.  Well the good news for the jury is that the entire top

7   part of Claim 13 is identical to Claim 1.  The only

8   difference is in this bottom wherein clause.  You'll recall

9   in Claim 1 we had some thickness specifications.  In this

10  claim, we're going to be talking about the resistance of the

11  Fin active region by enlarging the width within the

12  oxidation layer.

13          And give me a second to pull the model apart to

14  show the jury what we're looking at.

15  So what we're going to be talking about here is the claim is

16  claiming that the resistance is improved by the fact this

17  widens at the bottom.  And notice the widening at the bottom

18  is occurring within the second oxidation region so the part

19  the Plaintiff is talking about is widening as it comes down

20  through here.

21  Q.  Now, with respect to the common elements between Claim 1

22  and Claim 13, you earlier showed your analysis for those in

23  Claim 1.  So what's your conclusion for those common

24  elements in Claim 13?

25  A.  We've already shown those common elements to be

1   infringed, so we can check them off.

2   Q.  And so what's the last element that you're actually

3   analyzing here?

4   A.  We're analyzing a two-part element.  Again, it's

5   enlarging the width of said Fin active region within the

6   oxidation layer as it approaches the bulk substrate, and the

7   second part is the resistance of the active region will be

8   reduced as a consequence of this widening.

9         Let me make a note again for the jury.  This is

10  another place where the decisions of the Court apply.  The

11  oxidation layer is to be interpreted as the second oxide

12  layer.

13  Q.  And is this enlarging feature found in the accused

14  devices?

15  A.  Yes, sir.  And here's a picture.  This one happens to be

16  from TechInsights, but you've seen a number of pictures

17  earlier that show the same feature.  This is from 0373.  And

18  you can see the Fin widens as it approaches the bulk

19  substrate.

20  Q.  And does the widening reduce the Fin resistance in the

21  accused devices?

22  A.  Yes.  And I did some modeling on this.  And the

23  horizontal axis is resistance -- sorry, the vertical axis is

24  resistance, the horizontal axis is Fin width.  And what I'm

25  doing is I'm computing the resistance as a function of the

bottom Fin width.  And you can see the resistance is
decreasing.  At the bottom, Fin width increases.  And the
Samsung Fin lies about here.

Q.  So what is your conclusion with respect to Claim 13
then?

A.  That both parts of that claim are -- that both parts of
the last wherein clause are infringed.  And as a consequence
of the top being infringed from Claim 1 and the bottom
infringed what I just showed you, Claim 13 is infringed.

Q.  So would you summarize your infringement analysis and
your conclusions thus far?

A.  Yes.  I've shown Claim 1 is infringed, the dependent
claims that depend on Claim 1, 2 through 6, 11 and 12, and
15 through 17 are infringed, and I've shown Claim 13 is
infringed.

Q.  Now, Dr. Kuhn, we've just gone through the infringement
analysis.  What's the next topic you'd like to discuss?

A.  So next I want to talk a little bit about willful
infringement.  I am going to move the model back so I can
speak more directly to the jury.

        THE COURT:  Dr. Kuhn, as we go forward, would you
try to slow down just a little bit.

        THE WITNESS:  Yes, sir.  Absolutely, sir.

        THE COURT:  You're speaking a little fast, and I
want to make sure the jury follows what you say.

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Let's continue, counsel.

3          MR. CHOUNG:  Yes, Your Honor.

4  Q.  (By Mr. Choung)  Dr. Kuhn, I think you mentioned this

5  earlier, is intent, knowledge, or copying required to prove

6  infringement?

7  A.  No, intent, knowledge, or copying is not required.

8  Q.  So you've shown infringement independent of those?

9  A.  Yes, sir.

10 Q.  All right.  But is there evidence of copying in addition

11 to the infringement?

12 A.  Yes, there is evidence of that.

13 Q.  And what is that evidence?

14 A.  Well, there's a series of presentations that Professor

15 Lee gave to Samsung, and you've heard some discussion on

16 that already.  There's two groups of presentations, a 2006

17 and a 2012 group.  And I'm going to be showing some slides,

18 particularly from the 2006 group, that show key features of

19 Professor Lee's design that have been transferred to Samsung

20 through these presentations.

21 Q.  So what's an example in PX-273 of the features that were

22 taught to Samsung?

23 A.  This particular slide shows over here on the right-hand

24 side the same body type FinFET that we've been discussing

25 today.  And it walks through some of the benefits of this

design.  And then it compares over here, this design to the

SOI FinFET, which we've also talked about today.  And so

this slide is somewhat conveying the whole idea of the

body-tied FinFET in the presentation.

Q.  And have we seen this feature in both the claims and the

accused devices?

A.  Yes, we've seen the body-tied FinFET, yes, sir.

Q.  Now, did Professor Lee also teach the importance of any

other features to Samsung?

A.  Yes, he did.  Recall that we've talked about the idea of

being a wall-shaped Fin.  In this particular 2006

presentation, you can see over here an example of a

wall-shape Fin that's relatively short, and then Professor

Lee's advanced research on this Fin showing the progression

to an ever taller narrower Fin was quite flared at the

bottom.

Q.  And this is a feature that we find in both the claims

and the accused devices?

A.  Yes, sir.

Q.  Did Professor Lee teach the importance of any other

features?

A.  Yes, sir.  Recall a few minutes ago, we talked about the

triangular-shaped source/drain region and the contact

landing on that region, and we talked a little bit about

crystal growth with epitaxy, kind of like growing salt

1  crystals.

2      Professor Lee showed this.  This is a slide that on

3  this side, he shows the feature without the epitaxy, and on

4  this side he shows the feature with the epitaxy.  It's a

5  pasted Photoshop kind of image.

6      And then over here on the right we see two sets of

7  curves, dark ones and light ones.  And the dark ones are

8  taller than the light ones which shows significant

9  improvement.

10     So he's shown the importance of selective epitaxy

11  and the source/drain region enlargement or the contact

12  resistance that we just saw a few minutes ago in the claims.

13  Q.  And that feature is found in the accused devices?

14  A.  Yes, sir.

15  Q.  Any other features that Professor Lee demonstrated?

16  A.  Yes, sir.  Recall Claims 11 and 12 where I moved the epi

17  region above and below the edge of the second oxidation

18  layer, and I said Claim 11 was above and Claim 12 was below.

19     Well, this slide actually has the data by which

20  Professor Lee determined that that claim would be true.  And

21  he has a graph here that shows the depth and various

22  electrical properties showing Claim 12, which is the below

23  claim, has the better performance, and Claim 11, which is

24  the above claim, has the better short channel effects.  And

25  that's written in his patent specifications and captured in

1  the claims.

2  Q.  And you found these in the accused devices, as well?

3  A.  Yes, sir.

4  Q.  And any other feature that was taught in these

5  presentations to Samsung?

6  A.  Yes, sir.  We've talked a little bit about the

7  chamfering or corner rounding.  Professor Lee has shown the

8  chamfering process here in the presentations.  And that's

9  also reflected in some of the Samsung design documents,

10  specifically 0853.

11      And the original presentation, I'm sorry, was 0273.

12  Q.  Now, the figure here on the left from -- that's from

13  PX-273, that precise figure is not in the -- in the patent,

14  is it?

15  A.  No, only the description of the figure in Claim 15.  The

16  description in Claim 15 that would lead you to this figure.

17  Q.  Okay.  And that's Claim 15, and that's the chamfering

18  feature?

19  A.  Yes, sir.

20  Q.  And the Court defined that to mean beveled or rounding?

21  A.  Yes, sir.

22  Q.  Okay.  Thank you.

23      So based on the evidence that you've seen, where

24  does the Samsung design come from?

25  A.  All the evidence I've seen suggests it came from

1  Professor Lee.

2  Q.  Now, what's the next topic that you'd like to analyze?

3  A.  I'd like to talk about benefits of the invention.

4  Q.  And what was your conclusions -- could you give us a

5  summary of your conclusions on the benefits?

6  A.  At a very high level, the benefit gives improved

7  performance, improved power, and cost savings.

8  Q.  What does improved performance mean in sort of practical

9  real-life terms?

10  A.  Improved performance in real life means if I have a

11  phone or iPad, if I have improved performance I can either

12  have things run faster or I can run a lot more things at the

13  same time.

14  Q.  And what does improved power mean in sort of real-world

15  practice?

16  A.  Improved power means -- if I have, for example, I'm

17  taking a tablet or a laptop on an airplane, improved power

18  means that I either can have the battery last all across the

19  United States, something I just learned recently, or you can

20  have many more things running for a longer length of time.

21  Q.  Now, the benefits, what are they attributable to?

22  A.  The power performance benefits are directly attributable

23  to the '055 bulk FinFET transistor.

24  Q.  And how did you quantify those benefits?

25  A.  I started out by looking at Samsung's own performance

 1 data, which compares 20-nanometer and 14-nanometer

 2 transistors.

 3        I then looked at some power performance data, some

 4 benchmarking data from identically designed portions of 20

 5 and 14 chips.

 6        I have some external data for power comparisons at

 7 the transistor level.

 8        And then I looked at the Defendants' internal

 9 materials, and this was for comparing 28 to 14.

10 Q.  And what did you find for the Samsung devices?

11 A.  I'm going to start from a high-level presentation of

12 Samsung's, which is PX-0889.  And this talks about their

13 14-nanometer FinFET, the breakthrough power and performance.

14        And it gives two numbers, it gives a 20 percent

15 number right here and a 35 percent number right there.  And

16 in both cases, it's from 20 to 14LPE.  And this is PX-0889.

17 Q.  And is there data that confirms these improvements?

18 A.  Yes, there.  Amongst the data that was delivered to us

19 by Samsung is a chart, and it was originally an Excel file.

20 And I went in the file and double-checked it to make sure

21 the computations were correct.

22        It's a chart of the transistor-level performance

23 numbers for their devices, and it compares 20LPE to 14LPE.

24 And it has all the transistor parameters in it that device

25 people like to look at.

1      And they did a final summary here, and I did

2   double-check that summary.  It is correct from the numbers

3   in their table.  And if you average that, it gives a 21

4   percent performance improvement.

5          Now, what's cool about this chart is that this is

6   transistor-level data.  There's no circuits here.  These are

7   measured right off the devices.  And it's raw operating

8   data.  So it's very direct to confirm these numbers.

9   Q.  And that's for the performance improvement.  What was

10  the power consumption improvement that you found?

11  A.  So for power consumption, I used some external data from

12  a company called AnandTech, which is a gold standard

13  benchmarking company.  And they happen to have the operating

14  voltage numbers for various circuits, and operating voltage

15  is one of those things that is directly impacted by

16  improvement and short channel effects, the improvement

17  that's given by the '055 transistor.

18  And so I was able to take these numbers -- there's a little

19  math in between, but I was able to use them to determine

20  that there's a 36 percent average power improvement that is

21  due solely to the transistor itself.

22  Q.  And was there any other external data that you analyzed?

23  A.  Yes.  So far, all I've talked about is data that's

24  either at the transistor level or directly attributable to

25  the transistor.

1          Now, I'm going to go up one level.  Device
2  engineers like myself, what we love to find is a product
3  that a designer has left identical in two different
4  processes.  It's the same design, just moved, because what
5  we then do is we say, oh, it's an identical design in two
6  processes, therefore, any improvement, or for that matter,
7  any degradation, is due to the process.  It's not due to the
8  design.
9  And there's a couple examples of this.  And I show one here.
10 This happens to be one of the cores from the Exynos
11 processes, and it's an A53 core.  And what's plotted here is
12 performance on one axis and power on the other.  So
13 performance is horizontal.  Power is vertical.  And I have
14 two graphs, one for the 20-nanometer generation, and one for
15 the 14.  So identically designed cores, two different
16 generations.
17 I can read the plot crossways which gives me the performance
18 improvement at constant power.  Or I can read the plot down,
19 and that gives me power improvement at constant performance.
20 And so you can see there's 16 to 20 percent performance
21 improvement and 28 to 34 percent power improvement from a
22 core of identical design running two different processes.
23 Q.  Now, you mentioned this data is for the Exynos chip?
24 A.  Yes, sir.
25 Q.  Which Defendant is that?

1  A.  That's Samsung.

2  Q.  All right.  And so this is the data for the transistor

3  in the Samsung Exynos chip?

4  A.  Yes, sir.

5  Q.  All right.  And, again, this is representative of the

6  14-nanometer transistor?

7  A.  Remember the design is involved here.  So the previous

8  data is representative of all the transistors in the

9  process.  This data is -- because there's circuit design

10  involved, would be representative of the transistor

11  interacting with the circuit.

12  Q.  And so far you've looked at both the internal Samsung

13  data and this external data.  Are the numbers consistent for

14  the improvement?

15  A.  Yes.  And this is actually important.  Remember these

16  things stack on each other.  The transistor feeds into the

17  chip.  The chip feeds into the product.  If the number at

18  the transistor level and the number at the chip level are

19  the same, this is a really good sign.  It means that you're

20  just transferring the improvement up the stack.

21        If the number goes down, then you've lost it, and

22  it's very rare for the number to get bigger.  But if it got

23  bigger, it meant there was some additional improvement.  The

24  fact the numbers are the same is a very strong indication of

25  the transistor is responsible for the improvement.

1  Q.  Now, Dr. Kuhn, why are you running the comparison

2  against the 20-nanometer node?

3  A.  Because the 20-nanometer node was the last bulk planar

4  node, and the 14-nanometer node is the first FinFET node.

5  And the data was very clean from the Defendants'

6  documentation and externally.

7  Q.  But did you consider any other comparison?

8  A.  Yes.  As I -- you recall I mentioned earlier, the

9  20-nanometer node was not a successful node.  So I went

10  beyond that and looked at data from the 28-nanometer node,

11  as well.

12       And keep in mind that what happened here is I first

13  had done this comparison because the data was so good, but

14  I'm also going back and doing this one because we do have a

15  challenge that that was not a very successful node.

16  Q.  All right.  So for the -- this additional comparison

17  that you ran, what was the data that you looked at?

18  A.  I first looked at a document from Samsung, the PX-0380.

19  And this document discusses 14LPE in comparison to 28LPP.

20  And the summary is a 40 percent faster in performance

21  improvement, 60 percent less power consumption, and 50

22  percent smaller chip scaling.  And that is a two-node jump.

23  Q.  And what about the benefits from data from

24  GlobalFoundries?

25  A.  GlobalFoundries has a similar set of numbers, slightly

different slide.  This is from PX-0849.  Here, you're

looking at a 55 percent performance improvement, a 60

percent power improvement, and here they've gone from 28 to

14LPP.

Q.  Now, besides these performance and power benefits, are

there any other benefits to the invention?

A.  Yes.  There's a benefit in cost.  Keep in -- keep in

mind that the 20-nanometer node actually did something we

don't like in Moore's Law scaling, and the 20-nanometer node

was actually more expensive.

Here we see a return to traditional Moore's Law scaling with

a cost benefit with a node jump.  And so we have here from

GlobalFoundries an estimated die cost improvement of 25

percent.  This is from PX-0849.  And above it is an area

comparison.  And I used some of my own knowledge from Intel,

plus the area comparison number, to check that die cost

number, and I got a rather similar number.  I got 23

percent.  So I agreed with their 25 percent in cost savings

number.

Q.  Now, is there any other evidence that supports these

benefits being attributable solely to the '055 patent?

A.  Yes.  We have some testimony from Dr. Samavedam, who,

again, is a senior engineer at GlobalFoundries, and he

confirms in his testimony that the performance benefit from

28 to 14 is driven by the difference between the planar

1  transistor and the FinFET transistor.  And he confirms that

2  the density benefit of 28 compared to 14 is determined by

3  the FinFET, as well.  So he confirms that in his testimony.

4  Q.  And what about Samsung's engineers, what did they

5  confirm?

6  A.  Dr. Kim also confirms that the shape of the Fin in the

7  14-nanometer process is an important contributor to the

8  performance.

9  Q.  And so what are your conclusions about the benefits

10  attributable to the '055 patent?

11  A.  My high-level conclusions are in going from 20LPE to

12  14LPE, which is the jump from planar to FinFET, there's at

13  least a 20 percent performance improvement and at least a

14  simultaneous 30 percent power improvement attributable

15  solely to the transistor of the '055 patent.

16  Q.  Now, Dr. Kuhn, what's the last topic that you'd like to

17  address?

18  A.  I'd like to talk about a topic that I've labeled here:

19  No other options.

20  Q.  And what is that referring to?

21  A.  Well, this refers to an idea that the Defendants might

22  have had an alternative available to them or another option.

23  And there's the language "a non-infringing alternative,"

24  which would be an option that didn't infringe.  And what

25  we're going to be talking about is the lack of availability

1  of other non-infringing options or other non-infringing

2  alternatives.

3  Q.  Now, Dr. Kuhn, were there any commercially viable

4  non-infringing alternatives in 2015?

5  A.  No, sir.

6  Q.  Now, what was the state of alternatives starting in the

7  2000s?

8  A.  Well, if we wind back to the early 2000s and we look at

9  the semiconductor era of that time, the world was really

10  focused on SOI.  And it was focused on SOI in two forms.

11  Recall I told you about the improvement of strain scaling --

12  strain CMOS that provided an extension of Moore's Law and

13  the improvement of High-k that provided the extension of

14  Moore's Law.  People were really looking for something that

15  would provide an extension of the planar roadmap.

16        And there's an idea called fully depleted SOI, and

17  that idea is that you buy a magic substrate and you stick it

18  in your planar process and you get that improvement.  So

19  that idea was very exciting in the early 2000s.

20        The alternative idea is one you've already seen

21  which is running a FinFET but running it on an SOI

22  substrate.  So these were very attractive ideas, and the

23  community was going off pretty strongly that way.  And

24  Professor Lee was somewhat unique in going off in the

25  direction of a bulk FinFET.

1  Q.  And what information do we have that shows us what --

2  why the community was interested or in what the community

3  was interested in SOI?

4  A.  There's a group called the ITRS, the International

5  Technology Roadmap for Semiconductors.  This is actually

6  kind of like a committee or working group that meets, puts

7  out a report about every year.  And it's formed from senior

8  and knowledgeable representatives from all of industry and

9  from academia.

10        And their report is like a roadmap of where they

11  think the industry is going to go.  It's very reputable.

12  It's used extensively by the industry.

13        And we're going to look here at the ITRS for 2011.

14  And I want to draw your attention, this is a chart in

15  sequence with what's going to happen, with later stuff at

16  the bottom and earlier stuff at the top.

17        And you can see that fully depleted SOI MOSFETs,

18  that's my magic substrate a few minutes ago, are sitting

19  ahead of what's called multi-gate MOSFETs.  And multi-gate

20  MOSFETs are things like SOI FinFETs or bulk FinFETs.

21        So in 2011, the world really thought that FDSOI,

22  this magic substrate, was going to be the way people were

23  going to be able to stay on the CMOS roadmap.

24  Q.  And is this the direction that the industry was looking

25  at?

1  A.  Yes, very strongly.

2          I show on the top a document PX-2034.  This

3  document discusses GlobalFoundries, Samsung, as well as IBM.

4  And talks about the work particularly on UTB SOIs.  That's

5  another word for FDSOI or the magic substrate.

6          IBM was very focused on this at this time.

7          I show PX-2053.  This talks about ETSOI.  Again,

8  another name for FDSOI or the magic substrate.

9          So in 2011, people were very excited about the

10  option of an SOI alternative.

11  Q.  Now, that's not the state today.  So what changed in --

12  in the interim?

13  A.  Intel released the bulk FinFET, and they announced it in

14  May, and I believe the product qualified earlier the

15  following year.

16          This was an enormous game changer.  Intel at this

17  time had led the technology through four generations,

18  working on the fifth.  And the fact that they went to a bulk

19  FinFET was incredibly powerful.

20          Notice that their press release here, which is

21  PX-1322, they state:  22 nanometers, a New Technology

22  Delivers an Unprecedented Combination of Performance and

23  Power Efficiency.

24          And they have licensed the '055 patent.

25  Q.  Now, I want to look at this slide, how are you familiar

1  with all of this?

2  A.  I was at Intel working at Intel at this time.  I was an

3  Intel fellow at this particular time.  I was working on, I

4  believe, the 10-nanometer or 7-nanometer node.  So I was

5  deeply involved in these things.

6  Q.  Okay.  Now, you've dismantled your model so let's take a

7  look at Professor Lee's model.

8         In the Intel device there's a second oxide.  What

9  is that made of?

10  A.  In the Intel device the second oxide is made of silicon

11  dioxide.

12  Q.  That's the SIO2?

13  A.  That's the SiO2.

14  Q.  So you show here that Intel took a license to the '055

15  patent.  What happened after that license in this

16  announcement of Intel's bulk FinFET?

17  A.  There was an amazing shift of the community away from

18  SOI to bulk.  Intel built 22 and 14 on bulk.

19         As we've shown, Samsung built 14, GlobalFoundries

20  built 14, and we've shown both of those are infringing.

21  Those were on bulk.

22         Samsung then followed with 10.  And I've mentioned

23  TSMC already, TSMC moved to bulk FinFET on 16.

24  Q.  Now, how do you know that the Samsung's 10-nanometer

25  device uses bulk FinFET?

1    A.  I did a program analysis of this device.  I referenced

2    PX-0866 and PX-0424.  And I went through and evaluated Claim

3    1 against the materials in these two documents, and Samsung

4    10-nanometer meets the elements of Claim 1, as well.

5    Q.  And how do you know about the TSMC's bulk FinFET?

6    A.  Somewhat the same thing.  Here, I reference PX-1314.

7    And this meets the elements of Claim 1 and Claim 13.

8    Q.  And who else says that the industry embraced the bulk

9    FinFET?

10   A.  We can look to the testimony of Dr. Vadi, who I remind

11   you is a principal engineering manager at Qualcomm.  And he

12   points out in 2014, Qualcomm -- all the alternatives

13   Qualcomm were considering was bulk FinFET.  And he points

14   out, as is exactly correct, in 2014 everyone in the industry

15   was going in the bulk FinFET direction, including multiple

16   foundries, Intel, TSMC, and Samsung.

17   Q.  So by 2014 and 2015, the bulk FinFET was quite

18   established?

19   A.  Yes, sir.

20   Q.  But Intel announced in 2011/2012 -- was that

21   controversial before reaching the point that the industry is

22   now?

23   A.  Oh, yes.  It's hard to describe today now that it's been

24   successful.  But in the semiconductor industry the idea of

25   making things that stick up in the air was just very

1  frightening.

2          For manufacturing in this business, for 50 years,

3  people had learned the hard way that things that stick up in

4  the air break, they get stringers on the side, they get

5  layers that don't form correctly, they get things that hook

6  up in places and cause -- cause yield issues.

7          And so having us device guys proposing to the

8  manufacturing guys, we're going to make something that

9  sticks up in the air 15 nanometers, they're going, no way,

10  that's not going to work.

11          And so there was great resistance to this.  Some of

12  it was genuine.  They are hard to make.  But a lot of it was

13  just years and years of success with planar having to move

14  to something new.  So there was much resistance.

15  Q.  But the alternatives that were in development -- well,

16  let's look a planar -- planar SOI.  Was that actually an

17  option?

18  A.  No, it really wasn't.  I present some testimony here

19  from Dr. Samavedam that supports that certainly

20  GlobalFoundries was not looking at planar SOI.

21  Q.  And what about this SOI version of FinFET that we've

22  talked about, is that an alternative?

23  A.  Well, I start here with some testimony from Dr. Kim who

24  points out that as soon as Samsung began experimenting with

25  FinFETs, they rejected the option of SOI FinFETs.

1        I had a very similar experience to Dr. Kim at Intel

2   when we went through the process of evaluation, we also

3   rejected SOI FinFETs.

4        There's a number of reasons that are both

5   economical and manufacturing related, but every company

6   that's evaluated these things has moved to bulk FinFET

7   first.  To the best of my knowledge, there's only one SOI

8   FinFET process running, and it's a very low volume custom

9   boutique process that was only introduced last year.

10  Q.  In 2017?

11  A.  Yes, sir.

12  Q.  All right.  So that wasn't available in 2014 or 2015?

13  A.  No, sir.  No, sir.

14  Q.  Okay.  Now, you heard in the Defendants' opening

15  mentioning about prior art patents.  Are any of those

16  viable?

17  A.  No, sir.  I've reviewed several prior art patents.  I

18  summarized some of them there.  There's a block of patents

19  from Toshiba, there's a patent from Samsung, a much earlier

20  patent, there's a patent from LSI.

21       And sort of to summarize a higher level and more

22  detailed analysis, these patents were never commercialized.

23  Q.  All right.  So they just don't work?

24  A.  They just don't work.

25  Q.  Now, is there also another area of alternatives that you

understand the Defendants are proposing?

A.   Yes.   There's -- every year in this business, there are many clever new ideas that are proposed in the research community.   And all of them look really very good on paper. But what happens is they need to go through a long process of evaluation, and many of them are not successful.

And I present here one of these.   Dr. Subramanian has discussed this, as well.   This is called a nanowire or a multi-bridge conductor device.   It's actually built from a FinFET.

And it's an interesting idea, but it's theoretical research.   It's many, many years from commercialization. And certainly wasn't available in the timeframe of interest, is not available today, and it's not clear it will ever be commercialized.   We'll just have to wait and see.

Q.   So, Dr. Kuhn, what are your conclusions for each of the non-infringing alternatives that the Defendants are proposing?

A.   Here's a summary slide of the conclusions.   I'm just going to run down and hit each one at a high level, and then we'll discuss a few in detail.

Bulk FinFET, those are infringing alternatives. We've not run into one that we don't think would have not infringed.   Let me say that again, the bulk FinFET alternatives were most likely to have infringed.

1          Planar bulk, I've already discussed.  There's no

2    future for planar bulk past 20 nanometers.

3          Planar SOI comes in two camps.  There's a PDSOI

4    which scales just like planar bulk.  That won't work.  We've

5    already talked about FTSOI, the magic substrate.  It wasn't

6    available.

7    There's SOI FinFETs in the not available bucket.

8    There's prior art.  I've talked about that, that's not

9    viable.

10   And there's research topics which are a large number of

11   topics, but they tend to fall into either the not viable,

12   not available, or both category.

13   Q.  And so, Dr. Kuhn, would you summarize your conclusions?

14   A.  Certainly.  Overall, my conclusions are the Defendants'

15   14-nanometer bulk FinFET transistors infringe the '055

16   patent.  The benefits of using the '055 patent are at least

17   20 percent performance, at least 30 percent simultaneous

18   power improvement, and 25 percent cost savings.

19          And there were no commercially available

20   non-infringing alternatives.

21   Q.  Thank you, Dr. Kuhn.

22          MR. CHOUNG:  Pass the witness, Your Honor.

23          THE COURT:  Cross-examination by the Defendants?

24   Proceed when you're ready, Mr. Soobert.

25          MR. SOOBERT:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SOOBERT:

Q.  Good afternoon, Dr. Kuhn.

A.  Good afternoon, sir.

Q.  Good to see you.  It's been a few months since I saw you at your deposition.

A.  It has been.

Q.  How you been?

A.  I've been good.  You, too?

Q.  All right.  Let's talk about the question of what Professor Lee invented.  You understand that the claims define the invention, right?

A.  Yes, sir.

Q.  Okay.  And so whatever Professor Lee invented are defined in those claims, right?

A.  Yes, sir.

Q.  Okay.  Now, Professor Lee didn't invent the FinFET, did he?

A.  No, sir.

Q.  And Professor Lee didn't invent the bulk FinFET, did he?

A.  I disagree with that.

Q.  Okay.

MR. SOOBERT:  Let's go to DX-277, please.

THE WITNESS:  Is that -- oh.

THE COURT:  Do we have more notebooks to pass out?

1  Let's do that.

2      MR. SHEASBY:  May I approach?

3      MR. KENNERLY:  May I approach, Your Honor?

4      THE COURT:  Yes, you may.

5      MR. KENNERLY:  Thank you.

6  Q.  (By Mr. Soobert)  Dr. Kuhn, I'm not going to ask you

7  specifically about this document in your notebook.  I'd just

8  like to ask a couple of questions.

9  A.  Yes, sir.

10  Q.  Okay.  This is the Inaba patent reference that you've

11  analyzed in this case, isn't it?

12  A.  Yes, sir.

13  Q.  Okay.  This is a Toshiba patent?

14  A.  Yes, sir.

15  Q.  This was filed in September of 2001?

16  A.  Yes, sir.

17  Q.  All right.  And that's before the '055 patent was filed

18  in the United States?

19  A.  Yes, sir.

20  Q.  And that's before the Korean patent application from

21  Professor Lee was filed in Korea?

22  A.  I have -- I'm sorry, I have forgotten the exact filing

23  date of the Korean application.

24      MR. SOOBERT:  So let's zoom out for a moment,

25  please.

1  Q.  (By Mr. Soobert)  And look at the figure at the bottom.

2  A.  Yes, sir.

3  Q.  Okay.  And -- and just so we're clear, a bulk FinFET

4  simply means that the Fin is tied to the bulk substrate;

5  isn't that right?

6  A.  Yes, sir.

7  Q.  Okay.  And this Inaba patent shows that feature, a bulk

8  FinFET tied to the silicon substrate, doesn't it?

9  A.  Yes, sir.

10  Q.  Okay.  And now, let's turn to your notebook.  We don't

11  need to publish this, but I want to refresh your

12  recollection so you have a clear memory.

13        Turn to Page 59 in the tab in your notebook in

14  front of you, your rebuttal report, so...

15  A.  I have my rebuttal report, sir.

16  Q.  And I'd like to direct your attention, Dr. Kuhn, to Page

17  59.

18  A.  Yes, sir.

19  Q.  Okay.  And 59 lists a number of prior art patents that

20  predate the filing of the '055 patent; isn't that right?

21  A.  Yes, sir.

22  Q.  Okay.  And those are patents that you've analyzed in

23  this case, right?

24  A.  Yes, sir.

25  Q.  Okay.  And that chart that's on that page is a summary

1  to some extent of the features in those patents; isn't that

2  right?

3  A.  Yes, sir.

4  Q.  And you have a column there that identifies a number

5  of -- of those references as being bulk FinFET devices,

6  don't you?

7  A.  Yes, sir.

8  Q.  Okay.  There's about five there -- at least five, right?

9  A.  Slight correction.  The column type in that chart simply

10  refers to the substrate, not to whether it's a FinFET or

11  not.

12  Q.  Okay.  But you would agree that the bulk FinFET is the

13  Fin being tied to the substrate, right?

14  A.  Yes, sir.

15  Q.  Okay.  And we just saw the Inaba reference certainly has

16  that feature.

17  A.  Yes, sir.

18  Q.  And you're familiar with the Hieda reference which

19  you've analyzed extensively for this case.  That likewise

20  shows a bulk FinFET, doesn't it?

21  A.  Yes, sir.

22  Q.  Okay.  And so with those disclosures, amongst others in

23  your report, I mean, there's no question, is there, that

24  Professor Lee didn't invent the concept of tying a Fin to

25  the bulk substrate; isn't that right?

1   A.  That's fair, sir.

2   Q.  Okay.  So to say that in a short version, Professor Lee

3   didn't invent the bulk FinFET generally; isn't that correct?

4   A.  Yes, sir.

5   Q.  Okay.  Now, Dr. Kuhn, you -- you said you retired from

6   industry about --  about four years ago, 2014?

7   A.  Yes, sir.

8   Q.  So you haven't been working in industry in that time

9   period; is that correct?

10  A.  No, sir.

11  Q.  Okay.  You've been a professor in that period, as well?

12  A.  Yes.  A part-time professor, yes, sir.

13  Q.  But you certainly left Intel in 2014, right?

14  A.  May, sir.

15  Q.  Okay.  And Intel's a competitor of Samsung, right?

16  A.  Yes, sir.

17  Q.  And Intel's arguably one of the largest semiconductor

18  manufacturers in the world, right?

19  A.  I think it's No. 2 now, which is sad.

20  Q.  Samsung is not No. 1, are they?

21  A.  I think they are.

22  Q.  Oh.  And Samsung makes a lot of semiconductor devices,

23  not just FinFETs; isn't that right?

24  A.  I've actually not looked at that in a long time, so I

25  can't say.

1  Q.  But they make lots of chips.  You know that, right?

2  A.  They make lots of chips.

3  Q.  Right.  Not all -- not all of those chips have FinFETs,

4  right?

5  A.  I don't know, sir.

6  Q.  Let's talk about what you've been hired to do here.  So

7  you've been retained by the Plaintiff to help demonstrate

8  infringement; isn't that correct?

9  A.  No, sir, I disagree with that.

10  Q.  Tell me what you've been hired to do with respect to

11  infringement.

12  A.  Well, I was hired to review all the data, and there has

13  been an extensive amount of data, as you're well aware, and

14  to use my knowledge and my experience, particularly the

15  Intel experience, to look through all that data and to

16  compare it, the claims and the various structures in the

17  claims, the claims, the elements, and the limitations to

18  pair it to that mass of data, and to determine whether I

19  felt it infringed.

20  Q.  And you were retained by the Plaintiff?

21  A.  Yes, sir.

22  Q.  And it's the Plaintiff's burden to prove infringement?

23  A.  Yes, sir.

24  Q.  And the Plaintiff's offering your opinion in support of

25  its claim that there's infringement here, right?

1  A.  Yes, sir.

2  Q.  Okay.  Let's talk about infringement.  You understand

3  that each and every element of a claim needs to be found in

4  the accused product.  You understand that, right?

5  A.  Yes, sir.

6  Q.  Okay.  And you understand conversely that if one element

7  is entirely missing from the device, there's no

8  infringement, right?

9  A.  Yes, sir.

10  Q.  And in doing that analysis and in forming your opinions

11  in this case, you understand that you need to perform the

12  analysis on the actual accused product.  You understand

13  that, right?

14  A.  No, I disagree with that.

15  Q.  Well, you understand that the analysis for infringement

16  is a comparison of the claims to the accused product.  You

17  agree with that?

18  A.  Yes.

19  Q.  Right.  So it's the comparison of the claims to the

20  products?

21  A.  I agree with that.

22  Q.  Right.  So it's not a comparison of the claims to

23  specifications, for example, to demonstrate infringement, is

24  it?

25  A.  Keep in mind it's an atomistic-level product.  You can't

1  just open it up and look at it.

2  Q.  But as a general premise, you agree that you need to

3  apply the claims to the product, you agree?

4  A.  Yes, recognizing again these things count in atoms

5  across them.  It's not something you can break open and

6  measure with, you know, something.

7  Q.  Understood.

8       The specification is not the product, it's the

9  requirements for the product, isn't it?

10  A.  True.  But it forms part of the data, sir.

11  Q.  Okay.  So it's analogous to if we have a patent on a

12  table, you need to compare the patent to the accused table,

13  not to the instructions for making that table or putting it

14  together, you agree with that?

15  A.  I'm struggling a little bit with that.

16  Q.  Well, you have a patent on a table, and you have a table

17  that's accused of infringement.  You follow?

18  A.  Yes, sir.

19  Q.  Okay.  And you need to take the claims from that patent

20  and apply it to the table, correct?

21  A.  Yes.

22  Q.  Okay.

23  A.  Yes, sir.

24  Q.  Okay.  So you don't take the claims of that patent and

25  apply it to the instructions for putting -- or the table

1  together or otherwise assembling it?

2  A.  Well --

3  Q.  Do you?

4  A.  Oh, I'm sorry, didn't mean to talk over you.

5          So my struggle here is at this level of scale, the

6  specifications that the Defendants provide are a core part

7  of the evidence as to what they're trying to do.  And in the

8  cases where I use the spec, I also went and looked at things

9  like TEMs, where it's probably the closest thing to physical

10  evidence that exists in atomistic world.

11  Q.  And that's precisely the problem we have here is that

12  the specifications set a target, but to actually figure out

13  if there's infringement, you need to look at the device

14  itself with the TEMs, don't you?

15  A.  In general, yes.

16          MR. SOOBERT:  Let's take a look at Slide 2, please,

17  Mr. Dahm.

18  Q.  (By Mr. Soobert)  Now, Dr. Kuhn, you recognize this

19  claim, don't you?

20  A.  Yes, sir.

21  Q.  All right.  We've analyzed this for some time now?

22  A.  Yes, sir.

23  Q.  You spent hundreds of hours, actually, on this case

24  already; is that right?

25  A.  Yes, sir.

1   Q.  Okay.  And you see there, there's a term highlighted in

2   the second element of this claim, highlighted is

3   "wall-shape," do you see that?

4   A.  Yes, sir.

5   Q.  All right.  So this -- this element right here requires

6   a Fin active region, which is a wall-shape single

7   crystalline silicon on a surface of the bulk silicon

8   substrate and connected to that bulk silicon substrate.  You

9   see that?

10  A.  Yes, sir.

11  Q.  Okay.  So this requires essentially the Fin active

12  region in the device to be a wall-shape, we all agree with

13  that, right?

14  A.  Yes, sir.

15  Q.  Okay.  And that's a term that Professor Lee testified

16  that he put into the patent.  You were here for his

17  testimony, right?

18  A.  Yes, I was, sir.

19  Q.  Okay.  And he used that very specific term,

20  "wall-shape," didn't he?

21  A.  That's the term in the patent, sir.

22  Q.  Yeah.  And he didn't, for example, use the term "Omega

23  shape," did he?

24  A.  No, sir.

25  Q.  He didn't use the term "parabola shape," did he?

1   A.  No, sir.

2   Q.  He didn't use the term "parabolic shape," did he?

3   A.  No, sir.

4   Q.  He didn't use the term "triangular shape," did he?

5   A.  No, sir.

6       MR. SOOBERT:  Let's look at Slide 3, please.

7   Q.  (By Mr. Soobert)  Now, what what's shown here, Dr. Kuhn?

8   A.  It's the '055 patent, but it's really blurry.

9   Q.  Agreed.

10      MR. SOOBERT:  Let's -- let's blow it up, please.

11      Can we take -- take a look at the date of when it

12  was filed?

13  Q.  (By Mr. Soobert)  Okay.  So this is a little better.

14  It's the -- let me start again.

15      The patent was filed on February 4, 2003, correct?

16  A.  Yes, sir.

17  Q.  Okay.  And this patent doesn't refer back to the Korean

18  application, does it?

19  A.  I don't believe it does, sir.

20  Q.  Right.  And, in fact, there's no foreign priority claim

21  to the Korean patent application, correct?

22  A.  I don't believe so, sir.

23  Q.  And the -- the named inventor there is Jong-Ho Lee, you

24  see that?

25  A.  Yes, sir.

1   Q.  Okay.  And it has the '055 patent at the top, right?

2   A.  Yes, sir.

3   Q.  It's the patent that's subject to this lawsuit.

4       Now, if we focus again back on what's required for

5  the shape of the Fin active region, let's look at the --

6  let's look at the abstract.

7       And you see there that the abstract says

8  essentially -- and I'm paraphrasing -- that it needs to be

9  formed with the shape of a wall along the channel length

10  direction.  Do you see that?

11  A.  Yes, sir.

12  Q.  So it explicitly says with the shape of a wall, right?

13  A.  Yes, sir.

14  Q.  Okay.

15       MR. SOOBERT:  Next slide.

16  Q.  (By Mr. Soobert)  Background of the invention, same

17  thing, uses the phraseology "with the shape of a wall,"

18  right?

19  A.  Yes, sir.

20       MR. SOOBERT:  Next slide.

21  Q.  (By Mr. Soobert)  And so now if we go to the patent and

22  we look at what corresponds to that terminology, you see

23  there in Figure 3b Fin active region, correct?

24  A.  Yes, sir.

25  Q.  And that's a wall-shape Fin active region, according to

1  the patent, isn't it?

2  A.  It is, sir.  It's -- you don't see the whole

3  three-dimensional part if that's --

4       MR. CHOUNG:  Your Honor, objection.  Counsel is

5  trying to compare the claims to the specification.

6       THE COURT:  Speak up, Mr. Choung.

7       MR. CHOUNG:  Counsel is trying to claim -- compare

8  the specification and the figures to the claims.

9       THE COURT:  I don't -- is -- is that a legal

10 objection?  What's the basis of your objection?  You don't

11 like what he's saying?

12      MR. CHOUNG:  No, Your Honor.

13      THE COURT:  Mr. Sheasby, this is his witness, you

14 need to keep a seat, sir.

15      MR. CHOUNG:  No, Your Honor.  This has already been

16 covered by a motion in limine.

17      MR. SOOBERT:  Disagree, Your Honor.  This is -- I'm

18 just laying a foundation what the patent talks about with

19 respect to wall-shape and what's shown.

20      THE COURT:  All right.  What -- what motion in

21 limine are you asserting, Mr. Choung?

22      MR. CHOUNG:  I believe it's No. 8 in the order,

23 Your Honor.  I'm sorry, Your Honor, No. 6.

24      THE COURT:  What's your response, Mr. Soobert?

25      MR. SOOBERT:  I haven't made any comparison, Your

1   Honor, between this and the accused products, which I

2   believe is related to that MIL.

3         What I'm doing here is looking at the terminology

4   in the claim and seeing how it's depicted in the figure to

5   understand how that -- how Professor Lee used that term in

6   the patent.

7         THE COURT:  Well, pursuant to the Court's prior

8   order in limine, a comparison between the accused products

9   and the preferred embodiments is prohibited.

10        I'm going to allow the question, but if this line

11  continues and crosses that line, then I'll have something to

12  say about it.

13        MR. SOOBERT:  Understood, Your Honor.

14        THE COURT:  All right.  At this point the objection

15  is overruled.

16        MR. CHOUNG:  Thank you, Your Honor.

17  Q.  (By Mr. Soobert)  So in terms of how the "wall-shape"

18  term is used in the specification, this is an example of it,

19  isn't it?

20  A.  And I'm not quite sure if you mean -- my concern here is

21  this shows a cross section, it doesn't show the entire

22  length of the wall.

23  Q.  The Fin runs through that cross section, doesn't it?

24  A.  Yes, it does, sir.

25  Q.  Okay.  And your understanding wall-shape is it runs

1  through there in a rectilinear manner, right?

2  A.  Yes, sir.

3        MR. SOOBERT:  Let's take a look at the next slide,

4  please.

5  Q.  (By Mr. Soobert)  And this is a similar depiction, just

6  another cross-section view of the same figure we're looking

7  at, correct?

8  A.  Yes, it's Figure 7, I believe.

9        MR. SOOBERT:  Next slide.

10  Q.  (By Mr. Soobert)  And similar with this one, it shows a

11  cross-section of the Fin, as well, correct?

12  A.  Actually, I may have made an error.  Are we also going

13  to be talking about the gate oxide because the thickness

14  just changed between these two slides?

15  Q.  I'm focused on the Fin active region.

16  A.  Just on the wall?

17  Q.  Uh-huh.

18  A.  The cross-sections look similar, sir.

19  Q.  And they run vertically into the page?

20  A.  Thank you, sir.

21  Q.  Yeah.

22  A.  Yes.

23        THE COURT:  Mr. Soobert, non-verbal responses

24  aren't picked up in the record.  You just said uh-huh, so

25  try to correct that.

1          MR. SOOBERT:  I'm -- I'm sorry, Your Honor.  I'll

2    be on the lookout.

3          THE COURT:  Usually it's the witnesses that do

4    that.

5          MR. SOOBERT:  Fair enough.

6          THE COURT:  Let's continue.

7          MR. SOOBERT:  Thank you, Your Honor.

8    Let's go to the next slide, please.

9    Q.  (By Mr. Soobert)  Now, this shows Claim 1 again with

10   some highlights on it, doesn't it?

11   A.  Yes, sir.

12   Q.  And we -- we looked at the Fin active region which is a

13   wall-shape and highlighted in orange just now, right?

14   A.  Yes, sir.

15   Q.  Okay.  And there are additional elements that come after

16   that, including the second oxide layer, correct?

17   A.  Yes, sir.

18   Q.  And the gate oxide layer, correct?

19   A.  Yes, sir.

20   Q.  And that gate oxide layer specified as -- let -- let me

21   begin again.

22          And that element is specifying a gate oxide layer

23   which is formed on both side-walls of the Fin active region

24   protruded from said second oxide layer.  You see that?

25   A.  Yes, sir.

1  Q.  And that's a requirement of the claim, correct?

2  A.  Yes, sir.

3  Q.  The next element is a first oxide layer, which is formed

4  on the upper surface of the Fin -- said Fin active region

5  with a thickness greater or equal to that of the gate oxide.

6  You see that?

7  A.  Yes, sir.

8  Q.  And that's a requirement of the claim, as well?

9  A.  Yes, sir.

10  Q.  And then in green, we've highlighted a gate which is

11  formed on said first and second oxide layer.  You see that?

12  A.  Yes, sir.

13  Q.  That's a requirement of the claim, right?

14  A.  Yes, sir.

15  Q.  You have to meet each and every one of those elements to

16  prove infringement, right?

17  A.  Yes, sir.

18        MR. SOOBERT:  Next slide.

19  Q.  (By Mr. Soobert)  And just to understand what's

20  happening here with respect to how these are used in the

21  specification, we see Figure 7, don't we?

22  A.  Yes, sir.

23  Q.  And it's been color-coded to match the claims so we can

24  understand what the claim means at least with respect to

25  what's shown in this figure in the specification.  You

1  understand that?

2  A.  Yes.  I'm a little confused because I thought we have to

3  compare this to a product.

4  Q.  Okay.

5  A.  Per your previous comment.

6  Q.  Understood.  I'm laying a foundation for how these terms

7  are used with respect to the figure.  You understand that?

8          MR. CHOUNG:  Objection, Your Honor.  This is going

9  into redefining the claims and the meaning based on the

10  figures.

11         THE COURT:  Overruled.

12         And, Dr. Kuhn, it's not your place to ask counsel

13  if he's asking the proper questions or not.  That's why the

14  lawyers are here for the Plaintiff.  You either need to

15  respond or not respond.

16         THE WITNESS:  I'm sorry, sir.

17         THE COURT:  Let's continue, counsel.

18         MR. SOOBERT:  Thank you, Your Honor.

19  Q.  (By Mr. Soobert)  And so we see in the color-coded

20  version of Figure 7 there's a Fin active region in orange.

21  You see that?

22  A.  Yes, sir.

23  Q.  And then you see the second oxide layer on either side

24  of part of that Fin active region that's No. 10.  You see

25  that's gray?

1  A.  Yes, sir.

2  Q.  And then wrapping around the Fin active region at the

3  sides and the top is a gate oxide layer 12 and a first oxide

4  layer 6.  You see that?

5  A.  Yes, sir.

6  Q.  So we have a structure there where we have the Fin

7  active region in orange with that first oxide layer 6 formed

8  on that upper surface of the Fin.  You see that?

9  A.  Repeat that again.  My mind drifted for a second.

10  Q.  So we have a structure in which there is an orange Fin

11  with the blue first oxide layer at the top formed on the

12  upper surface of the Fin.

13  A.  Yes, sir.

14  Q.  Okay.  And then when we pull this device, we put a gate,

15  which is green 16, on top of that first oxide layer 6.  You

16  see that?

17  A.  Yes, sir.

18  Q.  Okay.  And that corresponds to the language in the

19  claim, a gate which is formed on said first and second oxide

20  layer.  You see that?

21  A.  Yes, sir.

22  Q.  Okay.  So this figure is showing a gate that's on the

23  first oxide.  Let me withdraw that.

24         So this figure is showing a gate which is formed on

25  the first oxide layer which, in turn, is formed on the upper

1   surface of the Fin, correct?

2   A.  Yes, sir.

3   Q.  And that gate is also formed on the second oxide layer

4   that's gray.  You see that?

5   A.  Yes, sir.

6   Q.  All right.

7        THE COURT:   Counsel, approach the bench, please.

8        (Bench conference.)

9        THE COURT:  Mr. Soobert, I am getting somewhat

10  concerned that beyond laying a foundation, we're getting

11  into comparison -- comparing the claims to an embodiment.

12        MR. SOOBERT:  Uh-huh.

13        THE COURT:  The claim language that you're showing

14  the jury is perfectly fine, but the figures representing

15  embodiments from the patent in a side-by-side comparison, I

16  believe, we're getting past laying a foundation.

17        MR. SOOBERT:  Uh-huh.

18        THE COURT:  I have no problem with you taking the

19  Plaintiff's model that they used or the photographs of the

20  transistors that were used, but the drawings for the

21  embodiments within the patent, I think, is improper beyond

22  laying a foundation.  I think you've probably laid your

23  foundation.

24        MR. SOOBERT:  And I have, Your Honor.

25        THE COURT:  Okay.  Then let's -- let's proceed

1  without the side-by-side of the figures and the claims.

2  　　　　MR. SOOBERT:  Understood.  And I'm planning to do

3  that.

4  　　　　THE COURT:  Okay.  Let's proceed.

5  　　　　MR. SOOBERT:  Thank you.

6  　　　　(Bench conference concluded.)

7  　　　　THE COURT:  Let's continue.

8  　　　　MR. SOOBERT:  Next slide.

9  Q.  (By Mr. Soobert)  Dr. Kuhn, you recognize this figure as

10 one of the defense exhibits, DX-430, right?

11 A.  I recognize the figure, yes, sir.

12 Q.  And this is a TEM.  It's a microscopic image of the

13 accused device, correct?

14 A.  Of one of the accused devices, correct.

15 Q.  And here, you -- you see that we have a Fin that's

16 protruding up from the bottom of the screen.  You see

17 that?

18 A.  Yes, sir.

19 Q.  Okay.  And then above that is a lighter-colored layer

20 that wraps all the way around that Fin, which is a silicon

21 dioxide layer, you agree with that, right?

22 A.  Yes, sir.

23 Q.  Okay.  And then on top of that silicon dioxide layer,

24 there is a Hafnium oxide layer that's a darker ring that's

25 around that, it's the next part of the layer, you see that?

1  A.  Yes, sir.

2  Q.  Okay.  Did I describe that correctly?

3  A.  Yes, sir.

4  Q.  Okay.  And then the gate goes on top of that material

5  towards the top of the picture, correct?

6  A.  The gate wraps all the way around.

7  Q.  Okay.  Thank you.

8        So I want to ask you a little bit about this

9  Hafnium oxide layer we were talking about.

10  A.  Yes, sir.

11  Q.  Hafnium oxide is a High-k dielectric, right?

12  A.  Yes, sir.

13  Q.  And it has a higher dielectric constant than the silicon

14  dioxide layer; isn't that right?

15  A.  Yes, sir.

16  Q.  Okay.  And not to get too technical, but tell us what

17  the dielectric constant means?

18  A.  It's kind of a relative thickness number.  Kind of

19  keeping it so the jury is clear, too.

20        If I have a film with a high dielectric constant,

21  the film acts electrically like it's thicker.

22  Q.  Okay.  So Hafnium oxide has a high dielectric constant,

23  right?

24  A.  Yes, it does, sir.

25  Q.  And so Hafnium oxide is also known as High-k, right?

1   A.  Yes, sir.

2   Q.  So if I refer to High-k, you know I'm talking about

3   Hafnium oxide, right?

4   A.  No, sir.

5   Q.  Okay.  I'll stick with Hafnium oxide.

6   A.  Yes, sir.

7   Q.  Now, the Defendants' products, these two layers, Hafnium

8   oxide, which is formed on the silicon dioxide layer, are

9   formed by different processes, aren't they?

10  A.  Yes, sir.

11  Q.  Silicon dioxide is formed by a process of oxidation; is

12  that correct?

13  A.  Sir, there are two devices in the process.  You're

14  showing the I/O device for which the oxide layer is formed

15  through an oxidation process, a conventional oxidation

16  process.

17         The logic device uses a different ChemiSorb

18  oxidation process that's rather dramatically different.

19  Q.  Let's focus on this device, how about that?

20  A.  I'm fine with that, recognizing that we keep in mind

21  there are two of these.

22  Q.  So with that clarification, you agree that the

23  lighter-colored silicon dioxide layer is formed through a

24  process of oxidation, right?

25  A.  Yes, sir.

1  Q.  Okay.  And in a different step in the process, we have a

2  Hafnium oxide layer, the darker ring, formed on top of the

3  silicon dioxide, correct?

4  A.  Yes, sir.

5  Q.  Okay.  And those are formed by separate processes,

6  correct?

7  A.  Yes, sir.

8  Q.  And they're actually formed on different machines in the

9  process; isn't that right?

10  A.  For this device, sir.

11  Q.  Okay.  And when I say machine, I'm loosely speaking as a

12  semiconductor tool, you understand that, right?

13  A.  Yes, sir.

14  Q.  Okay.  So in the process of fabricating a semiconductor

15  device, these devices are transferred from tool to tool as

16  they're being fabricated; is that correct?

17  A.  For the I/O device, the legacy I/O device, sir.

18  Q.  Okay.  The one we're talking about here?

19  A.  The device on the page, sir.

20  Q.  Okay.  So you agree that those two layers are formed on

21  different machines or tools, correct?

22  A.  Yes, sir.

23  Q.  Okay.  They're formed at different times in the process,

24  correct?

25  A.  Yes, sir.

1  Q.  The Hafnium oxide layer in this process is formed
2  actually by what's known as atomic layer deposition.  You
3  agree?
4  A.  That's my understanding, sir.
5  Q.  Right.  And we'll just talk that ALD, correct?
6  A.  Yes, sir.
7  Q.  Okay.  Now, we've heard from Professor Lee that he
8  didn't use Hafnium oxide by that name in his patent.  You
9  agree with that, right?
10  A.  That's my understanding, sir.
11  Q.  Okay.  So, in fact, I believe he testified that he
12  intended to create a FinFET without using a High-k material.
13  You agree with that?
14  A.  I don't recall that, sir.
15  Q.  Okay.  But you were here in the courtroom when he
16  testified, correct?
17  A.  Yes, I was, sir.
18  Q.  Okay.  And you haven't seen anything in his patent that
19  suggests that he intended to include -- let me rephrase
20  that.
21       You haven't seen the words "Hafnium oxide" in the
22  patent, have you?
23  A.  No, sir.
24  Q.  They, in fact, don't appear in there, do they?
25  A.  No, sir, they don't appear -- yes, sir, they don't

1 appear.  They don't appear.

2 Q.  And so we're clear, the patent also doesn't refer to

3 High-k materials?

4 A.  That's correct, sir.

5 Q.  Okay.  So I want to go back to about the 2003 time

6 frame?

7 A.  Yes, sir.

8 Q.  When this invention in the '055 patent was filed in the

9 United States Patent Office.

10 A.  Yes, sir.

11 Q.  Okay.  And at that time, the industry was wrestling with

12 how to make these devices smaller and scale them down, would

13 you agree with that?

14 A.  If I look at the industry at this time, the industry was

15 almost in the golden age of scaling.  I mean, this was about

16 the 130 nanometer generation.  And, man, silicon was

17 cranking.  Things were actually going really well.  Research

18 was looking at those things but not yet the industry.

19 Q.  Okay.  So research was looking at transistor scaling at

20 that time, fair?

21 A.  Extreme transistor scaling, yes, sir.

22 Q.  Okay.  And folks that you worked with at Intel, such as

23 Robert Chao, were looking at scaling and transistors,

24 weren't they?

25 A.  Again, research, yes.

1  Q.  They were looking at various options to consider to

2  reduce the gate size so there wouldn't be leakage, right?

3  A.  Yes, sir.

4  Q.  Okay.  That's what we're talking about in terms of

5  scaling, right?

6  A.  Yes, sir.

7  Q.  Okay.  We're trying to eliminate that leakage when we

8  make this gate so small that we don't have a problem, right?

9  A.  Yes, sir.

10  Q.  Okay.  One of the ways that was being kicked around is

11  let's introduce a High-k material so we can make the gate

12  smaller; isn't that right?

13  A.  It's two steps, but yes, sir.

14  Q.  And, again, Professor Lee wasn't focused on that and

15  didn't describe the High-k material in his '055 patent, did

16  he?

17  A.  I don't know about his focus.  But he certainly did not

18  describe High-k.

19  Q.  Yeah.  And this was actually a very significant problem,

20  you agree, in the industry?

21  A.  Scaling?  Yes, sir.  Scaling was a significant problem.

22  Q.  And you're a science fiction fan, aren't you?

23  A.  Yes, sir.

24  Q.  Okay.  And didn't you liken this problem to being on the

25  bridge of the Starship Enterprise at one point?

A.  Yes, I did.

Q.  Okay.

A.  I described working at a semiconductor facility as being -- like being on the bridge of the Starship Enterprise, that's correct.

Q.  Okay.  And you actually looked at these things as if -- at some point, the solution would almost be unheard of to folks in that present day; is that right?

A.  Oh, absolutely.  When we started each generation, we believed that the design rules that were released would be impossible.  And by the end of the generation, they were easy.

Q.  And that's when we fast forwarded from 2003 to 2007, a lot of work had been done, but then Hafnium oxide entered into devices, right?

A.  That's correct, sir.

Q.  Okay.  And one of the ways that problem -- let me rephrase.

        One of the ways that problem was solved was the introduction to -- of Hafnium oxide and then a metal gate, and that combination allowed the transistor to be -- transistor to be scaled further, right?

A.  Yes, sir, absolutely, sir.

Q.  Okay.  And that helped address the leakage problem that we touched on, right?

1  A.  Metal -- metal gate prevents polysilicon depletion.

2  Q.  The use of Hafnium oxide helped with the leakage

3  problem, right?

4  A.  Yes, sir.

5  Q.  Okay.  So it was Hafnium oxide or the High-k material

6  that helped you get past the leakage problem, not the metal

7  gate, right?

8  A.  The metal gate is simply to reduce polysilicon depletion

9  and to keep the VTs correct in the device.

10  Q.  So in this high -- timeline that I'm just talking about,

11  we hit 2007, and this Hafnium oxide high gate material

12  enters into the 45-nanometer devices, right?

13  A.  That's right.  Intel released 45-nanometer with High-k

14  metal gate in 2007.

15  Q.  Okay.

16       MR. SOOBERT:  Jeff, can we have the Gordon Moore

17  timeline of scaling from the Plaintiff's opening?  And I

18  apologize, Mr. Dahm.

19  Q.  (By Mr. Soobert)  While that's being pulled up, Dr.

20  Kuhn, I believe you testified Gordon Moore, he's a

21  co-founder of -- of Intel?

22  A.  Intel.

23  Q.  Yes?

24  A.  Yes.

25  Q.  And in terms of the elite folks that are Intel fellows,

1  where does he stack up in the process?

2  A.  Gordon Moore started the place.  I mean, he's very

3  senior, very respected.

4  Q.  So when he says something, people listen?

5  A.  Oh, yes.

6  Q.  He says something, people take notice?

7  A.  Yes, sir.

8  Q.  So if he said in 2007 this move to High-k Hafnium oxide

9  was groundbreaking and the biggest development in transistor

10  technology in the past 60 years, people would have known

11  about that, right?

12  A.  Yes, sir.

13  Q.  You yourself knew about that?

14  A.  Yes, sir.

15  Q.  Okay.  And, in fact, you agree that it was a significant

16  development, right?

17  A.  Yes, sir.

18  Q.  And at that point in time, before Intel introduced its

19  version of 45-nanometer device with Hafnium oxide, the

20  industry at that point was already taking notice and working

21  on the problem; isn't that right?

22  A.  Yes.  My memory is not totally clear there, but my

23  memory is in those years before, everybody was working very,

24  very hard on it, and they mostly were not successful.  When

25  I first joined 45-nanometer in 2005, we just looked at a

1    whole bunch of things that just didn't want to work.

2         MR. SOOBERT:  Can we go to -- let's do this.

3    Q.  (By Mr. Soobert)  Dr. Kuhn, will you turn to Tab 4 in

4    your -- in your binder, and I'm not going to put it up on

5    the screen yet.

6    A.  My transis -- actions on electron devices paper?

7    Q.  Yes.  I see you're familiar with that.

8    A.  Yes, sir.

9    Q.  You recall that paper?

10   A.  Yes, I do, sir.

11   Q.  You wrote it?

12   A.  Yes, sir.

13   Q.  And when did it come out?

14   A.  July 2012, as I recall -- late 2012.

15   Q.  And it's published in what journal?

16   A.  Transactions on Electron Devices.

17   Q.  On what -- on behalf of what organization?

18   A.  IEEE.

19   Q.  Right.  Is that a reputable organization?

20   A.  Yes, sir.

21   Q.  All right.  And it's an authoritative source for

22   information, isn't it?

23   A.  Yes, sir.

24   Q.  Okay.

25         MR. SOOBERT:  With your permission, Your Honor, can

1    I publish that to the jury?

2             THE COURT:  Is there any objection?

3             MR. CHOUNG:  This document is not pre-admitted.

4    It's hearsay.

5             THE COURT:  I'll overrule the objection.  Go ahead,

6    counsel.

7             MR. SOOBERT:  Thank you, Your Honor.

8    Q.  (By Mr. Soobert)  We'll take a look at this.  This is

9    the paper we just described that you wrote.  2012 -- I

10   believe, July 2012; is that right?

11   A.  Yes, sir.

12   Q.  All right.  And that's you there, Kelin J. Kuhn, fellow

13   at IEEE?

14   A.  Yes, sir.

15   Q.  So you're an Intel fellow also, but you're also a fellow

16   of the IEEE?

17   A.  I'm still a fellow of the IEEE.  When I retired from

18   Intel, I became -- oh, I don't know, a fellow emeritus, I

19   suppose, of Intel.

20   Q.  Okay.  And is a fellow of IEEE, frankly, a big deal?

21   A.  Yes, sir.

22   Q.  It's a prestigious title?

23   A.  Yes, sir.

24   Q.  We're going to hear from Dr. Wallace.  You know he is a

25   fellow of IEEE in material science and GIG oxide layers and

1  the like.  You understand that, right?

2  A.  Oh, yes, sir.  Dr. Wallace is -- is very well-known,

3  sir.

4        MR. SOOBERT:  So if we go to Page 1818, please.

5  Q.  (By Mr. Soobert)  And no offense, Dr. Kuhn, this is an

6  incredibly technical paper, so I'm going to focus on a few

7  parts, if that's okay.

8  A.  Certainly, sir.

9  Q.  Okay.  So in this section of your paper, you're talking

10  about variations on -- on the gate, and there's a statement

11  there that basically says:  Modern High-k gate dielectric

12  stacks are actually multilayers.

13  A.  Yes, sir.

14  Q.  Okay.  And what's a -- what's a dielectric stack?

15  A.  It means something similar to what we see in the Samsung

16  device.  It means you may have multiple components in the

17  layer.  Sometimes you'll hear me refer to those bilayers in

18  my report.  They're referred to that way.

19  Q.  Okay.  So when you say bilayer, you -- you actually --

20  that's a short form for two layers, right?

21  A.  Two layers that act as one, yes, sir.

22  Q.  Okay.  But they are two layers, right?

23  A.  Yes, sir, there's two components.

24  Q.  Okay.  And the device we looked at, we -- we agreed that

25  those were formed at different times, different processes,

1  and different machines.  You agree with that?

2  A.  In the I/O device, yes, sir.

3  Q.  Okay.  And modern devices today, as you yourself state,

4  include those multiple layers for gate dielectrics.  You

5  agree with that?

6  A.  Oh, yes, sir.

7  Q.  Right.  And they need to include High-k material, don't

8  they?

9  A.  If it's a High-k stack, yes, sir.

10 Q.  Right.  And you need a High-k stack if you're getting

11 down to 14 nanometers, don't you?

12 A.  That's the general consensus, sir.

13 Q.  All right.  So if I took a device -- let's say a FinFET

14 that has a Fin active region, has a silicon dioxide layer on

15 top of that Fin and a gate on top of that silicon dioxide

16 layer, try to shrink it down to 14 nanometers, I'm going to

17 have big time leakage problems, aren't I?

18 A.  Yes, sir.

19 Q.  Okay.  In fact, it wouldn't work?

20 A.  It would work, but I agree, it would have leakage

21 problems.

22 Q.  Okay.  It couldn't be commercially viable, would it?

23 A.  No, sir.

24      MR. SOOBERT:  Your Honor, I'd like to move the

25 admission of this exhibit, please.

1       THE COURT:  I'm not prepared to admit it as an

2  exhibit, counsel.  You've asked to use it in a

3  demonstrative -- a demonstrative fashion for what I assumed

4  was an effort to impeach the witness with her own

5  publication, and that's reflected in the record.  There's no

6  need for it to be formally admitted.  And as you well know,

7  the time for admission of exhibits has long passed during

8  the pre-trial period.  I'm not going to reopen that in the

9  middle of the trial, so your -- your motion is denied.

10       MR. SOOBERT:  Understood, Your Honor.  Thank you.

11       THE COURT:  Let's proceed.

12       MR. SOOBERT:  Thank you, Your Honor.

13  Q.  (By Mr. Soobert)  Now, when you moved -- well, let me

14  take that back.

15       You -- you worked on that device at Intel that got

16  to 45 nanometers with the High-k material, didn't you?

17  A.  Yes, sir.

18  Q.  All right.  Did you get the idea to use High-k material

19  from the '055 patent?

20  A.  No, sir.

21       MR. SOOBERT:  Go to Plaintiff's Exhibit 580,

22  please.

23  A.  Where should I look for it?

24  Q.  (By Mr. Soobert)  It may be in your Plaintiff direct

25  materials.  You were asked about it on direct.  You recall

1  that?

2  A.  Yes.  And I certainly recall -- is it -- is this on the

3  screen?

4  Q.  It is on the screen.

5  A.  Let's work off this, and if we have a problem, I'll go

6  locate it because I certainly recognize the reference.

7        THE COURT:  Counsel, do you want to work off the

8  screen, or do you want the witness to find the hard copy?

9  This is your call, not hers.

10       MR. SOOBERT:  Understood, Your Honor.  And thank

11  you.  I'll just work from the screen here.  It's the same

12  thing that's shown on the demonstrative.  If we need to dig

13  in for it, I'll let you know.

14  Q.  (By Mr. Soobert)  So let me ask my question.

15  A.  Sure.

16  Q.  So this -- this was highlighted in your direct, right?

17  A.  Yes, sir.

18  Q.  And you made a point that this shows that High-k

19  materials and silicon dioxide materials were being

20  researched as a single gate oxide, right?

21  A.  That, and there's some talk in this about putting one on

22  top of the other.

23  Q.  Okay.  So this is a -- like exploratory research type

24  paper considering various options, right?

25  A.  It's what's called a review paper.

1  Q.  Well, this isn't talking about a commercial device, is

2  it?

3  A.  No, it's a technical -- it's a technical review paper to

4  the technical community, sir.

5  Q.  Okay.  And so, again, a device with High-k material,

6  Hafnium oxide didn't come out in a commercial form until

7  2007; isn't that right?

8  A.  Yes, sir.

9       MR. SOOBERT:  Mr. Dahm, may I have Slide 11?

10  Q.  (By Mr. Soobert)  So you recognize this as the TEM of

11  the device we were looking at a little earlier, right?

12  A.  Yes, sir.

13  Q.  All right.  And you understand that this image was

14  actually taken on a machine in the fabrication system,

15  right?

16  A.  I don't understand the question.

17  Q.  Okay.  The TEM is an electron micro -- microscopic

18  image, right?

19  A.  Yes, sir.

20  Q.  All right.  It's taken with a machine on the device

21  itself, right?

22  A.  No, sir.  It's even more complicated than that.

23  Q.  Okay.  Give me a brief overview, please.

24  A.  You take the chip, you use what's called an ion mill to

25  cut a slice out of it that's about 10 nanometers thick, and

1  it's mounted by technologists who are really good at this,

2  in a special frame.  And then it's put in the tool, and then

3  it's imaged, and then the picture is taken.

4  Q.  I see.

5       So the -- the device itself is taken -- a cross

6  section is taken, and you put it in the machine and an image

7  is taken, correct?

8  A.  Yes.  It's two steps.  You can't even just put the thing

9  in the machine.  You have to cut it into this little thin

10 transparent thing to put it in the machine.

11 Q.  But it's a cross section of the actual device; is that

12 correct?

13 A.  Oh, yes, yes, sir.

14 Q.  All right.  Now, this device has some measurements on

15 it, you see that?

16 A.  Yes, sir.

17 Q.  Right.  And these measurements were on the device -- let

18 me rephrase.

19       These measurements were on the image that were

20 taken on the machine of the device, correct?

21 A.  I don't know, sir.  I've only seen the TEM at this end

22 state.

23 Q.  But these machines were added by folks at -- the

24 Defendants, correct?  That took the picture?

25 A.  I'm sorry, I didn't understand the question.

1   Q.  So are these -- how about this, let me ask you, how are

2   these -- these measured in your experience, briefly?

3   A.  In my experience, there's two methods.  The first method

4   is the machine comes with a tool, and a human sits there

5   with the tool and lays -- points for the measurements that

6   they want, and the tool auto computes that.

7           The second manner is that tool doesn't work for

8   some reason, and people do it by hand, or they use some more

9   physical method to measure the image.

10  Q.  Okay.

11  A.  And there is -- are automated ways to do this that are

12  used for multiple samples.  They are frequently

13  unsuccessful, and so they often bounce back to one of the

14  two previous techniques.

15          This particular image looks like it might have been

16  made by a person, or it might have been done by something

17  automatic.

18  Q.  Okay.  But it was made off the machine, correct?

19  A.  Remember, the machine will burn the sample.  So you

20  can't just sit there by the machine and -- and measure it.

21  The sample will fry.  It's like an old-fashioned film

22  projector with a light bulb.

23          So the way this works is the technician loads the

24  sample, takes a whole string of images, bang, bang, bang,

25  bang, bang, bang, bang, bang.  So they don't -- for example,

1   or they'll store the images somewhere.  And then they either

2   come back or someone else comes back and measures the

3   images.

4   Q.  I see.

5        And the samples are taken off the product that's in

6   the machine, correct?

7   A.  The images are taken off the product.  The image -- the

8   samples are taken off the product, and the images are taken

9   off of the samples.  And the images are placed someplace and

10  usually analyzed.

11  Q.  I see.

12       Just to be clear, the image is taken of the product

13  using the machines, and the samples are put on before you

14  pull it out, correct?

15  A.  Can you rephrase?

16  Q.  The image is taken of the device, and while the device

17  is in the machine, the samples are put on under the first

18  method, correct?

19  A.  Okay.  So I'm -- I'm -- I don't understand your

20  question.  Let me do a quick try again.

21       We take the product, we make the sample, we put the

22  sample in the machine, we take the pictures, we file the

23  pictures, then we go offline and analyze the pictures.

24       Did that answer the question?

25  Q.  Yes.  And the offline analysis of the pictures, tell me

1  about that in the first preferred method.

2  A.  Like anything, the first preferred method is some robot

3  analyzes them all by itself.  The first preferred method is

4  often not successful on these films because of the atomic

5  nature.

6         The next preferred method is a human measures it,

7  but with a tool that computes all the numbers.

8         The third preferred method is that a human measures

9  it again, but the software tool that does the measurement is

10  broken in some way and a human makes a printout and measures

11  it off the printout.

12  Q.  So the first preferred method is using the robot, right?

13  A.  Yes.

14         MR. SOOBERT:  Let's go to the next slide, please.

15  Q.  (By Mr. Soobert)  What are these black boxes around this

16  Fin?

17  A.  Those black boxes represent measurements that I made on

18  this image.

19  Q.  Okay.  So you got this image from the Defendants.  It

20  already had measurements on it, and then you made your own

21  measurements on top of it to do further analysis; is that

22  correct?

23  A.  That's correct.

24  Q.  Okay.

25  A.  Because the Defendants only had two lines, and I wanted

1  an entire curve.

2  Q.  Okay.  And you didn't take a new picture of the device

3  using the machine, right?

4  A.  No, sir, no, sir.

5  Q.  Okay.  And you used the picture that was already taken?

6  A.  Yes, sir.

7  Q.  Right.  You didn't use the robot technique, right?

8  A.  No, sir.

9        MR. SOOBERT:  Go back to Slide 9, please, Mr. Dahm.

10  Q.  (By Mr. Soobert)  And to frame this from an infringement

11  analysis standpoint, this thickness issue is relevant to

12  these light blue limitations, you agree with that?

13  A.  Yes, sir.

14  Q.  Okay.  And those, again, for the record are the gate

15  oxide layer, which is formed on both side-walls of the Fin

16  active region, and the first oxide layer, which is formed on

17  the upper surface of that Fin active region, right?

18  A.  Yes, sir.

19  Q.  And that first oxide layer must have a thickness greater

20  or equal to that of the gate oxide, do you see that?

21  A.  Yes, sir.

22  Q.  Okay.

23        MR. SOOBERT:  All right.  Let's go back to that

24  TEM, please.

25          Slide 13, please.

1  Q. (By Mr. Soobert)  So you see here we have the original

2  TEM that was produced in the case.  And on the right side,

3  we have the TEM that has your measurements on it?

4  A.  Yes, sir.

5  Q.  Correct?

6  A.  Yes, sir.

7  Q.  Okay.  And your measurements on the right side there are

8  blown up at the tip of the Fin, add up to 4.74, do you see

9  that?

10  A.  Yes, sir.

11  Q.  Okay.  And the measurements that were actually on the

12  TEM that were produced for this device add up to 4.33?

13  A.  Yes, sir.

14  Q.  Okay.  And, of course, your number is higher, obviously;

15  isn't that right?

16  A.  The two numbers do not agree, and my number is higher,

17  that is correct.

18  Q.  Right.  So in terms of thickness, your higher number is

19  thicker; isn't that right?

20  A.  Yes, it is.

21  Q.  All right.  So you took these measurements knowing that

22  you need to prove infringement to show a thickness greater

23  or equal to on the top, and you did that analysis, right?

24  A.  I made these measurements, yes, sir.

25  Q.  Right.  Knowing that you had to demonstrate infringement

1   of a thickness at the top that is equal to or greater than

2   the thickness on the sides, correct?

3   A.  When I made the measurements, I had no intent in mind.

4   Q.  Okay.  Putting aside intent -- let me rephrase.

5   Putting aside your intent, you made the measurements

6   yourself knowing that you needed to prove infringement,

7   correct?

8   A.  I disagree with that.

9   Q.  Okay.  You made the measurements yourself knowing that

10   you had been retained by the Plaintiff who has to prove

11   infringement, correct?

12   A.  I disagree with that, too.

13   Q.  Okay.  You made the measurements yourself, correct?

14   A.  Yes, sir.

15   Q.  You didn't send the image out to a third party to make

16   the measurement that doesn't have a dog in this fight,

17   right?

18   A.  No, sir.

19   Q.  All right.  You didn't send it to TechInsights; is that

20   right?

21   A.  No, sir.

22   Q.  You didn't ask TechInsights to measure it on their own,

23   did you?

24   A.  No, sir.

25   Q.  All right.  And you didn't send it to any other lab

1  asking them to measure it; is that right?

2  A.  No, sir.

3  Q.  We're talking about atomic level dimensions, aren't we?

4  A.  Yes, sir.

5  Q.  All right.  So a .4 error, is that statistically

6  significant?

7  A.  It could be.

8  Q.  What this size -- the difference between these numbers

9  is certainly statistically significant, isn't it?

10 A.  Yes, sir.

11         THE COURT:  Counsel, approach the bench, please.

12         (Bench conference.)

13         THE COURT:  What's the estimated length of your

14 remaining cross, Mr. Soobert?

15         MR. SOOBERT:  I'm hoping 30 minutes.

16         THE COURT:  Well, we've been back two hours from

17 lunch.  I'm going to give the jury a recess, and then

18 we'll continue.

19         MR. SOOBERT:  Thank you, Your Honor.

20         MR. CHOUNG:  Thank you, Your Honor.

21         (Bench conference concluded.)

22         THE COURT:  Ladies and gentlemen, this

23 cross-examination has some additional length to it, and

24 there's probably going to be redirect after that of this

25 witness.  So we're going to take this opportunity to take a

1  short recess.

2       You may simply close and leave your notebooks there

3  in your chairs.  Follow all my instructions, including not

4  to discuss the case among yourselves.  Use this opportunity

5  to stretch your legs, get a drink of water, and we'll be

6  back to continue shortly.

7       The jury is excused for recess.

8       COURT SECURITY OFFICER:  Rise for the jury.

9       (Jury out.)

10      THE COURT:  The Court stands in recess.

11      (Recess.)

12      COURT SECURITY OFFICER:  All rise.

13      THE COURT:  Be seated, please.

14      Are you prepared to continue with your

15  cross-examination, Mr. Soobert?

16      MR. SOOBERT:  I am, Your Honor.  Thank you.

17      THE COURT:  All right.  Then let's bring in the

18  jury, please.

19      COURT SECURITY OFFICER:  Rise for the jury.

20      (Jury in.)

21      THE COURT:  Please be seated.

22      We'll continue with the Defendants'

23  cross-examination of the witness.

24      You may continue, Mr. Soobert.

25      MR. SOOBERT:  Thank you, Your Honor.

1  Q.  (By Mr. Soobert)  Now, Dr. Kuhn, on direct, you

2  testified about an opinion of willful infringement, do you

3  recall that?

4  A.  Yes, sir.

5  Q.  Okay.  And I think you used the word -- I wrote it down,

6  you said Samsung engaged in egregious conduct.  Did you say

7  that?

8  A.  I don't recall that at all, sir.

9  Q.  You didn't intend to say that Samsung engaged in

10  egregious conduct, did you?

11  A.  I don't recall saying that, and that's not a word I

12  commonly use.

13  Q.  Okay.  You understand what that word means, though,

14  right?

15  A.  Again, sir, I don't use that word.  I don't know what it

16  means.  And I don't recall saying it.

17  Q.  But you understand what it means?

18  A.  I do not know what it means, sir.

19  Q.  Okay.  Do you know what the standard is for willful

20  infringement?

21  A.  No, sir.

22  Q.  Okay.  Well, you were here in the courtroom since the

23  beginning of the trial, right?

24  A.  Yes, sir.

25  Q.  All right.  So you were here for Professor Lee's

1   testimony, correct?

2   A.  Yes, sir.

3   Q.  You were here for the opening statements, right?

4   A.  Yes, sir.

5   Q.  All right.  You've heard testimony and examinations

6   concerning the relationship between Professor Lee and

7   Samsung, right?

8   A.  Yes, sir.

9   Q.  All right.  So you've heard a story of collaboration

10  between the two, right?

11  A.  There are opinions on both sides, sir.

12  Q.  Well, they were certainly working together at times,

13  that's for sure, right?

14  A.  I agree, sir.

15  Q.  Okay.  And they were -- there's certainly evidence that

16  Professor Lee was compensated for his efforts, correct?

17  A.  I think we could debate that, sir.

18  Q.  Okay.  Well, he's certainly been paid over time; isn't

19  that right?

20  A.  That's unclear, sir.

21  Q.  Well, you heard that testimony, didn't you?

22  A.  Yes, but --

23          THE COURT:  Counsel, your area of inquiry needs to

24  be this witness's expert report or her personal knowledge.

25  But a rehash of other people's testimony through this

1    witness is not really appropriate.

2            MR. SOOBERT:  Thank you, Your Honor.

3    Q.  (By Mr. Soobert)  Now, you also provided opinion on

4    benefits that the '055 patent provides, correct?

5    A.  Yes, sir.

6    Q.  All right.  And if I understood you correctly, you're

7    attributing the entire benefit of transitioning to the

8    14-nanometer FinFET by the Defendants to the '055 patent, is

9    that what you're saying?

10   A.  I don't recall saying that, sir.

11   Q.  Okay.  So what are you saying to frame the issue with

12   respect to the benefit that the '055 patent provides?

13   A.  I have talked about three distinct benefits for which

14   I've presented evidence and analysis.  The first is at least

15   a 20 percent performance improvement.  The second is at

16   least a simultaneous 30 percent power improvement.  And

17   third is at least a 25 percent cost improvement.  The last

18   of the three is from 28 nanometers to 14.

19   Q.  Okay.  Now, all those benefits that you just summarized,

20   you're attributing solely to the '055 patent, aren't you?

21   A.  I'm attributing to the transistor design in the '055

22   patent, that's correct.

23   Q.  Right.  And in doing that, you haven't done any analysis

24   of what the '055 patent contributes over the so-called prior

25   art, have you?

1  A.  I've not done a prior art analysis because it wasn't

2  necessary in this case.

3  Q.  Okay.  So you haven't done an analysis to apportion

4  whatever incremental benefit the '055 patent might provide

5  over the prior art; isn't that right?

6  A.  Well, yes, I did.  I apportioned that to the transistor

7  in my analysis.

8  Q.  Your analysis didn't include the incremental advance of

9  the '055 patent over, for example, Inaba in your benefits

10  analysis, did it?

11  A.  No, sir.

12  Q.  Your benefits analysis didn't apportion for the

13  incremental advance of the '055 patent over Mizuno, did it?

14  A.  No, sir.

15  Q.  And those are both Toshiba patents, right?

16  A.  Yes, sir.

17  Q.  So putting those patents aside, you attributed the

18  benefits that you just described moments ago solely to the

19  '055 patent, right?

20  A.  Yes, sir.

21  Q.  Right.  And you heard the phrase at some point, haven't

22  you, there's parts inspiration and there's parts

23  perspiration in developing a concept?  Have you heard that?

24  A.  Yes, sir.

25  Q.  All right.  So the '055 patent provides arguably the

1  inspiration; is that true?

2  A.  I would say so, sir.

3  Q.  Did you attribute any of the perspiration in actually

4  building that 14-nanometer FinFET, what went into that

5  vis--vis the '055 patent?

6  A.  It wasn't necessary in this case.

7  Q.  Okay.  So you haven't attributed it -- let me rephrase.

8       You haven't attributed any portion of your benefits

9  analysis to the perspiration and the hard work that went

10  into building that device; isn't that right?

11  A.  That would have happened anyway.

12  Q.  Okay.  So when you were working at Intel to -- let me

13  rephrase.

14       When you and others were working at Intel to

15  implement the 22-nanometer device that you referenced in

16  your direct exam, do you recall that?

17  A.  Yes, sir.

18  Q.  Okay.  You spent a lot of money at Intel to develop that

19  device, right?

20  A.  We spent a lot of money to develop the 22-nanometer

21  node, that's correct.  The exact amount of money Intel spent

22  on the device is confidential to Intel.

23  Q.  Okay.  You spent a lot of money to develop the node,

24  correct?

25  A.  Yes, sir.

1  Q.  You had lots of engineers working on the project, right?

2  A.  Yes, sir.

3  Q.  How many engineers?

4  A.  I don't know, sir.

5  Q.  Hundreds?

6  A.  I don't know, sir.  I'd have to sit and think about it.

7  Q.  Less than a hundred?

8  A.  I -- I can't say at this moment, sir.

9  Q.  You just can't say a ballpark?

10  A.  I'd have to sit and figure it out, so...

11      THE COURT:  Let me remind each of you to make sure

12  the other one is finished talking before you begin to speak.

13  We don't need either of you talking over the other.

14      MR. SOOBERT:  Thank you, Your Honor.

15      THE COURT:  Let's continue.

16      THE WITNESS:  Thank you, sir.

17  Q.  (By Mr. Soobert)  The -- the investment of the resources

18  and the time and the sweat equity and the money that went

19  into building that 14-nanometer device at Samsung, you

20  didn't apportion any of that value to the benefits that are

21  achieved, did you?

22  A.  The node would have happened anyway.

23  Q.  So the answer to my question is no?

24  A.  No, sir.  The node would have happened anyway, sir.

25  Q.  And instead, you attributed the entire benefit that you

1  described to the '055 patent alone and no other patent,

2  correct?

3  A.  Yes, sir.

4  Q.  And Intel has lots of patents in this area, as well,

5  don't they?

6  A.  I'd assume so, sir.

7  Q.  All right.  So you didn't consider any of those patents

8  in doing an analysis of what the '055 might provide in terms

9  of benefits to getting to the 14-nanometer node, right?

10  A.  I considered no Intel patents in my analysis.

11  Q.  Yeah.  You didn't consider any other patents other than

12  the '055; isn't that right?

13  A.  That's correct, sir.

14  Q.  And with respect to the -- with respect to the Hafnium

15  oxide and the High-k material we were talking about

16  earlier --

17  A.  Yes, sir.

18  Q.  -- you didn't attribute any of the benefits that are

19  achieved with the 14-nanometer FinFET to the use of Hafnium

20  oxide, did you?

21  A.  No, sir.

22  Q.  With respect to the 14-nanometer FinFET devices that are

23  accused in this case, you didn't attribute the benefit of

24  any High-k material in those devices, did you?

25  A.  No, sir.

1    Q.  Whatever benefit that High-k Hafnium oxide material

2    provides, it's not provided by the '055 patent.  You agree

3    with that?

4    A.  Yes, sir.

5    Q.  Now, you also offered some thoughts on what you said

6    were commercially viable alternatives.  Do you recall that?

7    A.  Yes, sir.

8    Q.  You know that GlobalFoundries, the Defendant in this

9    action, offers a 14-nanometer high-performance SOI FinFET

10   commercially, right?

11   A.  That is 14FDX, sir?

12   Q.  Can you answer my question?

13   A.  Oh, wrong part number.  Yes, sir, I'm aware of that.

14   Q.  It's referred to as the 14HP?

15   A.  Yes, sir, I'm aware of that.

16   Q.  And that's commercially viable?

17   A.  It's -- I would say no, sir, on that one.

18   Q.  Okay.  But it's commercially sold?

19   A.  No, sir.

20   Q.  It's a high performance FinFET.  You agree with that?

21   A.  Yes, sir.

22   Q.  It's available on -- to a customer, right?

23   A.  A single custom boutique customer, yes, sir.

24   Q.  Okay.  That -- a single custom boutique customer is IBM,

25   isn't it?

1  A.  Yes, sir.

2  Q.  Okay.  That's not -- that's not a mom and pop shop

3  somewhere.

4  A.  No, sir, I agree to that.

5  Q.  Right.  That's a big-time company in this space, isn't

6  it?

7  A.  Yes, sir.

8  Q.  And they use that 14HP FinFET SOI technology today,

9  don't there?

10  A.  In their special Z servers, I believe.

11  Q.  They use that technology today, don't they?

12  A.  Yes, sir.

13  Q.  Now, we mentioned Intel a few times.  You worked there?

14  A.  Yes, sir.

15  Q.  And there was an Intel license you mentioned, right?

16  A.  Yes, sir.

17  Q.  Okay.  Did you negotiate that license?

18  A.  Absolutely not, sir.

19  Q.  Did you make the decision to take that license?

20  A.  Absolutely not, sir.

21  Q.  You don't know the rationale or the reasoning behind --

22  let me withdraw and rephrase.

23  You don't know the reason why Intel took that license?

24  A.  No, sir, I don't know that reason.

25  Q.  That decision was made by somebody else, right?

1  A.  Yes, sir, that's correct.

2  Q.  Right.  So you don't know whether Intel took that

3  license to avoid litigation, do you?

4  A.  I don't know, sir.

5  Q.  So we've all spent a lot of time in this case, haven't

6  we?

7  A.  Yes, sir.

8  Q.  A lot of time and money?

9  A.  I'd assume so, sir.

10  Q.  Right.  A lot of hard litigation going on here?

11  A.  Yes, sir.

12  Q.  Right.  And you don't know if Intel took that license so

13  they didn't have to engage in this, and they could focus on

14  developing products instead, right?

15  A.  I don't know, sir.

16  Q.  Okay.  And you were asked to do a number of things in

17  this case, including an infringement analysis, right?

18  A.  Yes, sir.

19  Q.  And you were asked to do an infringement analysis of

20  Samsung's products, right?

21  A.  Yes, sir.

22  Q.  And of GlobalFoundries's products, right?

23  A.  Yes, sir.

24  Q.  And of Qualcomm's products, right?

25  A.  In the sense that they use Qualcomm as a designer.  So

1  they -- foundry with Samsung and GlobalFoundries, yes, sir.

2  Q.  Samsung -- pardon me.  Samsung makes the products for

3  Qualcomm that are at issue in this case; isn't that right?

4  A.  Yes, sir.

5  Q.  Qualcomm itself doesn't make those products, do they?

6  A.  No, sir.

7  Q.  And you did an infringement analysis on those products

8  which is essentially an infringement analysis of Samsung's

9  products, isn't it?

10  A.  No, sir.  I analyzed the 14LPE/LPP transistors, which

11  are in a variety of products that I listed.

12  Q.  And that's Samsung technology that you analyzed,

13  correct?

14  A.  And GlobalFoundries.

15  Q.  And --

16  A.  I use -- I included many, many illustrations from

17  GlobalFoundries.

18  Q.  Pardon me.

19       So you did that analysis with respect to Samsung

20  and GlobalFoundries's products?

21  A.  Yes, sir.

22  Q.  Okay.  That are made for Qualcomm, right?

23  A.  Some products are, yes, sir.

24  Q.  Now, you didn't do an analysis of the Intel products,

25  did you?

1    A.  No, sir.

2    Q.  You weren't asked to do an infringement analysis of the

3    Intel products, were you?

4    A.  I was not, sir.

5    Q.  Okay.  And so, therefore, you have no opinion that

6    you've been asked to provide on the infringement based on

7    Intel's products; isn't that right?

8    A.  I have no opinion on Intel products, that's absolutely

9    correct.

10   Q.  TSMC, that's another competitor, right?

11   A.  Yes, sir.

12   Q.  You weren't asked to provide an infringement analysis

13   with respect to TSMC; is that correct?

14   A.  I was, sir, with regard to their 16-nanometer

15   technology.  And it was, I recall, a preliminary analysis

16   because it was only off TechInsights.

17   Q.  Okay.  So you didn't have any -- let me withdraw.

18        You didn't have the type of data that you needed

19   from TSMC to do the full-blown infringement analysis, did

20   you?

21   A.  I certainly would have preferred a richer data set,

22   that's correct.

23        MR. SOOBERT:  Your Honor, I'll pass the witness at

24   this time.

25        THE COURT:  Is there redirect by Plaintiff?

1          MR. CHOUNG:  Yes, Your Honor.

2          THE COURT:  Proceed with your redirect examination.

3          MR. CHOUNG:  Can I have DX-430?

4                    REDIRECT EXAMINATION

5     BY MR. CHOUNG:

6     Q.  Dr. Kuhn, do you recognize this figure?

7     A.  Yes, sir.

8          MR. CHOUNG:  And could I get the top portion blown

9     up?

10    Q.  (By Mr. Choung)  Now, the top portion here -- this is a

11    TEM of the Defendants' transistor?

12    A.  It's a TEM of their I/O transistor, that's correct.

13    Q.  Thank you.

14          And the white band, I believe, that's the silicon

15    dioxide.

16    A.  Yes.

17          MR. SOOBERT:  Object -- objection, Your Honor,

18    leading.

19          THE COURT:  Sustained.

20    Q.  (By Mr. Choung)  What is the white band?

21    A.  The white band is a silicon dioxide layer.

22    Q.  And what is the darker band above it?

23    A.  A Hafnium oxide.

24    Q.  Do you see two measurements here?

25    A.  Yes, sir.

1  Q.  And what's the first measurement?

2  A.  The silicon dioxide is measured at 2.2 nanometers, and

3  the Hafnium is measured at 2.13 nanometers.

4  Q.  Are they measured at the same location?

5  A.  It does not appear so, sir.

6  Q.  Does that affect the measurement here if you're looking

7  at the thickness of the layer?

8  A.  Yes, sir.

9  Q.  And how would it measure -- how would it affect that?

10  A.  Because there's manufacturing variation in these layers,

11  and if you move a little bit, you're going to get a

12  different number.

13  Q.  Now, Dr. Kuhn, the measurements that you took --

14      MR. CHOUNG:  And could we pull this up, this is at

15  50 -- 57.

16  Q.  (By Mr. Choung)  How did you take your measurements?

17  A.  Well, the first thing I did is I made a template so I

18  would space these things without being affected by the

19  measurement.

20      I then took the image, put the template in.  And

21  just like I would have done at Intel, I located one side of

22  the line on the boundary between the silicon dioxide and the

23  Fin and the other side of the line on the boundary between

24  the Hafnium oxide and the first metal layer and the metal

25  gate.  And I did this on high resolution.  And I walked

1  around and placed all the images without knowing the
2  measurement values when I placed them.  I just placed them
3  based on my own years of experience in doing High-k.
4  Q.  So you made a measurement at one location for each point
5  along the film?
6  A.  I -- I placed the lines.  And then what I did is I went
7  back and printed it out on high quality paper because I did
8  not want to measure off the screen.  We didn't do that at
9  Intel.  It warps things.
10        I printed it out.  Took a pair of precision
11  calipers, I then measured each line.  And I measured the
12  fiducial in the corner.  And I went back and plugged
13  everything into a spreadsheet to do the computation in the
14  spreadsheet that normally we would have done in a tool at
15  Intel.
16        MR. CHOUNG:  So can I go back to DX-430 now, and
17  can we blow up the top.
18  Q.  (By Mr. Choung)  So the way you measured -- so is the
19  way that you measured in order to get the thickness of the
20  total layer, that's different from what's shown here?
21  A.  Yes, sir.
22  Q.  Which would be more accurate?
23  A.  Well, when you measure two things, as -- as machinists
24  know, you'll get the variation of each thing together.  And
25  so if you're interested in some combined measurement,

1  usually a machinist will measure the total thing so that

2  they only have the measurement variation of the single

3  measurement.

4  Q.  So with respect to measuring the total thickness, would

5  this approach of measuring at two different points on the

6  two layers and then adding them be a rigorous way of getting

7  a correct value?

8  A.  I wouldn't call it as rigorous as measuring the total

9  distance.  You're just going to have more variation due to

10  your measurement.

11  Q.  Now, Dr. Kuhn, in your time at Intel, are these the

12  kinds of measurement --

13      MR. CHOUNG:  Well, can we go back to 57, please?

14  Q.  (By Mr. Choung)  Dr. Kuhn, at your time at Intel, this

15  manner of measurement, is this something you did normally?

16  A.  Yes.  As I mentioned, though, the -- at the time that I

17  was at Intel, the robots couldn't measure things very well

18  at all, and so we had a software tool that would do the math

19  for you, but that software tool required the tool itself

20  writing information into the image that would then be read

21  by the software tool.  Like many of your cameras will write

22  the date into the photograph so can you get it later.

23      It was not uncommon for this tool to have the wrong

24  information in it.  The usual reason being that somebody

25  just didn't reset the tool.  And so it was not uncommon for

1  us to have a very high quality TEM image for which the

2  software computing tool would not work correctly.  You'd get

3  like 30 feet or something.  And so you'd sit down and do it

4  exactly the way I described.

5  Q.  Roughly, at Intel, how many of these types of

6  measurements did you make over your career?

7  A.  Hundreds maybe.

8  Q.  And in this case, how many -- how many sets of

9  measurements, roughly, did you make in analyzing the

10  Defendants' products?

11  A.  I'm trying to remember, not even all of them are in my

12  report because I have a summary table, but I remember doing

13  at least six Fins for each of the situations that we had an

14  analysis.  So it was multiple samples because I wanted to

15  make sure I had a large data set.

16  Q.  So these kinds of measurements, are you an expert in

17  making these kinds of measurements off the TEMs?

18  A.  I spent years doing it.

19  Q.  Dr. Kuhn, you were shown this slide earlier?

20  A.  Yes, sir.

21  Q.  And on the left, they're showing the figure that we just

22  talked about that has the two separate measurements placed

23  at different locations, do you see that?

24  A.  Yes, sir.

25  Q.  And they show it compared to your measurement?

1    A.  Yes, sir.

2    Q.  Is this comparison at all a fair comparison of what you

3    did?

4    A.  No, sir.

5    Q.  Dr. Kuhn, earlier, you testified that -- that these

6    scales were talking about things that -- I think you used

7    the analogy of marbles, all right.  And so what accounts for

8    this -- the differences in the values?

9    A.  Well, if you think about a Fin, and if you're wrapping

10   these marbles around the Fin, there's going to be one or two

11   atom variations even in a very healthy process.  So you're

12   going to see some level of manufacturing variation even in

13   an extremely healthy uniform process.

14   Q.  All right.  And so when you're making your measurements,

15   you need to take a fairly large sample of the film to get

16   reliable data?

17   A.  Yes, sir.

18   Q.  And what about on the upper surface of the film?

19   A.  Well, when I started doing this, immediately I

20   recognized that there was no data available from Samsung and

21   GlobalFoundries that had enough data points.  There was one

22   excellent GlobalFoundries picture, SEM 236, and that was it.

23   That's when I started measuring a number of Samsung and

24   GlobalFoundries samples to get a large enough data set.  And

25   I expanded that data set to include multiple measurements at

1  the top of the Fin, one in the middle, and then two off on

2  the edges in order to be as fair as possible.

3  Q.  And the claims refer to the upper surface of the Fin,

4  correct?

5  A.  Yes, sir.

6  Q.  All right.  So in order to make the comparison between

7  the side-walls and the upper surface, you need more than one

8  point on the upper surface?

9  A.  Yes, sir.

10  Q.  The claim does not say the tip of the Fin, does it?

11  A.  No, it does not, sir.

12  Q.  You were asked about the 14HPSOI --

13  A.  Yes, sir.

14  Q.  -- process.  There's only one customer for that?

15  A.  That's correct, sir.

16  Q.  When was that available?

17  A.  I believe it was the second half of 2017.  It's been in

18  the near recent time frame.

19  Q.  Okay.  So not in the 2014/2015 time frame?

20  A.  No, sir.

21  Q.  All right.  And does anyone else in the world use that

22  particular process?

23  A.  No, sir.  I believe it's part of some special deal,

24  which is why I said not commercially available because I

25  believe it was custom for IBM alone.

1  Q.  And is there an expression for what you call such

2  boutique or custom-tailored process?

3  A.  I called it golden toilet once.

4  Q.  Dr. Kuhn, you were asked if you had conducted any

5  analysis on the Intel chips.  Do you recall that?

6  A.  Yes, sir.

7  Q.  Given your previous employment with Intel and your

8  position, ethically speaking, could you have done that kind

9  of analysis?

10  A.  No, sir.  I actually expressed concern at my deposition

11  that if there were such questions asked, I'd need to go seek

12  help from Intel legal.

13  Q.  Dr. Kuhn, I'd like to talk about the Hafnium oxide

14  that's been coming up quite a lot now.  I believe you

15  testified earlier that Intel innovated that feature?

16  A.  Yes, sir.

17  Q.  And that was something that you worked on directly, you

18  innovated that feature?

19  A.  I was head of the transistor group that made that

20  feature successful, yes, sir.

21  Q.  And that was done on a planar node or a planar

22  transistor?

23  A.  Yes, it was, sir.

24  Q.  Was it part of the planar transistors all the way down

25  to the 20 nanometers?

A. Yes, sir. Once we got it to work, it just replicated

forward.

Q. So it was a big deal for the progression of the trans --

the planar transistors?

A. Well, remember, when you -- when you get one of these

features in, once it's in, part of the assessment for it is

that it will survive through multiple generations. No

manufacturer wants to put in some fancy feature and have to

pull it out the next time around.

        And the idea is when you spend the energy to put

the new feature in like the High-k metal gate process, you

want it to replicate in subsequent generations in a very

straightforward fashion, or you're doing this massive amount

of redevelopment every time.

        So all of these things like the Intel string layer

process, the High-k metal gate process, and the FinFET

itself is you put all this energy into the first time you do

it, and then it just kinds of trucks along in sort of a

manufacturing mode.

Q. All right. So when Samsung tried to implement the

20-nanometer planar transistor, that Hafnium oxide, that had

been around?

A. Oh, yes, sir.

Q. And so that was implemented into the 20-nanometer node?

A. Now, here I'm going to speak without full assurance.

1   And this is from my experience at Intel, and I may not have

2   the details quite right.  But my understanding is that

3   Samsung first adopted IBM's version of High-k on 32 and 28,

4   and then switched to Intel's version on 20.  And I'm not a

5   hundred percent sure of that, but they may have done two

6   different High-k processes over the course of the time frame

7   here.

8   Q.  But that involved applying the Hafnium layer?

9   A.  Yes, it did.  And my point is Intel did it once and

10  stayed with it.  It's distinctly possible that Samsung did

11  it twice.

12  Q.  Okay.  20 nanometers, the planar transistor, I believe

13  you testified earlier that failed?

14  A.  Yes, sir.

15  Q.  All right.  So the Hafnium oxide -- well, let me -- let

16  me reframe that for you.

17          The FinFET -- the transmission to the FinFET, was

18  that based on the Hafnium oxide?

19  A.  No, sir.  As is often true with these introductions, you

20  put them in, you get a significant amount of benefit the

21  first generation, and then you squeeze the blood out of the

22  stone the next generation.  And then you got to do something

23  else.  You can't take out because you lose everything, but

24  you're kind of done with getting more innovation out of

25  that.

1        So if you look at, for example, Intel's

2   progression, we put in the string layer transistor in '90,

3   we squeezed the blood out of the stone in '650, okay,

4   everyone past that still had strained transistors, but it

5   just kinda clock along.  Then we put in High-k at 45,

6   squeeze the blood out of it at 32.  It's still there

7   clocking along, but then we had to put in the FinFET in

8   order to keep moving down the Moore's Law progression.

9   Q.  So 20 nanometers, even with the Hafnium oxide layer

10  being implemented, Samsung, GlobalFoun -- Samsung and the

11  other industry leaders that implemented 20 nanometers, those

12  still failed?

13  A.  Yes, I -- I am not for positive because I have to go do

14  research on this, but I believe that all of those failed

15  technologies had High-k.

16  Q.  So for the transition -- in order to get past the

17  roadblock to move to a lower node, was the innovation the

18  Hafnium oxide or the bulk FinFET design?

19  A.  The bulk FinFET.

20  Q.  So let's turn to the benefits that you discussed.  Given

21  what you just testified about the Hafnium oxide layer, is

22  there any way that's tied to the benefits attributable to

23  the bulk FinFET transistor development?

24  A.  No, sir.

25  Q.  Now, earlier you testified -- and I believe these are

1    the numbers you gave -- 20 percent performance improvement,

2    30 percent power improvement, and 25 percent in cost

3    savings; is that right?

4    A.  With the caveat that the cost savings is the double

5    jump, so it's not as clean as the other two numbers.

6    Q.  Thank you.  Thank you for clarifying that.

7    Where do those benefits come directly from?

8    A.  The benefits come from the transistor.

9    Q.  Is there any need to apportion out from there the

10   benefits that come from something else?

11   A.  No.  When I started the analysis, I was concerned that

12   such an apportionment would be necessary and concerned that

13   it might be very difficult to do with the data I had

14   available.  And then I sort of sat down and said, well,

15   let's look at the data before I panic here.  And the data

16   was startlingly clear in this case.

17        The 20-nanometer to 14-nanometer transition, the

18   data fell out very crisply where the improvement in

19   performance and power had been attributable directly to the

20   transistor.

21   Q.  So if we refer to, for example, a company's processing

22   technology, you're not saying there's no benefit from that,

23   are you?

24   A.  They have to do that anyway because if we look at this

25   generational thing, it's like you've got to put that next

1  generation out anyway, whether you went to FDSOI and the

2  magic wafer or you went to something else that, you know,

3  someone invented some wonderful new transistor technology.

4  All the rest of the infrastructure has to happen anyway

5  because that's the way Moore's Law works, and that's the

6  assumption of the industry.

7        Now, of course, if you didn't go to the next

8  generation, that's a whole different set of assumptions.

9  But in general we assume that there will be a next node and

10  that all the infrastructure has to happen anyhow.

11  Q.  So the benefits that might allegedly be attributable

12  to some other technology, that's just not coming out --

13  well, strike that.  Let me rephrase that.

14        So the benefits that might be attributable to some

15  other technology, that's just in a different universe from

16  what you're calculating, is that a fair statement?

17  A.  "Universe" is a little odd.  But let me put it this way.

18  Again, I'm going to stick by what I said before.

19        Because of the way the industry is structured,

20  there is going to be another node, and so there's the

21  expense of going into manufacture.  They are going to run

22  another node no matter what.  And it's not fair to attribute

23  the cost of what is going to inevitably happen.

24        If they kept with the same transistor, they would

25  have run another node.  They could have always kept the 28

1  device and redone their design rules in some spectacular

2  way, and generated a new node.  It would be a little weird

3  looking, and it might not have good performance, and it

4  might have a whole lot of other problems, but they could

5  have done that.

6  Q.  All right.  Now, would you be able to compare the

7  benefits to a device that doesn't work?

8  A.  Not easily.

9  Q.  Defendants' counsel mentioned a number of prior --

10 pieces of prior art.  Do any of those work?

11 A.  No, sir.

12 Q.  In fact, among those are -- are -- are there some that

13 are not even complete devices?

14 A.  Yes, sir.

15 Q.  Okay.  So you couldn't very well calculate benefits from

16 a -- from something that doesn't actually work?

17 A.  That's correct, sir.

18 Q.  All right.

19        MR. CHOUNG:  Could I have the slides PDX-3.55,

20 Slide 55?

21 Q.  (By Mr. Choung)  Now, earlier, you recall you were asked

22 about the claim term "wall-shape"?

23 A.  Yes, sir.

24 Q.  And you were asked to look at expressions in the patent

25 that called it the wall-shape, the length of the channel?

1  A.  Yes, sir.

2  Q.  Is that what this figure shows?

3  A.  Well, this figure certainly shows the walls.  You can

4  very clearly see the walls of the Fins coming down here.

5  Q.  All right.

6          MR. CHOUNG:  Can we get DX-1?

7          Can we go to Figure 12, 12d.

8          It's DX-1 at 18.

9          Thank you.

10  Q.  (By Mr. Choung)  Figure 12d, this is from the '055

11  patent?

12  A.  Yes, sir.

13  Q.  And what does this figure show?

14  A.  It shows a bulk FinFET device with an oxide wrapping

15  around the device with the top a little bit thicker.

16  Q.  And what does it show in terms of the shape of the Fin?

17  A.  It shows that the Fin is widening as it approaches the

18  substrate, as seen in this drawing.

19  Q.  All right.  So you're referring to the curving outward

20  as the size of the Fin come down?

21  A.  Yes, sir.

22  Q.  All right.  So this is expressly described in the

23  patent; is that correct?

24  A.  Oh, yes, sir, absolutely.

25  Q.  All right.  And is this the wall-shape?

1  A.  Yes, sir.

2  Q.  Now, earlier, we talked about Claim 15, do you remember

3  that?

4  A.  Yes, sir.

5  Q.  All right.  Do you remember what that claim -- what

6  feature that claim added?

7  A.  Yes, that's the claim with the chamfered corners that

8  the Court has interpreted as being beveled or rounded.

9  Q.  All right.  And in this figure, what would that do to

10  the shape?

11  A.  Let's see if I can do this.  I can't quite draw.

12      It would round the top in a similar way to what

13  we've seen in the TEMs.

14  Q.  All right.  So then you would have a rounded top, and

15  then the Fin comes down and enlarges out?

16  A.  A flaring bottom, yes, sir.

17  Q.  All right.

18      MR. CHOUNG:  Can you put up DX-430 again?

19  Q.  (By Mr. Choung)  And is that the same shape?

20  A.  Pretty much, sir.

21  Q.  And is that what you analyzed in your earlier testimony

22  when you walking through your infringement analysis when you

23  looked at this element, were you -- were you analyzing the

24  wall-shape with respect to the entire shape of the Fin as it

25  is in the accused products?

1  A.  Yes, sir.

2  Q.  Okay.  Now, let's talk about -- let's talk about the

3  combination of the silicon dioxide and Hafnium layer.

4  A.  Yes, sir.

5  Q.  Now, the claims don't require -- strike that.  Let me

6  phrase that better.

7        What kind of oxide layers do the claims require?

8  A.  The claims simply require a gate oxide on the side and

9  the first oxide on the top.  They specify nothing beyond

10 that.

11 Q.  All right.  And does the silicon dioxide and Hafnium

12 layers provide the gate oxide and the first oxide layers?

13 A.  Yes, the way we think about --

14        MR. SOOBERT:  Objection, form.

15        THE COURT:  Sustained.

16 Q.  (By Mr. Choung)  Does the silicon dioxide and Hafnium

17 layers provide the gate oxide layer?

18 A.  Yes, sir.

19 Q.  All right.  How do they contribute to the function of

20 the gate?

21 A.  So both the silicon dioxide and the Hafnium dioxide are

22 necessary for operation of devices.  At these channel

23 lengths, if you remove either layer, the devices don't work

24 properly.  And so you need to have both of those to have a

25 layer that fulfills the gate oxide as one would think of it

1  from a POSA's standpoint.

2  Q.  And can either one of those be a gate oxide?

3  A.  By itself, yes.  I mean, you can go off and make silicon

4  dioxide gates.  People have been doing that for 45 years.

5       You can also go off and make Hafnium oxide gates.

6  People have done that research.  They don't work very well

7  by themselves for complex reasons.

8       But at this geometry, both of them are necessary in

9  order to have the performance and power that you need in

10  these small devices.

11  Q.  And the claim says "a gate oxide," right?

12  A.  Yes, it does, sir.

13  Q.  And so that can be one or more?

14  A.  Yes, sir.

15  Q.  So it could be one or more gate oxides like silicon

16  dioxide and Hafnium?

17  A.  Yes, sir.

18  Q.  All right.  Dr. Kuhn, earlier, you were asked a series

19  of questions comparing the claims to the specification and

20  the figures in the claim -- in the patent, do you remember

21  that?

22  A.  A few minutes ago, you mean?

23  Q.  By Defendants' counsel?

24  A.  Yes, sir.

25  Q.  My apologies.

1    A.  Yes, sir.

2    Q.  In your analysis, you applied the claims to the accused

3    products?

4    A.  Yes, I did, sir.  I used as much data as I could get

5    from the Defendants and the addition of TechInsights to

6    apply each claim to specifications from the Defendants, as

7    well as images and testimony, as much information as I could

8    get for each claim.

9    Q.  All right.  So -- and you went through some rules of how

10   you conduct the infringement analysis, and you're not

11   supposed to compare the products to, for example, the

12   figures?

13   A.  That's my understanding, sir.

14   Q.  All right.  And so you applied the claim language to the

15   products?

16   A.  Yes, I did, sir.

17   Q.  All right.  So Dr. Kuhn, one last question, the work you

18   did at Intel, you were at every phase of a commercialization

19   of a product, correct?

20   A.  Is this for High-k or for FinFET?

21        MR. SOOBERT:  Objection, form.

22        THE COURT:  Just -- just a minute.

23        I'll sustain the question as to a leading question.

24   This is direct examination.

25        Refrain from leading the witness, counsel.

1    MR. CHOUNG:  Yes, Your Honor.

2    THE COURT:  Restate your question.

3  Q.  (By Mr. Choung)  Dr. Kuhn, at your time at Intel, what

4  were you all the phases of development and commercialization

5  that you worked on?

6  A.  In totality, all projects?

7  Q.  Yes.

8  A.  Oh, okay.  When I first joined Intel, I worked in pure

9  manufacturing.  In the parlance of the era, I ran -- I

10  worked at the manufacturing floor, I worked with

11  manufacturing technicians.  I came in at 6:00 in the morning

12  for passdown and left at 6:00 at night after passdown.  I

13  worked a pure manufacturing floor, as many of you folks are

14  probably familiar with.

15    And then I got promoted out of that, and I ended up

16  in the development cycle where I worked on 130 nanometers.

17  And at that point, I worked as a senior engineer on one

18  module of the process.

19    And sort of the same thing, was in at 6:00 in the

20  morning, we had passdown at 6:00, and same sort of thing.

21  That was development.  That was four years or so long.

22    And then I began to advance in the company at --

23  I'll skip some steps in between to afford boring everybody.

24  And when I did 45 nanometer, I was in charge of the

25  development cycle.  I ran the transistor development

1  activity.

2       And at that point, I started on like the first day

3  of pathfinding, and I moved on after we hand it off to

4  manufacturing in what's called the sync point, which is when

5  you get it to the manufacturing guys, and you've done the

6  copy exactly, and it's in their hands, and you run off to do

7  something else.

8       And then after 45, as I mentioned, I turned into a

9  fellow.  I did the FinFET project, which was a mixed

10 development research project because I was assessing the

11 transition between research and development.

12      And then after that, I did a number of research

13 projects, some of which I think are still confidential to

14 Intel, and I can't talk about.

15 Q.  Thank you, Doctor.

16      MR. CHOUNG:  We pass the witness.

17      THE COURT:  All right.  Is there additional cross?

18      MR. SOOBERT:  There is, Your Honor.  May I proceed?

19      THE COURT:  You may proceed.

20      MR. SOOBERT:  Mr. Dahm, may I have Slide 9?

21                    RECROSS-EXAMINATION

22 BY MR. SOOBERT:

23 Q.  All right.  Dr. Kuhn, counsel asked you about the first

24 oxide layer and the requirements of the claims just a moment

25 ago, do you recall that?

1  A.  Yes, sir.

2  Q.  All right.  The first oxide layer -- layer specified in

3  this Claim 1, in this Claim 1 -- and let me rephrase.

4      This limitation appears in every asserted claim at

5  issue in this case, right?

6  A.  Yes, sir.

7  Q.  And we already established -- I don't want to rehash,

8  but the claims define the invention and Professor Lee and

9  the Plaintiff need to live by the words in the claim.  You

10  understand that?

11  A.  Yes, sir.

12  Q.  So this claim limitation is very clear and says a first

13  oxide layer which is formed on the upper surface of said Fin

14  active region.  You see that?

15  A.  Yes, sir.

16      MR. SOOBERT:  Slide 13, please.

17  Q.  (By Mr. Soobert)  Now, these measurements on the

18  right-hand side that you put on, you put them on by hand,

19  right?

20  A.  Yes, sir.

21  Q.  And, again, you didn't send this out to a third party to

22  do this analysis, you did it yourself?

23  A.  No, sir, I didn't.  And, yes, sir, I did.

24  Q.  And you said you attempted to do it the same way that

25  Intel does it, right?

1  A.  For a manual measurement, sir.

2  Q.  Not using a robot?

3  A.  Neither using a robot, nor using the special tool that

4  comes with the TEM because I didn't have access to that.

5  Q.  And you also left Intel about four years ago, right?

6  A.  Yes, sir.

7  Q.  So the machines -- how often do they change those

8  machines out?

9  A.  I would say every technology generation.  So every two

10  years.

11  Q.  So you left four years ago?

12  A.  Yes, sir.

13  Q.  Two generations ago?

14  A.  Yes, sir.

15  Q.  So the machine that's making measurements when you left

16  and the techniques that you're using by hand, it's two

17  generations old, isn't it?

18  A.  One could say that, sir.

19  Q.  And we've established and counsel asked you that -- some

20  questions about Hafnium oxide.  The device wouldn't work,

21  the 14-nanometer range, without the Hafnium oxide, right?

22  A.  Not successfully, sir.

23  Q.  So you take that Hafnium oxide out, that device has no

24  value, right?

25  A.  Well, it certainly wouldn't work, and I would assume it

1  would have no value under the circumstances.

2  Q.  Right.  It wouldn't work, right?

3  A.  That's correct, sir.

4  Q.  And it would have no value commercially; isn't that

5  right?

6  A.  A non-functional device has no value, sir.

7  Q.  Okay.  And you didn't attribute any of that value that

8  was to that Hafnium oxide device, but if you remove it, the

9  device becomes useless, right?

10  A.  No, sir, I didn't attribute the Hafnium -- let me see.

11  Can you rephrase that, sir?

12  Q.  You didn't attribute any of the value of the device --

13  let me withdraw and rephrase.

14       You didn't attribute any of the benefits to the

15  device to that Hafnium oxide layer, right?

16  A.  No, sir.

17  Q.  And all the value is gone when you take it out, right?

18  A.  Yes, sir.

19  Q.  You looked at the Samsung 10-nanometer process, too,

20  didn't you?

21  A.  I did a preliminary analysis on it, yes, sir.

22  Q.  Is there a High-k layer in there?

23  A.  I don't actually recall.  I was so focused on the Fins,

24  I didn't know.

25  Q.  Okay.  You don't know one way or the other?

```
 1   A.  I don't know one way or the other.
 2   Q.  Now, the patent requires a Fin active region that's a
 3   wall-shape, right?
 4   A.  Yes, sir.
 5   Q.  Okay.  And we -- counsel asked you about rounding
 6   corners, chamfering, right?
 7   A.  Yes, sir.
 8   Q.  When you chamfer, you still need to have a wall-shape
 9   Fin active region, right?  That's still a requirement?
10   A.  Yes, sir.
11          MR. SOOBERT:  I have no further questions at this
12   time, subject to any further redirect.
13          THE COURT:  You pass the witness?  Counsel, you
14   pass the witness?
15          MR. SOOBERT:  I apologize, Your Honor.  I pass the
16   witness.
17          THE COURT:  All right.  Is there further direct
18   from the Plaintiff?
19          MR. CHOUNG:  No, Your Honor.
20          THE COURT:  Then you may step down, Dr. Kuhn.
21          THE WITNESS:  Thank you, sir.
22          MR. SHEASBY:  Your Honor, may we clear the binders?
23          THE COURT:  Yes.  We'll take a moment, clear the
24   binders.
25          All right.  Plaintiff, call your next witness.
```

1        MS. WEN:  Plaintiff calls David Witt, Your Honor.

2        THE COURT:  All right.  If you'll come forward and

3 be sworn, please, Mr. Witt.

4        (Witness sworn.)

5        THE COURT:  Please have a seat, sir.

6        THE WITNESS:  Thank you.

7        THE COURT:  You may proceed with your direct

8 examination, Ms. Wen.

9        MS. WEN:  Thank you, Your Honor.

10        THE COURT:  And you may also stand at the side of

11 the podium so you can see.

12      DAVID WITT, PLAINTIFF'S WITNESS, SWORN

13          DIRECT EXAMINATION

14 BY MS. WEN:

15 Q.  Mr. Witt, could you please introduce yourself to the

16 jury?

17 A.  Yes.  Good afternoon.  My name is David Witt.

18 Q.  Where do you live?

19 A.  I live in Plano, Texas.

20 Q.  How long have you lived in Texas?

21 A.  Over 35 years.

22 Q.  And are you married?

23 A.  I'm married, and I have four children.

24 Q.  Have you ever been an expert witness in a litigation

25 before?

1  A.  Never before.

2  Q.  Are you being paid for your work on this case?

3  A.  Yes.  I have rate of $250.00 an hour.

4  Q.  And is that compensation contingent on the outcome of

5  this case?

6  A.  Not at all.

7  Q.  And how many hours have you worked so far?

8  A.  Approximately 170.

9  Q.  Have you prepared any demonstratives for your

10  presentation today?

11  A.  I have.  And with any luck, they'll come up.  Okay.

12  Q.  What is your professional background?

13  A.  Okay.  It's -- it's summarized here.  But I got a

14  Bachelor of Science in electrical engineering from

15  University of Wisconsin.

16          After that, I went directly into the semiconductor

17  industry.  I worked there for over 30 years.  I've worked at

18  large semiconductor manufacturers, such as Texas

19  Instruments, Advanced Micro Devices, and Motorola.  I worked

20  on high end X86 microprocessors, as well as at TI,

21  smartphone SoCs directly like the ones that Qualcomm and

22  Samsung manufacture.  I've led worldwide teams of over 300

23  engineers when I was at TI.  I've worked on over 20 devices

24  that have gone into high volume manufacturing, represented

25  in billions of devices all over the world.

1   Q.  And could you remind the jury what SoC is?

2   A.  Oh, yes.  Sorry.  SoC -- you've probably heard that a

3   couple of times -- that stands for system on a chip.  The

4   way to think about it is all you guys have had PCs or --

5   I've certainly have had a few.  If you take all that, the --

6   the computer, the X86 processor, the graphics card that your

7   sons and daughters probably use because there's a GPU on it,

8   the camera display, you take all that hardware and you

9   shrink it all down into a very small 10 millimeter by 10

10  millimeter chip, so it's all the functionality on -- an

11  incredible small area.  That's what an SoC is.

12  Q.  And have you designed every part of an SoC like you just

13  described?

14  A.  Yes, every part.

15  Q.  And in your leadership role at Texas Instruments, did

16  you ever deal with the cost of different process

17  technologies?

18  A.  Yes, absolutely.  It's a trade-off that we had.  An

19  example would be a number of metal layers or where we set a

20  particular transistor threshold.  Those are the kind of

21  things we would do at TI.

22  Q.  And have you invented any patents?

23  A.  Yes.  It's shown here.  Roughly a hundred patents --

24  just over a hundred patents, all related to chip design.

25  All my time at Advanced Micro Devices.

1  Q.  And what are you currently working on?

2  A.  So I am working on a small startup called My Replica

3  Technology.  My two other co-founders and I are building a

4  computer vision processor.  That's really exotic thing to

5  try and make computers see.  That's a very important

6  problem.  And, believe me, it's very hard.  What you and I

7  take for granted is very, very hard for a computer to do.

8  Q.  And do you have expertise on assessing the performance

9  impact of transistors on chips and mobile -- mobile

10  products?

11  A.  Yes, it was part of the job at Texas Instruments.  We --

12  we had -- comparing our -- our currently generation with --

13  with -- with -- with our previous generation.  We looked at

14  billions transistors and run benchmarks to see how much

15  better they were.  So very similar to what I've been asked

16  to do here.

17         THE COURT:  Let me ask both of you to slow down

18  just a little bit, please.  We'll all benefit.

19         THE WITNESS:  Sorry.

20         MS. WEN:  Sorry, Your Honor.

21         THE COURT:  Let's continue.

22         MS. WEN:  And, Your Honor, I'd like to offer this

23  witness as an expert in the field of processor performance

24  and the management of chip development.

25         THE COURT:  Is there objection?

1          MR. KENNERLY:  No objection, Your Honor.

2          THE COURT:  Then the Court will recognize the

3    witness as expert in those designated fields.

4          Continue, Ms. Wen.

5    Q.  (By Ms. Wen)  Mr. Witt, what was your role in this case?

6    A.  Okay.  So it's summarized here.  But it's really to

7    evaluate the benefit of the 14-nanometer bulk FinFET

8    transistor as deployed in the 14-nanometer SoCs from Samsung

9    and Qualcomm, and comparing to that to the next best planar

10   devices at 20 nanometers or 28 nanometers.  And at these

11   geometries, there's actually billions of transistors in

12   these SoCs.

13   Q.  And what information did you review as part of your

14   assignment?

15   A.  So I'm an expert witness.  So I was given the access to

16   the Defendants' confidential documents, as well as the

17   deposition.  You probably heard several of those today.

18          I had internal benchmarks that I received from --

19   from Qualcomm, as well as the Defendants' public marketing

20   documents.  And -- and then just some independent analysis

21   of Samsung and Qualcomm benchmarks.

22   Q.  And have you done this type of analysis before?

23   A.  Yes.  It's part of the job at Texas Instruments.

24   Q.  Did you analyze the '055 patent infringement or

25   validity?

1    A.  No, that was Dr. Kuhn.  She's a worldwide expert in

2    infringement and validity.  I was just looking at the

3    real-world benefits of the billions of transistors we talked

4    about and showing what performance improvement and power

5    performance would be for that.

6    Q.  So based on your investigation, what overall conclusions

7    have you reached about the benefit of the 14-nanometer

8    FinFET transistor?

9    A.  So they're summarized here.  But just high-level, there

10   is significant speed and battery life benefits at the SoC

11   levels for the accused chips.

12   Q.  And do you have an opinion one way or another about

13   whether the benefits you described are attributable to the

14   14-nanometer FinFET transistor?

15   A.  Yes.  In my opinion, they're all attributed to the

16   14-nanometer FinFET.  The devices had to get down to

17   14 nanometer.  There was no other way of building

18   competitive devices at 14 -- without the 14-nanometer

19   FinFET.

20   Q.  Have Defendants discussed whether the benefits that you

21   observe come from the FinFET transistor design?

22   A.  Yes.  This is one of those public marketing documents.

23   This is from Samsung.  And I'll just read the highlighted

24   text.  This is PX-138:  The advantages to the 14-nanometer

25   FinFET platform is a result of utilizing 3D FinFET

1  transistors.

2          14-nanometer bulk FinFET.  This is Samsung's view.

3  Q.  And was Samsung the only Defendant that discussed the

4  relationship between the FinFET transistor and any

5  performance advantages?

6  A.  No.  The jury's probably seen this several times

7  already, but this is that internal document from -- from

8  GlobalFoundries.  So this is for engineers like myself would

9  see this document.

10         And the highlighted text there, it's talking about

11  the end of bulk CMOS scaling and planar CMOS hitting hard

12  scaling limits at 20 nanometers.

13         So what -- this is PX-0807.  So what this is

14  telling you is the planar device you see on the left was

15  actually used from the late 1960s all the way up to around

16  2010.  And pretty much regularly like clockwork every two

17  years you get a shrink that would double the number of

18  transistors, lower the voltage, reduce the cost, allowing

19  the performance and -- and power and cost benefits that

20  drove the semiconductor industry everywhere.

21         At 20 nanometers, so the second bullet there, they

22  start hitting hard scaling limits, which you heard about

23  this morning.

24         And -- and they had to come up with a radical

25  solution.  That's -- that's what I would call it, which is

the three-dimensional FinFET transistor you see on the right

that enabled the gate-level shrinking under 20 nanometers.

That was fundamental for the semiconductor industry.

Q.  Do chip manufacturers have a view on the ability to

shrink transistors like you just described?

A.  Yes.  This is kind of a marketing slide.  But -- so all

the happy stuff.

But this is the -- what I did at -- at Texas

Instrument.  I was in the smartphone industry, and so our

job was to build the -- you know, the smartphone handsets

that every year you'd want, you know, a -- you know, a

really cool new feature in it.

So -- so on today's smartphones, you can do 60

frames per second, 1080p recording, or download Netflix and

have it displayed and be able to -- to see that for hours.

A few years ago, that was just unimaginable, that kind of

performance.

The way that you achieve those new features was

smaller transistor, doubling transistors year after year

after year.  So the only way that we were able to provide

all those features in those new smartphones was smaller

transistors, just hard stuff.

Q.  So did you come to any conclusions about why Defendants

adopted the 14-nanometer bulk FinFET transistors?

A.  They adopted the 14-nanometer bulk FinFET transistor to

1  continue business after 20 nanometers.  20 nanometers was

2  just very unsuccessful, the last planar node.  They needed

3  this to get back on track.

4  Q.  And what technologies did Defendants use before adopting

5  14-nanometer FinFET transistors?

6  A.  The planar SoCs that they've talked about, those are

7  what the SoCs were based off of.  Samsung built 28-nanometer

8  planar and 20-nanometer planar SoCs, their Exynos line.

9        Qualcomm built 28-nanometer and 20-nanometer

10  Snapdragon.  That's their SoC smartphone line.  But they had

11  incredible problems, extreme problems with their

12  20-nanometer Qualcomm Snapdragon devices.

13  Q.  And why do you say that they had extreme problems with

14  their 20-nanometer chips?

15  A.  So with that, I'll -- I'll turn to this slide, which

16  actually is -- this is a Qualcomm marketing document

17  actually explaining the problem.

18        The -- the yellow line that you see kind of going

19  down into the right represents what the market requirements

20  are.  The performance and power in cost going -- increasing,

21  which is kind of seen, the line going down over time.

22        Lower is better, so you're below the line, you're

23  meeting or exceeding what the market requirements are.

24  Above the line is you're not providing what the customer

25  wants.

1        And this is PX-0522.  You see the highlighted red

2    there, and what that actually is talking about is that

3    Snapdragon SoCs and the performance power.  So the -- the --

4    the blue bars represent the chips, the -- the -- you know,

5    each individual chip at each generation.

6        Staying under the line is the goodness.  But there,

7    you can see the 20-nanometer where you're expecting the

8    performance and power to get better, it's really basically

9    no better than 28-nanometer device.

10        And you see it getting back on track at 14

11   nanometers.  And so you see a 28-nanometer hitting the

12   performance goals, 14 nanometer hitting the performance

13   goals.

14        And you recall from Dr. Kuhn talking about jumping

15   a generation, two generations.  There you can see it

16   physically in Qualcomm's own marketing slide, getting back

17   on track at 14 nanometer with the FinFET.

18   Q.  And did you review any other commentary on the market's

19   view of 20-nanometer technology?

20   A.  So this is PX-483.  This is AMD's view.  They're a

21   long-time GlobalFoundries customer.  And -- and, again, this

22   is their slide.

23        You can see there 28-nanometers, they're building

24   GPUs.  AMD's rating group builds GPUs.  They go on to those

25   graphics accelerator cards.

1          And you can see there, 28-nanometer planar, and

2    they skip completely and go directly to 14-nanometer FinFET.

3          If I just read the -- the highlighted text, this is

4    from AnandTech.  The highlighted text says:  The

5    20-nanometer planar process proved unsuitable for GPUs.  The

6    failure of 20 nanometers has essentially stalled GPU

7    manufacturing improvements.

8          This is AnandTech and AMD's view of what

9    20-nanometer planar was and its success for getting back on

10   track, 14-nanometer FinFET.

11   Q.  Could you explain what AnandTech is?

12   A.  Yes, I'm familiar with them.  We used them extensively

13   at Texas Instruments.  They're kind of the gold standard.

14   They do independent benchmark analysis of the latest and

15   greatest PCs or smartphones and tablets compared to the

16   previous generation.  So you can see what the relative

17   performance and power gains from generation to generation

18   is.

19   Q.  And were you able to find any information about the cost

20   associated with 20 nanometers?

21   A.  Yes.  For this, I'll turn to one of the depositions.

22   This is Dr. Vadi.  He's a Qualcomm engineer.

23          And, again, I'll just read the quote, what's --

24   what's highlighted in red.  He's talking about 28-nanometer

25   compared to 20-nanometer.

 1      20 was actually a very expensive technology node.

 2 20 is one of the most expensive technology nodes,

 3 significantly more expensive than 28 nanometers.

 4      This is Qualcomm's view of the cost of 20

 5 nanometers.  So performance and power was no better than 28,

 6 and it was significantly more expensive.  20-nanometer

 7 planar was a failure.

 8 Q.  So what did you do to evaluate the benefit of the

 9 14-nanometer bulk FinFET transistor?

10 A.  I used the same methodology or -- what I used at Texas

11 Instruments to compare our -- our next generation versus our

12 previous generation, as well as our competitor.  I used

13 standard benchmarks that measure key factors that you care

14 about in smartphones and -- as well as internal benchmarks.

15 Q.  And as you're comparing Defendants' 14-nanometer chips

16 with their 20 and 28-nanometer planar chips, what attributes

17 that are important to smartphones did you consider?

18 A.  So these are the three attributes I did, and they should

19 be familiar to -- well, to me.  But CPU performance -- this

20 is web browsing, so everyone wants your web pages to -- to

21 come up faster.  That's what this CPU performance will show.

22      Battery life, everyone wants all these cool

23 features to kind of last forever, so measuring battery life

24 is very important.

25      And GPU performance, that's actually that Netflix

1   video.  That's based on the GPU.  Any graphic games that you

2   want to play on your phone, that will be the GPU.  And the

3   fact the entire user interface, what you actually -- appears

4   as the display, that's all based on the GPU.  I compared

5   these three factors.

6   Q.  And do you have an opinion about the impact of the

7   14-nanometer FinFET transistor on CPU performance in

8   Samsung's chips?

9   A.  Yes.  This is the AnandTech benchmark.  We talked about

10  them before.  This is really a good one because this is

11  comparing Samsung Exynos SoCs at 20-nanometer compared to

12  14-nanometer.  And it's actually just looking at the

13  processor of CPU cores for a fixed amount of power.  And for

14  that fixed amount of power, the same cores, how much better

15  or faster would they run in -- in 14 nanometers compared to

16  20.

17          So here we see 18 to 25 percent improvement.

18  That's directly related to the 14-nanometer FinFET.  This is

19  PX-0500.

20          MS. WEN:  And at this point, Your Honor, I believe

21  the Defendant would like to seal the courtroom.  We're about

22  to go into some confidential --

23          THE COURT:  All right.  Is that correct,

24  Mr. Kennerly?

25          MR. KENNERLY:  We may not need that, Your Honor.

1    May I approach?

2         THE COURT:  Well, if either of you want to request

3    the Court to seal the courtroom, do so.  But don't speak for

4    the other.  If it's time, if you believe we're fixing to go

5    into confidential information that needs the protection of

6    the sealing process, let me know.  If not, we'll continue.

7         MR. KENNERLY:  With the same understanding that was

8    expressed on the record with respect to Dr. Kuhn -- that is,

9    at the level of the demonstratives that we've seen, we do

10   not make a request to seal.  If something goes below that,

11   then we have to consider that.

12        THE COURT:  Without a request directed to the

13   Court, we'll continue without the courtroom being sealed.

14        MR. KENNERLY:  Thank you, Your Honor.

15        THE COURT:  Let's continue.

16        MS. WEN:  Thank you.

17   Q.  (By Ms. Wen)  Do you have an opinion about the impact of

18   the 14-nanometer FinFET transistor on CPU performance in

19   Qualcomm chips?

20   A.  Yes, I do.  This is a spreadsheet showing a large number

21   of Qualcomm's internal benchmarks.  So this is their view of

22   what the relative benefit is.  The one I'm showing here is

23   processor speed impact of the Qualcomm benchmark.  And

24   comparing 28 planar to 14-nanometer FinFET, Qualcomm's

25   benchmarks said -- showed a 23 percent improvement in

1   processor speed ignoring power.  That 23 percent processing
2   speed from 28 to 14 is directly related to the 14-nanometer
3   FinFET.
4   Q.  And why did you use Qualcomm's 28-nanometer planar data
5   instead of -- instead of 20 even though you used 20 for
6   Samsung?
7   A.  So as -- as described before, from the slide from
8   Qualcomm, 20-nanometer was really no better performance in
9   power.  It -- Qualcomm's own word, it wasn't a successful
10  node.  So I'm using the baseline which is 28-nanometer of
11  their last successful Qualcomm Snapdragon SoC.
12  Q.  And do you agree with the performance numbers on this
13  spreadsheet?
14  A.  I -- I agree with them, but I think they're actually
15  conservative.  This is PX-0822.  This is talking about
16  relative clock speed independent power.  It can be much
17  better if you factor what power is, as well as processor
18  speed.
19          THE COURT:  I'm going to ask both of you to slow
20  down, please.  All right?
21          MS. WEN:  Yes, Your Honor.
22          THE COURT:  It's important that the jury follows
23  the testimony, and at the rate of speed you're both talking,
24  I have a concern that that's going to be difficult to do.
25  So please talk more slowly, all right?

1        THE WITNESS:  Yes, sir.

2        MS. WEN:  Yes, Your Honor.

3        THE COURT:  Let's continue.

4   Q.  (By Ms. Wen)  What is your opinion on the impact of the

5   14-nanometer bulk FinFET transistor on battery life in

6   Qualcomm's chips?

7   A.  So, again, this is a Qualcomm benchmark.  And this

8   spreadsheet is -- is the results from that Qualcomm

9   benchmark.  Here they're talking about battery life

10  benefits, and battery life benefit has an internal days of

11  use, how much that you spend on a call, how much that you

12  play games, how much you do video, how much you don't spend

13  any time doing anything at all.  That's what a battery life

14  benchmark is.

15       Again, using 28 to 14, they show a 45 percent

16  benefit in -- in -- in -- at the SoC level in their

17  benchmark.  That's actually as is shown here at the chip

18  level or the SoC level.

19       What matters to the end user is what you see at the

20  phone level.  And at the phone level, that SoC is going to

21  be driving speakers or displays, so roughly half of that

22  benefit that you see at the chip level, you'll see to -- to

23  the consumer at the phone.

24       So that's where the 22 and a half percent

25  improvement, half the 45 percent comes from.  That's a -- a

1  good estimate of battery life at the phone level.  And,

2  again, that's due to the FinFET.  That's due to the

3  14-nanometer compared to the 28-nanometer.  This is PX-0822.

4        THE COURT:   That's much better.  Thank you.

5        THE WITNESS:  Thank you.

6        THE COURT:  Let's continue.

7  Q.  (By Ms. Wen)  And were you able to assess the impact of

8  the 14-nanometer bulk FinFET transistor on battery life in

9  Samsung's chips?

10  A.  Yes.  It's -- it's very similar.  The only difference

11  was Samsung actually successfully shipped some 20-nanometer

12  devices.  So the benefit's roughly half.  That's a more

13  aggressive process technology.  The 45 percent at the chip

14  level would be roughly 22 and a half percent.  And you'd see

15  a 12.375 percent improvement in battery life at the phone

16  level for the Samsung Exynos device.  Again, you know, a day

17  of use or battery life for Samsung will be very, very

18  similar to what it'd be for Qualcomm.

19  Q.  And --

20  A.  Go ahead.

21  Q.  Now, is there a way to quantify these battery life

22  benefits that you've been talking about in terms of speed or

23  performance?

24  A.  Yes, absolutely.  This is a design rule, if it ever will

25  advance.  We use this design rule at Texas Instruments when

1  I was there for smartphones.  And -- and what it is, is just

2  a way to quantify the benefit of any particular feature

3  that's -- that you're adding.  If you add something, like

4  say that video that we talked about before, well, that's

5  going it take some amount of physical area, as well as

6  power.

7       So any additional benefit that you're putting on

8  the chip, you want it to have a minimum -- in our particular

9  case, it was 2X or better speed performance for that

10  incremental amount of power.

11       The other side of that is if you save any battery

12  life, which we kind of did in the previous benchmark, well,

13  then you can take whatever you saved in power from the

14  battery life, and then multiply that up by 2X for what

15  that's worth in speed performance.  So that's relating

16  battery life gains to what you could use for performance.

17       So the battery life power that we saw on the

18  previous slide then just gets multiplied up by 2X to show

19  this is what I could do to use that for relative

20  performance.  That's what we used at TI.

21  Q.  And so taking this design rule into consideration, could

22  you please summarize your opinions about the speed and

23  battery life benefits of the 14-nanometer bulk FinFET

24  transistor?

25  A.  Yes.  It's all summarized on this slide.

1  The Samsung Exynos, if you recall, that was a 20-nanometer

2  to 14-nanometer SoC comparison.  There with AnandTech we saw

3  18 to 25 percent improvement in max megahertz.  We saw

4  12.375 percent battery life.  And, again, with that 2X

5  multiplier, that would be 24.75 percent battery life

6  converted to performance.

7  Qualcomm Snapdragon, this is 28 to 14, the last good node we

8  could compare to.  Their own benchmarks was 23 percent for

9  what the max megahertz benefit was.  22 and a half percent

10  on battery life -- again, their benchmark.  And then that 2X

11  factor, 44 and a half battery life converted to performance.

12  These are very conservative numbers.  The user benefit will

13  actually be much greater.  We haven't actually looked at all

14  of what the GPU benefit would be, and that drives all the

15  graphics.

16  Q.  So then, Mr. Witt, what is your opinion about the

17  impact of the 14-nanometer bulk FinFET transistor on

18  graphics performance?

19  A.  It's shown on this slide.  This is AnandTech again.

20  This is their benchmark.  And this is a graphics-related

21  benchmarks.  It's actually running a game.  And the faster

22  the game runs, the better it is.

23        But they're actually looking not this -- so much

24  how much faster the game runs but how much power it takes.

25        And -- and you can see here in PX-0501 there's

1  actually when you look at performance over power for 20

2  nanometers to 14 nanometers, they're seeing 77 percent

3  improvement in GPU performance on this benchmark.

4         And so why that's true is -- is this is kind of how

5  GPU works, the graphics unit is, so you can think about them

6  as if RAM is over here and you have GPUs over here, the more

7  GPUs you have, really, which you can think about is hands,

8  as shown there, and you grab from the RAM, and you pull over

9  here, you manipulate a little, and you actually have to put

10 it back in the RAM.

11        So the GPUs kind of work like hands grabbing,

12 processing, and back.  But the more hands you have and the

13 faster the hands run, the faster the graphics is, it's just

14 that.  That's video, that's games, that's the user

15 interface, that's everything.

16        And so that's -- if you look at the 20-nanometer

17 Exynos device here, they had 6 GPU cores running at 700

18 megahertz in -- in -- in a fixed amount of area.  And then

19 in a smaller amount of area, because of the 14-nanometer

20 FinFET, they now have 8 GPU cores running at 800 megahertz

21 so they have more cores running faster in a smaller area at

22 a lower voltage.  That's giving you this about -- 1.77X

23 performance increase.  That's what GPUs provide and what the

24 real big advantage is at 14-nanometer FinFET.

25 Q.  And so what is your opinion about the relationship

1  between the 14-nanometer FinFET transistor and RAM?

2  A.  So for -- all right.  So this is my example.  I have to

3  explain RAM and GPUs.

4          So you think of RAM, next generation RAM is kind of

5  like tires, okay?  So if you have a faster interface you can

6  grab to and from the things faster.  But if you don't have

7  those GPUs on top, lots of GPUs, then it's kind of like

8  putting monster tires here, the RAM, on something without

9  lots of GPUs, a Toyota Prius, instead of something that

10  would actually take advantage of it.

11          What you really want to do is have lots and lots of

12  GPUs to make with those really big tires.  And that's the

13  kind of vehicle, and that shows you the combination of why

14  external RAM being the wheels and why you needs lots and

15  lots of transistors to take advantage of it.

16          And if you do that, then you see those -- those

17  really, really cool types of things that smartphones provide

18  today.

19  Q.  Thank you, Mr. Witt.

20          Do you have an opinion about the relationship

21  between Qualcomm and its foundries?

22  A.  Yes, I do.

23  Q.  What is that opinion?

24  A.  Qualcomm, because of their -- the volume that they

25  provide, they're the largest smartphone manufacturer.  And

1    their insight into -- into what they want smartphones to be,

2    basically Qualcomm enable -- or has as contractors both

3    Samsung and GlobalFoundries.

4    Q.  Sorry, did you say smartphone manufacturer?

5    A.  Sorry, I did.

6            Qualcomm enables or contracts the foundries,

7    Samsung and GlobalFoundries, because of their ability to

8    drive large number of -- of devices and their insight into

9    smartphones.

10   Q.  Have you reviewed any materials that reflect the

11   relationship between Qualcomm and its foundries?

12   A.  Yes, this is a master foundry agreement between Qualcomm

13   and Samsung.  This is PX-0809.

14           What this high-level agreement agrees is the

15   processing characteristics of the transistor.  Qualcomm,

16   driving for what they want Samsung to be, and -- and Samsung

17   agreeing to keep those parameters.  This is actually a very

18   important thing.  We only do this for a very, very specific

19   customers that can drive that kind of volume.

20           This is another one.  This is actually from

21   Qualcomm to GlobalFoundries.  What this says, high level, if

22   you read below about the 14LPP process, is they're going to

23   copy exactly that 14LPP process developed at Samsung over in

24   GlobalFoundries.  This is Qualcomm contracting with

25   GlobalFoundries.

1       The reason they do this is then they have a process

2  here, a process here, they can go to either one of these

3  fabs and get the most aggressive pricing.  That's kind of

4  what a contract -- contract is doing.

5  Q.  And in the materials you reviewed, did you find any

6  examples of the types of inter -- interactions that you just

7  described?

8  A.  Yes, this is PX-0044.  In -- Dr. Kim, an engineer at --

9  or technical VP at Samsung, here he's talking about changing

10  a threshold.  So this is a -- a change to a high-volume

11  process, that's something that's a fairly major thing.  You

12  don't just go off and do that unless the customer is

13  important enough.

14       And what he's actually talking about here is

15  changing the threshold.  Major difference, the biggest

16  difference is position of the threshold.  So this is a

17  change to the process flow that Qualcomm wants and that

18  Samsung's providing.

19       The other side of that, this is Dr. Vadi, principal

20  engineering manager at Qualcomm.  And so here in the

21  highlighted text, this is Dr. -- Dr. Vadi describing the

22  kind of changes that they -- that they would ask from --

23  from their contract fabrication facilities.

24       For instance, changing the metal stack, which is

25  kind of similar of what we saw at TI.  Or changing of

threshold characteristics.  Again, these are majors changes.
You'd only want to do these for your best customers.

        And this is the opposite of Qualcomm indicating
what they want to see.  And -- and Samsung providing on the
other side.

Q.  And, Mr. Witt, do you have an opinion about the 14 HP
SOI process?

A.  I do.

Q.  What is the 14 HP SOI process?

A.  The 14 HP SOI process is -- it's starting with the
different starting material.  This is silicon insulator
instead of bulk CMOS.  And then basically building a FinFET
transistor on top of the SOI.

Q.  And in terms of timeline, what -- was 14 HP SOI process
a commercially viable alternative to bulk FinFET?

A.  No, not at all.

        This is a slide.  I think Dr. Kuhn mentioned this,
as well, but the 14-nanometer bulk FinFET was ready for
production in 2014.  Both Qualcomm and Samsung went into
volume production in 2015/2016.  The soonest that 14 HP SOI
was available was 2017 Q3.  So from a smartphone business,
this is two or three years too late.  This is a nonstarter.

Q.  And so --

A.  Go ahead.

Q.  And so based -- I'm sorry.

1        And so based on all of the analysis that you've

2  done in this in this case, what are your overall

3  conclusions?

4  A.  These are my overall conclusions, summarizing them here.

5  14-nanometer FinFET provides significant performance and

6  power -- power benefits to the SoC.  Summarized here.

7  14-nanometer FinFET SoCs improved the usage of RAM, as we

8  saw, provides 77 better performance (sic) in graphics, from

9  performance in power perspective.

10        Samsung and GlobalFoundries are acting as

11  contractors for Qualcomm.  And 14 HP SOI is not a viable

12  alternative.  It's several years too late.  These guys

13  wouldn't be in business anymore if they had to wait for it.

14  Those are my conclusions.

15  Q.  Thank you, Mr. Witt.

16        MS. WEN:  Your Honor, I pass the witness.

17        THE COURT:  Cross-examination by the Defendants.

18        MR. KENNERLY:  Yes, Your Honor.  Thank you.

19        May I approach, Your Honor?

20        THE COURT:  You may.

21        MR. KENNERLY:  Thank you, Your Honor.

22        THE COURT:  All right.  Counsel, proceed with your

23  cross-examination.

24        MR. KENNERLY:  Thank you, Your Honor.

25        May it please the Court.

<u>CROSS-EXAMINATION</u>

BY MR. KENNERLY:

Q.  Good afternoon, Mr. Witt.

A.  Good afternoon, sir.

Q.  You discussed RAM just now.  RAM relates to storage capacity, right?

A.  That's true.

Q.  And in general, the more RAM you have the more storage capacity you would have in a smartphone?

A.  That's true.

Q.  And would you agree that RAM is really important in a smartphone?

A.  You need a certain fixed amount.  Over that amount, you don't need more.

Q.  Would you agree that consumers value RAM in making smartphones purchase decisions?

A.  Flash, if they think of that as RAM, less so DRAM.

Q.  You talked about RAM in your testimony so --

A.  That's correct.

Q.  And I apologize, sir, if you'll let me finish my question.

A.  Sorry, go ahead.

Q.  You spoke about RAM.  And so my question at that level, would you agree that RAM storage capacity is important as a feature in a smartphone?

1   A.  RAM is working space, not really storage capacity.

2   Storage capacity is flash.  That's permanent storage.  RAM

3   is working space.  So a certain amount of RAM is very

4   important, but once you get over working space, more doesn't

5   really help.

6   Q.  And would you agree that memory in the form of flash is

7   very important in a smartphone?

8   A.  Yes.

9        THE COURT:  Mr. Kennerly, pull the microphone a

10  little closer to you, please.

11        MR. KENNERLY:  Yes, Your Honor.

12  Q.  (By Mr. Kennerly)  Would you agree that consumers value

13  flash in making smartphone purchase decisions?

14  A.  Yes.

15  Q.  And generally, they would pay more for a smartphone that

16  had more flash memory, right?

17  A.  That is true.

18  Q.  Now, you were asked by Plaintiff to assess the benefit

19  of the 14-nanometer bulk FinFET transistors manufactured by

20  Samsung and GlobalFoundries, right?

21  A.  Can you repeat the question again?  Sorry.

22  Q.  Yes, sir.  You were asked by Plaintiff in this case to

23  assess the benefit of the 14-nanometer bulk FinFET

24  transistors manufactured by Samsung and GlobalFoundries.

25  A.  At the SoC level, yes.

1  Q.  And what do you mean by that?

2  A.  I don't -- I don't evaluate an individual transistor.

3  My experience is that hundreds of millions to billions of

4  transistors, and I never really did with individual

5  transistors.  So all my testimony has been what the value is

6  of a billion transistors compared to the next best 20,

7  28-nanometer SoC.

8  Q.  And, sir, you have a -- a binder in front of you with

9  some documents.  Your report is in there.  You have a

10  supplemental report, and I've included your deposition.  If

11  you'd look at your report, please, and that's at the first

12  tab.

13  A.  Okay.

14  Q.  Paragraph 2, please.

15  A.  Sure.

16  Q.  And in Paragraph 2, you state, quote, I have been asked

17  to assess the benefit of the 14-nanometer bulk FinFET

18  transistors manufactured by Samsung and GlobalFoundries.

19  You see that?

20  A.  Transistors, plural.  There's an S.

21  Q.  Right.  And I believe I included that in my question.

22  A.  I interpreted it as single transistor.  I probably just

23  didn't hear it.

24  Q.  Okay.

25  A.  But it's easier if you say SoCs just because I know

1  that's many transistors.

2  Q.  Well, what we have here is your report.  And your

3  opinion, you'd agree, in this case is set forth in your

4  report, right?

5  A.  That's correct.

6  Q.  And in your report, you stated your assignment in this

7  case, right?

8  A.  Yes, I did.

9  Q.  And is that a correct statement that I read into the

10  record at Paragraph 2 of your report?

11  A.  Yes.

12  Q.  You rely on Dr. Kuhn's opinion that the incremental

13  benefits of those 14-nanometer FinFETS are solely

14  attributable to the '055 patent, right?

15  A.  That's not true.

16  Q.  Not true.  You deny that?

17  A.  I didn't rely on her.  My thing -- my job was to assess

18  the performance benefits of 14-nanometer at the SoC to

19  20/28-nanometer at the SoC.  Mine was not to do the

20  individual benefit of or ability of the transistor itself.

21  Q.  So is your testimony that your opinion does not rely on

22  Dr. Kuhn's opinion?

23  A.  My testimony does not rely on Dr. Kuhn's opinion, yes,

24  that's true.

25  Q.  So -- strike that.

1          As you testified at the outset today, you didn't do

2   any analysis of the '055 patent -- patent invention against

3   the prior art, right?

4   A.  That's true.

5          MR. KENNERLY:  Mr. Dahm, may we pull up the

6   demonstrative, please?  And if we just have the -- the

7   first -- I'm sorry, the -- the first list.  And if we could

8   just have the first line.

9   Q.  (By Mr. Kennerly)  Is this a fair representation of what

10  you just testified to?

11  A.  Oh, yes, that's true.

12  Q.  Is it also correct that you didn't do any analysis to

13  determine what the advance of the '055 patent is over the

14  prior art?

15  A.  That is true.

16  Q.  You didn't evaluate or look at a single other patent

17  than the '055 patent in terms of analyzing the benefits that

18  are achieved from moving from 28-nanometer to 14-nanometer?

19  A.  That's true.

20  Q.  You also don't have any basis for an opinion as to the

21  value of the incremental differences between the '055 patent

22  and those patents that existed in the prior art, right?

23  A.  That's true.

24  Q.  You haven't done an analysis of the '055 patent against

25  any bulk FinFET that may exist in the prior art, right?

1   A.  That's true, sir.

2          MR. KENNERLY:  You can have that one.  Thank you.

3   Q.  (By Mr. Kennerly)  And you haven't considered the

4   differences between the accused FinFET technology of the

5   Defendants and any bulk FinFET in the prior art, right?

6   A.  You're talking about the Defendants' patents; is that

7   what you were asking?

8   Q.  I'm speaking about the Defendants, so I said in my

9   question the accused bulk FinFET technology of the

10  Defendants -- I'll reask the question.

11  A.  Okay.  Sorry.

12  Q.  You haven't considered the differences between the

13  accused FinFET technology of the Defendants and any bulk

14  FinFET in the prior art?

15  A.  That's true.

16  Q.  You didn't do any analysis to gauge the value of the

17  differences between the accused FinFET technology of the

18  Defendants and any bulk FinFET that's in the prior art?

19  A.  That's true.

20  Q.  And you haven't done any apportionment of any value of

21  the benefits that may be attributed to the '055 patent

22  versus any other patents that may have contributed to the

23  shift from 28 nanometer to 14 nanometer?

24  A.  That's true.

25  Q.  Looking at the demonstrative, you'd agree you haven't

1  analyzed or considered any of the items listed here in

2  forming your opinions?

3  A.  I believe -- if all these are related to patents and

4  prior art, I did nothing in -- in my report or in my

5  deposition relative to prior art.

6  Q.  The -- the characterization of your testimony, as stated

7  here on this demonstrative, is that a fair characterization?

8  A.  That's true.  There's a "14n" at the end.  You might

9  want to make that "nm," but the rest of it seems fine.

10 Q.  I believe we can probably fix that on the fly.

11 A.  Okay.

12       MR. KENNERLY:   Thanks, Mr. Dahm.

13 Q.  (By Mr. Kennerly)  While he's doing that, I will --

14 there you go.  Do you see it?

15 A.  Excellent.

16 Q.  Are you good with that?

17 A.  Yes.

18 Q.  Thank you.

19       Now, as to whether benefits are solely attributable

20 to the FinFET design, in your report you copied nearly

21 verbatim certain language from Dr. Kuhn's report, correct?

22 A.  No, that's not true.

23 Q.  Would it help you to see a paragraph from your report

24 versus hers?

25 A.  Sure.

1          MR. KENNERLY:  Mr. Dahm, can you pull that up,

2     please?

3          MS. WEN:  Your Honor, we object to this slide.  You

4     can't publish expert reports to the jury.  That's hearsay.

5          THE COURT:  What's your response, Mr. Kennerly?

6          MR. KENNERLY:  Dr. Kuhn has testified, and I'm

7     going to ask this witness questions about sentences in a

8     paragraph of his report that is verbatim from Dr. Kuhn's

9     report.

10          THE COURT:  Well, you may certainly ask him

11    questions about what he heard Dr. Kuhn testify to, but I

12    don't see any basis upon which to publish his report or Dr.

13    Kuhn's report to the jury.  The reports are prepared by the

14    experts so that each side knows the extent of the expert's

15    opinions and where they will and won't testify.  But they're

16    not to take the place of the testimony of a live witness.

17    So ask your questions.

18          MR. KENNERLY:  Your Honor, if I may, my first area

19    of inquiry is that he didn't write this -- this part of his

20    report, and then I will ask him about this very opinion

21    that's stated in this paragraph.

22          THE COURT:  You can ask him about the preparation

23    of his report and whether he did it or whether he had

24    assistance, but as I think I've made clear, his report, as

25    published to the jury, does not take the place of, nor

1  should it take the place of his live testimony.  So ask him

2  a question, and we'll get a live answer.

3          MR. KENNERLY:  Okay.

4  Q.  (By Mr. Kennerly)  Sir, would you turn to Paragraph 207

5  of your report?

6  A.  Sure.

7  Q.  Are you there?

8  A.  No.  I would say I'm lost.  Say 207?

9  Q.  Paragraph 207.  Oh, paragraph, I'm sorry --

10  A.  Got it.  Yes, I'm there.

11  Q.  Thank you, sir.

12          Beginning at the second sentence, you state, quote:

13  Transitioning from 28-nanometer or 20-nanometer to

14  14-nanometer FinFET designs provided two benefits:  (a) the

15  benefit of node shrinkage; (b) the intrinsic benefit of the

16  FinFET transistor design over planar.  Both of these

17  benefits are as a practical matter the sole result of the

18  FinFET.

19          Do you see that?

20  A.  Yes.

21  Q.  As to what you say there in your opinion, is the

22  intrinsic benefit of the FinFET design over planar.  You

23  agree that prior art FinFET designs also have that intrinsic

24  benefit, right?

25  A.  Can you restate the question, please?

1  Q.  As -- as stated in Paragraph 207, I'm referring to what

2  you say is the intrinsic benefit of the FinFET design.  Do

3  you see that?

4       It's --

5  A.  Yes, I see it.

6  Q.  And as to what you say is the intrinsic benefit of the

7  FinFET design over planar, you agree that prior art FinFET

8  designs also had that same intrinsic benefit?

9  A.  If you're asking was the 14-nanometer FinFET fundamental

10 to moving under 20 nanometers, which I think is what this

11 statement is, then absolutely.  I'm -- I'm getting lost in

12 what's the substatement that you're trying to make after

13 that.

14       MR. KENNERLY:  Objection, nonresponsive.

15       THE COURT:  I'll strike the portion of "I'm getting

16 lost in what's the substatement you're trying to make."  The

17 remainder of the answer, though, is responsive, and I'll

18 overrule the objection as to that portion.

19       Let's move along, counsel.

20 Q.  (By Mr. Kennerly)  Let me ask you the question,

21 Mr. Witt, you refer to here to the intrinsic benefit of the

22 FinFET transistor design over planar.  Do you see that?

23 A.  Yes.

24 Q.  What you say is the intrinsic benefit of the FinFET

25 design over planar, I'm not asking you to agree me, but that

1  intrinsic benefit is also present in prior art FinFET

2  designs?

3  A.  No, I -- I don't believe that.  Prior art FinFET

4  designs?

5  Q.  Yes, sir.

6  A.  If -- if FinFET designs have not been reduced to

7  practice, and I'm not aware of any that were reduced to

8  practice, then -- then -- then they have no attributable

9  benefit.

10  Q.  So a -- a FinFET design that's in the prior art, your

11  testimony is that it has no benefit over a planar design?

12  A.  Even if it was not reduced to practice, then it -- it

13  was never a transistor, and I certainly couldn't have

14  evaluated it in the transistors that the 14-nanometer

15  FinFETs are here.

16  Q.  So your -- your qualification is that your -- your

17  statement here in this paragraph, though not stated, is

18  about a FinFET design that has been reduced to practice

19  versus something that hasn't?

20  A.  Yes.  All the questions you said before were all about

21  prior art, and I absolutely agree, I did not look at prior

22  art.  But I did look at devices that were in production.

23  Q.  You'd agree -- I'm sorry, did you finish?

24  A.  I'm finished.

25  Q.  You agree with me that in Paragraph 207 you didn't make

1  this qualification about reduction to practice?

2      THE COURT:  You're going to have to speak up,

3  Mr. Kennerly.

4  Q.  (By Mr. Kennerly)  Did you hear me, sir?

5  A.  Is it all right if I reread 207 since you're --

6  Q.  Please?

7  A.  Okay.  Thanks.  Hold on.

8      Yes, all we're talking about here is the transition

9  from 28 to 20 to 14-nanometer FinFET.  That's what the

10  statement of 207 does.  And it's saying that all the

11  benefits there can be due to 14-nanometer FinFET.  Because

12  it will defend and enable the transition.  There's nothing

13  there about prior art, but that is talking about practically

14  devices moving from 28 planar to 20 planar to 14-nanometer

15  FinFET.  That's what this statement is about, speed and

16  energy efficiency.

17  Q.  I understand your testimony today, sir.

18      With respect, your report expressing your opinion

19  says 14-nanometer FinFET design.  And so I'm asking you

20  about the design, and that's the nature of my question.  So

21  I'm not asking about reduction to practice or anything else.

22      Your statement here, your opinion expressed here is

23  there is an intrinsic benefit of the design of the FinFET,

24  right?

25      THE COURT:  Counsel, approach the bench.

1           (Bench conference.)

2           THE COURT:  You're not going to argue with the

3   witness, Mr. Kennerly.  Ask him questions.  If he gives you

4   an answer that's contradicted by his report, then you may

5   seek leave to publish that portion of the report to impeach

6   him.  But ask him questions, get answers, don't argue with

7   him.  All right?

8           MR. KENNERLY:  Understood, Your Honor.

9           THE COURT:  All right.  Let's proceed.

10          MR. SHEASBY:  Thank you, Your Honor.

11          (Bench conference concluded.)

12          THE COURT:  Let's proceed, please.

13  Q.  (By Mr. Kennerly)  Let's talk about the other stated

14  benefit you referred to there, which is node shrinkage.  Do

15  you see that?

16  A.  Yes, I do.

17  Q.  And as to the benefit of node shrinkage you relied on

18  deposition testimony from a GlobalFoundries witness,

19  Dr. Samavedam.  To the effect that shrinking the size

20  provides most of the performance and energy benefits, right?

21  A.  Yes, I see in Paragraph 208.

22  Q.  And he testified that at least some of the performance

23  and energy benefits come from other device improvements like

24  contact resistance, oxide scaling, et cetera, agreed?

25  A.  Yes, I see it there.

1 Q. And you would agree that those other device improvements

2 are distinct from the benefit of node shrinkage and distinct

3 from the intrinsic benefit of the FinFET design?

4 A. Before 20 nanometers, sure.

5 Q. The testimony on which you rely is not limited to before

6 20 nanometers, agree?

7 A. For Dr. Samavedam, I believe that's true. But I'd have

8 to see -- read his entire deposition slowly again.

9 Q. Well, you certainly read it before preparing your

10 report, correct?

11 A. Yes, that's true.

12 Q. And am I correct that you assumed no contribution from

13 those other device improvements in coming up with your

14 estimated performance and power benefits in this case?

15 A. It's -- again, there would not be a 14-nanometer node,

16 so it was the invention that made them move to 14, so -- and

17 20 nanometer clearly was not a -- a good node. So it was

18 what enabled you to move down to 14 nanometers.

19 Q. And so the answer to my question is, no, you assume no

20 contribution from that, right?

21 A. There would not have been a node without the FinFET.

22         THE COURT: Gentlemen, what do I need to do to get

23 you to speak up. This is a big room. There are a lot of

24 people. You're mumbling. Speak up. You have microphones.

25 I'm tired of having to remind you of this.

1          MR. KENNERLY:  Yes, Your Honor.

2          THE COURT:  Let's continue.

3          MR. KENNERLY:  Yes, Your Honor.

4          THE COURT:  We're wasting everyone's time if the

5    jury can't hear what you're asking and what you're

6    answering.

7    Q.  (By Mr. Kennerly)  Sir, you assume no contribution from

8    those other device improvements, right?

9    A.  That's true.

10   Q.  Now, your estimated performance and power benefits for

11   Samsung's Exynos chips and Qualcomm's Snapdragon chips are

12   different, right?

13   A.  Yes.

14   Q.  And at least for power consumption, you estimate a much

15   bigger improvement, almost double, for Qualcomm's Snapdragon

16   versus Samsung's Exynos, right?

17   A.  Are you talking about CPU or battery or GPU

18   specifically?

19   Q.  Since you have your report in front of you, if you'll

20   look at the prior paragraph, it's 206?

21   A.  Okay.

22   Q.  And I'm referring to power consumption or power as

23   stated in your -- your table there.  So comparing Exynos and

24   Snapdragon, you'd agree with me that Snapdragon is about

25   double?

1  A.  For -- for battery life benefit, correct.

2  Q.  Okay.  And you'd agree that both Exynos and Snapdragon

3  contain the same size 14-nanometer FinFETs, right?

4  A.  Correct.

5  Q.  And would you agree that the designs of Samsung's Exynos

6  chips and Qualcomm's Snapdragon chips are not identical?

7  A.  They're not identical.

8  Q.  And would you agree that where those designs are not

9  identical, where they differ, they differ in ways that are

10  not solely attributable to the '055 patent?

11  A.  Could you repeat the question, please?

12  Q.  Where the designs differ between the Exynos and

13  Snapdragon chips, would you agree that they differ in ways

14  that are not solely attributable to the patent?

15  A.  Relative to the 14-nanometer Exynos and Snapdragon

16  devices?

17  Q.  Yes, relative to each other, those differences, you'd

18  agree, are not attributable to the patent?

19  A.  They used the transistors in different ways.  The

20  transistors are attributable to the patent.  So they use

21  different circuits, and they use different number

22  transistors of circuits, so -- but underlying it, it's still

23  the same transistor.

24  Q.  The -- the numbers that you state in your chart, those

25  differences are not solely attributable to the patent,

1  right?

2  A.  One of the parts is 20 nanometers, and the other part is

3  28 nanometers.  That's probably the biggest difference

4  comparing to 14 nanometers is -- is the previous planar SoC.

5  Q.  You heard Dr. Kuhn's testimony about Hafnium oxide,

6  right?

7  A.  I did.

8  Q.  You agree that use of the additional Hafnium oxide layer

9  was important to the ability to scale down to 14 nanometers?

10  A.  It's really not my expertise.

11  Q.  You don't have any reason to disagree with Dr. Kuhn's

12  testimony?

13  A.  No, she's a -- a perfect expert for that.

14  Q.  Are you able to agree that you couldn't have gotten to

15  14 nanometers without Hafnium oxide?

16  A.  I'm not the person to ask that, truly.

17  Q.  Would you agree that if the products could not have

18  gotten down to 14 nanometers, there would have been no

19  value, right?

20  A.  The smartphone business would have come to a halt.

21       MR. KENNERLY:  That's all I have, Your Honor.  Pass

22  the witness.

23       THE COURT:  Redirect, Ms. Wen?

24       MS. WEN:  Yes.

25                    REDIRECT EXAMINATION

1  BY MS. WEN:

2  Q.  Do you recall when you talked to opposing counsel about

3  reduction to practice?

4  A.  Yes.

5  Q.  What did you mean by reduction to practice?

6  A.  That the only devices that I could look at were devices

7  that had actually, you know, gone as far as -- as being

8  built as devices and put in the phones.  So I wasn't able to

9  look at anything that wasn't a real large device that had

10 gone through production.

11 Q.  And do you recall when opposing counsel asked you about

12 whether you analyzed the claims of the '055 -- I'm sorry,

13 whether you analyzed prior art?

14 A.  Yes.

15 Q.  Why didn't you do that analysis?

16 A.  If there had been any prior art in 14-nanometer FinFET

17 or any type of FinFET device that had gone in production --

18 you know, people would have used it.  I believe all the

19 previous attempts at it were -- were not successful.  So

20 that's why I didn't -- you know, if -- if 14 nanometer -- if

21 FinFETs had worked, we would have seen them in SoCs, and the

22 only ones we saw were relative to the '055 patent.

23 Q.  And do you know if the 20-nanometer node used Hafnium

24 oxide?

25 A.  Only from Dr. Kuhn's testimony this morning.

1  Q.  And do you know if the 20-nanometer node used High-k

2  metal gates?

3  A.  Only from Dr. Kuhn's testimony this morning.

4          MS. WEN:  That's all, Your Honor.  I pass the

5  witness.

6          THE COURT:  Is there further cross-examination?

7          MR. KENNERLY:  No, Your Honor.

8          THE COURT:  All right.  You may step down, Mr.

9  Witt.

10         THE WITNESS:  Thank you.

11         THE COURT:  Ladies and gentlemen, we're going to

12  take another brief recess.

13         You may close your notebooks and leave them in your

14  chairs.  Follow all my other instructions, and we'll be back

15  in here shortly to continue.  The jury is excused for

16  recess.

17         COURT SECURITY OFFICER:  Rise for the jury.

18         (Jury out.)

19         THE COURT:  Be seated, please.

20         Mr. Sheasby, who does Plaintiff intend to call

21  next?

22         MR. BUNT:  Your Honor, we're going to call Roy --

23  Mr. Roy Weinstein.

24         THE COURT:  All right.  Do you have deposition

25  witnesses to call?

1          MR. BUNT:  We do have some deposition --

2          THE COURT:  They will follow Mr. -- Dr. Weinstein?

3          MR. BUNT:  Mr. Weinstein, yes, sir.  Yes, Your

4   Honor.

5          THE COURT:  All right.  What's your best estimate

6   as to your direct examination of your damages expert?

7          MR. BUNT:  About an hour and 10 minutes.

8          THE COURT:  All right.  Thank you for that

9   information.

10         We stand in recess.

11         (Recess.)

12         COURT SECURITY OFFICER:  All rise.

13         THE COURT:  Be seated, please.

14         All right.  Plaintiffs, are you prepared to call

15  your next witness?

16         MR. BUNT:  Yes, Your Honor.  We're going to call

17  Mr. Roy Weinstein.

18         THE COURT:  All right.  Let's bring in the jury,

19  please, Mr. Elliott.

20         COURT SECURITY OFFICER:  All rise for the jury.

21         (Jury in.)

22         THE COURT:  Plaintiff, call your next witness.

23         MR. BUNT:  Thank you, Your Honor.  Plaintiff calls

24  Mr. Roy Weinstein.

25         THE COURT:  If you'll come forward and be sworn,

1    please, Mr. Weinstein.

2            (Witness sworn.)

3            THE COURT:  Please have a seat, sir.

4    Mr. Bunt, you may proceed with your direct examination of

5    the witness.

6            MR. BUNT:  Thank you, Your Honor.

7            ROY WEINSTEIN, PLAINTIFF'S WITNESS, SWORN

8                    DIRECT EXAMINATION

9    BY MR. BUNT:

10   Q.  Mr. Weinstein, can you please state your full name for

11   the jury?

12   A.  Roy Weinstein.

13   Q.  And can you tell the jury a little bit about yourself?

14   A.  My name is Roy Weinstein.  I live in Los Angeles,

15   California.  I'm married with two grown children.  I'm an

16   economist and a managing director at an economic research

17   and consulting firm known as Micronomics.

18   Q.  And why are you here today?

19   A.  I'm here today to talk about a fair amount that should

20   be paid by the Defendants to KAIST for use of its patented

21   technology.

22   Q.  And, Mr. Weinstein, we're going to go through your

23   analysis in detail in just a moment.  But can you first

24   provide the jury with your conclusions?

25   A.  Yes, sir.  I have concluded that damages adequate to

1  compensate for infringement for the period November 29th,

2  2016, through May 14th, 2018, are $321,438,451.00 for

3  Samsung; $296,851,609.00 for Qualcomm; and $98,541,744.00

4  for GlobalFoundries.

5  Q.  Is this a slide that you've prepared for us?

6  A.  Yes, sir, it is.

7  Q.  And have you prepared other slides to assist the jury

8  with your testimony?

9  A.  I have.

10  Q.  What is it that you do that enables you to come up with

11  these figures?

12  A.  Well, I'm an economist by training.  I have academic

13  training in economics and accounting, economic theory,

14  statistics, and econometrics.  I try and stay current with

15  academic and professional literature.  I'm a member of

16  professional associations that like economists like myself

17  tend to join.

18        And what I do as an economist is study questions

19  such as how prices are determined.  Economists also look at

20  things like interest rates and employment and the economy,

21  although I personally don't do too much of that.  But I also

22  use complex models to understand and measure various

23  economic relationships and inter -- interrelationships.

24  Q.  Mr. Weinstein, is your firm being compensated for the

25  work you've done on this case?

1  A. Yes, sir, it is. My firm, Microeconomics, receives

2  $750.00 per hour for my time.

3  Q. And do you believe that the Defendants' experts are

4  being compensated for their time?

5  A. I do.

6  Q. And is your compensation independent of the outcome of

7  this litigation?

8  A. No, sir, it isn't in any way.

9  Q. It is dependent or is not?

10  A. No. My composition or my firm's compensation is in no

11  way dependent on how this litigation winds up.

12  Q. Can you tell the jury about your educational background?

13  A. Yes. I received a Bachelor of Business Administration

14  degree with honors in economics from City College New York

15  back in 1964, and a Master of Arts degree, also in

16  economics, from the University of Chicago in 1967.

17  Q. Did you receive any honors and awards in connection with

18  your education?

19  A. I did. At City College, I received a couple of awards

20  for academic performance, and at graduate school, University

21  of Chicago, I received fellowships from the Walgreen

22  Foundation and the U.S. Public Health Service.

23  Q. And have you been honored since leaving school for your

24  work as a professional economist?

25  A. Yes, sir, I have. I received one award from the

1   Business and Economics Alumni Society at City College back

2   in 2008 or 2005.  It was called the Career Achievement

3   Award, and I'm the first recipient of that award.

4   Q.  And can you briefly summarize your professional

5   experience for the jury?

6   A.  Yes.  I've been engaged in economic research and

7   consulting continuously since leaving school.  I've

8   published articles dealing with the -- the calculation of

9   damages in patent infringement cases that was published by

10  the Journal of the Patent and Trademark Office Society or

11  the PTO.  Another article published by the Federal Circuit

12  Bar Journal, also dealing with the calculation of patent

13  damages.  I've been invited frequently to speak at various

14  public forums or seminars, again, on the calculation of

15  patent damages.  And I'm a member of professional

16  associations, as I indicated, the American Economic

17  Association, and also the Dean's Council at my alma mater.

18  Q.  Can you identify some of the consulting clients that

19  you've had over the course of your career?

20  A.  Yes.  So over the years I've had a number of fairly

21  well-known names as clients, Adidas and Dell and Intel,

22  National Basketball Association, Halliburton, Ericsson, lots

23  of others.  And I've also had a fair number of clients that

24  I had never heard of until the engagement.  So over the

25  years, I've been fortunate to have an interesting -- an

1　interesting group of clients.

2　Q.　What sort of assignments have you been asked to

3　undertake as an economist during your career?

4　A.　Well, as with the interesting set of clients, I've had

5　interesting assignments.　I've been asked to calculate the

6　value of oil rights off the City of Long Beach in

7　California.　I was asked to do that by the City of Long

8　Beach in the state of California.　I've done a number of

9　economic impact studies, economic impact of the Rose Bowl

10　and the Tournament of Roses Parade on -- on -- Pasadena and

11　Los Angeles, also economic impact studies on the Oscars and

12　the Emmys, and most recently, the National Basketball

13　Association All Star game which was held in Los Angeles.

14　And I -- I do those studies because the communities are

15　interested in knowing something about the impact that those

16　studies have on -- on the local environment, both businesses

17　and -- and residential areas and traffic and things of that

18　sort.

19　　　　　And, obviously, I also have done quite a bit of

20　work involving the calculation of patent damages in numerous

21　different context.

22　　　　　MR. BUNT:　Your Honor, at this point, we'd like to

23　offer Mr. Roy Weinstein as an expert on the valuation of

24　intellectual property and the calculation of patent damages.

25　　　　　THE COURT:　Is there objection?

1           MR. KENNERLY:  No objection.

2           THE COURT:  Then the Court will recognize the

3   witness as an expert in those designated fields.

4           Continue, counsel.

5           MR. BUNT:  Thank you, Your Honor.

6   Q.  (By Mr. Bunt)  Mr. Weinstein, can you tell the jury what

7   materials you considered in reaching your conclusions in

8   this case?

9   A.  Yes, sir.  I had access to materials that were made

10  available to me both from KAIST and the Defendants, as well

11  as materials that I gathered on my own.  I looked at the

12  patent-in-suit.  I had a chance to look at deposition

13  testimony from many of the individuals involved in this

14  case.  I had access to quite a bit of internal information

15  from the Defendants, internal presentations, internal

16  correspondence, marking materials, license agreements, quite

17  a bit of their sales and financial information over time.

18          And then in the right-hand column of this slide,

19  there's information, most of which I gathered on my own at

20  Micronomics, information on mobile device pricing and

21  various specifications associated with mobile devices.  We

22  collected industry analyst reports, trade press.  There's

23  academic literature that I review from time to time.  And

24  then I had access to other expert reports in this case.

25  Q.  Can you provide the jury with your understanding of why

patent rights are important in the United States?

A.  Yes.  Patent rights are important because they are

designed to encourage innovation.  The idea behind patent

rights is that they give the patentholder the -- the right

to exclude others from using an invention.  And by so doing,

the concept is that individuals and entities will be

encouraged to innovate and develop new inventions.  And they

are protected by the patent system in that if anyone else

wants to use those inventions, they need permission from the

patentholder.  And so it's from that that the concept of --

of patent rights has evolved.

Q.  Is there a name for agreements that are reached between

patentholders and the entities that wish to have access to

those patents?

A.  Yes, sir, there is.  Those agreements are called license

agreements.  And license agreements are entered into by the

patentholder, which typically is known as the licensor, and

the entity which wants permission to use the patent, and

that entity is known as the licensee.

Q.  And how do these license agreements come into existence?

A.  They come into existence through negotiations between

the patentholder and the licensee.  In other words, the two

entities sit down and negotiate fair payment for permission

to use the invention.

Q.  And in this case, how did you go about determining what

1  constitutes fair compensation to KAIST for use of the

2  patent-in-suit?

3  A.  Well, I began with a patent statute.  And this is a U.S.

4  Government patent statute.  And it says that the claimant,

5  that's -- that's the patentholder, should receive damages

6  adequate to compensate for infringement but in no event less

7  than a reasonable royalty for use of the invention made by

8  the infringer.  And so that's the starting point.  The

9  starting point is that damages should be sufficient to

10  compensate for infringement but not less than a reasonable

11  royalty.

12  Q.  And then how do you go about determining damages

13  adequate to compensate for infringement?

14  A.  What you do in order to -- to answer that question is

15  you put the entities together.  And you have them conduct

16  what's called a hypothetical negotiation between the

17  patentholder and the parties that are accused of

18  infringement.

19        So in this case, in this -- in this slide, I depict

20  a negotiation.  It's called a hypothetical negotiation

21  because it didn't actually happen.  But we put them back

22  together in January of 2015 because that's the first date

23  of -- of alleged infringement in this case.  And we say to

24  them negotiate for rights to use the '055 patent.  Negotiate

25  for permission to use the patent before infringement occurs.

1  And it's called a hypothetical negotiation because it didn't

2  actually occur.  But that's how we get to the answer of what

3  damages should be adequate to compensate for infringement.

4  Q.  And why did you use this idea of a hypothetical

5  negotiation?

6  A.  In my experience, it's used in virtually every patent

7  damage case that I've -- I've ever been aware of.  And I've

8  been doing patent damages work now since the late 1980s.

9  But in every situation, this hypothetical negotiation

10  framework is the one that in my experience both the

11  Plaintiff and the Defendant use to resolve the question of

12  what fair payment would be.

13  Q.  Now, in the slide that you prepared, you have listed

14  P&IB on the left-hand side as the licensor.  Doesn't the

15  patent belong to -- to KAIST IP US?

16  A.  Yes, it does.  My understanding is that the patent was

17  transferred by P&IB to KAIST US some time in 2016.

18          But in 2015, at the time of the hypothetical

19  negotiation, P&IB had the patent, and so P&IB would be

20  sitting at this negotiating table.

21  Q.  The damages that you have calculated are owed to KAIST

22  IP US not P&IB; is that right?

23  A.  Yes, sir.

24  Q.  Are there certain assumptions that are necessary for

25  purposes of this hypothetical negotiation?

1  A.  Yes, sir, there are.

2  Q.  And can you talk us through those?

3  A.  Yes.  The hypothetical negotiation framework carries

4  with it a series of assumptions that are always attached to

5  it.  And so the assumptions for this hypothetical

6  negotiation that the parties on both sides of the table

7  agree to and have in mind are that the patent is valid, it's

8  infringed, and it's enforceable.  There isn't any question

9  or any debate or any discussion about those concepts.

10  They're agreed to by the parties.

11          In addition, the parties at the hypothetical

12  negotiation table, they have to reach an agreement.  They

13  have to get to the finish line, unlike a real-world

14  negotiation where one side or both sides can get up and walk

15  away.  Here we have to get to an answer.

16  Q.  Are there any other assumptions that make a hypothetical

17  negotiation different from a real-world negotiation?

18  A.  Yes, sir, and that's -- that's No. 3 on this slide.  And

19  that's a -- as with the others, it's a very important

20  assumption.

21          The parties at the negotiating table in this

22  hypothetical negotiation are actually aware of information

23  about the future importance of the patent.  In a real-world

24  negotiation, you may have some estimate or some expectation

25  or some hope or some forecast about the importance of a

1  particular technology.

2          At the hypothetical negotiation, they actually know

3  how important the technology is.  In other words, they have

4  access in a sense to information about the future, to the

5  future sales, the future profits associated with using the

6  technology.  And that is part of the framework of

7  assumptions for the hypothetical negotiation.  And

8  obviously, that's very, very different from a real-world

9  negotiation.

10  Q.  Is there any other information available in a

11  hypothetical negotiation that's not necessarily available in

12  a real-world negotiation?

13  A.  Well, yes, to be clear, in the hypothetical negotiation,

14  the entities sitting on both sides of the table, they know

15  something about future sales and future profits associated

16  with the technology.

17  Q.  And would the folks in this hypothetical negotiation be

18  aware of the calculations of performance, battery -- battery

19  life, and cost improvements that we've been talking about in

20  this case?

21  A.  Yes, sir, they would, they would be aware of the

22  contributions of -- of the patent, of the '055 patent, as

23  described by Mr. Witt and Dr. Kuhn.

24  Q.  Aside from the assumptions made as a part of the

25  hypothetical negotiation, is there anything -- anything else

1  that you relied on in forming your opinions for this case?

2  A.  Yes, sir.  There -- there's one more thing, which is

3  part of this hypothetical negotiation framework.  And that's

4  called the Georgia-Pacific factors.

5          The Georgia-Pacific factors can be thought of as a

6  checklist of 15 items that the entities sitting at the

7  hypothetical negotiation table would have in mind as they

8  negotiate over rights for the patent.

9          They don't have to use all these items, but it's a

10 handy checklist to run down as they go through the

11 negotiation.  And so the Georgia-Pacific factors, in my

12 experience, are always part of this hypothetical negotiation

13 framework.

14 Q.  So you discussed the Georgia-Pacific factors, the patent

15 law statute, and the hypothetical negotiation used -- that

16 you use in this case.  Are -- are those all used by the

17 Defendants' damage expert in this case, as well?

18 A.  Yes, sir.

19 Q.  Okay.  And did you consider all 15 of these

20 Georgia-Pacific factors in developing your reasonable

21 royalty?

22 A.  I -- I consider all 15, as is always the case.  Some are

23 more important than others, but I think about all 15 because

24 they're on the checklist.

25 Q.  How did you analyze the hypothetical negotiation here?

1  A. Well, with that Georgia-Pacific checklist, I usually

2  start with Georgia-Pacific Factor 1, which has to do with

3  basically prior licenses, and I will come back to that.

4  That's the place that I usually begin.

5        But in this case, on given what I've learned about

6  the importance and the contributions made by the patents,

7  I'm beginning today with a discussion of Georgia-Pacific

8  Factors 9 and 10.  They are two different factors, but

9  they're really very similar in the sense that they address

10 the contributions associated with the invention.

11 Q. And what were the benefits associated with the patented

12 invention?

13 A. We've heard about three separate benefits.  Those

14 include increased speed, increased power efficiency, and

15 significant cost savings.  And those are the three benefits.

16 Q. Do those three benefits overlap?

17 A. No, sir.  They're -- they're separate.

18 Q. And have you seen information regarding the speed and

19 power efficiency benefits provided by the patent-in-suit?

20 A. Yes, sir, I have.  This slide is a 2017 Samsung

21 document.  And I abstracted out from a page inside the

22 document which identifies power efficiency benefits

23 associated with longer battery life and in -- enhanced

24 performance associated with speed.  And these are both in

25 connection with the -- the 14-nanometer FinFET technology.

1  Q.  And what exhibit number is that for the jury's benefit?

2  A.  That's Exhibit 1170.

3  Q.  Have you seen any information quantifying the speed and

4  power efficiency benefits provided by the accused FinFET

5  technology?

6  A.  Yes, sir, I've seen -- I've seen several sources of such

7  information.  This next slide, which is Plaintiff's

8  Exhibit 134, is -- is a 2017 Samsung document.  And in it,

9  it talks about Samsung's 14-nanometer FinFET processing

10  offering.  And toward the bottom, it talks about 14LPE,

11  which I believe stands for low power -- low power early,

12  offers 40 percent faster performance, 60 percent less power

13  consumption, and 50 percent smaller chip scaling area as

14  compared to the 28LPP, which I understand means low power

15  plus predecessor technology.

16  Q.  And is that Plaintiff's Exhibit No. 134?

17  A.  It is, sir.

18  Q.  Now, have you seen similar information for

19  GlobalFoundries?

20  A.  I have.  So this document, which is Plaintiff's

21  Exhibit 849, again, talks about 14LPP FinFET.  You can see

22  it's a 2016 GlobalFoundries document.  And it shows an arrow

23  for device performance, an increase of 55 percent.  And the

24  power is a little bit covered up by the -- by the arrow on

25  the right.  But it shows improvement of 60 percent between

1  28 nanometer and 14.

2  Q.  Mr. Weinstein, have you seen any documents that suggest

3  these benefits were important to the Defendants?

4  A.  Yes, sir, I have.

5  Q.  What do we see in this slide?

6  A.  This next slide is a 2015 Fortune Magazine article, and

7  it refers back to a survey that was conducted over the new

8  year at a convention in Las Vegas.  And it talks about --

9  the question that's asked is:  What new or improved

10  smartphone features are you most excited about?

11         Improved battery life was the leading answer with a

12  third of the respondents identifying that as the most

13  important feature -- most improved feature.  And faster

14  processors came in second with 16 percent.  So these are

15  features that are very important to consumers of

16  smartphones.

17  Q.  And is that PX-1204?

18  A.  It is, sir.

19  Q.  And are there any other documents showing the importance

20  of battery life and speed?

21  A.  Yes.  This is another -- another article.  Consumers --

22  ConsumerScape is -- it's a survey entity, it's part of IDC.

23  IDC is sort of the gold standard data -- data group for

24  semiconductor industry and telecommunications.

25         And so this is a June '14 -- 2014 survey result,

1  and it talks about what drives smartphone purchases.  And in

2  the middle, it says:  At the very top of the list of

3  purchase drivers is battery life.

4          There's a typo there, but it's battery life.

5          And at the bottom it says -- it indicates that

6  battery life is also the most important driver of smartphone

7  purchase in any region of the country across operating

8  systems and brands, et cetera.

9          So my take from this is that battery life helps

10 drive demand for smartphone products.

11 Q.  And is this Plaintiff's Exhibit 929?

12 A.  It is, sir.

13 Q.  So did you actually measure the dollar value of benefits

14 provided by the '055 patent?

15 A.  I did.

16 Q.  And how did you do that?

17 A.  Well, I began by looking at two of the benefits that

18 we've heard about, increased speed and increased power

19 efficiency.  So that's where I -- that's where I start.

20 And, subsequently, I'll talk about significant cost savings,

21 as well.

22 Q.  Okay.  So did you examine the effects that these

23 increases in speed and power efficiency would provide --

24 that were provided by the patent-in-suit?

25 A.  I did, and I used the technique that's available to me

1  as an economist in order to do that.

2  Q.  And what was that?

3  A.  That technique is known as regression analysis.

4  Q.  Okay.  What is a regression analysis?

5  A.  Well, regression analysis is a statistical or

6  econometric tool that's used by economists and statisticians

7  and financial analysts to separate out the impact of

8  individual variables, individual components in a way that

9  holds other things that could be affecting -- affecting

10  outcomes.  It holds those other things constant.

11  Q.  What did you use regression analysis to calculate in

12  this case?

13  A.  In this case, I used regression analysis to actually

14  determine the contribution made by increased speed and power

15  efficiency to smartphone and tablet prices.  In other words,

16  I used regression analysis to isolate the incremental or

17  additional benefits associated with increased speed and

18  power efficiency on smartphone and tablet prices, holding

19  all of those other inputs constant, all the other kinds of

20  things that may impact smartphone and tablet prices.

21  Q.  And can you provide the jury with an example of how

22  regression analysis works?

23  A.  Well, this is a very simple example.  You have on the

24  slide depictions of two cars that are identical in every

25  respect, except one has an automatic transmission and the

1  other has a manual transmission.  It's the left and the

2  right, respectively.

3        And the difference in price is about a thousand

4  dollars.  And since everything else about the cars is

5  identical, what one can say is having an automatic

6  transmission on a car adds a thousand dollars to the price.

7  Despite the fact that the cars themselves are very

8  complicated products and they have all kinds of other

9  components, given that we're saying that everything else is

10  held constant, you can actually isolate the incremental or

11  additional value to the price associated with an automatic

12  transmission.

13        And this is an example of what regression analysis

14  allows you to do.  It allows you to compare two complicated

15  products but hold a lot of things constant so that you can

16  isolate the importance of some individual component.

17  Q.  And was the regression analysis that you ran as simple

18  as this one?

19  A.  No, it wasn't.

20  Q.  So how did you go about conducting the regression

21  analysis to analyze speed and power benefits?

22  A.  Yeah.  The reason that my regression analysis isn't as

23  simple as that is that with respect to the devices, such as

24  smartphones, you have literally hundreds of components, if

25  not more.  And they can all be different.  And so it becomes

1  very difficult to hold everything else constant.

2        So in order to do my regression analysis, what I

3  did is, is as follows.  We purchased a -- a huge amount of

4  information from an entity known as Strategy Analytics which

5  collects this information and sells it to people like me who

6  are interested in it.  And we gathered up information on --

7  on smartphone and tablet prices for a five-year period,

8  January 2013 to December of 2017.

9        And in -- in that data that we bought, we had

10  information on retail prices of smartphones.  Ultimately, we

11  wound up with 43,000 observations over this five-year period

12  for basically all of the smartphone manufacturers.

13        We also had information on -- on specifications

14  associated with these products, such as processing speed and

15  battery capacity.  And then a series of variables which I

16  call control variables, which going into the regression

17  analysis, it seemed to me I would want to include as things

18  that I'd want to hold constant because I felt they might

19  have an important effect on the price.

20        So in deciding what to -- what to include in the

21  regression analysis, I really had two things in mind at the

22  outset.

23        One is what facts in this case are we interested in

24  knowing about?  And we're interested in knowing about the

25  importance of speed and battery capacity.  And so they had

1 to be in the regression analysis.

2      And then the -- the rest is what else might be

3 important enough in connection with this investigation to

4 include in the study?  And so for No. 4, I have a summary of

5 the other variables that I included.

6      So I had a separate variable for the operating

7 system.  Was it Apple or Android or a BlackBerry system or

8 something else?

9      For the manufacturer, was it an Apple phone or a

10 Google phone or somebody else's phone?

11      For the retailer, was it purchased at Walmart or

12 from Amazon Online, or from some other type of store?  I

13 have a variable for time which since I have a five-year

14 period, I want to adjust for the fact that maybe phone

15 prices are changing over time.  Five years is a long time.

16 So I include that.  And the price variable is -- that's the

17 launch price.  That is when the phone first -- first went

18 out, what was the launch price?  And then some other things

19 relating to screen size and camera size, et cetera.

20 Q.  How do the dollar benefits associated with the speed and

21 power benefits affect the Defendants?

22 A.  Well, they -- they affect the Defendants because other

23 things equal, if -- if processing speed and improved battery

24 life have -- have an impact on the final price of the phone,

25 the Defendants benefit from that.  If -- if other things

1  equal, if the price of smartphones and tablets goes up as a

2  consequence of improvements in speed and battery capacity,

3  then that works its way back to the Defendants.

4  Q.  Did you prepare regression analyses both for tablets and

5  for smartphones?

6  A.  I did.

7  Q.  And did you consider the same factors in connection with

8  each of those two regressions?

9  A.  I didn't consider exactly the same factors in connection

10  with each.  I had most of the same factors.  But there are

11  some differences in the way in which tablets are used and

12  the way in which phones are used.  Tablets are sometimes

13  used for multitasking in ways that phones aren't, and so I

14  tried to take account of that by including slightly

15  different variables in some cases in the tablet regression,

16  for the phone regression.

17  Q.  Have you seen any evidence that speed and power

18  efficiency benefits are important factors affecting

19  smartphone demand?

20  A.  Yes, sir.  I think we've seen some of those, but this is

21  a 2017 survey by an entity known as Statista, which is an

22  entity that collects voluminous information in all kinds of

23  industries -- just collects it and then sells it to people

24  who are interested in having it.  This is PX-1077.

25          And this survey indicates that with respect to

which properties users find particularly important for their

smartphone, 82 percent answered long battery time, 61

percent talked about a fast processor.  So speed and battery

life clearly are important to smartphone consumers.

Q.  So what were your regression findings?

A.  This slide contains a summary of the findings.  With

respect to smartphones, what I found is that a 1 percent

increase in speed leads to a $1.06 increase in the retail

price of smartphones, holding other things constant.  All

right?

With respect to tablets, a 1 percent increase in

speed leads to a price increase of 92 cents, holding other

things constant.  The other things that I'm talking about

are such as identified on the previous slide.

And, finally, with respect to SoCs not sold in

phones, I apportioned that down to the chip level.  And

there, a 1 percent increase in speed leads to a price

increase of about 18 cents.

Q.  What do these price increases represent to the

Defendants?

A.  They represent additional benefits that the -- benefits

that the Defendants receive as a result of these

improvements in speed and battery life.

Q.  And would these represent profits for the Defendants?

A.  They would.  The reason they'd represent profits is

1  that, as we've heard, the technology taught by the '055

2  patent does not bring about cost increases.  In fact, it

3  brings about cost savings.  So these benefits represent

4  net -- net profits to the Defendants.

5  Q.  What was the next step in your analysis?

6  A.  Well, next, I took into account the conclusions of

7  Mr. Witt on the actual benefits that he found associated

8  with using 14-nanometer chips prior to the previous

9  technology.  And this is a summary of the findings that he

10 just presented here in his testimony.

11        And what I used is a -- are the figures at the

12 bottom, and those are either averages or conservative

13 numbers of the actual figures that he just presented.

14        So for speed, I -- I used a 20-percent improvement

15 with respect to Exynos and Snapdragon chips and a 12-percent

16 benefit with respect to power efficiency converted to speed

17 as described by Mr. Witt.  And for Exynos chips, I used

18 12 percent, Snapdragon chips I used 22 percent.

19        So these figures come from -- from Mr. Witt.

20 Q.  Based on these regression results, can you provide an

21 example of how you determined Defendants' incremental

22 profits due to the speed and battery life benefits provided

23 by the patent?

24 A.  Yes, sir.  So this is an example with respect to the

25 Galaxy S7 smartphone.  That's one of -- one of Samsung's --

1  Samsung's big sellers.

2          And, again, for the period November 29th, 2016, to

3  May 18th, 2018, according to Mr. Witt, the benefits are

4  20 percent for speed, 12 percent for power efficiency

5  converted to speed.  And that comes from the last exhibit

6  that we just looked at which came from Mr. Witt.

7          So the combined total of those is 32 percent

8  because those two benefits are separate.

9          So what I do next is I take the regression results,

10 which I obtained of the increased profit associated with a

11 1-percent increase in speed, and I multiply that times the

12 benefits as calculated by Mr. Witt.  And when you do, that

13 the total increase in profit in this example with respect to

14 the Galaxy phone is 33.92.

15 Q.  And is that total per year unit increase for each Galaxy

16 S7 phone that uses an Exynos processor?

17 A.  Yes, sir.

18 Q.  Sir, how did you calculate the total incremental speed

19 and profits for the rest of Samsung's products?

20 A.  I -- I used the same method.  So that was an example.  I

21 go through the same method.  I take my regression results

22 and apply to them the speed and power efficiency benefits

23 that were described by Mr. Witt.  And I do that for each of

24 the accused Samsung products.

25          And this slide depicts those products.  You have

1  phones and tablets with Exynos chips, phones and tablets

2  with Snapdragon chips, Exynos chips sold alone, and then the

3  sum of those -- those three.

4  Q.  And so at the bottom, the total incremental profits for

5  Samsung created by the '055 patent infringement would be how

6  much?

7  A.  $1,860,232,783.00.

8  Q.  And then what about for Qualcomm, how did you do your

9  analysis there?

10  A.  I did the same thing for Qualcomm, except here -- so

11  it's the same approach, and the total for Qualcomm is

12  $2,470,571,452.00.  Those are the incremental profits.

13  Q.  And did you use the same regression analysis to

14  calculate benefits realized by GlobalFoundries from use of

15  the '055 patent?

16  A.  No, sir, I did not.  GlobalFoundries, my analysis is

17  limited to the cost savings since GlobalFoundries is a

18  foundry, it's a manufacturer.  And so with respect to

19  GlobalFoundries, I calculated damages using cost savings,

20  not the regression analysis.

21  Q.  Well, have you seen any information suggesting that the

22  Defendants realized cost savings in producing the infringing

23  products?

24  A.  Yes, sir, I have.  This -- this slide, which is PX-849,

25  depicts a -- it's a GlobalFoundries document, and it depicts

1  a comparison between 28-nanometer and 14-nanometer chips,

2  the 28 nanometer is on the left and 14 nanometer is on the

3  right.

4  Q.  And then at the bottom of that, the bottom portion

5  that's highlighted says estimated die cost, and then it has

6  1 beside -- or 128 nanometers and .75 under 14 nanometers.

7  What does that mean?

8  A.  Well, what that means is there's a 25 percent savings in

9  die cost when you move from 28 nanometers to 14 nanometers.

10 And you can see that between -- by comparing the 1 and the

11 0.75.  That's a 25-percent difference, and that's the

12 savings associated with moving from 28 nanometers to 14

13 nanometers.

14 Q.  Did you see any testimony from the Defendants concerning

15 cost savings?

16 A.  Yes, sir, I did.  This is from Mr. Samavedam at

17 GlobalFoundries, and his testimony on this slide is

18 consistent with the last document that we just saw; namely,

19 he depicts an estimated die cost savings of 25 percent in

20 moving to 14-nanometer production.

21 Q.  And would these cost savings apply to Samsung, as well?

22 A.  Yes, my understanding is that they would.

23 Q.  So what factors other than Georgia-Pacific Factors 9 and

24 10, did you consider in your analysis?

25 A.  Right.  So we just finished my analysis of

1  Georgia-Pacific Factors 9 and 10.  And as I said, I

2  ordinarily thought with Georgia-Pacific Factor 1, but I

3  thought today I would start today talking about 9 and 10

4  given the benefits.

5         So the next one that I considered is

6  Georgia-Pacific Factor 1, which pertains to rates received

7  by the patentholder for licensing the patent-in-suit.  And

8  that's -- that's one of the factors that one looks at.

9  Q.  Did you find that there was any actual evidence of

10 prices paid for the patent-in-suit?

11 A.  Yes, sir, I did.

12 Q.  And what was that?

13 A.  There's a license we've heard something about between

14 P&IB on the one hand and Intel on the other in the U.S. in

15 2012.  And there's also a license between KAIST and Intel

16 for the Korean counterpart of the '055 patent at the same

17 time.

18 Q.  And can you tell us a little bit more about those two

19 agreements?

20 A.  Yes, those -- those two agreements included payment by

21 Intel to P&IB in the United States for -- of $6.8 million.

22 And with respect to the Korean counterpart, payment to KAIST

23 of $1.7 million.  So the total payment with respect to the

24 two that was negotiated for those licenses is $8.5 million.

25 Q.  Are there any differences between these two Intel

1  agreements and the agreement that would result from the

2  hypothetical negotiation that you discussed earlier?

3  A.  Yes, sir, there are.  And this next slide summarizes

4  some of those differences.  I've talked about some already.

5  So I'll -- I'll go through them quickly.

6       But when the Intel agreement was negotiated, there

7  wasn't necessarily agreements about infringement and

8  validity.  And with respect to the hypothetical negotiation,

9  as I said earlier, the parties agree that the patent is

10  infringed and valid.

11       At the time back in 2012, P&IB was relative

12  certainly to Intel.  It was -- it would have difficulty

13  sustaining in litigation if it wanted litigation, but there

14  wasn't litigation with Intel.

15       And here today, the Defendants are required to take

16  a license.  They can't get up and walk away from the table.

17       Finally, with respect to this slide, at the time of

18  the Intel negotiation, we've -- we've heard from Dr. Kuhn

19  that there was a fair amount of uncertainty in the industry

20  as to whether even the -- whether the bulk FinFET technology

21  would ultimately be adopted.  So there was lack of

22  information about -- about that, as well as whether or not

23  this would prove to be profitable to Intel, whereas, at the

24  hypothetical negotiation, as I've been describing, the

25  parties would be aware of these significant benefits in

1  terms of profits and cost savings.

2  Q.  How would that affect the negotiating positions of the

3  parties if they had that information in the hypothetical

4  negotiation?

5  A.  Well, it's a completely different picture from the

6  actual negotiation between P&IB and KAIST back in 2011/2012

7  and the 2015 hypothetical negotiation.  It's completely

8  different.

9  Q.  Did you find any evidence of other differences between

10  the Intel negotiation and the hypothetical negotiation?

11  A.  Yes, sir, I did.  There's just one more slide on this.

12  At the time of the Intel negotiation, 20-nanometer planar

13  was still under consideration in the industry.  But by 2015,

14  as we've heard, 20-nanometer planar had failed.  And the

15  industry had moved toward 14-nanometer bulk FinFET.

16  Finally, in the same concept, 2012, Intel was the only

17  entity going forward with bulk FinFET, but by 2015, the

18  industry had adopted it.

19  Q.  Have you seen any testimony from the Defendants about

20  the lack of alternatives to 14-nanometer FinFET?

21  A.  Yes, sir, I have.  This is testimony from Mr. Vadi at

22  Qualcomm, and he's saying basically in 2014, if you look at

23  the bottom, the entire industry was going forward bulk

24  FinFET.

25  Q.  Have you seen any evidence that Qualcomm has input in

the manufacturing decisions of Samsung and GlobalFoundries?

A.  Yes, sir, we have.  This is PX Exhibit 0546.  And as one

would expect, Qualcomm plays a significant role in designing

the chips that it -- that it's involved with.  That's

indicated on this slide, and at the bottom is a joint press

release from Qualcomm and Samsung talking about the fact

that they're collaborating on 10-nanometer process

technology for the next generation mobile processor.

Q.  Did you find any other evidence that the Intel agreement

is not -- or that the Intel agreements are not comparable to

what would have emerged from the hypothetical negotiation?

A.  I did.

Q.  What was that?

A.  This is PX-0947.  And it relates to some emails created

at the time of the -- of -- that the Intel agreement was

being negotiated.  And at the top, we have an email from

Mr. Son at KAIST to -- to Intel indicating a -- a

willingness to take 30 percent off of its earlier proposal,

which had been a hundred million dollars, making it $70

million if they could get to a -- sort of a fast resolution

of these conversations or negotiations.

        And at the bottom, there's reference to the fact

that part of the negotiation about -- about this -- this

agreement related to the question of whether or not the

patent was valid.  That was an issue that was addressed by

1  the parties at the time.

2  Q.  So you mentioned earlier that one of the differences

3  about the hypothetical negotiation is that the parties will

4  know the -- the future sales and revenue and profits, the

5  incremental profits and cost savings.  What would those

6  incremental profits and cost savings be that would be known

7  to those parties at the time of the hypothetical

8  negotiation?

9  A.  Well, what I've done here is summarize those benefits

10  with respect to Samsung and Qualcomm and GlobalFoundries,

11  using the regression analysis results that I obtained, plus

12  the conclusions of Mr. Witt on the speed and power benefits,

13  as well as the 25 percent cost savings figure associated

14  with using bulk FinFET technology.

15          And so when you summarize all of that, the

16  benefits -- this is not the damages, these are the

17  benefits -- associated with this technology that would be

18  known to the parties at the time of the hypothetical

19  negotiation are approximately $2.7 billion in benefit to

20  Samsung; $2.47 billion to Qualcomm; and $821 million to

21  GlobalFoundries.

22  Q.  And, again, are these just the incremental cost savings

23  and benefits associated with the patent-in-suit?

24  A.  Yes, sir.  These are just the additional benefits

25  associated with using the patent-in-suit.

1  Q.  Now, let's -- let's move on to Georgia-Pacific Factor

2  No. 2.  Can you tell the jury what that is?

3  A.  Yes.  This is sort of similar to Georgia-Pacific Factor

4  1, but instead of talking about licenses that the

5  patentholder may have entered into, it talks about licenses

6  that involve the potential licensee -- in this case, let's

7  say, Samsung or GlobalFoundries -- for patents that might be

8  comparable to the patent-in-suit.  And that's

9  Georgia-Pacific Factor 2.

10          MR. BUNT:  Your Honor, the Defendants have

11  requested that I seal the courtroom or that I ask you to

12  seal the courtroom at this point in time for the next slide.

13          THE COURT:  All right.  Based on that request, I'll

14  order the courtroom sealed, which means that anyone present

15  who is not subject to the protective order that's been

16  entered in this case should excuse themselves from the

17  courtroom.  In following the practice that we implemented

18  earlier, that includes the corporate representatives and

19  the parties.

20          All right.  For the record, the courtroom is

21  sealed.

22          (Courtroom sealed.)

23          (Sealed portion saved in separate sealed

24  transcript.)

25          (Courtroom unsealed.)

1    THE COURT:  You may continue.

2    MR. BUNT:  Thank you, Your Honor.

3 Q.  (By Mr. Bunt)  Mr. Weinstein, did you consider any other

4 agreements as part of your consideration of Georgia-Pacific

5 Factor No. 2?

6 A.  Yes, sir.  Samsung produced a number of agreements, and

7 I did have an opportunity to review them.  Most of them were

8 lump-sum agreements.  There were several agreements that

9 were running royalty agreements, as well, indicating that

10 while Samsung may have a preference for lump-sum agreements,

11 it also occasionally enters into running royalty agreements.

12 I didn't find any agreements that were produced that

13 reflected the kind of power and speed benefits that I've

14 been talking about here.

15 Q.  Did you consider the remaining Georgia-Pacific factors?

16 A.  Yes, sir, I did.

17 Q.  And can you tell the jury your conclusions regarding

18 those factors.

19 A.  Well, what I've listed here are the remaining factors

20 by -- by number.  So we've already been through Nos. 1 and 2

21 and 9 and 10 where I started, and these are the others.

22    And what I did here is summarize them briefly.

23 Some of them have what I call a downward effect on the

24 agreement.  In other words, some of them favor the

25 Defendants in -- in arguing toward a lower royalty, and some

1  of them have a -- an upward effect.

2          So just to give an example of two, the geographic

3  scope, that's No. -- Georgia-Pacific Factor No. 3, the

4  geographic scope of the hypothetical license in this case

5  would be limited to the United States.  It would not be

6  worldwide.

7          And other things equal, that's worth less than a

8  worldwide license, and so I treat that one as downward, all

9  right.

10          Another one that I'll talk about that's downward is

11  No. 5.  Sometimes the licensor and the licensee are

12  competitors, and when they're competitors, you don't like to

13  license your technology, and that would have an upward

14  effect.

15          But in this case we're not talking about

16  competitors so that tends to have an downward effect.

17          The last one I'll mention is No. 6, and that is a

18  factor that pertains to whether or not the licensee has the

19  ability to make what are called convoyed sales or additional

20  sales that go along with the sale of the product in

21  question.

22          And so here, if we're talking about smartphones,

23  then Samsung has an opportunity to sell cases or plugs or

24  apps or other things.  And so that means that there's an

25  additional benefit that could be associated with using this

1  technology that's not included just in the damages

2  associated with the phones.  And so that has an upward

3  effect.

4         So I went through all of these with that kind of

5  thought process.  And in the end, what I found is that some

6  of these factors were downward; that is, they would tend to

7  produce a lower outcome.  Some of the factors were upward,

8  they would tend to produce a higher outcome.  And No. 12,

9  there's no information on.  There's nothing customary about

10 what fair payment here would be so that's neutral.

11        And so this is a summary of my consideration of the

12 other Georgia-Pacific factors.

13 Q.  Thank you, Mr. Weinstein.

14        You've testified about the benefits that the

15 Defendants obtained from using the '055 patent.  Did you

16 determine the share of the benefits provided by the

17 patent-in-suit that would go to P&IB at the hypothetical

18 negotiation and what share would go to the Defendants?

19 A.  Yes, sir, I did.

20 Q.  And what share have you concluded would go to P&IB?

21 A.  I concluded that P&IB at the hypothetical negotiation

22 would negotiate for 12 percent of the share of the benefits,

23 and the Defendants would wind up with 88 percent of the

24 benefits.

25 Q.  How did you reach that conclusion?

1  A.   I reached that conclusion going back to one of the

2  emails we looked at, at the time of the negotiation.

3        But to summarize it briefly, P&IB ultimately

4  accepted $8.5 million for the U.S. license and the Korean

5  counterpart license with Intel in 2012.  And $8.5 million is

6  12 percent of the $70 million that P&IB had been asking for

7  in connection with that license.

8        And so what I did is I concluded that that

9  agreement, those two agreements reflect the willingness on

10 the part of P&IB to accept 12 percent of what it perceived

11 to be the benefits associated with its licenses.

12       And so I used that 12 percent here as the share

13 that P&IB would be willing to accept at the hypothetical

14 negotiation with the Defendants.

15 Q.   Mr. Weinstein, before we get to the actual calculation

16 of damages, have you prepared some slides that identify the

17 accused products in this case?

18 A.   Yes, sir, I have.

19 Q.   So if you could briefly tell us what Samsung products

20 are accused?

21 A.   Yes, sir.  The Defendants in this case, including

22 Samsung, produced information in the process whereby they

23 identify the accused products.

24       And so this slide which is from PX-0803, PX-2087,

25 PX-0805, and PX-1985 includes the list of Samsung accused

1  products.  And those are mobile devices on the left, and

2  then 14-nanometer Exynos chips, 14-nanometer Snapdragon

3  chips, 14-nanometer Nvidia chips, and then chips sold to

4  Apple.

5  Q.  And then what Qualcomm products are accused?

6  A.  Qualcomm products are shown on PX-0803, and these are

7  14-nanometer Snapdragon chips.

8  Q.  And then what GlobalFoundries products are accused?

9  A.  Take several pages to include all of the GlobalFoundries

10  products.  It's PX-0821.  But these are 14-nanometer AMD

11  chips, and 14-nanometer Exynos chips, and 14-nanometer

12  Snapdragon chips.

13  Q.  Finally, Mr. Weinstein, let's turn to your damages

14  calculations.  And can you please walk the jury through how

15  you went about calculating damages?

16  A.  Yes.  In this next slide is a summary of unit sales of

17  all Samsung infringing products between November 29th, 2016,

18  May 14th, 2018, that's the damage period that I've been

19  using for purposes of my calculation.

20        And so on this slide, one sees for 14-nanometer

21  products, each category of sales made by Samsung.

22  Q.  So for smartphones with Exynos chips, how many unit

23  sales were there?

24  A.  1,022,562.

25  Q.  And is this the amount received by Samsung for those

1   smartphones, or is that just unit sales?

2   A.   No, those -- those are the sales.

3   Q.   Okay.

4   A.   Those are the sales.

5   Q.   And then for the tablets with Exynos chips, what were

6   the unit sales?

7   A.   Unit sales for tablets with Exynos chips are 1,289,678.

8   Q.   And for smartphones with the Snapdragon chip?

9   A.   7,292,550.

10  Q.   And for Samsung tablets with the Snapdragon chip?

11  A.   343,142.

12  Q.   And for Exynos chips that were sold alone?

13  A.   245,000 -- 245 million -- excuse me, I'll start again.

14       245,656,852.

15  Q.   And where did you get this information from?

16  A.   This information was made available to me from documents

17  that were produced by Samsung in connection with this

18  litigation.

19  Q.   And what do you call this -- this combination of

20  numbers?

21  A.   I -- I probably call it the damage base.

22  Q.   Okay.  What did you do with this damage base?

23  A.   So what I did with the damage base is I calculated the

24  incremental benefits per unit, which come from the

25  regression analysis and Mr. Witt's conclusion, and I applied

1  to it the share of those benefits which I have concluded

2  would have gone to P&IB at the hypothetical negotiation.

3          So an example of that calculation is set forth on

4  this next slide, and the incremental speed profits per unit

5  when I used Mr. Witt's conclusion about the 20-percent

6  benefits and my regression results of $1.06, amounts to

7  $21.22, multiply that times the 12 percent to get the speed

8  damages rate benefit that P&IB would have negotiated for

9  that 12 percent.

10          And at the bottom I do a similar calculation with

11  respect to the power benefits.  And, again, P&IB's share is

12  12 percent.

13          So the power efficiency benefits that would be

14  negotiated using that 12-percent figure by P&IB are 2.19.

15          And then the next step will be to add those up

16  because they're separate.

17  Q.  Before we go to the next step, just so we're -- at the

18  top of this slide, the incremental speed profit per unit,

19  that's the total incremental speed profits that Samsung has

20  realized from using the patent-in-suit?

21  A.  Yes, sir, I believe that's a conservative estimate.

22  Q.  And then the 12 percent you're saying that you multiply

23  there, that's the amount that's going to be allocated as a

24  part of this hypothetical negotiation to KAIST, correct?

25  A.  Correct.

1 Q. And then you've done the same numbers below that for the

2 incremental power efficiency profits, right?

3 A. I have.

4 Q. So what's the total speed and power efficiency damages

5 rate for smartphones?

6 A. Well, as I said, the next step would be to add those two

7 up, and so I've done that on the next slide, I've added the

8 two. And the total rate is $4.74.

9 Q. And then did you do similar calculations with respect to

10 Samsung tablets and Samsung Exynos system on chips?

11 A. I did. And so this next slide is a summary for Samsung

12 of the damages per unit rates that I've calculated for

13 smartphones, and that's the $4.74 rate that we just looked

14 at for tablets and for Exynos chips. And in the middle

15 column, I've -- I've shown the rate per unit that I believe

16 P&IB would have negotiated for. And in order to calculate

17 damages, you multiply that rate, which is 12 percent of the

18 entire benefit, times the number of units that are shown on

19 the left. And when you do that total, Samsung speed and

20 power efficiency damages are $219,936,743.00.

21 Q. Now, that's for speed and power efficiency damages.

22 What about for cost saving damages -- cost savings damages?

23 A. Cost savings damages are separate, and so that's a

24 separate calculation. That has to be added to these.

25 Q. So how did you go about calculating those costs?

1  A.  I took the 25 percent figure of cost savings that --

2  that we heard testimony about, and I applied that to

3  Samsung's direct cost associated with manufacturing

4  14-nanometer bulk FinFET.

5  Q.  And then can we go to Slide No. 50, and can you show us

6  how you calculated the cost savings for Samsung?

7  A.  Right.  We know that those cost savings are 25

8  percent -- cost savings are 25 percent, but since the cost

9  that we're talking about or that we're looking at in this

10 period have already reflected the benefit associated with

11 the cost savings, when you look at this exhibit, the cost

12 savings attributable to the '055 patent are going to be

13 essentially a third of the cost that are shown.  And that's

14 because of the -- of the way in which the math works out

15 when you have 25 percent cost savings.

16         So I took those 25 percent cost savings, which are

17 shown on Line 2, and I multiplied times the share that P&IB

18 would have negotiated for, 12 percent, and so the total cost

19 savings on -- to Samsung and P&IB's share would be

20 $101,501,708.00.

21 Q.  And, again, are these cost savings damages separate from

22 the speed and power efficiency damages that you calculated

23 earlier?

24 A.  Yes, sir, they are.  They should be added to the other

25 damages.

1    Q.  So what are the total damages owed to KAIST by Samsung

2    for use of the patent-in-suit?

3    A.  This next slide depicts that total.  You have the speed

4    and power damages of roughly 219 million.  The total cost

5    saving damages of another 101 million.  For total damages

6    owed by Samsung for the period November 29th, 2016, to May

7    14th, 2018, of 301 -- $321,438,451.00.

8    Q.  What does Samsung get to keep?

9    A.  Well, it gets to keep almost 2.4 billion.  Those are

10   the -- that's its 88 percent share of the benefits.  So

11   Samsung gets to keep approximately 2.4 billion of the

12   incremental speed and power savings benefits.

13           P&IB gets to keep -- or negotiates for 321 million.

14   So P&IB gets 12 percent.  Samsung gets 88 percent.

15   Q.  How about for Qualcomm?

16   A.  Qualcomm, I used the SoC rate of 93 cents per unit,

17   applied that to the -- what I'll call the damage base of

18   accused units.  And so total speed and power damages for

19   Qualcomm are $296,851,609.00.

20   Q.  And what amount does Qualcomm keep?

21   A.  So Qualcomm here gets to keep approximately $2.2

22   billion.  That's its 88 percent share.

23           P&IB gets to keep 296 million.

24   Q.  And for GlobalFoundries?

25   A.  GlobalFoundries, it's a pure cost savings.  And so I

1  took the share that I believe P&IB would have negotiated

2  for -- namely, 12 percent of the $821 million -- and so the

3  cost savings damages associated with GlobalFoundries are

4  $98,541,744.00.

5  Q.  And what would GlobalFoundries keep?

6  A.  GlobalFoundries would keep approximately $722 million.

7  That's its 88 percent share.

8          P&IB would keep approximately $98 million.  That's

9  its 12 percent.

10 Q.  So one final summary, Mr. Weinstein.  Can you please

11 tell the jury what the minimum damages are to compensate

12 KAIST for infringement by Samsung of the patent-in-suit?

13 A.  I've concluded that the minimum damages to compensate

14 KAIST for infringement by Samsung of the patent-in-suit for

15 the period of November 29th, 2016, to May 14th, 2018, are

16 $321,438,451.00.

17 Q.  And can you tell the jury what the minimum damages are

18 to compensate KAIST for infringement by Qualcomm of the

19 patent-in-suit?

20 A.  Damages adequate to compensate for infringement by

21 Qualcomm amount to $296,851,609.00.

22 Q.  And can you please tell the jury what the minimum

23 damages are to compensate KAIST for infringement by

24 GlobalFoundries of the patent-in-suit?

25 A.  Damages adequate to compensate KAIST for infringement by

1  GlobalFoundries amount to $98,541,744.00.

2          MR. BUNT:  I pass the witness.

3          THE COURT:  Cross-examination?

4          MR. KENNERLY:  Yes, Your Honor.

5          THE COURT:  Proceed when you're ready,

6  Mr. Kennerly.

7          MR. KENNERLY:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9  BY MR. KENNERLY:

10  Q.  Good afternoon, Mr. Weinstein.

11  A.  Good afternoon.

12  Q.  We meet again.

13  A.  We do.

14  Q.  You'd agree Plaintiff is not seeking damages for any

15  time before the filing of this lawsuit; is that right?

16  A.  Yes, sir.

17  Q.  You understand the Defendants deny they infringe and

18  assert the patent is invalid?

19  A.  I do.

20  Q.  And you understand it's Plaintiff's burden to prove

21  infringement?

22  A.  That's my understanding, yes, sir.

23  Q.  And you understand if the jury finds no infringement,

24  Plaintiff is not entitled to any damages?

25  A.  Correct.

1  Q.  And you understand if the jury finds the patent is

2  invalid, Plaintiff is not entitled to any damages?

3  A.  Yes, sir, that's also correct.

4  Q.  Now, you relied on Dr. Kuhn's opinion and Mr. Witt's

5  opinion; is that right?

6  A.  I did, yes, sir.

7  Q.  And would you agree their opinions on which you rely

8  were important to your opinions?

9  A.  Yes, sir.

10  Q.  Would you agree if Dr. Kuhn is incorrect that the

11  incremental benefits of the accused 14-nanometer FinFETs are

12  solely attributable to the '055 patent, that your damages

13  opinion is overstated?

14  A.  I would agree that if her opinion is incorrect, my

15  damages results would also be incorrect.

16  Q.  And similarly, if Mr. Witt has overstated the percentage

17  improvements that he testified about, would you agree that

18  your damages are overstated?

19  A.  I would.

20  Q.  Regarding the Intel license which you talked about, you

21  would agree that valuing the patent based on real-world

22  comparable licenses is typically reliable because the

23  parties are constrained by the market's actual valuation of

24  the patent, fair?

25  A.  Yes, fair.

1          MR. KENNERLY:  Can we pull up DX-526, please, Mr.

2    Dahm?

3    Q.  (By Mr. Kennerly)  Sir, this is the patent license

4    agreement between P&IB, Professor Jong-Ho Lee, and Intel

5    involving the '055 patent, correct?

6    A.  Yes, sir.

7    Q.  And would you agree this is the only actual real-world

8    license to the '055 patent?

9    A.  I would -- I would agree to that, yes, sir.

10   Q.  And so no dispute, the Intel agreement and the

11   hypothetical negotiation in this case involves the same

12   licensors -- that is, P&IB and Professor Lee?

13   A.  That's fair.

14   Q.  And the very same patent, right?

15   A.  Yes, sir.

16   Q.  Exact same claimed invention, right?

17   A.  Correct.

18   Q.  And would you agree that this Intel agreement is

19   certainly relevant here and should be considered with

20   respect to damages in this case?

21   A.  I do.

22   Q.  The agreement here was entered into in late 2012 -- on

23   September 27, 2012, right?

24   A.  Yes, sir.

25   Q.  And the hypothetical negotiations with each Defendant in

1  this case would have occurred in late 2014 or early 2015,

2  right?

3  A.  That's -- that's fair, yes, sir.

4  Q.  Okay.  And you're not aware of any reason why the

5  outcome of your analysis would be different if the

6  hypothetical negotiation had occurred in late 2014 versus

7  early 2015, right?

8  A.  Yes, sir.

9  Q.  And would you agree there's a difference of about two

10 years between the Intel agreement in late 2012 and the

11 hypothetical negotiation in this case?

12 A.  I do.

13 Q.  Now, you understand P&IB is a patent licensing company,

14 among other things?

15 A.  Yes, sir.

16 Q.  And in that role, P&IB is seeking to make the best

17 possible deals it can for its clients, obtain the highest

18 possible license fees it can, right?

19 A.  Correct.

20 Q.  And you'd also agree P&IB and Professor Lee, by

21 licensing the patent to Intel, showed their willingness to

22 license the patent?

23 A.  I agree with that.

24 Q.  And this agreement, as you testified, Intel paid $6.8

25 million for its rights to the '055 patent, right?

1  A.  Yes, sir.

2  Q.  And would you agree that P&IB and Professor Lee received

3  that as a fully paid-up lump-sum royalty, and there were no

4  running or ongoing royalties owed?

5  A.  Correct.

6  Q.  Would you agree a lump-sum royalty is a common form of

7  royalty in patent license agreements?

8  A.  Yes.

9  Q.  Would you agree that the $6.8 million royalty for the

10  license to the '055 patent, that amount represented a fair

11  market value in the context of information available to

12  those parties at the time?

13  A.  I -- I generally agree with that, yes, sir.

14  Q.  This Intel agreement did not give Intel rights to any

15  other patents or patent applications, any other technology

16  or know-how besides just the '055 patent, right?

17  A.  True.

18  Q.  In the same way the hypothetical negotiations in this

19  case would involve only negotiations about the '055 patent,

20  not any other patents or other technology or know-how?

21  A.  Correct.

22  Q.  And in this agreement, Intel was granted non-exclusive

23  rights to the '055 patent, meaning P&IB and Professor Lee

24  could still go out and license the patent to other

25  companies?

1    A.  That is correct.

2    Q.  And you'd agree that's in contrast to a sale -- sale of

3    the patent where P&IB and Professor Lee could never license

4    the patent to anyone else?

5    A.  Sure, that's true.

6    Q.  And for that reason, buying a patent outright usually

7    costs more than buying a non-exclusive license?

8    A.  Other things equal, yes.

9    Q.  Other things equal, owning the patent is worth more than

10   just a license, right?

11   A.  Sure.

12   Q.  And just as in the Intel agreement in the

13   hypothetical -- hypothetical negotiations in this case, each

14   Defendant would be negotiating only for non-exclusive

15   rights?

16   A.  Correct.

17   Q.  Would you agree that Intel was granted rights under the

18   patent to make and sell its own chips?

19   A.  As far as I know, yes.

20   Q.  And in this agreement with Intel, because of that, the

21   royalty was paid at the chip or the -- the wafer

22   manufacturing level -- that is, from Intel and not from

23   Intel's customers; is that fair?

24   A.  Well, the royalty was -- the lump-sum payment was from

25   Intel, that's true.

1   Q.  Would you agree that after licensing Intel, based on the

2   terms of this agreement, that P&IB and Professor Lee

3   couldn't go after more royalties from Intel's customers?

4   A.  As far as I know, that's right.

5        MR. KENNERLY:  Can we pull up Section 3.4, please,

6   Mr. Dahm?

7   Q.  (By Mr. Kennerly)  Mr. Weinstein, this is Section 3.4 of

8   the Intel agreement, DX-526.

9        And if you look at this, would you agree with me

10  that based on this agreement, customers of Intel would be

11  free to use the patented rights and that P&IB and Professor

12  Lee would not have an ability to go seek more royalties from

13  Intel's customers?

14  A.  That seems to be what it says, yes.

15       MR. KENNERLY:  Can we pull up Section 3.1, please,

16  Mr. Dahm?

17  Q.  (By Mr. Kennerly)  This section describes the licenses

18  granted to Intel.  Do you see that?

19  A.  I do.

20  Q.  And do you see in Section A, Intel is granted the right

21  to make, use, sell, offer to sell, import, otherwise dispose

22  of the licensed products?

23  A.  I see that, yes, sir.

24  Q.  And to be clear, the -- the licensed products of Intel

25  included its bulk FinFET chips, right?

A.  Yes, sir.

Q.  Okay.  You see here also Intel was given the right under Section B to make, have made, use, et cetera -- given other rights, for example, to have another company make chips on its behalf.  Would you agree?

A.  Yes.

Q.  So, for example, Intel acquired foundry rights under this agreement.  It could make chips and sell them to others, and it also had the right to have someone make chips for it; is that fair?

A.  That seems to be true, yes.

Q.  Referring to Section C, again, we see have made rights.  Do you see that?

A.  I do.

Q.  And is that consistent with your prior answer?

A.  I believe so.

Q.  Now, in the hypothetical negotiation with the Defendants, Qualcomm would be getting these same rights for its chips -- that is, to have them made by other companies like Samsung and GlobalFoundries, right?

A.  Well, it would have the right to use -- use the technology.  In other words, it would have a right to the 14-nanometer technology.

Q.  And its rights would include the ability to -- to have that technology made for it by, say, Samsung and

1  GlobalFoundries, rather than making those chips itself,

2  right?

3  A.  Presumably, yes.

4  Q.  Well, it's clear, isn't it?

5  A.  Well, that's a -- that's an interesting point about a

6  hypothetical negotiation.  It usually doesn't get too much

7  further than just the rights, but that seems to be fair,

8  yes.

9  Q.  Well, Qualcomm in that hypothetical negotiation would be

10  similar -- similarly situated -- that is, what rights would

11  it need -- if it would need the right to have Samsung and

12  GlobalFoundries make chips for it, those same type of rights

13  are what Intel was granted in the -- in the actual license

14  that we're looking at, fair?

15  A.  That seems fair, yes.

16  Q.  Now, you understand Qualcomm never makes any of the

17  accused chips in the U.S., right?

18  A.  I do.

19  Q.  And you understand Qualcomm never sells any of the

20  accused chips in the U.S., right?

21  A.  As far as I know.

22  Q.  Would you agree that in this case, for each Qualcomm

23  chip or system on a chip that's accused, if -- if Plaintiff

24  fails to meet its burden to prove that Qualcomm actually

25  made those chips in the U.S. or sold them in the U.S. or

1  imported them into the U.S., there cannot be any damages as

2  to such a chip?

3  A.  That sounds right.

4  Q.  Would you agree that the vast majority of your claimed

5  damages as to Qualcomm are for chips that it never makes,

6  never sells, or never imports into the U.S.?

7  A.  I believe so.

8       MR. KENNERLY:  Now, if we can pull up Section 6.1

9  of the agreement, please?

10 Q.  (By Mr. Kennerly)  This regards the term of the

11 agreement, and you understand this agreement gave Intel

12 rights through expiration of the patent in 2023?

13 A.  Yes, sir.

14 Q.  And given the time of the hypothetical negotiation in

15 late 2012, that's about 11 years?

16 A.  That's fair.

17 Q.  In the hypothetical negotiation in this case, Defendants

18 would be negotiating a license for a shorter time, through

19 the life of the patent from late 2014, early 2015, right?

20 A.  That's true.

21 Q.  About eight years?

22 A.  That's fair.

23 Q.  Okay.  So we're comparing eight years versus 11.  Would

24 you agree that all else being equal, a longer license is

25 worth more than a shorter -- shorter license?

1    A.  I do.

2    Q.  I think I saw this in your slide deck.  I think it was

3    Slide 34.  But you would agree at the time of the

4    hypothetical negotiation in this case, Intel had launched

5    its 22-nanometer bulk FinFET products, right?

6    A.  Yes.

7    Q.  And you would agree at the time, Intel was the largest

8    American semiconductor manufacturer?

9    A.  I believe so, yes.

10    Q.  And so it was known with a hundred percent certainty at

11    the time of the Intel agreement, DX-526, that Intel had

12    launched those FinFET chips, right?

13    A.  Now, you're talking about 2012, the Intel agreement?

14    Q.  Right.

15    A.  Yes.

16    Q.  Okay.  So to be clear, at the time of the Intel

17    agreement between P&IB, Professor Lee, and Intel, all those

18    parties knew with certainty that Intel had already launched

19    its 22-nanometer FinFET products?

20    A.  I believe so, yes.

21    Q.  You're familiar, I believe, from your work in this case

22    with a number of articles and other public information

23    describing Intel's announcement of its 22-nanometer FinFETs

24    in 2011, the build out of fabs, and the launch of those

25    products in, say, the first half of 2012; is that fair?

1  A.  I believe so, yes.

2  Q.  At the time of the Intel license, if it had switched

3  from its 22-nanometer bulk FinFET device technology to some

4  other technology to avoid using the patent, if that were

5  necessary, it wouldn't surprise you if the cost of that

6  would be in the -- the billions of dollars; is that fair?

7  A.  Well, it would depend on whether -- I can't answer that

8  question as is.

9  Q.  Fair point.  Fair point.  Let's move on.

10 All the facts that we described about Intel, and essentially

11 the fact that it was -- it had launched in 2012, was in

12 large scale mass commercial production, that would have been

13 known to the parties that entered that license agreement --

14 that is, to P&IB and Professor Lee, right?

15 A.  I believe so, yes.

16 Q.  At the time Intel launched production of its bulk FinFET

17 devices in -- in early 2012, would you agree, based on what

18 you've heard in this case, that at least Professor Lee also

19 knew at the time that Samsung planned to mass produce bulk

20 FinFET devices?

21 A.  I can't speak to that.

22 Q.  Okay.  You -- you've sat in for the duration of the

23 trial?

24 A.  I have.

25 Q.  Did you hear Professor Lee's testimony?

1  A.  I did.

2  Q.  You're unable to say whether he knew that Samsung

3  planned or intended or anticipated to mass produce bulk

4  FinFET devices?

5  A.  I'm -- I'm sorry, I can't.

6  Q.  Okay.  Would you agree the Intel license agreement does

7  not state any requirement that Intel mark its licensed

8  products with the '055 patent number?

9  A.  I don't know.

10  Q.  You've certainly reviewed the agreement?

11  A.  I did.

12  Q.  You just don't recall as to that point?

13  A.  Correct.

14  Q.  Would you agree that nothing in the Intel agreement

15  restricted its use of the '055 patent to a particular node

16  or generation of FinFET so it purchased a license not only

17  for its 22-nanometer bulk FinFETs but also for future

18  smaller nodes of those FinFETs?

19  A.  Yes, I agree with that.

20  Q.  And would you agree that in contrast in the hypothetical

21  negotiations in this case, the negotiation would only be

22  centered -- centered around what's accused -- that is, the

23  14-nanometer node?

24  A.  That's fair.

25  Q.  And each Defendant would only be negotiating for rights

1    to that 14-nanometer node, as opposed to other nodes in the

2    future?

3    A.  Yes.

4    Q.  And all other things being equal, a 14-nanometer only

5    restricted license that each Defendant would -- would be

6    negotiating for would be less than the unrestricted license

7    of the type that Intel paid for?

8    A.  Correct.

9    Q.  Would you agree that -- well, strike that, please.

10   We've heard about alleged benefits of the patent or the

11   patented technology from -- from others.  Regarding those

12   alleged benefits, broadly speaking, would you agree that the

13   benefits would be similar for Intel as for the Defendants in

14   this case?

15   A.  Well, you said broadly speaking.  I guess the -- the

16   answer to that is to some extent.  I mean, Intel is in a

17   slightly different business from the Defendants.  Intel

18   doesn't make smartphones and tablets.  So there -- there are

19   some similarities and some differences.

20   Q.  You're speaking about different intended market segments

21   as between Intel and -- and, say, Samsung?

22   A.  In -- in that case, yes.

23   Q.  Putting aside that market segment issue, would you agree

24   that broadly speaking, the -- the benefits -- the technical

25   benefits would be similar for Intel as far the Defendants?

1  A.  Well, broadly speaking, the technical benefits would be

2  similar, I agree with that, but you can't really put aside

3  the -- the market segments.

4  Q.  Understood.  Now, you're -- you're aware that in the --

5  in the negotiations with Intel, P&IB and Professor Lee took

6  the position that Intel's bulk FinFET devices infringed?

7  A.  They did.

8  Q.  And you know Intel told them it disagreed that its bulk

9  FinFETs infringed, right?

10  A.  I'm aware of that.

11  Q.  Now, this was at a time that Dr. Kuhn was at Intel.  Do

12  you understand that?

13  A.  I do.

14  Q.  Would you agree that in the -- in the negotiation

15  documents with Intel -- that is, the licensing history

16  that's been produced in this case -- P&IB and Professor Lee,

17  the licensors, never expressed any doubt about whether Intel

18  infringed?

19  A.  That's my best recollection, yes.

20  Q.  You haven't seen that in the email correspondence, for

21  example?

22  A.  I haven't seen them expressing doubt about Intel using

23  the technology, that's true.

24  Q.  Now, as you testified, Intel ultimately agreed to two

25  licenses, one for the '055 patent for a fully paid up lump

1　sum of $6.8 million, and the other for the Korean

2　counterpart patent for a fully paid up sum -- lump sum of

3　$1.7 million, right?

4　A.  Correct.

5　Q.  So the total was $8.5 million?

6　A.  Correct.

7　Q.  And 80 percent of that was for the '055 patent -- that

8　is, $6.8 million?

9　A.  Yes.

10　Q.  And the other 20 percent was for the Korea patent, $1.7

11　million?

12　A.  True.

13　　　　THE COURT:  Counsel, approach the bench, please.

14　　　　(Bench conference.)

15　　　　THE COURT:  Mr. Kennerly, where are you in your

16　cross as far as remaining time?

17　　　　MR. KENNERLY:  For time, I'm probably a third of

18　the way.

19　　　　THE COURT:  So what would your -- what would your

20　best estimate be about remaining time in number of minutes?

21　　　　MR. KENNERLY:  Half-hour -- half-hour, 40 minutes

22　tops.

23　　　　THE COURT:  All right.  I'm not going to keep the

24　jury that late.  We're already at a quarter till 7:00.

25　We're going to recess for the day.  You can finish in the

1 morning. And then if there's redirect, we'll take it up

2 then.

3          (Bench conference concluded.)

4          THE COURT: Ladies and gentlemen, this examination

5 has apparently some additional time to go, and it's getting

6 late in the evening. I'm not prepared to keep you any later

7 tonight. So we're going to recess for the day at this time.

8          I'm going to ask you to -- as you leave the

9 courtroom, to go through the jury room and leave your closed

10 notebooks on the table in the jury room on the table there.

11 I'm going to remind you to follow all my instructions,

12 including not to discuss the case with anyone in any way.

13 Please travel safely to your homes.

14          And I'd like to have you back tomorrow morning,

15 just like today, about 8:15, assembled and ready to go so

16 that we can start as close to 8:30 as possible.

17 Travel safely, ladies and gentlemen. You're excused for the

18 evening.

19          COURT SECURITY OFFICER: All rise for the jury.

20          (Jury out.)

21          THE COURT: Be seated, please.

22 Counsel, I've looked at your previous submissions with

23 regard to the proposed final jury instructions and verdict

24 form. And given the presentation of the evidence to this

25 date, it appears to me that the parties and the Court could

1  both benefit with a revised submission concerning your

2  proposed final jury instructions and verdict form.  So I'm

3  going to direct and order the parties to meet and confer and

4  submit an updated proposed final jury charge and verdict

5  form not later than 3:00 p.m. tomorrow afternoon.

6  Obviously, if there are areas of disagreement, you'll submit

7  both competing areas in the same document.

8  And I'm also going to direct that you email a copy of that

9  submission, both as to the final jury instructions and the

10  verdict form, to my law clerks in a Word format by the same

11  time tomorrow afternoon.

12  Are there other matters that either Plaintiff or Defendants

13  are aware of that we need to take up before we recess -- or

14  before we recess for the day?

15  Is there anything further from the Plaintiff?

16          MR. BUNT:  No, Your Honor.

17          THE COURT:  Anything further from Defendants?

18          MR. JACOBS:  Not from the Defendants, Your Honor.

19          THE COURT:  I will be in chambers by 7:30 against

20  the prospect that there may be disputes develop overnight

21  that can't be resolved.  I will remind you that the Court's

22  expectation is that you seriously meet and confer and fully

23  communicate in an attempt to minimize such late-breaking

24  disputes.  But if they are unable to be avoided, you're to

25  advise my staff, per the existing practice, and I'll be

1  available to meet with you in the morning before we bring

2  the jury in and address those.

3        Likewise, in the morning, as we did today, before I

4  bring the jury in, I'll expect each side to offer a

5  recitation of those items from the list of pre-admitted

6  exhibits that were used before the jury during today's

7  portion of the trial.

8  Unless there's anything else, we stand in recess until

9  tomorrow morning.

10        COURT SECURITY OFFICER:  All rise.

11        (Recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


        I HEREBY CERTIFY that the foregoing is a true and

correct transcript from the stenographic notes of the

proceedings in the above-entitled matter to the best of my

ability.



 /S/ Shelly Holmes _____          _6/12/18__
SHELLY HOLMES, CSR, TCRR              Date
OFFICIAL REPORTER
State of Texas No.: 7804
Expiration Date: 12/31/18