1                  IN THE UNITED STATES DISTRICT COURT

2                  FOR THE EASTERN DISTRICT OF TEXAS

3                            MARSHALL DIVISION

4  KAIST IP US LLC,              )(
         PLAINTIFF               )(    CASE NO.
5                                )(    2:16-CV-1314-JRG-RSP
   VS.                           )(
6                                )(
   SAMSUNG ELECTRONICS CO., LTD; )(    MARSHALL, TEXAS
7  SAMSUNG ELECTRONICS AMERICA,  )(
   INC.; SAMSUNG SEMICONDUCTOR,  )(
8  INC; SAMSUNG AUSTIN           )(
   SEMICONDUCTOR, LLC;,          )(
9  GLOBALFOUNDRIES, INC.;        )(
   GLOBALFOUNDRIES U.S., INC.;   )(
10 AND QUALCOMM, INC.,           )(    JUNE 15, 2018
         DEFENDANTS              )(    8:24 A.M.

11

12                TRIAL TRANSCRIPT OF JURY TRIAL

13          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14             UNITED STATES CHIEF DISTRICT JUDGE

15 APPEARANCES:

16 FOR THE PLAINTIFF:      Mr. Andrew Y. Choung
                           Mr. Guy M. Rodgers
17                         Mr. S. Desmond Jui
                           GLASER WEIL FINK HOWARD
18                         AVCHEN & SHAPIRO LLP
                           10250 Constellation Boulevard
19                         19th Floor
                           Los Angeles, California 90067
20
   THE COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
21                         Official Court Reporter
                           United States District Court
22                         Eastern District of Texas
                           Marshall Division
23                         100 E. Houston
                           Marshall, Texas  75670
24                         (903) 923-7464

25 (Proceedings recorded by mechanical stenography, transcript
   produced on a CAT system.)

```
 1  FOR THE PLAINTIFF:        Mr. Jason Sheasby
                              Ms. Charlotte Wen
 2                            IRELL & MANELLA LLP
                              1800 Avenue of the Stars
 3                            Los Angeles, California 90067

 4                            Mr. Christopher Bunt
                              Mr. Charles Ainsworth
 5                            PARKER BUNT & AINSWORTH PC
                              100 E. Ferguson Street
 6                            Suite 1114
                              Tyler, Texas 75702
 7
    FOR THE DEFENDANTS:       Mr. Blair M. Jacobs
 8                            Mr. Allan M. Soobert
                              Mr. Stephen B. Kinnaird
 9                            PAUL HASTINGS LLP
                              875 15th Street, N.W.
10                            Washington, DC 20005

11                            Ms. Melissa R. Smith
                              GILLAM & SMITH LLP
12                            303 S. Washington Avenue
                              Marshall, Texas 75670
13
                              Mr. Christopher W. Kennerly
14                            PAUL HASTINGS LLP
                              1117 S. California Avenue
15                            Palo Alto, California 94304

16                            Mr. Jeffrey D. Comeau
                              PAUL HASTINGS LLP
17                            4747 Executive Drive
                              12th Floor
18                            San Diego, California 92121

19                            Mr. Joseph J. Rumpler, II
                              PAUL HASTINGS LLP
20                            1117 S. California Avenue
                              Palo Alto, California 94304
21
                              Ms. Soyoung Jung
22                            PAUL HASTINGS LLP
                              515 South Flower Street
23                            25th Floor
                              Los Angeles, California 90071
24

25
```

```
 1
 2  FOR DEFENDANTS:          Mr. Grant N. Margeson
                            PAUL HASTINGS LLP
 3                          101 California Street
                            48th Floor
 4                          San Francisco, California 94111

 5                          Ms. Ariell Bratton
                            PAUL HASTINGS LLP
 6                          4747 Executive Drive
                            12th Floor
 7                          San Diego, California 92121

 8          _____

 9                       P R O C E E D I N G S
10

11          (Jury out.)

12          COURT SECURITY OFFICER:  All rise.

13          THE COURT:  Be seated, please.

14          Good morning, counsel.

15          Before we get into the formal charge conference,

16  yesterday, after the close of the evidence, the Court took

17  up and heard arguments from both Plaintiff and Defendants

18  presented under Rule 50(a) of the Federal Rules of Civil

19  Procedure.  During of the course of that, I asked each party

20  to state the theories and bases for their respective

21  motions.  At that time, the Defendant moved for judgment

22  under Rule 50(a) regarding non-infringement.

23          I do not recall that the Plaintiff formally

24  indicated that they were seeking judgment as a matter of law

25  of infringement.  But during the argument, counsel for
```

```
 1   Plaintiff said KAIST IP US also cross moves for a judgment

 2   as a matter of law that no reasonable jury could find that

 3   the Defendants have not infringed the asserted claims of the

 4   '055 patent.

 5         That was presented for the first time in argument.

 6   I did not expressly rule on the assertion of infringement as

 7   a matter of law by the Plaintiffs.  So to make sure the

 8   record is absolutely complete, to the extent Plaintiffs

 9   argued for JMOL under Rule 50(a) regarding infringement,

10   that motion is denied.

11         All right.  Are the parties prepared to read into

12   the record the items used during yesterday's trial from the

13   list of pre-admitted exhibits so that we can keep that clear

14   at this point.

15         MS. SMITH:  Yes, Your Honor.

16         MR. BUNT:  Mr. Rodgers is going to read --

17         THE COURT:  That's fine.

18         MR. BUNT:  -- for the Plaintiff.

19         THE COURT:  If you'll approach the podium,

20   Mr. Rodgers.  You and Ms. Smith may make that joint offer at

21   this time.

22         MR. RODGERS:  Thank you, Your Honor.

23         Yesterday, June 14th, Plaintiffs offered Exhibit

24   PX-0008, PX-0044, PX-0139, PX-0362, PX-0384, PX-0413,

25   PX-0596, PX-0622, PX-0625, PX-0627, PX-0670, PX-0672,
```

1    PX-0673, PX-0708, PX-0729, PX-1290, PX-1291, PX-1294,

2    PX-1299, PX-1306, PX-1328, PX-1349, PX-2117, and IX-004.

3         THE COURT:  All right.  Is there objection to that

4    rendition from the Defendants?

5         MS. SMITH:  No, Your Honor.

6         THE COURT:  Do Defendants have a similar rendition

7    to offer into the record?

8         MS. SMITH:  Yes, Your Honor.

9         THE COURT:  Please proceed.

10        MS. SMITH:  Defendants offered DX-134, DX-272,

11   DX-275, DX-279, DX-316, DX-329, DX-513, DX-523, and DX-524.

12        THE COURT:  Is there objection from Plaintiff?

13        MR. RODGERS:  No there's not, Your Honor.

14        THE COURT:  All right.  Thank you, counsel.

15        We'll now proceed to conduct a formal charge

16   conference on the record.  I'll note for the record that

17   after the close of the evidence yesterday, the Court held an

18   informal change conference in chambers with counsel for all

19   the parties.  I didn't time it, but it looked like it was

20   approximately two hours in duration.  The Court went through

21   the then most current version of the final jury instructions

22   and verdict form and had input and discussion with counsel

23   in a free-flowing and open manner.

24        The Court has considered all the input from the

25   parties and has generated, based thereon, what it believes

```
 1  to be an appropriate and final jury instruction, together
 2  with the verdict form.
 3          That was delivered overnight to the parties.
 4  They've had an adequate opportunity to review it and
 5  consider it.  And the Court will now conduct a formal charge
 6  conference on the record allowing any party to lodge such
 7  objections as they believe are supported by the law.
 8          And in this regard, I'm going to request that a
 9  single spokesman for Plaintiff and a single spokesman for
10  Defendants approach the podium together.  My intention is to
11  go through these documents on a page-by-page basis.  And at
12  any point in that review, if either side believes a matter
13  has been included, which is improper, or has been omitted
14  which should have been included, then the Court invites them
15  to offer such objections at that point as they believe the
16  best interest of their clients require.
17          So we'll -- we'll proceed with the formal charge
18  conference with Mr. Choung for Plaintiff and Mr. Kinnaird
19  for Defendants.
20          We'll begin with the final jury instructions.  I'll
21  begin with Page 1 of that document.  Are there objections to
22  anything on Page 1 of the final jury instructions from
23  either Plaintiff or Defendants?
24          MR. CHOUNG:  None from the Plaintiffs, Your Honor.
25          MR. KINNAIRD:  None from the Defendants, Your
```

1   Honor.

2          THE COURT:  All right.  Turning then to Page 2, are

3   there objections from either party?

4          MR. CHOUNG:  None from Plaintiffs, Your Honor.

5          MR. KINNAIRD:  None from Defense -- Defendants,

6   Your Honor, assuming we'll have an opportunity to object to

7   the verdict form itself.

8          THE COURT:  We will -- we will review the verdict

9   form after we review the final jury instructions.

10          MR. KINNAIRD:  Thank you.

11          THE COURT:  Based on those comments, we'll turn to

12   Page 3, are there objections to anything on Page 3 of the

13   final jury instructions from either party?

14          MR. CHOUNG:  None from the Plaintiffs, Your Honor.

15          MR. KINNAIRD:  None from the Defendants, Your

16   Honor.

17          THE COURT:  Turning then to Page 4, are there

18   objections from either party?

19          MR. CHOUNG:  None from the Plaintiffs, Your Honor.

20          MR. KINNAIRD:  None from Defendants, Your Honor.

21          THE COURT:  All right.  Page 5, are there

22   objections?

23          MR. CHOUNG:  None from Plaintiffs, Your Honor.

24          MR. KINNAIRD:  Your Honor, we would object to the

25   reference to the Samsung Defendants in which there are four

1    collectively as Samsung or the Samsung Defendants and the

2    GlobalFoundries Defendants to be collectively referred to as

3    GlobalFoundries to the extent that also requires the jury to

4    make determinations on that collective basis rather than on

5    an individual basis.

6            THE COURT:  All right.  The Court notes that

7    beginning with its preliminary jury instruction, the Court

8    has indicated throughout the trial that the Defendants would

9    be identified and referred to on that same basis.  And no

10   one for Defendants has raised an objection prior to this

11   point, but nonetheless, having heard the objection of

12   Defendants in that regard, as called out on Page 5 of the

13   final jury instructions, that objection is overruled.

14           MR. KINNAIRD:  Thank you, Your Honor.

15           THE COURT:  We'll turn next to Page 6 of the final

16   jury instructions.  Is there any objections?

17           MR. CHOUNG:  None from Plaintiffs, Your Honor.

18           MR. KINNAIRD:  None from Defendants, Your Honor.

19           THE COURT:  Page 7, are there objections?

20           MR. CHOUNG:  None from Plaintiffs, Your Honor.

21           MR. KINNAIRD:  None from the Defendants, Your

22   Honor.

23           THE COURT:  Page 8, are there objections?

24           MR. CHOUNG:  None from Plaintiffs, Your Honor.

25           MR. KINNAIRD:  None from Defendants, Your Honor.

```
 1              THE COURT:  Page 9, are there objections?
 2              MR. CHOUNG:  None from Plaintiffs, Your Honor.
 3              MR. KINNAIRD:  Your Honor, Defendants would object
 4    that the instruction on Page 9, "comprising" fails to inform
 5    the jury that the "comprising" term does not permit an
 6    additional recited element to be added to the device, it
 7    would cause another limitation of the claim not to be met.
 8              THE COURT:  That objection is overruled.  Anything
 9    further on Page 9?
10              If not, we'll turn to Page 10, is there --
11              MR. KINNAIRD:  No, Your Honor.
12              THE COURT:  Is there objection to anything on Page
13    10 from either party?
14              MR. CHOUNG:  Not from Plaintiffs, Your Honor.
15              THE COURT:  I will note, counsel, on Page 10, there
16    is a correction that's not so much of a substantive nature
17    as it is a matter of semantics and proper verbiage.  But in
18    the middle of the page, the paragraph beginning "in
19    determining infringement," I'm going to reword that first
20    sentence to read as follows:  In determining infringement,
21    comma, once the patent is issued, comma, the owner of a
22    patent has the right to stop others from making, using,
23    comma, selling, or offering for sale the patented invention
24    throughout the United States or from importing it into the
25    United States for the life of the patent.
```

1          That will make that first sentence consistent with

2     the other similar insertions of that same matter throughout

3     the rest of the instructions.

4          With that clarification, does either party have

5     objections to either that change or anything else on Page 10

6     of the final jury instructions?

7          MR. CHOUNG:  No, Your Honor.  None from Plaintiffs.

8          MR. KINNAIRD:  No objection, Your Honor, on Page

9     10.

10         THE COURT:  Turning then to Page 11, are there

11    objections?

12         MR. CHOUNG:  None from Plaintiffs, Your Honor.

13         MR. KINNAIRD:   Your Honor, may I ask a

14    clarification?  When the second paragraph says "you must

15    make separate determinations based on the evidence for each

16    of the Samsung Defendants and GlobalFoundries," is it the

17    Court's intent to say that means for each one of those

18    groups as opposed to each of the individual Defendants?

19         THE COURT:  Counsel, I believe that's clear in that

20    I've identified the four Samsung Defendants as the Samsung

21    Defendants, and the two GlobalFoundries Defendants as the

22    GlobalFoundries Defendants elsewhere.  So this follows the

23    same grouping of Defendants as we've used throughout the

24    trial beginning with the preliminary instructions up to this

25    point.

1          So it's not to change it to individual Defendants

2    on all seven separate corporate structures, but it is to

3    continue the treatment of the four Samsung corporations as

4    collectively the Samsung Defendants and the two

5    GlobalFoundries corporate entities collectively as the

6    GlobalFoundries entities, and, of course, Qualcomm stands

7    alone.

8          MR. KINNAIRD:  Thank you for --

9          THE COURT:  Does that answer your question.

10          MR. KINNAIRD:  Yes, it does, Your Honor.  Thank you

11    for the clarification.

12          In that case, Defendants do object to these

13    instructions that the jury should make determinations with

14    regard to the Samsung and GlobalFoundries Defendants

15    collectively rather than individually for each of the four

16    Samsung Defendants or two GlobalFoundries Defendants.

17    Patent infringement is a personal tort.  Section 271(a)

18    provides that except as otherwise provided in this title,

19    whoever without authority makes, uses, offers to sell, or

20    sells any patented invention within the United States or

21    imports into the United States any patent invention during

22    the term of the patent, therefore, infringes the patent.

23    Each Defendant can be liable only for its own act.

24          Plaintiff has not raised any claim of or sought any

25    instruction regarding inducement, agency, control, alter

```
 1   ego, joint infringement, or any other basis for either

 2   disregarding corporate forum or imposing joint and several

 3   liability and corporate lia -- affiliates for the acts of

 4   another, nor would the evidence support any such

 5   instruction.

 6         Thank you.

 7         THE COURT:  Well, you raised this earlier in the

 8   formal charge conference.  I overruled that objection there.

 9   And consistent with it, I'll overrule the -- that same

10   objection here.

11         If you -- if you feel compelled to repeat that

12   objection throughout the remainder of the process, you're

13   free to, but the Court's rulings will be consistent.

14         MR. KINNAIRD:  Thank you, Your Honor.  I'll just

15   take it as a standing objection.

16         THE COURT:  All right.  Unless there's something

17   further, we'll turn to Page 12, and I'll ask if there's

18   objection from either party to anything on Page 12?

19         MR. KINNAIRD:  Yes, Your Honor.  Defendants would

20   object to the inclusion of a Doctrine of Equivalents

21   instruction in the case because no Doctrine of Equivalents

22   position was timely and properly asserted by Plaintiff.

23         THE COURT:  That's overruled.

24         Anything from Plaintiff on Page 12?

25         MR. CHOUNG:  None, Your Honor.
```

```
1              THE COURT:  On Page 12, counsel, there are two

2    relatively minor typographical errors to correct.  On the

3    paragraph near the top of the page that begins, "a patent

4    can be directly infringed," on the second line of that

5    sentence, "the patent and without the infringer knowing that

6    was it is," not what it "was" doing.  So the word "was"

7    before "doing," I will change from "was" to "is."

8              And then two paragraphs below that, "under the

9    Doctrine of Equivalents, if a person makes, uses, sells,

10   offers to sell within the United States" was left out

11   inadvertently.  And I'm going to add after the word

12   "within," "the United States or imports into the United

13   States," which follows.  Is that clear?

14             MR. CHOUNG:  Yes, Your Honor.

15             THE COURT:  Any objection to those corrections?

16             MR. CHOUNG:  None from Plaintiffs.

17             MR. KINNAIRD:  None from Defendants, Your Honor.

18             THE COURT:  All right.  Anything further on Page

19   12?

20             MR. CHOUNG:  No.

21             THE COURT:  If not, we'll turn to Page 13.  Are

22   there objections from either party with regard to any matter

23   on Page 13 of the final jury instructions?

24             MR. CHOUNG:  None from Plaintiffs, Your Honor.

25             MR. KINNAIRD:  Your Honor, Defendants would object
```

1    to the failure of the willfulness instruction to instruct

2    that knowledge -- explicitly that knowledge of the patent at

3    the time of infringement is not enough to prove willfulness

4    and to consider the totality of the circumstances.

5           We would -- Defendants would also object to the

6    inclusion of an instruction on the Patent Office

7    and Trial -- Patent Trial and Appeals Boards proceedings

8    which is unwarranted and will confuse the jury.

9    Instructions should have been limited to instructing the

10   jury that it finds -- that if it finds that new prior art

11   has been presented that was not before the Patent Office, it

12   should consider that the PTO had no opportunity to evaluate

13   the prior art before granting the party (sic).

14          Defendants object to the instruction that the jury

15   may consider the decision of the Patent Office conducting or

16   not conducting a review proceeding after a patent has been

17   issued based on the prior art.  The PTAB proceedings

18   mentioned are restricted to the grounds of institution, and

19   thus a reference that's raised for obviousness will not

20   allow consideration of that reference for anticipation.  And

21   if a reference cannot be considered for anticipation, the

22   institution of a PTAB proceeding will not bring the

23   reference before the PTO in the relevant sense.

24          The instructions are improper because it does not

25   inform the jury of that limitation.  One of the key prior

```
 1   art -- one of the key references was not before the PTAB for
 2   anticipation.
 3          THE COURT:  All right.  That objection is
 4   overruled.
 5   If there's not anything further on that page, we'll turn
 6   from Page 13 to Page 14.  Are there objections to anything
 7   on Page 14?
 8          MR. CHOUNG:  Not from Plaintiffs, Your Honor.
 9          MR. KINNAIRD:  None from Defendants, Your Honor.
10          THE COURT:  All right.  Page 15 is next.  Are there
11   objections from either party?
12          MR. CHOUNG:  None from Plaintiffs, Your Honor.
13          MR. KINNAIRD:  None from Defendants, Your Honor.
14          THE COURT:  Turning then to Page 16, are there
15   objections from either party?
16          MR. KINNAIRD:  Your Honor, the Defendants object to
17   failure to instruct the jury on the reasonable expectation
18   of success requirement of obviousness and to instruct them
19   that absolute predictability is not required.
20          THE COURT:  That objection is overruled.
21          Anything further?
22          MR. KINNAIRD:  No, Your Honor.
23          THE COURT:  All right.  We'll turn to Page 17.  Are
24   there objections there from either party?
25          I do have, counsel, for your information one other
```

1   stylistic correction on the very top line of Page 17.  It

2   presently reads:  Publication or patent will not be an

3   anticipation unless.  I'm going to reword that to say:

4   Publication or patent will not anticipate unless.  That's

5   basically a stylistic change that I think will be clearer

6   for the jury.

7           MR. KINNAIRD:  No objection from the Defendants,

8   Your Honor.

9           MR. CHOUNG:  No objections, Your Honor.

10          THE COURT:  Are there any other objections to

11  anything on Page 17?

12          MR. CHOUNG:  None, Your Honor.

13          MR. KINNAIRD:  None from the Defendants, Your

14  Honor.

15          THE COURT:  Okay.  Then I'll turn to Page 18.  Are

16  there any objections here from either party?

17          MR. CHOUNG:  None from Plaintiffs, Your Honor.

18          MR. KINNAIRD:  None from Defendants, Your Honor.

19          THE COURT:  All right.  Turning then to Page 19,

20  are there any objections?

21          MR. CHOUNG:  None from Plaintiffs, Your Honor.

22          MR. KINNAIRD:  None from the Defendants, Your

23  Honor.

24          THE COURT:  Turning then to Page 20, are there any

25  objections?

```
 1            MR. CHOUNG:   None from Plaintiffs, Your Honor.

 2            MR. KINNAIRD:  None from the Defendants, Your

 3   Honor.

 4            THE COURT:  All right.  On Page 20, counsel, toward

 5   the bottom of the page, the paragraph that begins "if you

 6   find that any."  On the second line of that paragraph, we

 7   personally say "the Qualcomm has infringed."  I'm going to

 8   omit the article "the" so it will simply say on that line

 9   "Qualcomm has infringed."  Again, a stylistic change.

10   Any objection there?

11            MR. CHOUNG:  None, Your Honor.

12            MR. KINNAIRD:  No, Your Honor.

13            THE COURT:  Then we'll turn to Page 21.  Are there

14   objections there from either party?

15            MR. CHOUNG:  None, Your Honor.

16            THE COURT:  Anything on Page 21 from Defendants?

17            MR. KINNAIRD:  No.  No, Your Honor.

18            THE COURT:  Turning then to Page 22, are there

19   objections there from either party?

20            MR. CHOUNG:  None, Your Honor.

21            MR. KINNAIRD:  Your Honor, Defendants would object

22   that we believe an instruction is necessary that the parties

23   to the hypothetical negotiation cannot be presumed to have

24   future knowledge -- or knowledge of the future and that they

25   also -- the royalty may want be based on an after-the-fact
```

1  calculation of sales, profits, or cost savings.

2          THE COURT:  All right.  That objection is

3  overruled.

4          Anything further on Page 22?

5          If not, we'll turn to Page 23, are there objections

6  on Page 23 from either party?

7          MR. CHOUNG:  None from Plaintiffs, Your Honor.

8          MR. KINNAIRD:  Your Honor, we -- Defendants would

9  object to the failure to instruct the jury that the smallest

10 salable unit is the proper starting point for apportioning

11 value to the patented feature -- patented features.

12         THE COURT:  All right.  That objection is

13 overruled.

14         Also, counsel, I'll note that beginning at the --

15 toward the bottom of Page 23, there's a recitation of all

16 the various Georgia-Pacific factors, and I'd like to confirm

17 on the record that neither party objects to the Court

18 charging this jury on all the Georgia-Pacific factors.

19         Does Plaintiff have any objection to that?

20         MR. CHOUNG:  No, Your Honor.

21         THE COURT:  Does Defendant?

22         MR. KINNAIRD:  No, Your Honor.

23         THE COURT:  Okay.  Then we'll turn to Page 24,

24 again, these are Georgia-Pacific factors.  Are there any

25 objections to anything on Page 24?

```
 1              MR. CHOUNG:  No, Your Honor.

 2              MR. KINNAIRD:  No, Your Honor.

 3              THE COURT:  Turning then to Page 25, are there

 4    objections here from either party?

 5              MR. KINNAIRD:  Your Honor, Defendants would object

 6    to the instruction that a reasonable royalty can exceed the

 7    profits expected by the patentee.  The parties to the

 8    hypothetical negotiation must negotiate a royalty that is

 9    designed to yield the infringer a -- accused infringer a

10    reasonable profit.

11              THE COURT:  All right.  That objection is

12    overruled.

13              Any other objections on Page 25?

14              MR. CHOUNG:  None from Plaintiffs, Your Honor.

15              MR. KINNAIRD:  And none from Defendants, Your

16    Honor.

17              THE COURT:  All right.  Before we move on, counsel,

18    I will note one other stylistic change.

19              On the paragraph that begins "Now, no one of these

20    factors is dispositive," I'm simply going to change that to

21    read, "None of these factors is dispositive."

22              Again, that's a stylistic change I think will be

23    clearer for the jury.

24              Any objection to that change from either party?

25              MR. CHOUNG:  No, Your Honor.
```

1          MR. KINNAIRD:  No, Your Honor.

2          THE COURT:  Turning then to Page 26 of the final

3    jury instructions, is there objection from either party?

4          MR. KINNAIRD:  Your Honor, Defendants would object

5    to the instruction that a patent owner is entitled to

6    protect its patent rights under the U.S. Constitution.  And

7    this includes bringing a suit in a United States District

8    Court for money damages for infringement.

9          This is not a correct statement of the law.  The

10   constitution simply gives Congress the power to grant

11   inventors exclusive rights in their discoveries.  Congress

12   is under no obligation to pass a patent statute unless any

13   right of enforcement is not of constitutional dimension.

14   The constitution says nothing about the entitlement of

15   patent owners to protect their rights.  Any such rights are

16   solely a matter of statute.

17         And this paragraph improperly suggests that

18   patentees -- may lead the jury to think that patentees are

19   constitutionally favored, and we believe that it should be

20   deleted.

21         THE COURT:  All right.  In response to that

22   objection, the sentence on the lower third of 26, which

23   currently reads, "A patent owner is entitled to protect his

24   rights -- its patent rights under the United States

25   Constitution," I will grant the objection to this extent, I

1  will modify that sentence so that it now reads, "A patent

2  owner is entitled to protect his rights under the laws of

3  the United States."

4        MR. KINNAIRD:  No objection to that, Your Honor.

5        THE COURT:  Anything else on Page 26?

6        If not, we'll move to Page 27, are there objections

7  from either party to anything on Page 27 of the final jury

8  instructions?

9        MR. KINNAIRD:  No, Your Honor.  I just would ask,

10  the Defendants would like to renew their objections to the

11  claim construction in the jury -- in the juror notebook that

12  the jury's instructed to use and would ask the Court's leave

13  to rely on the reasons given in the proposed final jury

14  instructions rather than to read all of those orders in open

15  court, although I'm prepared to do so.

16        THE COURT:  Is your objection, counsel, to the

17  Court referencing the claim construction definitions that

18  are included in the juror notebooks as opposed to expressly

19  including them and reading them in the final jury

20  instructions?

21        MR. KINNAIRD:  No, Your Honor.  I'm sorry to

22  clarify, we were just renewing our objection to the

23  substance of the claim constructions to which we objected

24  and the Court overruled previously.

25        THE COURT:  Well, that objection is overruled.

```
 1              MR. KINNAIRD:  Thank you, Your Honor.

 2              THE COURT:  Is there any objection on Page 27 from

 3     Plaintiff?

 4              MR. CHOUNG:  Your Honor, then from Plaintiffs in

 5     that regard, we'd like to renew our objections to the ruling

 6     on the claim construction for "directly formed on" to

 7     preserve the record.

 8              THE COURT:  All right.  Well, that objection,

 9     likewise, is overruled.

10              Is there anything on Page 27 Plaintiff cares to

11     object to?

12              MR. CHOUNG:  No, Your Honor.

13              THE COURT:  That appears to be the last page of the

14     final jury instructions.

15              We'll next move to the verdict form.  We'll pursue

16     this or take this up in the same manner.  We'll begin with

17     Page 1 of the verdict form.

18              Is there objection to anything from either party to

19     Page 1 of the verdict form?

20              MR. KINNAIRD:  Your Honor, the Defendants do object

21     that the same objection we had to the jury instruction that

22     the verdict form improperly forces the jury to determine

23     infringement, willfulness, and damages for the Samsung

24     Defendants collectively and for the two GlobalFoundries

25     Defendants collectively rather than for each Defendant
```

```
 1   separately.  This amounts to directing a verdict if

 2   infringement is found for any one --

 3            THE COURT:  You've given me your reasons, counsel.

 4   Same ruling, those are overruled.  Those -- that objection

 5   is overruled.

 6            MR. KINNAIRD:  Thank you.

 7            THE COURT:  Anything from Plaintiff on Page 1?

 8            MR. CHOUNG:  No, Your Honor.

 9            THE COURT:  Turning then to Page 2 of the verdict

10   form, is there any objection from either party?

11            MR. CHOUNG:  No, Your Honor.

12            MR. KINNAIRD:  No, Your Honor.

13            THE COURT:  Turning to Page 3 where Question 1 is

14   located, is there objection from either party?

15            MR. CHOUNG:  No, Your Honor.

16            MR. KINNAIRD:  No, Your Honor.

17            THE COURT:  Turning to Page 4 where Question 2 is

18   located, is there objection from either party?

19            MR. CHOUNG:  No, Your Honor.

20            MR. KINNAIRD:  No, Your Honor.

21            THE COURT:  Turning to Page 5, is there objection

22   from either party?

23            MR. CHOUNG:  No, Your Honor.

24            MR. KINNAIRD:  No, Your Honor.

25            THE COURT:  Turning then to Page 6 where Question 3
```

1    is located, is there objection from either party?

2          MR. CHOUNG:  No, Your Honor.

3          MR. KINNAIRD:  No, Your Honor, other than

4    previously stated.

5          THE COURT:  Turning then to Page 7, is there

6    objection from either party?

7          MR. CHOUNG:  No, Your Honor.

8          MR. KINNAIRD:  No, Your Honor.

9          THE COURT:  Turning then to Page 8 where Question 4

10   is located, is there objection from either party?

11         MR. CHOUNG:  Your Honor, from Plaintiffs we renew

12   our objection on the lump -- paid-up lump sum as an option.

13         THE COURT:  That's overruled.

14         Is there any objection from Defendants on Page 8?

15         MR. KINNAIRD:  Your Honor, the only objection would

16   be that we think it to be parallel to the jury instructions,

17   it should say "fully paid-up lump sum" or "paid-up lump

18   sum," one or the other.

19         THE COURT:  That's overruled.

20         Anything else?

21         MR. CHOUNG:  And also, Your Honor, just to clarify

22   on the damages portion of this, to any extent that the

23   verdict is limited to the 14-nanometer devices per the

24   parties' stipulation.

25         THE COURT:  Say that again, counsel.

1          MR. CHOUNG:  That the damages verdict is limited to

2    the 14-nanometer devices per the parties' stipulation.

3          THE COURT:  Are you suggesting that I add language

4    to Page 4?

5          MR. CHOUNG:  No, Your Honor.

6          THE COURT:  To Question 4?

7          MR. CHOUNG:  I just wanted to put it on the record.

8          THE COURT:  Okay.  To the extent that's an

9    objection, it's overruled.  To the extent it's a statement,

10   it's noted.

11         We'll move then to Page 9 which is the final page

12   of the verdict form, is there objection there from either

13   party?

14         MR. CHOUNG:  No, Your Honor.

15         MR. KINNAIRD:  No, Your Honor.

16         THE COURT:  All right.  That completes the formal

17   charge conference, counsel.  I'll make these noted changes

18   that resulted from the formal charge conference.

19         It's my intention to prepare eight final hard copy

20   versions of the final jury instructions and to send those

21   eight copies back with the jury when they retire to

22   deliberate.  And I will consequently tell them that they

23   will have that at the beginning of these instructions so

24   they will be free to listen rather than to feel compelled to

25   take copious notes.

```
 1              It will take me some small amount of time to do
 2    that, but once that's done, I intend to return to the bench,
 3    bring in the jury, and proceed with the final jury
 4    instructions, hear argument -- closing argument from
 5    counsel, and then direct the jury to retire and deliberate
 6    on its verdict.
 7              I mentioned in chambers to counsel earlier, but I
 8    think it's worthy of repeating again.  The Court considers
 9    its final jury instructions and counsel's closing arguments
10    to be the most serious part of an inherently serious
11    process.
12              Consequently, to those in the gallery, we are more
13    than welcome to have you here throughout the process.  I
14    insist, however, that you be respectful, that you avoid any
15    and all disruptions.  I do not want to see people coming and
16    going from the courtroom once I begin the final jury
17    instructions.  I do not want to hear whispering.  I do not
18    want to see notes or papers passed.  I want everyone to be
19    as quiet and as respectful as possible.
20              Please take that into account, and follow those
21    instructions once I begin my final -- final jury
22    instructions to the jury.
23              Are there questions before the Court recesses?
24              MR. SHEASBY:  Yes, Your Honor, there are two
25    questions.
```

1          First, I just received the revised version of their

2    demonstrative, and it's still inaccurate.  This SO2 layer --

3    there's no such thing as a second oxide layer.  It's a

4    single SO2 layer that wraps all the way around the Fin, and

5    we request the entire Fin be made blue.  There's no physical

6    difference between there and there, and that's the only

7    thing that's in the record.

8          THE COURT:   Well, that's overruled, Mr. Sheasby.

9    You may argue to the contrary.  You may present something

10   else to the contrary, but I'm not going to keep the

11   Defendants from making that argument.

12         MR. SHEASBY:  And the second request is I'm going

13   to be using the drawing board during my closing.

14         THE COURT:  The easel?

15         MR. SHEASBY:  The easel.  And with your permission,

16   so we'd -- we'd like to place it -- pre-place it on this

17   side.  Let me ask you this way.  Is there a particular place

18   you'd like me to stand when I draw with the easel?

19         THE COURT:   I have no problem with counsel using

20   the easel during your final argument.  It does need to be

21   placed so that it doesn't block the view of opposing

22   counsel.  It does need to be placed fairly close to the

23   podium, within a few feet.  If you'd like to stand beside

24   the easel while you're making an argument related to what

25   you may be drawing on the easel, that is perfectly fine.

 1          You will need to speak up.  There will be no

 2    amplification there.  You have had a tendency to talk softly

 3    during the trial.  You will need to stay within an arm's

 4    length of easel, not roam around the well of the Court.  But

 5    if you will stay within an arm's length of the easel and if

 6    you'll speak up so that you're clearly heard, I have no

 7    problem with you speaking from the side of the easel once

 8    you've placed it somewhere in the vicinity of the podium

 9    where it doesn't block anyone's view.

10          MR. SHEASBY:  With your permission, may we

11    pre-place it so it doesn't waste time?

12          THE COURT:  Put it where you want, and when I come

13    back out, if I have a problem with it, I'll tell you about

14    it.

15          MR. SHEASBY:  Thank you, Your Honor.

16          THE COURT:  Do we have any other questions?

17          MR. SHEASBY:  No, Your Honor.

18          THE COURT:  Anything from Defendants?

19          MR. JACOBS:  No, Your Honor.

20          THE COURT:  The Court stands in recess.

21          COURT SECURITY OFFICER:  All rise.

22          (Recess.)

23          (Jury out.)

24          COURT SECURITY OFFICER:  All rise.

25          THE COURT:  Be seated, please.

```
 1              Mr. Sheasby, I don't see any problem with the
 2   placement of that easel there.
 3              Is there any objection from anybody?
 4              MR. JACOBS:  No objection, Your Honor.
 5              THE COURT:  Okay.  Is there anything else we need
 6   to take up before I bring in the jury and begin my final
 7   jury instructions?
 8              MR. SHEASBY:  Nothing from the Plaintiffs, Your
 9   Honor.
10              MR. JACOBS:  Nothing from the Defendants, Your
11   Honor.
12              THE COURT:  All right.  Let's bring in the jury,
13   please, Mr. Nance.
14              COURT SECURITY OFFICER:  All rise for the jury.
15              (Jury in.)
16              THE COURT:  Good morning and welcome back, ladies
17   and gentlemen.  Please have a seat.
18              Ladies and gentlemen of the jury, you have now
19   heard the evidence in this case, and I will now instruct you
20   on the law that you must apply.  I want each of you to
21   understand that you will each have a copy -- a printed hard
22   copy of these final jury instructions that I'm about to give
23   you, which hopefully means you should be able to pay full
24   attention to my oral instructions and not feel compelled to
25   take notes at this time.  You will each have your own hard
```

1  copy to review when you retire to deliberate.

2           It's your duty to follow the law as I give it to

3  you.  On the other hand, ladies and gentlemen, and as I've

4  previously said, you, the jury, are the sole judges of the

5  facts in this case.

6           Do not consider any statement that I have made in

7  the course of the trial or make during these instructions as

8  an indication to you that I have any opinion about the facts

9  in this case.

10          You're about to hear closing arguments from the

11 attorneys.  Statements and arguments of the attorneys, let

12 me remind you, are not evidence, and they are not

13 instructions on the law.  They're intended only to assist

14 the jury in understanding the evidence and the parties'

15 contentions.

16          A verdict form has been prepared for you.  You're

17 to take this verdict form with you to the jury room, and

18 when you've reached a unanimous decision as to the verdict,

19 you're to have your foreperson fill in the blanks in the

20 verdict form to reflect those unanimous decisions, sign it,

21 date, it, and then deliver it to the Court Security Officer.

22          Answer each question in the verdict form from the

23 facts as you find them to be.  Do not decide who you think

24 should win the case and then answer the questions to reach

25 that result.  Again, ladies and gentlemen, your answers and

1   your verdict must be unanimous.

2          Now, in determining any fact and whether it's been

3   proven in this case, you may, unless otherwise instructed,

4   consider the testimony of all the witnesses, regardless of

5   who may have called them, and you may consider all of the

6   exhibits received and admitted into evidence, regardless of

7   who may have produced them or presented them.

8          You, the jurors, are the sole judges of the

9   credibility of each and every witness and the weight and

10  effect to be given to the evidence in this case.

11         As I've said previously, the attorneys in this case

12  are acting as advocates for their competing parties and

13  their competing claims, and they have a duty to object when

14  they believe evidence is offered that should not be admitted

15  under the rules of the Court.

16         In that case, when the Court has sustained an

17  objection to a question addressed to a witness, you're to

18  disregard the question entirely, and you may draw no

19  inference -- excuse me, inference from its wording or

20  speculated about what the witness would have said if I had

21  permitted them to answer the question.  On the other hand,

22  if the objection was overruled, then you're to treat the

23  answer to the question and the question itself just as if no

24  objection had been made; that is, like any other question

25  and answer.

1          Now, at times during of the course of the trial,

2     it's been necessary for the Court to talk with the lawyers

3     here at bench or outside of your hearing by calling a recess

4     while you were in the jury room.  This happens sometimes

5     during a trial because there are things that occasionally

6     come up that do not involve the jury.  You should not

7     speculate about what was said during these discussions that

8     took place outside of your presence.

9          Now, ladies and gentlemen, there are two types of

10    evidence that you may consider in properly finding the truth

11    as to the facts in this case.  One is direct evidence, such

12    as the testimony of an eyewitness.  The other is indirect or

13    circumstantial evidence; that is, the proof of a chain of

14    circumstances that indicates the existence or nonexistence

15    of certain other facts.

16          As a general rule, you should know that the law

17    makes no distinction between direct or circumstantial

18    evidence, but simply requires that you, the jury, find the

19    facts based on the evidence presented, both direct and

20    circumstantial.

21          The parties may have stipulated or agreed to some

22    facts in the case.  And when the lawyers for both sides

23    stipulate as to the existence of a fact, you must, unless

24    otherwise instructed, accept that stipulation as evidence

25    and regard that fact as proven.

1          Certain testimony in this case has been presented

2    to you through depositions.  A deposition is the sworn,

3    recorded answers to questions asked to a witness in advance

4    of the trial.  If a witness cannot be physically present to

5    testify in person, then the witness's testimony may be

6    presented under oath in the form of a deposition.

7          As I've told you earlier, before the trial began,

8    attorneys representing all the parties questioned these

9    deposition witnesses under oath.  A court reporter was

10   present, and the witness was placed under oath.  Remember,

11   deposition testimony is entitled to the same consideration

12   by you, the jury, as testimony given by a witness in person

13   from the witness stand in open court.  And accordingly, you

14   should judge the credibility and the importance of the

15   deposition testimony to the best of your ability just as if

16   the witness had testified personally in open court before

17   you.

18         Now, while you should consider only the evidence in

19   this case, ladies and gentlemen, you should understand that

20   you are permitted to draw such reasonable inferences from

21   the testimony and the exhibits as you feel are justified in

22   the light of common experience.

23         In other words, you may make deductions and you may

24   reach conclusions that reason and common sense lead you to

25   draw from the facts that have been established through the

testimony and other evidence in this case.

However, you should not base your decision on any evidence not presented by the parties in open court during the trial of this case, including your own personal experiences with any particular transistor devices.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all of the evidence you believe that single witness.

When knowledge of a technical subject may be helpful to the jury, a person who has special training and experience in that technical field, we call them an expert witness, is permitted to state his or her opinions on those technical matters to you, the jury.

However, ladies and gentlemen, you're not required to accept any of those opinions.  As with any other witness, it is solely up to you to decide who you believe and who you don't believe and whether or not you want to rely on their testimony.

Now, certain exhibits have been shown to you over the course of the trial which were illustrations.  We call these types of exhibits demonstrative exhibits or simply just demonstratives.  Demonstratives are a party's

description, picture, or model to describe something involved in the trial.  If your recollection of the evidence differs from the demonstratives, you should rely on your recollection.  Demonstrative exhibits, demonstratives, are sometimes called jury aids, and they are not evidence, but the witness's testimony during the use of a demonstrative is evidence.

In any legal action, facts must be proven by a required amount of evidence known as the burden of proof. The burden of proof in this case is on the Plaintiff for some issues, and it's on the Defendants for other issues.

There are two burdens of proof that you will apply in this case.  They are the preponderance of the evidence and clear and convincing evidence.

The Plaintiff in this case, KAIST IP US LLC, which you've heard referred to throughout the trial simply as KAIST, has the burden of proving patent infringement by a preponderance of the evidence.  KAIST also has the burden of proving willful patent infringement by a preponderance of the evidence.  And KAIST has the burden of proof of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  This is sometimes talked about as being the greater

1    weight and degree of credible testimony.

2         Now, the Defendants in this case, Samsung

3    Electronics Company Limited, Samsung Electronics America,

4    Inc., Samsung Semiconductor, Inc., Samsung Austin

5    Semiconductor, LLC, who you've heard referred to

6    collectively through the trial as Samsung or the Samsung

7    Defendants, together with GlobalFoundries, Inc.,

8    GlobalFoundries U.S., Inc., who you've heard referred to

9    collectively through the trial as GlobalFoundries or the

10   GlobalFoundries Defendants, and Qualcomm, Inc., who you've

11   heard referred to through the trial simply as Qualcomm, they

12   have the burden of proving patent invalidity by clear and

13   convincing evidence.

14        Clear and convincing evidence means evidence that

15   produces in your mind an abiding conviction that the truth

16   of the party's factual contentions are highly probable.

17   Although proof to an absolute certainty is not required, the

18   clear and convincing evidence standard requires a greater

19   degree of persuasion than is necessary for the preponderance

20   of the evidence standard.

21        If proof establishes in your mind an abiding

22   conviction in the truth of the matter, then the clear and

23   convincing evidence standard has been met.

24   Now, these standards are different from what you've heard

25   about in criminal proceedings where a fact must be proven

1    beyond a reasonable doubt.

2         On a scale of the various standards of proof, as

3    you move from preponderance of the evidence where proof need

4    be only sufficient to tip the scales in party -- in favor of

5    the party proving fact, to at the other end, beyond a

6    reasonable doubt, where the fact must be proven to a very

7    high degree of certainty, you can think of clear and

8    convincing evidence as being between these two ends of the

9    spectrum or these two different standards.

10        In determining whether any fact has been proven by

11   a preponderance of the evidence or by clear and convincing

12   evidence, you may, unless otherwise instructed, consider the

13   stipulations of the parties, the testimony of all the

14   witnesses, regardless of who called them, and all the

15   exhibits received into evidence, regardless of who produced

16   them.

17        Now, as I did at the beginning of the case, I'm

18   going to give you a summary of each side's contentions, and

19   then I'll provide you with detailed instructions on what

20   each side must prove in order to win on each of its

21   contentions.

22        As I told you previously, this case concerns one

23   United States patent, and that is, patent -- U.S. Patent No.

24   6,885,055, which you've consistently heard referred to

25   throughout the trial as the '055 patent.  And I'll refer to

1    this as the patent-in-suit sometimes.

2         And you've also heard it referred to as the

3    asserted patent.  All of those references are to the '055

4    patent.

5         The Plaintiff in this case, KAIST, seeks money

6    damages from the Defendants for allegedly infringing the

7    patent-in-suit -- that is, the '055 patent -- by making,

8    using, selling, and/or offering for sale in the United

9    States its 14-nanometer bulk FinFET transistor devices on

10   semiconductor wafers, chips containing those transistor

11   devices, and products containing those chips.

12        KAIST contends that the Defendants' accused

13   products infringe the following claims of the '055 patent:

14   Claim 1, Claim 2, Claim 3, Claim 4, Claim 5, Claim 6, Claim

15   11, Claim 12, Claim 13, Claim 15, Claim 16, and Claim 17.

16   All of these claims are sometimes referred to collectively

17   as the asserted claims.

18        KAIST has alleged that the accused products

19   infringe the asserted claims either literally or through the

20   Doctrine of Equivalents.

21        KAIST also alleges that Samsung, GlobalFoundries,

22   and Qualcomm's infringement has been -- is -- has been and

23   is willful.  KAIST seeks a reasonable royalty from the

24   Defendants for the alleged infringement.

25        The Defendants deny that their 14-nanometer bulk

FinFET transistor devices infringe the asserted claims of the '055 patent.

Defendants further deny KAIST's allegations that they willfully infringed any claim of the '055 patent.

Defendants also contend that the asserted claims are anticipated by or obvious in view of prior art that existed before KAIST's alleged inventions, and, therefore, that the '055 patent's asserted claims are invalid.

Now, ladies and gentlemen, invalidity is a defense to infringement.  Defendants deny that they owe KAIST any damages in this case.

Invalidity and infringement are separate and distinct issues.  However, your job is to decide whether the asserted claims of the asserted patent have been infringed and whether any of those asserted claims of that patent are invalid.

Now, if you decide that any claim has been infringed and is not invalid, then you will need to decide the amount of money damages that are to be awarded to KAIST as compensation for that infringement.

You must also decide whether each of the Defendants' infringement has been willful.

Now, before you decide any of the issues in this case, you'll need to understand the role of the patent claims.

1          The patent claims are those numbered sentences at

2    the end of the patent.  The claims define the patent owner's

3    rights under the law.  The claims are important because it's

4    the words of the claims themselves that define what the

5    patent covers.  The figures and the text in the rest of the

6    patent provide a description, examples, and a context for

7    the invention.  They provide a context for the claims, but

8    it is the claims that define the breadth of the patent's

9    coverage.

10         Each claim is effectively treated as if it were its

11   own separate patent, and each claim may cover more or may

12   cover less than any other claim.  Therefore, what a patent

13   covers collectively or as a whole depends on what each of

14   its claims cover.

15         You'll first need to understand what each claim

16   covers in order to decide whether or not there is

17   infringement of that claim and to decide whether or not the

18   claim is invalid.  And the first step is to understand the

19   meaning of the words used in the patent claim.

20         Now, the law says that it is my role as the Judge

21   to define the terms of the claims, but it's your role as the

22   jury to apply my definitions to the issues that you've been

23   asked to decide in this case.

24         I'll now explain how a claim defines what it

25   covers.  A claim sets forth in words a set of requirements.

Each claim sets forth its requirements in a single sentence. If a device satisfies each of the requirements in that sentence, then it is covered by and infringes that claim.

There can be several claims in a patent.  A claim may be narrower or broader than another claim by setting forth more or fewer requirements.  The coverage of a patent is accessed on a claim-by-claim basis.

In patent law, the requirements of a claim are upon -- are often referred to as the claim elements or the claim limitations.  Those terms mean the same thing.

When a product meets all the requirements of a claim where it meets all of its limitations or all of its elements, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim elements or limitations is present in that product.  If a product is missing even one limitation or element of a claim, the product is not covered by that claim.  And if the product is not covered by the claim, the product does not infringe the claim.

This case involves two types of patent claims, independent claims and dependent claims.

An independent claim does not refer to any other claim in the patent.  It stands alone.  An independent claim sets forth all the requirements that must be met in order to

be covered by the claim, and it's not necessary to look to any other claim in the patent to determine what an independent claim covers.

However, a dependent claim does not by itself recite all the requirements of the claim but refers to another claim or claims for some of its requirements.  In this way, the dependent claim depends on another claim.

The law considers a dependent claim to incorporate all the requirements of the claim or claims to which it refers or from which it depends, as well as the additional claims set forth within the dependent claim itself.

To determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other claim to which it refers, or as we sometimes say, from which it depends.

And a product that meets all the requirements of both the dependent claim and the claim or claims from which it refers or from which it depends is covered by that dependent claim.

The claims of the patent-in-suit use the word "comprising."  Comprising means including or containing.  A claim that includes the word "comprising" is not limited to the methods or devices having only the elements recited in the claim but also covers methods or devices that add additional elements.

1          For example, if you take a claim that covers the

2     invention of a table, if the claim recites a table

3     comprising a tabletop, four legs, and the glue that holds

4     the legs to the tabletop, the claim will cover any table

5     containing those structures, even if the table also contains

6     other structures, such as leaves to go in the tabletop or

7     wheels to go on the ends of the legs.

8          Now, that's a simple example of using the word

9     "comprising" and what it means.  In other words, ladies and

10    gentlemen, it can have other features in addition to those

11    that are covered by the patent.

12         Now, the law says it's my role to define the terms

13    of the claims, and it's your role to apply my definitions to

14    the issues that you're asked to decide in this case.

15         For any words in the claims for which I have not

16    provided you with a definition, you should apply their plain

17    and ordinary meaning.  My interpretation of the language

18    should not be taken by you as an indication that I have a

19    view regarding the issues of infringement or validity.

20    Those issues are yours to make.

21         Now, during your deliberations, you must apply

22    these meanings which I have provided regarding the

23    construction of the terms in the claim language.  These

24    terms which I have construed are set forth in your juror

25    notebooks.  And you have also been provided with a complete

1  copy of the '055 patent, and you may use these in your

2  deliberations.

3       I'll now instruct you on the specific rules that

4  you must follow to determine whether the Plaintiff, KAIST,

5  has proven that the Defendants have infringed the asserted

6  claims of the '055 patent.

7       In determining infringement, once the patent is

8  issued, the owner of the patent has the right to stop others

9  from making, using, selling, or offering for sale the

10  patented invention throughout the United States or importing

11  it into the United States for the life of the patent.  If a

12  person makes, uses, sells, or offers for sale within the

13  United States or imports into the United States what is

14  covered by a patent claim without the patent owner's

15  permission, that person is said to infringe the patent.  For

16  any claim of infringement, an accused infringer's ownership

17  of its own patent is not a defense to infringement.

18       In reaching your decision on infringement, keep in

19  mind that only the claims of a patent can be infringed.  To

20  determine whether there is infringement, you must compare

21  the asserted patent claims as I have defined each of them

22  for you to the accused products to determine whether or not

23  there is infringement.

24       That is the only correct comparison.  The claims

25  asserted against the accused products.

1          You should not compare the accused products with

2   any specific example set out in the patent or with the

3   patent owner's commercial products or with the prior art in

4   reaching your decision on infringement.

5          As I have reminded you throughout the trial, the

6   only correct comparison is between the accused products and

7   the language of the claim itself.

8          Now, you must reach your decision as to each

9   assertion of the infringement based on my instructions about

10  the meaning and scope of the claims, the legal requirements

11  for infringement, and the evidence that's been presented

12  throughout the trial by both -- or both sides in this case,

13  all the parties in this case.

14         For each Defendant, you must determine whether the

15  Defendant makes, uses, sells, or offers for sale within the

16  United States or imports into the United States an accused

17  product covered by a patent claim without the patent owner's

18  permission.

19         You must make separate determinations based on the

20  evidence for the Samsung Defendants, the GlobalFoundries

21  Defendants, and Qualcomm.

22         As I remind you, the issue of infringement is

23  assessed on a claim-by-claim basis.  Therefore, there may be

24  infringement as to one claim, even if there is no

25  infringement as to other claims.

1          I'll now instruct you on the specific rules that

2     you must follow to determine whether the Plaintiff, KAIST,

3     has proven that any of the Defendants have infringed one or

4     more of the patent claims involved in this case.

5          In order to prove direct infringement of a patent

6     claim, the Plaintiff, KAIST, must show by a preponderance of

7     the evidence that the accused product includes each and

8     every element, requirement, or limitation of the claim

9     either literally or under the Doctrine of Equivalents.

10         In order to infringe a patent claim, the accused

11    device must include each and every element of the claim.

12         In determining whether the Defendants infringe

13    patent -- excuse me, Plaintiff's asserted claims, you must

14    determine if the accused FinFET contains each and every

15    element recited in a claim of the '055 patent.  A claim

16    element is literally present if it exists in the accused

17    device as it is described in the claim language either as I

18    have explained it to you, or if I did not explain it,

19    according to its plain and ordinary meaning as understood by

20    one of ordinary skill in the art.

21         Now, in making your determination, you must

22    consider each claim separately.  Not all of the claims of a

23    patent must be infringed for infringement to exist.  The

24    Plaintiff needs only establish by a preponderance of the

25    evidence that one claim is infringed.  If you find that each

and every element of an asserted claim is found in the

accused device, then the claim is infringed, even if the

accused device may include additional features or functions

not found in the claims.

A patent can be directly infringed even if the

alleged infringer did not have knowledge of the patent and

without the infringer knowing that what it was doing is

infringement of the claim.  A patent may also be directly

infringed, even though the accused infringer believes in

good faith that what it is doing is not infringement of the

patent.

Now, if you find that the accused products do not

literally infringe a claim of the '055 patent, you must then

determine whether the products infringe that claim under the

Doctrine of Equivalents.

Under the Doctrine of Equivalents, if a person

makes, uses, sells, or offers for sale within the United

States or imports into the United States a product that does

not meet all of the requirements of a claim and thus does

not literally infringe that claim, there can still be direct

infringement if the product satisfies that claim under the

Doctrine of Equivalents.

Under the Doctrine of Equivalents, a product

infringes a claim if the accused product contains elements

corresponding to each and every requirement of the claim

1  that is equivalent to, even though not literally met by, the

2  product.

3        You may find that an element is equivalent to a

4  requirement of a claim that is not literally met if a person

5  having ordinary skill in the field of the technology of the

6  patent would have considered the differences between them to

7  be insubstantial or would have found that the action or

8  structure performs substantially the same function in

9  substantially the same way to achieve substantially the same

10 result as the requirement of the claim.

11       In order for the structure to be considered

12 interchangeable, the action or structure must have been

13 known at the time of the alleged infringement to a person

14 having ordinary skill in the field of technology of the

15 patent.

16       Interchangeability at the present time is not

17 sufficient.  In order to prove infringement by equivalents,

18 KAIST bears the burden to show the equivalency of each claim

19 element by a preponderance of the evidence.

20       In this case, KAIST contends that Defendants

21 willfully infringed its patent.  If you decided that one or

22 more of the Defendants have infringed, you must go on and

23 separately address the additional issue of whether or not

24 each Defendants' infringement was willful.

25       The Plaintiff must prove willfulness by a

1   preponderance of the evidence.  In other words, you must

2   determine for each Defendant whether it is more likely than

3   not that the Defendant willfully infringed.

4          You may find that a Defendant willfully infringed

5   if you find that it acted egregiously, willfully, or

6   wantonly.  You may find the Defendants' actions were

7   egregious, willful or wanton if it acted in reckless or

8   callous disregard of or with indifference to the rights of

9   KAIST.

10         A Defendant is indifferent to the rights of another

11  when it proceeds in disregard of a high or excessive danger

12  of infringement that is known to it or was apparent to a

13  reasonable person in its position.

14         I'll now instruct you on the rules that you must

15  follow in deciding whether or not Defendants have proven

16  that the asserted claims of the patent are invalid.

17         An issued United States patent is accorded a

18  presumption of validity based on the presumption that the

19  United States Patent and Trademark Office, which you've

20  heard referred to throughout the trial simply as the PTO or

21  the Patent Office, acted correctly in issuing the patent.

22  This presumption of validity extends to all United States

23  patents.  In order to overcome this presumption, the

24  Defendants must establish by clear and convincing evidence

25  that the Plaintiff's patent or any claim in the patent is

1    not valid.

2         When you were shown the patent video during jury

3    selection and prior to the beginning of the trial, you

4    learned about the examination process that patents undergo

5    prior to being issued by the Patent Office.  For many

6    patents, this is the only time that the Patent Office

7    considers the validity of the application before the patent

8    is issued, and there is the possibility that the Patent

9    Office did not have all the relevant prior art before it

10   during its examination and issuance of the patent.

11        As a part of your consideration of whether the '055

12   patent is invalid, you should consider whether new prior art

13   has been presented at trial which was not before the Patent

14   Office before the patent was issued.

15        However, the examination process prior to issuance

16   is not the only time that a patent's validity may be

17   considered by the Patent Office.  A party can request that

18   the Patent Office review a patent again in a proceeding

19   known as a review proceeding.

20        Requesting parties can present certain types of

21   prior art, specifically other patents or printed

22   publications, to the Patent Office for consideration in

23   these review proceedings.

24        Sometimes these review proceedings may include

25   prior art that was considered by the examiner during

1   examination before the patent was issued.  In other

2   instances, the prior art may be new to the Patent Office.

3          The Patent Office will conduct a review proceeding

4   after a patent has been issued if it believes there is a

5   likelihood that at least one claim in the patent is invalid

6   based on the newly presented prior art.

7          The Patent Office will not conduct this proceeding

8   if it does not believe there is a likelihood that at least

9   one claim of the patent is invalid based on the newly

10  presented prior art.

11         Just as you may consider whether new prior art has

12  been presented at trial that was not before the Patent

13  Office during the examination before issuance of a patent,

14  you may similarly consider the decision of the Patent Office

15  in conducting or not conducting a review proceeding after a

16  patent has been issued based on new prior art.

17         Like in infringement, invalidity, ladies and

18  gentlemen, is determined -- determined on a claim-by-claim

19  basis.  You must determine separately for each claim whether

20  the claim is invalid.  Each claim of the patent is presumed

21  valid, regardless of the status of any other claim in the

22  patent.  Just because one claim is invalid does not mean

23  that any other claim is necessarily invalid.

24         Claims are construed in the same way for

25  determining infringement as for determining invalidity.  You

1   must apply the claim language consistently and in the same

2   manner for the issues of infringement and for issues of

3   validity.

4           In making your determination as to invalidity, you

5   should consider each claim separately.

6           Some of these instructions that I'm giving you

7   refer to prior art.  Prior art means technology and

8   information that was publicly available before the date of

9   the invention.

10          In considering prior art, you should consider prior

11  art that is relevant to the particular problems the inventor

12  faced.

13          Prior art includes:

14          (1) patents issued more than one year before the

15  filing of the patent or before the date of the invention;

16          (2) publications having a date of more than one

17  year before the filing of the patent or before the date of

18  the invention;

19          And (3) U.S. patents that have a filing date prior

20  to the date of the invention of the subject matter in the

21  patent.

22          Now, these instructions have sometimes been

23  referred to the -- sometimes referred to the date of the

24  invention.  In this regard, you're instructed that there are

25  two parts of making an invention.

1          The inventor has the idea of the invention.  This

2   is referred to as conception of the invention.  A conception

3   of an invention is complete when the inventor has formed the

4   idea of how to make and use every aspect of the claimed

5   invention, and it can be made without the need for any

6   further inventive effort.

7          The actual making of the invention is referred to

8   as reduction to practice.  An invention is said to be

9   reduced to practice when it is made and shown to work for

10  its intended purpose.

11          Under the patent laws, the date of invention is

12  generally the date that the patent application was filed.

13  This is also referred to as constructive reduction to

14  practice.

15          In this case, the filing date is February the 4th,

16  2003.  Ordinarily, art dated before the application filing

17  date is prior art to the patent claims.

18          There are, however, circumstances under which art

19  dated before the application filing date is not prior art.

20  When the inventor was the first to conceive of the invention

21  and exercised reasonable diligence in reducing the invention

22  to practice, then art dated after the inventor's conception

23  is not prior art.

24          Reduction to practice occurs either as of the

25  filing of the patent application or when the invention was

1    actually made and shown to work for its intended purpose.

2         Reasonable diligence means that the inventor worked

3    continuously on reducing the invention to practice.

4    Interruptions necessitated by every day problems and

5    obligations of the inventor or others working with him or

6    her do not prevent a finding of diligence.

7         Now, I want to talk to you about anticipation by

8    prior art.  The patent laws of the United States require

9    that invention must be new for a person to be entitled to a

10   patent.

11        The Defendants assert that the patented claims at

12   issue are invalid because they were not new or they lacked

13   novelty.

14        If an invention is not new, we say that it was

15   anticipated by the prior art.  An invention that is

16   anticipated by the prior art is not entitled to patent

17   protection.

18        In order for a patent claim to be anticipated by

19   the prior art, each and every limitation of the claim must

20   be present in a single item of prior art, whether that prior

21   art is a publication or a prior patent, a prior invention, a

22   prior public use or sale or some other item of prior art.

23   You may not find that the prior art anticipates a patent

24   claim by combining two or more items of prior art.  A

25   printed publication is only prior art if it was published

 1   before the date of the invention or -- or more than one year

 2   before the date of the filing of the application.

 3         A printed publication or patent will not anticipate

 4   unless it contains a description of the invention covered by

 5   the patent claims that is sufficiently detailed to teach a

 6   person -- a skilled person how to make and use the entire

 7   invention without undue experimentation.

 8         That means that a person skilled in the field of

 9   the invention reading the printed publication or patent

10   would be able to make the invention using only an amount of

11   experimentation that is appropriate for the complexity of

12   the field of the invention and for the level of expertise

13   and knowledge of persons skilled in that field.

14         In deciding whether or not a single item of prior

15   art anticipates a patent claim, you should consider only

16   what is expressly stated or present in the prior art or

17   inherently present.  A prior art reference does not have to

18   use the exact same words as the claims in order to

19   anticipate the claims.

20         Something is inherent in an item of prior art only

21   if it necessarily results from the practice of the prior art

22   and if a skilled person would recognize that to be the case.

23   The prior art must clearly and unequivocally disclose the

24   elements as arranged in the claim without needing to pick,

25   choose, and combine various disclosures from the prior art.

```
1    You cannot combine separate embodiments disclosed in the

2    prior art unless the prior art actually teaches or suggests

3    combining those embodiments.

4           In order to find a claim invalid, you must find by

5    clear and convincing evidence that a patent claim is not

6    new, as explained above.

7           Defendants contain -- contend in this case that the

8    asserted claims of the asserted patent are invalid as being

9    obvious.  Even though an invention may not have been

10   identically disclosed or identically described in a single

11   prior art reference before it was made by an inventor, the

12   invention may have been obvious to a person of ordinary

13   skill in the field of technology of the patent at the time

14   the invention was made.

15          The Defendants bear the burden of establishing

16   obviousness by clear and convincing evidence.  A patent

17   claim with several elements is not proved obvious merely by

18   demonstrating that each of the elements was known.  Most, if

19   not all, inventions rely on the building blocks of prior

20   art.

21          Now, in determining whether the patent is invalid

22   because of obviousness, you must consider the scope and

23   content of the prior art, the differences between the prior

24   art and the claimed invention, and the level of ordinary

25   skill in the art.  In determining the level of ordinary
```

skill in the art, you -- you should consider the person of

ordinary skill as one who is presumed to be aware of all the

pertinent prior art.  The skill of the actual inventor is

irrelevant because inventors may possess something that

distinguishes them from workers of ordinary skill in the

art.

In considering whether a claimed invention is

obvious, you should consider whether as of the priority date

of the asserted patent there was a reason that would have

prompted a person of ordinary skill in the field to combine

the known elements in a way that the claimed invention does

taking into account such facts as:

(1) whether the claimed invention was merely the

predictable result of using prior art elements according to

their known function;

(2) whether the claimed invention provides an

obvious solution to a known problem in the relevant field;

(3) whether the prior art teaches or suggests the

desirability of combining elements in the claimed invention,

such as where there is a motivation to combine;

(4) whether the prior art teaches away from the

combining elements -- away from combining elements in the

claimed invention;

(5) whether it would have been obvious to try the

combinations of elements in the claimed invention;

1          And (6) whether the change resulted more from

2    design incentives or other market forces.

3          Now, in determining whether the claimed invention

4    was obvious, consider each claim separately and consider

5    only what was known at the time of the invention.  In

6    determining whether the claim invention was obvious, do not

7    use hindsight.  In other words, you should not consider what

8    a person of ordinary skill in the art would know now or what

9    has been learned from the teaching of the patent-in-suit.

10          In making these assessments, you must also take

11    into account any objective evidence, sometimes called

12    secondary considerations, that may have existed at the time

13    of the invention and afterwards that shed light on

14    non-obviousness.  These include:

15          (1) whether the invention was commercially

16    successful.  However, there must be a causal connection

17    between the patented features of the invention and the

18    commercial success of the device;

19          (2) whether the invention satisfied a long-felt

20    need in the art;

21          (3) whether others had tried and failed in making

22    the invention;

23          (4) whether others copied the invention;

24          (5) whether the there were changes or related

25    technologies or market needs contemporaneous with the

1    invention;

2         (6) whether others sought or obtained rights to the

3    patent from the patentholder;

4         (7) whether the invention achieved unexpected

5    results;

6         (8) whether others in the field praised the

7    invention;

8         And (9) whether the invention departed from other

9    principles or accepted wisdom of the art.

10        These objective indicia can show that the invention

11   is not obviousness.  While these objective indicia must be

12   taken into account, you must consider all of the evidence

13   related to obviousness before you reach a decision.

14        In order to find any of the asserted claims of the

15   patent invalid you must find that Defendants have proven

16   obviousness by clear and convincing evidence.

17        Now, several times in my instructions, ladies and

18   gentlemen, I've referred to a person of ordinary skill in

19   the field of the invention.  It's up to you to decide the

20   level of ordinary skill in the field of the invention.

21        In deciding what level of ordinary skill is, you

22   should consider all of the evidence introduced at trial

23   including:

24        (1) the levels of education and experience of

25   persons working in the field;

1            (2) the types of problems encountered in the field.

2            (3) prior art solutions to those problems;

3            (4) rapidity with which innovations are made;

4            And (5) the sophistication of the technology.

5            A person of ordinary skill in the art is a

6    hypothetical person who is presumed to be aware of all the

7    relevant prior art at the time of the claimed invention.

8            If you find that any of the Samsung Defendants, the

9    GlobalFoundries Defendants, or Qualcomm have infringed any

10   of the claims of the '055 patent, and if you find these

11   claims are not invalid, then you should consider the amount

12   of money the Plaintiff should recover or receive as damages.

13           I'll now instruct you as to the calculation of

14   damages.  Even though I'm instructing you on how you should

15   measure damages, this should not be taken to mean that I

16   think either side is right.  These are issues for you to

17   resolve under the instructions that I'm giving you.

18           I'm instructing you on damages only so that you

19   will have guidance should you decide that the Plaintiff is

20   entitled to recover damages.

21           Now, the Plaintiff has the burden of proving by a

22   preponderance of the evidence the amount of damages caused

23   by each Defendants' infringement.  If you find that there

24   has been infringement, the owner of the patent is entitled

25   to an award of damages adequate to compensate for the

infringement, which in this case would be a reasonable
royalty adequate to fully compensate the Plaintiff for the
use the Defendants made of the invention.

Your damages determination must -- must not include
additional sums to punish a Defendant or to set an example.
Your damages also should not be based on the size of a
Defendant or a perceived ability to pay an award.

This determination of a damages award is not an
exact science, ladies and gentlemen, and the amount need not
be proven with unerring precision.  You may approximate, if
necessary, the amount to which the patent owner is entitled.
It may be proper to award a damages amount if the evidence
shows the extent of damages as a matter of just and
reasonable inference.

A reasonable royalty is the minimum amount of
damages that a patent owner may recover.  A royalty is the
amount of money a licensee pays to a patent owner for each
article the licensee makes or uses or sells under the
patent.  A reasonable royalty is an amount of money a
willing patent owner and a willing prospective licensee
would have agreed upon at a hypothetical negotiation at the
time the Defendants began infringing the '055 patent.

In considering this hypothetical negotiation, you
should focus on what the expectations of the patent owner
and the infringer would have been had they entered into an

1    agreement at that time and they -- and that -- and had they

2    acted reasonably in their negotiations.

3          In determining this, you must assume that both

4    parties believed the patent was valid and infringed, and the

5    patent owner and infringer were willing to enter into an

6    agreement.

7          The reasonable royalty you determine must be the

8    royalty that would have resulted from this hypothetical

9    negotiation and not simply the royalty that either party

10   would have preferred.

11         In making your determination about the amount of a

12   reasonable royalty, it's important that you focus on the

13   time period when the infringer first infringed the patent

14   and the facts that existed at that time.

15         Your -- your determination does not depend on the

16   actual willingness of the parties to this lawsuit to engage

17   in such negotiations.  You are to assume that the Defendants

18   are willing to pay.  Your focus should be on what the

19   parties' expectations would have been had they entered into

20   negotiations for royalties at the time the first -- excuse

21   me, at the time the infringing activity, assuming there is

22   infringement, and the patent is invalid -- and the patent is

23   valid.

24         You may consider sales' expectations at the time

25   the infringement began as a basis for royalty rate.  You may

also consider the actual profits subsequently earned in the
infringement period, but only in an indirect and limited way
as some evidence bearing on a directly relevant inquiry into
anticipated profits.

Evidence of things that happened after the
infringement first began may be considered in evaluating the
reasonable royalty only to the extent the evidence aids in
assessing what royalty would have resulted from a
hypothetical negotiation.

Although evidence of the actual profits an
infringer made may be considered in determining -- in
determining a reasonable royalty at the time of the
hypothetical negotiation, the royalty may be -- may not be
limited or increased based on the actual profits the alleged
infringer made.

Where the parties dispute a matter concerning
damages for infringement, it is KAIST's burden to prove what
is more probable than not.

A reasonable royalty can take the form of a running
royalty or a fully paid-up lump-sum royalty.

A running royalty is a fee that is paid for the
right to use the patent that is paid for each unit of the
infringing product sold.

A paid-up lump-sum is when the infringer pays a
single price for a license covering both past and future

infringing sales.

If you find KAIST is entitled to damages, you must determine -- determine whether the parties would have agreed to a running royalty or a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.

The amount you find as damages must be based on the value attributable to the patented technology as distinct from other unpatented features of the accused product.  A patentholder should only be compensated for the approximate incremental value derived from his invention.  The royalty must reflect the value attributable to the infringing features of the product.

If unpatented features contribute to the value of accused products -- of an accused product, you must apportion that value to exclude any value attributable to unpatented features.

The Plaintiff, KAIST, bears the burden to establish amounts attributable to the patented features. In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors you may consider in making your determination are:

(1) whether the patent owner had an established royalty for the invention, in the absence of such licensing

history, any royalty arrangements that were generally used and recognized in the particular industry at the time;

(2) the nature of the commercial relationship between the patent owner and the licensee, such as whether they were competitors or whether their relationship was that of inventor and promoter;

(3) the established profitability of the patented product, its commercial success, and its popularity at the time;

(4) whether the patent owner had an established policy of granting licenses or retaining the patented invention as his exclusive right, or whether the patent owner had a policy of granting licenses under -- under special conditions designed -- designed to preserve his monopoly;

(5) the size of the anticipated market for the invention at the time the infringement began;

(6) the duration of the patent of the license, as well as the terms and scope of the license, such as whether it's exclusive or non-exclusive and subject to territorial restrictions;

(7) the rates paid by the licensee for the use of other patents comparable to the Plaintiff's patent;

(8) whether the licensee's sales of the patented invention promote sales of its other products and whether

1   the invention generates sales to the inventor of his

2   non-patented items;

3         (9) the utility and advantages of the patent

4   property over the old modes or devices, if any, that had

5   been used for working out similar results;

6         (10) the extent to which the infringer used the

7   invention and any evidence probative of the value of such

8   use;

9         (11) the portion of the profits in the particular

10  business that are customarily attributable to the use of the

11  invention or analogous inventions;

12        (12) the portion of the profits that should be

13  credited to the invention -- to the invention as

14  distinguished from the non-patented elements, the

15  manufacturing process, business risk, or significant

16  features or improvements added by the infringer;

17        (13) the opinion and testimony of qualified experts

18  of the patentholder; and

19        (14) the amount that a licensor, such as the

20  patentee, and a licensee, such as the infringer, would have

21  agreed upon at the time the infringement began if both sides

22  had been reasonably and voluntarily trying to reach an

23  agreement.

24        That is, what amount a prudent licensee who desired

25  as a business proposition to obtain a license to manufacture

and sell a particular article embodying the patented

invention would have been willing to pay as a royalty and

yet be able to make a reasonable profit and which amount

would have been acceptable to a prudent patentee who was

willing to grant a license.

Ladies and gentlemen, none of these factors is

dispositive, and you can and you should consider the

evidence that has been presented in this case -- presented

to you in this case on each of these factors.

You may also consider any other factors which in

your minds would have increased or decreased the royalty the

infringer would have been willing to pay and the patent

owner would have been willing to accept acting as normally

prudent business people.

You are permitted to consider all the benefits

conferred to the Defendants through their infringement of

the '055 patent, including evidence of cost savings that the

Defendants have achieved and can expect to achieve through

their use of the '055 patent.

A reasonable royalty can exceed profits expected by

the patentee.

In determining a reasonable royalty, you may also

consider evidence concerning the availability or lack

thereof of non-infringing alternatives to the patented

invention.

1          You must not award the Plaintiff any additional

2    amount for the purposes of punishing the Defendants or for

3    setting an example.  You must not consider the Plaintiff's

4    allegations of willfulness in considering damages.

5          Consideration of willfulness is entirely separate

6    from the question of damages.  You may not increase damages

7    because you find willfulness or decrease damages because you

8    did not find willfulness, nor may you -- nor may you include

9    damages that are speculative.

10          Now, with these instructions, ladies and gentlemen,

11    we're ready at this time to hear closing arguments for the

12    attorneys for the parties in the case.

13          Mr. Bunt, you may proceed to present the

14    Plaintiff's first closing argument.

15          MR. BUNT:  Thank you, Your Honor.  May it please

16    the Court.

17          Good morning, ladies and gentlemen.  I want to

18    begin by thanking you again for your service this week.  I

19    know we have presented a lot of information and asked you to

20    consider it in a very rapid fashion.  And I realize you've

21    had to spend long days away from your family and your jobs.

22    I know that's been a sacrifice, so I just want to say we

23    truly appreciate your service.

24          At the beginning of this trial, His Honor discussed

25    the importance of the Seventh Amendment to the Constitution,

 1  which guarantees the right to a trial by jury.

 2         Our founding fathers placed an extraordinary power

 3  in the hands of our -- of the citizens, the power to

 4  dispense justice.

 5         Our Constitution begins with the following words:

 6  We, the people of the United States, in Order to form a more

 7  perfect Union, establish Justice.

 8         Justice is the very first thing that we the people

 9  established in this country, and that is what we are seeking

10  from you today.

11         If you recall back to the opening statements, you

12  heard two different stories.  We told you about Professor

13  Lee's invention that resulted in the '055 patent.

14         Professor Lee, if you wouldn't mind standing up for

15  me for a moment.

16         Professor Lee, as you've heard, is one of the most

17  respected researchers in the world.  He is the director of

18  the Inter-University semiconductor research group for all of

19  Korea.  He won Korea's highest award for the invention

20  described in the '055 patent.  And he won that award for

21  creating the first bulk FinFET device in his lab, and he

22  didn't need Samsung, Qualcomm, or GlobalFoundries.  He did

23  that all by himself.

24         Thank you, Professor Lee, you may sit down.

25         Now, to hear Samsung tell it, Professor Lee needed

1  Samsung to pay his bills.  They basically told you that in

2  opening statements, that Professor Lee should be grateful

3  for their help.

4          That's where Defendants' credibility crisis begins

5  in this case.  There has not been one shred of evidence that

6  Professor Lee needed Samsung for anything with regard to

7  this invention.  In fact, as you heard from Mr. Dong-won

8  Kim, Samsung's corporate representative, he testified that

9  Professor Lee never received any funding from Samsung

10  relating to his invention.

11          Ladies and gentlemen, credibility is important, and

12  you are the sole judges of the credibility of the evidence.

13  So I'd ask you to ask yourselves who has been credible in

14  this case.

15          You'll recall that Samsung claimed Professor Lee

16  never raised any concerns with Samsung.  In fact, they asked

17  you about this in voir dire.

18          Mrs. Smith asked you if you saw someone putting an

19  oil rig up on your property, would it make sense to wait 12

20  years before you said something about it?

21          Now, during opening statements, the Defendants then

22  used this timeline that you see here, without the additional

23  language at the back -- on the right side, and they used the

24  timeline, and it says, in the middle, Lee never raised

25  concerns to Samsung.

1          What's missing from that timeline, though?

2          When Samsung started talking about the possibility

3    of going to a bulk FinFET design around 2011, Professor Lee

4    notified them of his patent.  He notified them again in

5    2012.  And then in 2015, when Samsung released its first

6    bulk FinFET product, Professor Lee notified Samsung yet

7    again.  And he, once again, notified them in 2017 of his

8    patent.

9          THE COURT:  Four minutes have been used.

10         MR. BUNT:  He also -- thank you, Your Honor.

11         But did that make a difference to the Defendants?

12   No, because Professor Lee was just a small inventor.

13         You'll recall what Defendants said in their opening

14   statement.  Plaintiff was not making or selling a product,

15   so his products -- his property rights did not matter to the

16   Defendants.

17         Basically, the Defendants thought we'll just ignore

18   Professor Lee, and eventually he'll go away.

19         The most glaring example of the Defendants'

20   credibility problem was their assertion during opening

21   statement that the Mizuno prior art reference was never in

22   front of the United States Patent Office.  Of course, we

23   learned yesterday that that was completely false.

24         Samsung filed a petition with the U.S. Patent

25   Office while this lawsuit was pending trying to get the

Patent Office to invalidate Professor Lee's patent in a review proceeding.  And in that petition, as you can see here, it cited the Mizuno prior art reference.  What did the United States Patent Office do?  It rejected Samsung's attempt to invalidate the patent.

Ladies and gentlemen, when you go back to the jury room to deliberate, please ask yourself who told conflicting stories in this case.  Ask yourself who answered questions directly and who tried to avoid answering questions directly.  Please ask yourself who seemed qualified to give the testimony that they did.

Thank you, ladies and gentlemen.  I look forward to your verdict.  Mr. Sheasby is going to talk to you about infringement, willful infringement, validity, and damages.

MR. SHEASBY:  May it please --

THE COURT:  You may continue, counsel.

MR. SHEASBY:  May it please the Court.

I want to stop -- or start where Mr. Bunt stopped, which on the issue of credibility.

And I think what he said was right, credibility is important.

And when we think about credibility, the first place it comes into play is with the question of infringement.

At the beginning of this trial, I told you that I

1    thought that Professor Kuhn was a -- was a special person,

2    and I actually used that phrase, and maybe -- maybe you

3    thought that was a bit funny that I used that phrase.  But

4    during this trial, I was in awe of Professor Kuhn.  I was in

5    awe of her.  And I actually want her to stand and be

6    acknowledged.

7            And at a very basic level, the infringement

8    question comes down to this:  For you to find that

9    Defendants do not infringe this patent requires you to

10   conclude that Dr. Kuhn is an uncredible witness.  It

11   requires you to completely reject the credibility of a woman

12   who has spent her entire life designing bulk FinFETs.  It

13   requires you to reject the credibility of a woman who has

14   create -- who created the first commercial bulk FinFET at

15   Intel.  And it requires you to accept the credibility of Dr.

16   Subramanian and Dr. Wallace, both of whom seemed like very,

17   very smart individuals, but both of whom have no experience,

18   whatsoever, in the field of the '055 patent.

19           The question of infringement is simple.  Professor

20   Kuhn walked through every limitation.  And for you to find

21   non-infringement is for you to reject utterly the label and

22   the careful attention played by Professor Kuhn.

23           Coming to the point of credibility, we heard this

24   talk about Hafnium dioxide, and we heard so much of it in

25   the opening, and it -- when Professor Kuhn got on the stand,

1  she told us it's a complete and utter distraction.  The

2  claims include Hafnium dioxide.  They cover any gate oxide

3  layers.  The Hafnium dioxide layer was in Intel's FinFET

4  design, and Intel licensed it, and the Hafnium dioxide layer

5  was in the 20-nanometer failed planar transistors.

6         What allowed them to go to 14 nanometers?  It

7  wasn't Hafnium dioxide, it was the design of the '055

8  patent.

9         Now, at the beginning of Dr. Subramanian's

10  testimony, you may have been thinking, well, what

11  limitations are actually disputed?  And one of the things I

12  did, and I know it was a long day, but I actually carefully

13  walked through and asked him what limitations are disputed.

14  And in his testimony, the only limitations that he disputed

15  were those in yellow, and I know this because I asked him

16  expressly -- let's pull up Thursday AM, 82, 1 through 16,

17  and trailing.

18         Question:  There are a number of limitations in the

19  claims of the '055 patent that you don't dispute are met by

20  the 14-nanometer transistors in this case?

21         Answer:  Yes, that's true.

22         Question:  In your report, you don't discuss the

23  limitation, a gate which is formed on said first and second

24  oxide layer, fair point?

25         He goes on to answer:  I don't remember it.

1          And then he finally admits he does not find that

2     limit -- he doesn't find that limitation listing from the

3     14 nanometers.

4          So I want to show that to you because I think it's

5     very important to focus on credibility.  Even Samsung's own

6     paid expert admitted that many of the limitations, including

7     the gate -- a gate formed on second oxide layer limitation

8     was met.

9          Can we go back to the slides now?

10         So when we start thinking about infringement, we

11    start from the word "comprising."  And Professor Kuhn talked

12    to you about the importance of the word "comprising."

13         Comprising means you just have to have the elements

14    in the claim.  You can put anything else you want in the

15    claim, and it's still infringing.

16         And I think that's a very important point for you

17    to remember.  And potentially write down what -- during this

18    argument when you take into court.

19         Now, we also heard that infringement is based on

20    both literal infringement and equivalence.  So even if you

21    think the element is not met literally, you have to ask the

22    question is something equivalent present?  It doesn't have

23    to be literally there, it just needs to be something

24    equivalent.

25         Now, the first limitation that they disputed was

1   wall-shape Fin active region.  And Dr. Kuhn talked about

2   this in her direct.  And if you remember, in every slide

3   when they talked about wall-shape, they showed the side view

4   of the Fin.  Remember how they called it a shark's fin?  And

5   they said -- they showed it a side Fin.

6          And I talked to Dong-won Kim, who was their

7   corporate representative, and I said:  Hey, that's the width

8   of the Fin that you're showing, right?

9          And he said:  Yes.

10          And I took him to the abstract.  And if you go to

11   the abstract of the patent, you will see that the shape --

12   that when it talks about wall-shape, it means along the

13   channel length direction.  What that means is you have to

14   look at it from the top, not the side.

15          So they were showing you that -- what they called a

16   shark's fin, but they were showing you the width, not the

17   length.  When you look at the length and you can see this in

18   DX-336, if you want to ask for this piece of evidence -- if

19   you look at it from the top, it absolutely looks like a

20   wall.  Any common sense person would understand that when

21   you look at it from the top, it's a wall.

22          Dr. Kuhn explained that to you, and they showed you

23   the completely different side.

24          Now, they also talk a fact -- a fact that, oh, it

25   can't be wall-shaped because we have rounded -- our corners

have been rounded.  But Dr. Kuhn also told you that's a --
that's a nonsensical argument because the wall-shape claim
limitations expressly allow for the corners to be rounded.

So when they tell you they're non-infringing
because they have a continuous curve, that's the exact
opposite of what the specific claims say.

And Dr. Subramanian admitted this.  He admitted
that oxidation can convert corners into one continuous
round.

Now, the next issue that they spoke about was the
issue of oxide thickness.  Once again, Dr. Kuhn did it
right.  Was the -- was the oxide thickness equal on all
sides of the Fin?  She did the measurements using the exact
same procedure she used at Intel, and she concluded that it
was equal.

Now, ask yourself this question.  These are three
of the largest companies in the world.  GlobalFoundries
spent $14.7 billion to build their factory.  Samsung is the
largest company in Korea.  Qualcomm is the largest mobile
chip designer in the world.  They couldn't afford to do
their own measurements?  The only systematic measurements
you saw were done by Professor Kuhn.

Now, I next want to talk about the issue of first
oxide layer and gate oxide layer.  But before I do that, I
want you to remember a very important rule about the claims.

1   You'll see the claims say a first oxide layer, a gate oxide

2   layer, and a second oxide layer.  But that word "a," which

3   seems so important -- unimportant to us as lay people, is

4   incredibly important in the patent.  It means one or more.

5   You can have more than one gate oxide layer.  You can have

6   more than one first oxide layer.  You can have more than one

7   second oxide layer.

8        So all that stuff about, oh, we have a Hafnium

9   layer, we have a silicon dioxide layer, that was a giant

10  misdirection.  And Dr. Subramanian admitted it because the

11  claims expressly say "a".

12       Now, the next thing I'm going to do, and I'm going

13  to give this a try.  I'm going to speak much louder.  I'm

14  going to draw for you what I think Professor Kuhn taught me.

15  And you can see if you learned the same thing or not.

16       So I believe Professor Kuhn taught us about a

17  substrate with a Fin.  And in Professor Lee's patent, it can

18  be curved at the bottom.  She showed us that figure.  And it

19  can be rounded at the top.

20       Now, I believe Professor Kuhn taught us about oxide

21  layers.  And she noted that when you make an oxide layer,

22  you make it in one continuous flow.

23       And then she taught us about a gate which sits on

24  top of the oxide and the substrate.  I think that's pretty

25  fair about what she taught us.

1          Now, there's a lot of disputes about whether the

2   first oxide limitation layer and the gate oxide limitation

3   layer were met.  But once again, I would submit to you that

4   that is a significant amount of misdirection.

5          And I know that for the following reason.  Let's

6   turn to Thursday AM, and we're going to look at some of Dr.

7   Subramanian's testimony.

8          It says:  Question:  In fact, the specification

9   describes the first oxide and the gate oxide layer as

10  different regions of one continuous layer that surrounds the

11  Fin active region.

12         That generally -- that's a fair description.  He

13  admitted it.

14         Now, maybe because it was late in the day, that you

15  didn't realize how important that was.  But he's saying this

16  one layer can, depending on where it is, serve as the first

17  oxide layer.  It can serve as the gate oxide layer.  It can

18  serve as the second oxide layer.  So there's regions that

19  you can define, gate -- sorry -- first, gate, second.

20         THE COURT:  17 minutes have been used.

21         MR. SHEASBY:  So what you have is you have a very

22  clear description from Professor Kuhn about why the

23  limitations have been met.

24         Now, let's see if there's any agreement on those

25  limitations.

1            Let's go back to the slides.

2            And I think you'll see that it -- that there is.

3    This is Dr. Wallace.  Dr. Wallace says there's a gate oxide

4    layer.  It's made up of Hafnium, and it's made up of

5    silicon.  And the gate oxide layer is on the top -- on the

6    top -- on top of it there's formed a gate.  And the gate

7    oxide layer is formed on the Fin.  So Dr. Wallace admits

8    each and every limitation.

9            Now, let's go to -- so let me just stop there.

10           And I want to say this quite clearly.  What I just

11   drew there, the experts in this case on both sides admit.

12   The only person who disagrees with this is counsel for

13   Defendants who's going to be speaking next.

14           First oxide layer met.  Gate oxide layer met.  Gate

15   on second oxide layer met.  Every single expert in the case

16   agrees with this.  And you will not see one slide of

17   testimony from Defendants from any independent expert

18   disputing that these limitations are met.

19           Now, I want to talk about Professor Lee's patent

20   and its validity.  Patents are assumed valid -- presumed

21   valid, and that's why the weight of evidence that is

22   necessary to invalidate the patent is so high.

23           I want to talk about the critical fact that the

24   references that are being used in this case to suggest

25   you -- you invalidate this patent were rejected by the

1    Patent Office in petitions filed by Samsung but also filed

2    by GlobalFoundries and Qualcomm.

3            I now want to talk about willfulness.  You do not

4    need to find willfulness in order to find infringement.

5    Whether you think they had a guilty heart or not, whether

6    you think they did it intentionally or not is irrelevant to

7    the question of infringement.

8            But on the issue of copying, I think something

9    unbelievable happened at this trial.  And I wanted to

10   emphasize that.

11           Dr. Kuhn did an investigation.  Remember how she

12   told you she was a fellow at Intel?  She was incredibly

13   senior.  She did an investigation to determine if there was

14   misconduct.  And she found that based on the evidence she

15   saw, there was copying.

16           Now, you heard a lot of Samsung employees saying we

17   didn't copy.  But what's interesting is they hired Vivek

18   Subramanian to speak for them.  And you heard that he gets

19   paid to be an expert witness all the time.  He's gotten paid

20   by Samsung to do it previously.  And he did no

21   investigation, none whatsoever.  As to damages, amounts need

22   not be proven with unerring certainty.

23           Mr. Becker, who I actually thought was a very nice

24   man, said things that were so important to this case.  He

25   said that there can be patents that are worth hundreds of

1   millions of dollars.  Did anyone else catch that when he

2   said that, when he acknowledged that there are patents that

3   are hundreds of millions of dollars, that there is nothing

4   out of the ordinary about what the Plaintiffs -- Plaintiff

5   asked in this case?

6        You heard from David Witt about the speed and

7   battery life benefits solely attributed to the '055 patent.

8   Three of the largest companies in the world, and they

9   couldn't be bothered to present you with their -- their own

10  numbers.  The only numbers you have are from Mr. --

11  Mr. Witt.

12       Dr. Kelin Kuhn did a cost savings analysis with Roy

13  Weinstein.  They're saving billions from using this.  Three

14  of the largest companies -- multinational companies in the

15  world, they couldn't be bothered to say one thing about

16  different cost numbers.

17       Now, at a very basic level, the dispute between the

18  parties is simple.  Mr. Becker asked the question how much

19  is the patent worth in 2011 when the Intel negotiation

20  occurred.  And I think he probably gave a very fair answer

21  to that question, and I actually don't have a dispute with

22  him.  I think that's what the patent was worth in 2011.

23       That's not the question we're asking today.  The

24  question we're asking today is what is the patent worth in

25  2015 when we know that there is no other possible way of

1    doing what Samsung and Qualcomm and GlobalFoundries do?

2    What is it worth in 2015?

3         And you heard -- you heard the Judge say you can

4    consider whether there are any viable non-infringing

5    alternatives.

6         In 2011, there were many.  Professor Kuhn told us

7    that.  Professor Kuhn told us people laughed at her when

8    she -- in the community because Intel was so aggressively

9    bulk FinFET.  By 2015, everyone needed -- needed it.

10        So what's the answer here?  The answer here is that

11   Plaintiff should receive 300 million from Samsung, 296

12   million from Qualcomm, and 98 million from GlobalFoundries.

13   And that is a small portion, a small portion of the billions

14   these companies have made by stealing this invention.

15        Now, ladies and gentlemen, I just want to go

16   briefly through the verdict form.

17        For Question 1, we would respectfully ask you to

18   mark "yes" to the question of infringement.

19        For Question 2 on invalidity, we'd respectfully ask

20   that you mark "no."

21        For Question 3, as to whether there was

22   willfulness, we would respectfully ask that you mark "yes."

23        And for Question 4, we'd respectfully ask that you

24   analyze the value in 2005, that you mark "yes" for

25   reasonable royalty, and that you give the number that was

 1  given by Dr. Kuhn, Mr. Witt, and our damages expert,

 2  Mr. Weinstein.

 3          Ladies and gentlemen of the jury, I'll be able to

 4  speak with you one more time, but I will now cede the podium

 5  to the Defendants.  Thank you so much.

 6          THE COURT:  All right.  The Defendants may now

 7  present their closing argument.

 8          Before Defendant begins his closing argument,

 9  Plaintiff's counsel should move the easel back and turn it

10  to a clean sheet of paper.

11          Thank you.

12          Mr. Jacobs, you may proceed when you're ready.

13          MR. JACOBS:  Thank you so much, Your Honor.

14          Ladies and gentlemen of the jury, I didn't have the

15  opportunity to tell you much about myself when I came

16  forward and presented my opening statement, but I have a

17  story I want to convey to you about something that happened

18  this week, and then I'm going to move on with the evidence

19  because I'm going to focus on the evidence here.

20          I started when I was a young man in the Army.

21  That's how I started.  Before I went to college and law

22  school, I was in the Army.  And I called home this week, and

23  I was talking to my daughter, my 13-year-old daughter.  And

24  she said:  I haven't heard from you in several days, it's

25  kind of like you're deployed.

1          And I said to her, I said:  No, this isn't like

2    being deployed.  We get less sleep than you do when we're

3    deployed when we're in trial.

4          Thank you for your service.  We know and we have

5    watched and observed on behalf of all the Defendants and on

6    behalf of the Plaintiffs, we know that you have taken time

7    out of your busy schedules, and we appreciate it.  This is

8    very, very valuable service, and we want to thank you for

9    your service.

10          Now, as I said, I'm not much into mud slinging, but

11    I certainly will push back when I see something that I think

12    is inappropriate or not correct.

13          And what I'm going to do is I'm going to walk

14    through and marshal the evidence here because I think the

15    evidence tells a very, very different story than what we

16    just saw.

17          Remember what Judge Gilstrap told us at the

18    beginning.  Pictures that are drawn by counsel, that's not

19    evidence.  Evidence is what we saw, what witnesses said, and

20    what witnesses testified to when they got up here and

21    actually were in the box, and we had a chance to talk to

22    them.

23          And so as I told you at the very, very beginning of

24    this case, Professor Lee asked Samsung to help.  I don't

25    think there's any dispute about that.  Samsung agreed.

1    Dr. Tai-Su Park, we had a chance to see him, and

2  others started to build his device at Samsung.  And the

3  evidence was clear, and nobody has refuted this evidence.

4  The idea that Dr. Lee had, that Professor Lee had, would not

5  work.  It just wouldn't work.  So they created -- Samsung

6  created their own different and independent bulk FinFET that

7  has something very, very different in it than what Professor

8  Lee's invention has in it.

9    So the Defendants have taken a stand here, and

10  they've said, you know, enough is enough.  We don't infringe

11  the '055 patent.  And the amount of damages that KAIST IP is

12  asking for is outrageous.

13    So how do we know with the evidence that we saw

14  that this case is about the Defendants doing something

15  different, and this is very important, and I'm going to show

16  it to you in a few minutes.  The evidence has shown that

17  Professor Lee specifically omitted the use of Hafnium oxide

18  from his idea, okay?  The evidence has shown that he said

19  from the beginning:  I'm not using Hafnium oxide in my idea.

20    That was his choice back in 2001.  He was a

21  researcher.  That was his choice.  He made the express

22  choice to exclude the use, not use Hafnium oxide in his

23  research device.  And that's very, very important, because

24  now, the Plaintiff is coming forward into this court, and

25  they are accusing the Defendants of infringement, trying to

1  accuse us of infringement for using a concept, Hafnium

2  oxide, that Professor Lee intentionally chose in 2002 not to

3  include in his device.

4       Is that fair?  You're going to judge that.  You are

5  the judges of credibility.  You make the determination as to

6  whether that fair is -- is not (sic).  I'm going to show it

7  to you as we walk through the evidence.

8       So as I talked with you a little bit about in the

9  beginning, this case has a lot to do with time.  Time

10  marches on.  I showed you the activities, but I want you to

11  bear in mind, we're dealing with an idea that was conceived

12  in 2001, okay?  It was conceived in 2001, and it didn't come

13  to market until 2014.

14       Why is that important?  That is important, ladies

15  and gentlemen, because every two years, as you can see

16  looking at this timeline, there is a new transistor device

17  coming out.  So Professor Lee asks for help in 2002, please,

18  Samsung, can you help me?  But there are six different

19  generations of devices after Professor Lee asked for help.

20       And why is that important?  The evidence has shown

21  that every generation requires new modifications, changes to

22  the device, and, eventually, when you get to the

23  45-nanometer level, something entirely different, this

24  Hafnium oxide layer.  That's very, very different than

25  anything contemplated.

1          We also know because we saw Dr. Samavedam, and we

2    also saw Dr. Kim testify that the Defendants spent a lot of

3    money in being able to bring these six different generations

4    of technology to us.

5          Evidence showed that $400 million was invested to

6    make this -- these products by Samsung.  Same thing from

7    GlobalFoundries, $400 million.

8          So these -- this money is because there are process

9    steps, 2,500 process steps, each time you make one of these

10   new generations of transistors.  The evidence has shown us

11   that there are substantial changes that are associated with

12   those.

13         So we've talked a little bit about this Hafnium

14   oxide.  This is a very, very important concept because this

15   is the concept that Professor Lee chose not to use in his

16   research device.

17         And you saw the evidence.  This is important

18   because in 2003, you had larger devices, and you didn't have

19   problems with leakage.  There was no problem with leakage.

20   You could use a single silicon dioxide layer, no problem

21   whatsoever to insulate the gate.  That was not a problem.

22         You start moving forward, and we start seeing

23   devices getting smaller and smaller, and the evidence showed

24   us that eventually a new idea needed to be implemented.

25   That was in 2007, and that's something that the Defendants

1    came up with.

2            Now, we never said we were the only one to come up

3    with that.  Other -- other companies in the industry came up

4    with that, as well.  But the important thing here is this is

5    very, very different than what Professor Lee did.  It was

6    also a ground-breaking change.

7            Could we have had -- the 14 -- this is a

8    14-nanometer bulk FinFET device accused of infringement in

9    this case.

10           Could we have had it without Hafnium oxide because

11   it's such a small device?

12           The evidence, no, it's my view, it's not possible

13   at all.  Absolutely not.

14           This was -- Dr. Kim provided this testimony.

15           Look what Dr. Kuhn had to say about it.  High-k is

16   the holy grail, something that I should translate.  And I

17   think you probably picked this up.  High-k is the same thing

18   as Hafnium oxide.  Hafnium oxide is a category within

19   High-k, so if you see High-k, it's the same thing, okay?

20   It's the holy grail of the business.

21           This is their expert testifying.

22           So in 2007, if this move to Hafnium oxide was

23   groundbreaking and the biggest development in technology in

24   60 years, people would have known about that, right?

25           Yes, sir.

1            That's Dr. Kuhn talking about this transitional

2  change, dramatic change in technology that is in Samsung's

3  technology.  And it's not in Professor Lee's.

4            And how do we know that?  We also had

5  Dr. Samavedam.  You would not be able to build a device

6  without this Hafnium oxide layer.

7            The evidence is clear that this Hafnium oxide layer

8  was necessary for moving down to the 14-nanometer level.

9            So I'm going to pause on this slide because this is

10  important.  This is evidence.  This is Professor Lee.

11            Now, I want -- I want to set the stage for this.

12  This was not defense counsel tricking Professor Lee.  This

13  is on direct examination.  And let's look at the question

14  and answer.

15            Why didn't you use and why didn't you and Samsung

16  use the High-k gate oxide layer in your original devices?

17            Remember, these devices are what led to his patent.

18            At the time of my research, we wanted to show that

19  we can create an advanced performance transistor structure

20  without using High-k.

21            That's the evidence.  The evidence is Professor Lee

22  did not want to use High-k.  The patent that resulted from

23  his research device, it has the concepts from his research.

24  He told us in his testimony that he did not want to use

25  Hafnium oxide or High-k.

1          You want to talk about conflicting stories?

2     Credibility is important, ladies and gentlemen.   Credibility

3     is very, very important.

4          This is evidence -- this is very, very important

5     evidence because it tells us that Professor Lee did not want

6     to use High-k in his transistor structure.   The accused

7     devices, they all use that.   This is very, very important

8     evidence.   And we're going to talk about it as we move

9     through -- march through what the evidence showed.

10          We asked Dr. Kuhn, their expert:   Hafnium oxide,

11     you don't see it anywhere in the patent.

12          No wonder she didn't see it.   Professor Lee didn't

13     want High-k materials or Hafnium oxide.   He intentionally

14     designed a transistor to not use it.   So that's why we don't

15     see it anywhere in the patent.   And we confirmed this with

16     their expert.   We wanted to make absolutely sure, you know,

17     we're not missing anything.   We wanted to make sure that

18     this High-k or this Hafnium oxide was nowhere to be found.

19          And why is that important?   That's important

20     because as I talked about a little bit at the beginning, and

21     nobody has refuted this fact, a patent is like a deed.   You

22     use your words to describe in here whatever you are

23     claiming, and you tell the public this is my idea.   That's

24     what a patent does.

25          And what you don't do is you don't come over here

1  later and say, oh, hold on, I didn't use those words

2  anywhere in my patent, but my patent actually covers that.

3         Well, we know that Hafnium oxide is not in this

4  patent.  We know that the device that led to the patent

5  intentionally was designed not to include what they're now

6  accusing the Defendants of using in their device.  That just

7  isn't fair, ladies and gentlemen.  It's not fair.  They are

8  bound by the words in Professor Lee's patent, and those

9  words were chosen for a very, very good reason.

10        And as a result of this, there is no infringement

11  here.  And, remember, if you find that even one element is

12  missing, that -- that means non-infringement.  If one

13  element is missing, that means non-infringement.  There are

14  three that we focused on.  And I'm going to walk you through

15  these three.

16        The red underline in the claim language, that's

17  important.  The formed on, that -- that is what we are

18  focusing on is the formed on.  So you have to have -- if you

19  look here, you have to have a first oxide layer, which is

20  formed on the upper surface of the Fin region.  Okay?  So

21  you have this first -- this first -- this first layer here.

22  That must be formed on it.  And you must have a gate that is

23  formed on the top right here.  This is the gate in green.

24  You have to have the gate formed on the first and on the

25  second oxide layer here, okay?

1          So that is what the patent requires.  Why is

2     Hafnium oxide important?  Why did we talk about Hafnium

3     oxide so much?  We talked about Hafnium oxide.  It's the

4     black line here.  It's the black line.

5          And what Hafnium oxide does is it creates a

6     separate layer so that you cannot have a first oxide layer

7     formed on the Fin because that would be -- in our structure

8     you can see the Si02, the silicon oxide layer.

9          And then the second requirement is the key one

10    here.  A gate which is formed on said first and second oxide

11    layer.  It can't be the same layer.  The gate is formed on

12    the Hafnium dioxide.  You can see that right here.  The gate

13    is formed on here.

14         And the second oxide layer, you can't have that

15    either because you have the Hafnium oxide.

16         That's what the Hafnium oxide does.  The Hafnium

17    oxide is different, and it takes you outside of the scope of

18    the claims when you looked on these crucial formed on claim

19    terms.

20         Now, we also have marked up here for you an actual

21    image of one of our devices, and you'll see exactly what

22    we're talking about.  The green would be the gate.  We have

23    the blue would be the -- the silicon oxide level -- or the

24    first -- that would be -- could be the first oxide layer,

25    which would be formed on the Fin, but you don't have a gate

```
 1   formed on the first and second oxide layer because the
 2   Hafnium oxide layer takes it outside of the scope of the
 3   claims.
 4           So that is why this has been such a crucial issue
 5   in walking through, and that's why we spent a lot of time
 6   with fact witnesses and the expert witnesses on this.  But,
 7   remember, we know that Professor Lee did not want Hafnium
 8   oxide in his patent.  He's told us that.  We saw that
 9   testimony.
10           It's important to note that the Hafnium oxide layer
11   is a separate layer.  It's formed on different machines and
12   tools.  It's formed at different times.  This is testimony
13   from Dr. Kuhn telling us this.
14           So we know it's a separate layer, and that's
15   important.
16           Dr. Samavedam told us the same thing.  It's a
17   separate layer.  And he was asked:  Is the Hafnium oxide
18   layer formed on the surface of the Fin?
19           No, it's not.
20           He's telling us that what we have here is a
21   fundamentally different structure.  And the reason that it's
22   different is 2007 was a very, very different time period
23   than 2001.  Time marches on.  This -- this Moore's Law and
24   this change in transistors every two years leads to a very,
25   very different structure when you come to 2007 and 2008 and
```

 1    you flash forward.

 2          I want to talk with you just a little bit about

 3    this -- two models and why it is that -- you know, I showed

 4    Professor Lee the model and talked a little bit about this.

 5          So on the left-hand side, we have a model that

 6    Professor Lee used before this litigation was filed.  It was

 7    a picture.  I showed it to you during his cross-examination.

 8    And you'll note that it says SiO2 in the single layer there,

 9    the blue layer.  That's silicon oxide, okay?

10          So as you can see as you look at this testimony on

11    the bottom of the screen here, the model they brought to

12    court here is shown on the right-hand side.  And you'll see

13    they had put tape over the SiO2.  There was tape here, and

14    there was tape here.  And it says:  Oxide.

15          And I asked Professor Lee, that picture was taken

16    before the litigation was filed.  That was the one on the

17    left.  And then I asked him:  And the stickers were applied

18    to the model saying oxide after this litigation was filed;

19    is that correct?

20          And he says, the answer:  They were put on when I

21    came here for the jury.

22          So why is this important?  It is a literal

23    cover-up.  He's trying to cover up the fact that as he was

24    showing the model, which demonstrated his idea to students,

25    and things of that nature, in Korea it had a single layer,

 1   silicon oxide.  You can see it.

 2        But they wanted -- but they knew that we had a

 3   Hafnium dioxide layer.  So as they're coming here they get

 4   tape, and they changed that word to oxide so that they can

 5   perhaps try to capture more than what actually was shown

 6   originally before this litigation was filed.

 7        So that's the first non-infringement position.  If

 8   you accept that non-infringement position, you can check no

 9   with regard to infringement, and that is the end of the

10   inquiry.

11        But there are two more, and I'm going to briefly go

12   through them.

13        The second one, if you recall, had to do with the

14   first oxide layer being formed on the upper surface of the

15   Fin region with a thickness greater or equal to that of the

16   first gate oxide.  I just want to raise a couple of points

17   with regard to this non-infringement position.

18        One I believe is very, very important, and that is

19   we brought -- we brought witnesses forward, not just

20   experts, but witnesses who know about the structure of these

21   devices, this is Dr. Samavedam from GlobalFoundries, and

22   they said it's fundamental.  The physics of this device

23   means that you're always going to be thinner at the top

24   region than -- than on the sides.

25        Now, why is that important?  That's important

because we didn't hear anybody refute that evidence.  In
other words, nobody came forward on the other side and said,
hey, hold on, physics is wrong here.  I'm going to tell you
why that proposition is not correct.  We had no refutation,
nobody who came forward and told us that the concept of
fundamental physics that we heard a couple of witnesses talk
about on behalf of the Plaintiff was wrong in some way.  And
we -- we showed it.

It's because we had a low atomic density.  We used
this with Dr. Wallace.  And -- and Dr. Samavedam also talked
about it.  You have a low atomic density at the upper part
of the Fin region, you see that up here.  And you have a
higher atomic density here on the side.  And that's why
physics dictates that you're going to be thinner at the top
of the Fin region rather than thicker, as the claim
requires, as you get to these smaller size devices, the
devices that are accused of infringement in this case.

There's nothing equivalent to this.  It says
thicker.  We're thinner.  That cannot be equivalent.  That's
substantially different.  It's the opposite.

All right.  So we have a little bit about
measurements, and I'm not going to get into that.  That was
confusing.  Dr. Kuhn admitted she did hand measurements.
She admitted that she didn't send those measurements out to
anybody to have them checked.  And she admitted that, in

 1  fact, her measurements were different.

 2          THE COURT:  10 minutes remaining.

 3          MR. JACOBS:  Thank you so much, Your Honor.

 4          They were different than actual measurements taken

 5  internally.

 6          And I want to point this out because counsel said

 7  during his closing statement, and this is important, he said

 8  they were the only one to do measurements.  That is not

 9  correct.  That is -- that is -- that is simply not correct.

10          There were measurements done in GlobalFoundries on

11  these exact TEMs that you're seeing, on these images that

12  you're seeing.  And what they did was they came back after

13  the litigation was filed, and they changed the measurements.

14  They did their own measurements, and they came up with

15  different numbers.  That's their non-infringement position.

16  They did it by hand.  They didn't use a computer, the

17  software that could assist in this.

18          You heard some testimony about a robot, a robotic

19  assistance for that.  They didn't do that either.  Instead,

20  they did it by hand.  They got different numbers.

21          But, again, they did it after litigation was filed.

22  So after -- we have -- we have pre-litigation, corporate

23  documents showing us that were thinner, okay.

24  Non-infringement.

25          After the litigation is filed, they come in, they

1    make some new measurements, they do it by hand which is the

2    least reliable of all the ways to do this.  And now all the

3    sudden they say they -- they have -- they have us.  They

4    have us on infringement.

5            It's credibility.  It's your decision.

6    Pre-litigation, post litigation.  I would submit that

7    something that is in corporate records, pre-litigation is

8    much, much more reliable from a measurement perspective than

9    something that is made after a litigation is filed.

10           Third position, and I'm just going to quickly cover

11   this one, it's the -- it's the parabola, it's the

12   wall-shape.  And all I want to say here is if you choose

13   wall-shape, everybody admits that wall-shape means a

14   rectangle.  Here we have Dr. Kuhn rectilinear.  Here we have

15   Dr. Samavedam talking about it, rectangular sections.

16           So what we're looking at here is we're looking for

17   rectangular sections, that's what the testimony shows.  And

18   when you look at the accused devices there, this continual,

19   continual curvature, you see it here on the left-hand side,

20   so you see the continual curve, you see the continual curve,

21   and that is like a shark's fin.  So we have the shark's fin

22   here, and that's what we're dealing with.

23           We're dealing with -- with ours then, something

24   that is very different than this rectangular wall-shape.

25           They chose to use the word "wall-shape."  They

```
 1    use -- when they did that, again, the deed, they're putting
 2    it out to the public.  We have a wall-shape, and that's what
 3    they're telling the public we're entitled to rely upon that.
 4    Ours is different.  That's the third non-infringement
 5    position.
 6            Again, any one of those non-infringement positions
 7    is enough.
 8            Three different positions.  We have the formed on.
 9    We have the thicker or equal limitation.  And we have the
10    wall-shape position.  Three different non-infringement.
11    Regardless of the results, here are on the right-hand side,
12    this is a summary of why it is that the Defendants do not
13    infringe.
14            All right.  So willfulness, we were working
15    together.  We were collaborating together.  I have just a
16    couple of points to raise on willfulness because I don't
17    think that willfulness is really going to be hopefully that
18    big of a deal.
19            Egregious conduct is required.  And you'll see it
20    in your jury instructions.  Egregious, willful, wanton
21    conduct for a finding of -- of willfulness.  We were working
22    together, we were working, we were collaborating.
23            But remember this, we didn't copy because we
24    introduced Hafnium oxide into a product.  And Professor Lee
25    said that, in fact, he did not use Hafnium oxide in his
```

     1   research idea.  So we could not have copied.  That -- that

     2   should be the end of that.

     3          These documents, I showed these to you in opening

     4   statement.  These are us working together.

     5          You saw this evidence.  Transferred key technology

     6   to Samsung, okay?  So you saw all this.

     7          And we talked about this a little bit with

     8   Professor Lee.  This is DX-47.  I transferred my technology.

     9   This was 2004.  That's -- that's not egregious conduct,

    10   that's not willful, wanton, malicious conduct.  These were

    11   companies that were trying to help each other.  And

    12   eventually, Samsung figuring out this technology just won't

    13   work.  We -- we need to move on.  We need to move in a

    14   different direction.

    15          We saw Dr. Park, he came in, he testified, and he

    16   said we had to make changes.

    17          We had the head of -- we had the corporate rep from

    18   KAIST IP.  Do you know anything about copying?

    19          His answer:  We are not able to know.

    20          Okay.  So I'd like to now finish up by talking a

    21   little bit.  Invalidity, I'm going to leave that to you.  We

    22   showed that yesterday.  It should be fresh in your mind.

    23          We mapped out Mizuno.  There were some accusations

    24   in the beginning about Mizuno being at the Patent Office.

    25          THE COURT:  Five minutes remaining.

```
 1              MR. JACOBS:  Thank you, Your Honor.

 2              Mizuno was not at the Patent Office as an

 3   anticipatory reference.  In other words, there was not a

 4   one-to-one measure at the Patent Office between Mizuno and

 5   the '055 patent.  It was one of many references that were

 6   mentioned in combinations.  So that's -- that was not a fair

 7   statement by the Plaintiff when they made that accusation,

 8   not a fair statement at all.

 9              I'll read the testimony yesterday.  This was

10   from -- this was from our expert witness yesterday.  He

11   mapped everything out, and he showed this patent was, in

12   fact, invalid.

13              So there's no damages if there's no infringement.

14   That's point number one on damages.  No damages if there's

15   no infringement.

16              Here, there's no infringement.  There's no damages.

17              But if you look at damages -- first of all, we have

18   Dr. Kuhn telling us that a product would have no value if it

19   was nonfunctional and that this product without Hafnium

20   oxide would not work, okay?  Without Hafnium oxide, this

21   product wouldn't work.  It would have no value.

22              But we do have two very, very important licenses

23   that you can look at.  $6.8 million was the Intel license.

24   That would have been used in a negotiation, right?  That

25   would have been used in a negotiation.
```

 1              And then at the bottom was the IBM license that

 2    Dr. Becker talked about, $3 million, and that was for a

 3    series of patents, okay?  So they could have purchased

 4    FinFET technology for $3 million.  That's what the

 5    Defendants could have done.  And that's what this shows us.

 6    This is from IBM, right here on the right-hand side.

 7              But I would submit that when you look at this

 8    evidence, the most important thing to look at is the Intel

 9    license.  It's the same -- it would have been the same

10    party.  It would have been beginning of coming into the

11    market.  Intel was huge when they took this license.  They

12    were the biggest company by far in the industry.  And here,

13    this is their expert witness:  Was 6.8 market value?

14              Yes, 6.8 at that time was market value.

15              Of course, companies negotiating would have known

16    that, and they would have -- they would have fought hard.

17              If you look at damages, this Intel license is by

18    far the most critical and important piece of evidence to

19    look at.

20              And here's the Intel license on the left-hand side.

21    That's what Dr. Becker used as he walked you through his

22    damages.  And on the right-hand side is a crystal ball where

23    you just throw anything in there, and you're just coming up

24    with a number.  That is not appropriate.  That is not

25    satisfying evidentiary standards.

1        The Intel license is a ceiling here, but Intel was

2   bigger.  So to the extent you consider damages, you should

3   drive down from the Intel license.  They would have been

4   aware of that, and they would have used it to negotiate in

5   the beginning of those negotiations.

6        If you look at the impact of using a crystal ball

7   versus using the Intel license, you see that's how you get

8   to the large, large damage request that was here.  But the

9   first factor that you're looking at -- you have it in your

10  jury instructions -- is comparable licenses.

11       The Intel license is a comparable license.  It was

12  between parties, same patent, big, big semiconductor

13  company, $6.8 million.

14       So I would submit that's very, very important for

15  your consideration.

16       So, ladies and gentlemen, at the end of the day,

17  I'd like to finish up with a statement or two.  Woody

18  Guthrie once said:  All my words, if not well put nor well

19  taken, are well meant.

20       On behalf of all of the Defendants, we've tried to

21  be respectful, to respect the process throughout, and we

22  hope that that has transferred to you, and you have seen

23  that.

24       In the end of the day, follow the evidence.  The

25  evidence will lead you to the right conclusion.  Here on the

1   screen is the statement that at the time of my research, we

2   wanted to show we could create an advanced performance

3   transistor without using Hafnium oxide.

4           Could I have the ELMO real quick?

5           So this is the verdict form.  This is Question 1.

6   It says:  Do -- did KAIST IP prove by a preponderance of the

7   evidence that any Defendant named below infringed any of the

8   asserted claims?  Answer:  Yes or no.  And it lists the

9   three Defendants.  If you check no for each one of these

10  Defendants, you are done, ladies and gentlemen.  And I would

11  submit that that is what the evidence has shown.  They did

12  not use Hafnium oxide.  We do.  It was an intentional

13  decision on their part.

14          Ladies and gentlemen, thank you so much for your

15  time and attention.  We look forward to receiving your

16  verdict.  And we really do appreciate all the assistance and

17  attention you've given us during the week.  Thank you.

18          THE COURT:  All right.  Plaintiff may now present

19  its final closing argument.  You have 6 minutes and 15

20  seconds left, Mr. Sheasby.

21          MR. SHEASBY:  May I have the ELMO, please?

22          What Defendants have said is that you need to focus

23  on the claims, nothing beyond the claims.  And if you look

24  at the claims, you'll see that the claims make no reference

25  whatsoever to any specific type of oxide.  You can have any

1  type of gate oxide.  You can have any type of second oxide.

2  You can have any type of first oxide.  This is just common

3  sense.

4          The reason why Professor Lee didn't experiment with

5  Hafnium is because he wanted to make a device that would

6  work with any dioxide layer.  That was his goal.  The

7  structure could be used with any device.  And his claims

8  that the Patent Office gave him, his property says it

9  doesn't matter what type of oxide you use, you infringe.

10         Let's go to Slide 39.

11         Defendants' own expert admitted that the

12  combination of Hafnium and silicon dioxide is a gate oxide.

13  The claim says:  Gate oxide.

14         Defendants admit Hafnium plus silicon dioxide meet

15  the claims.  It's our property.  They can't take it.  The

16  Patent Office said:  We cover any type of gate oxide.  And

17  there's not a word that they can say that can change what

18  the experts and the Patent Office did.

19         Woody Guthrie was right.  We're bound by words.

20  And the words we're bound by are the words in the claims.

21         Let's go back to the claims just briefly.  I mean,

22  to the ELMO just briefly.

23         You also heard a complete and utter misdirection by

24  Plaintiff (sic).  They're talking about the gate not being

25  on the -- on the oxide.  Their expert admitted that that

 1   wasn't infringement.  He spent many -- that was not a basis

 2   for non-infringement.

 3          He spent many, many minutes talking about that, but

 4   what it says is it only says formed on.  It doesn't say

 5   formed directly on.

 6          And Professor Kelin Kuhn said that there was -- it

 7   is not appropriate to add the word "directly" there.  When

 8   you go back to the jury room, ask yourself whether the word

 9   "directly" is on those claims.  Bound by words.  The words

10   of the claim.

11          Your Honor, can you let me know when I have one

12   minute left, please?

13          THE COURT:  I will.

14          MR. SHEASBY:  Let's now go to -- and so when

15   Professor Lee showed you the model, when he said the side

16   was oxide, he said:  I did it for the jury.  And you know

17   why he did it?  He did it because the claims apply to any

18   oxide.  They don't just apply to silicon dioxide.  And he

19   wanted to teach you the right way because he was concerned

20   that the Defendants were going to try to trick you and say

21   that these claims were only limited to silicon dioxide.

22          Let's go to Slide 67.

23          So Georgia-Pacific factors.  The Judge read in all

24   15 factors.  Mr. Becker was -- was a really nice person, but

25   did you notice something?  Counsel only asked him about two

 1  factors, only the first two factors.  He didn't do an

 2  analysis of every other factor.  And the reason why that's

 3  so important is because he ignored two things.

 4          On Factor 2, he ignored that GlobalFoundries paid

 5  $588 million to have access to this technology.  And he said

 6  nothing about the benefits of the patent.  It's not that

 7  Mr. Becker is a nice man.  He just didn't ask the right

 8  questions.

 9          Let's go to Slide 71.

10          So Samsung and Defendants say they didn't take

11  Hafnium oxide from Professor Lee.  That's right, they took

12  it from -- actually from Dr. Kuhn, because Dr. Kuhn, if you

13  heard her testimony, was the person who invented High-k

14  Hafnium dioxide in FinFET transistors.

15          Now, what we have done is we have acknowledged that

16  there's other things that exist in these transistors.  And

17  it's for that exact reason that we know all the benefits

18  from the '055 transistor.  We calculated them exactly.

19  We've given 88 percent to the Defendants.  That covers their

20  Hafnium dioxide.  That covers whatever investments they

21  made.  And we only get 12 percent.

22          This idea that we're not taking into account

23  Hafnium oxide is a giant misdirection.  Of course, we are.

24  We're giving them 88 percent of all the benefits that were

25  achieved by the '055 patent.  88 percent go to them, and 12

1    percent go to us.

2          Can I have Slide 69?

3          So I told you guys that I spent my whole life in

4    California.  And there's this great basketball player in

5    California named Steph Curry.  And when Steph Curry first

6    joined the NBA, he was really thin, and people didn't think

7    he was actually going to be that good of a player.  His

8    rookie contact with Golden State was incredibly low.  Golden

9    State got this incredible deal, but his next contract, when

10   people knew how amazing he was, was incredibly large.

11         Intel, the American company, who did the -- who

12   followed the law -- Intel, the American company --

13         THE COURT:  One minute left.

14         MR. SHEASBY:   -- who took a license to this patent

15   voluntarily, got an incredible deal.  No one disputes that.

16   These multi-national companies that are the biggest in the

17   world, they don't get a rookie deal.  Rookie deals were in

18   2011.  Today, they get what is due.

19         Ladies and gentlemen of the jury, this case,

20   Professor Lee, a labor of a lifetime.  Professor Kuhn's

21   analysis.  This is in your hands.  Thank you.

22         THE COURT:  All right.  Ladies and gentlemen, I

23   have a few final instructions to give you before you begin

24   your deliberations.

25         You must perform your duties as jurors without bias

1    or prejudice as to any party.  The law does not permit you

2    to be controlled by sympathy, prejudice, or public opinion.

3    All parties expect that you will carefully and impartially

4    consider all the evidence, follow the law as I have given it

5    to you, and reach a just verdict regardless of the

6    consequences.

7         Answer each question in the verdict form from the

8    facts as you find them to be.  Follow the instructions that

9    I have given you.  Do not decide -- as I've said before, do

10   not decide who you think should win and then answer the

11   questions accordingly.  Your answers and your verdict in

12   this case must be unanimous.

13        You should consider and decide this case as a

14   dispute between persons of equal standing in the community

15   of equal worth and holding the same or similar stations in

16   life.

17        This is true in patent cases between corporations,

18   partnerships, or individuals.  A patent owner is entitled to

19   protect his rights under the laws of the United States.

20   This includes bringing a suit in a United States District

21   Court for money damages for infringement.  The law

22   recognizes no distinction among types of parties.  All

23   corporations, partnerships, other organizations, and

24   individuals stand equal before the law, regardless of their

25   size, regardless of who owns them, and they are to be

1    treated as equals.

2         When you retire to the jury room to deliberate on

3    your verdict, you're each going to have a copy of these

4    written -- a written copy of these instructions that I'm

5    giving you.  If you desire to see any of the exhibits which

6    the Court has admitted into evidence during the course of

7    the trial, you should advise me by a written note delivered

8    to the Court Security Officer, and I will then send that

9    exhibit or those exhibits to you.

10        Once you retire, you should first select your

11   foreperson and then conduct your deliberations.  If you

12   recess during your deliberations, follow all the

13   instructions the Court has given you about your conduct

14   during the trial.

15        After you've reached your verdict, your foreperson

16   is to fill in the verdict form which reflects your unanimous

17   answers to the questions.  Do not reveal your answers until

18   such time as you are discharged unless otherwise directed by

19   me.  And you must never disclose to anyone, not even to me,

20   your numerical division on any question.

21        Any notes that you've taken over the course of the

22   trial are aids to your memory only.  If your memory should

23   differ from your notes, rely on your memory and not your

24   notes.  The notes are not evidence.  A juror who has not

25   taken notes should rely on his or her own independent

1    recollection of the evidence and should not be unduly

2    influenced by the notes of other jurors.  Notes are not

3    entitled to any greater weight than the recollection or

4    impression of each juror about the testimony.

5         If during your deliberations you want to

6    communicate with me at any time, you should give a written

7    message or question to the Court Security Officer who will

8    then bring it to me.  I'll respond as promptly as possible

9    either in writing or by having you brought back into the

10   courtroom where I can address you orally.  I will always

11   first disclose to the attorneys in the case your question

12   and my response before I answer any question.

13        After you've reached a verdict and I have

14   discharged you from your positions as jurors, you are not

15   required to talk to anyone about your service in this case

16   unless the Court orders otherwise.  And by the same token,

17   at that time, after you've returned a verdict and I've

18   discharged you, you're free to discuss your service in this

19   case with anyone if you choose to.  That decision at that

20   time will be yours and yours alone.

21        I'll now hand a clean copy of the verdict form and

22   eight copies of these written -- of these final jury

23   instructions to the Court Security Officer to deliver to you

24   in the court -- in the jury room.

25        Ladies and gentlemen of the jury, you may now

1    retire to the jury room to deliberate.  We await your

2    verdict.

3            COURT SECURITY OFFICER:  All rise for the jury.

4            (Jury out.)

5            THE COURT:  Counsel, while the jury is

6    deliberating, you are welcome to wait here in the courtroom.

7    You are welcome to leave a representative here and wait

8    elsewhere.  You're welcome to wait elsewhere.  If you choose

9    to be somewhere else, I would ask that you stay close to the

10   area so that we can call you if we receive a question or a

11   verdict.

12           If you elect to not leave anyone here or to

13   completely be elsewhere, make sure that my staff has a good

14   working cell phone number where a member of each trial team

15   can be contacted so that we can bring you back in the event

16   we receive a note from the jury or a return of a verdict.

17           With those instructions, awaiting either a note

18   from the jury or the return of the verdict, the Court stands

19   in recess.

20           (Recess.)

21           (Jury out.)

22           COURT SECURITY OFFICER:  All rise.

23           THE COURT:  Be seated, please.

24           Counsel, we have received the following note from

25   the jury.  I'll read it for the record.  It starts at the

1   top.

2         Evidence needed.

3         And below that it says:  Dr. Kuhn's direct

4   examination slides;

5         Professor Lee's deposition;

6         DX-526 Intel license agreement;

7         PX-1322.

8         And then it is signed by Juror No. 4, Ms. Mobley,

9   and dated with today's date.

10        We'll assume that she is the foreperson of the

11  jury, and I'm going to put a one in the upper right-hand

12  corner of the document for identification, and I'll hand it

13  to the courtroom deputy.

14        Also, counsel, in light of the note, I've drafted a

15  response subject to any comments that you may want to offer.

16  If somebody's from both sides will approach, I've got two

17  copies for each side to look at.

18        My proposed response to the jury is as follows:

19        Members of the jury, in response to your note, I am

20  sending you the following exhibits:  DX-526 and PX-1322 as

21  you requested.

22        With regard to Dr. Kuhn's direct examination slides

23  and Professor Lee's deposition, these were presented as

24  demonstratives only and were not introduced as exhibits in

25  the trial.  Consequently, they are not evidence, and I

1    cannot send them to you.  However, the testimony of the

2    witnesses about these demonstratives is evidence, and you

3    should consider and focus on your memory of that testimony

4    in this regard.

5           Is there any objection to this response from

6    Plaintiff?

7           MR. SHEASBY:  No objection from the Plaintiff, Your

8    Honor.

9           THE COURT:  Any objection from the Defendants?

10          MS. SMITH:  No, Your Honor.

11          THE COURT:  Then I'll execute the original of this

12   response, and I'll hand it to the Court Security Officer

13   along with the two exhibits and direct him to deliver these

14   to the jury in the jury room.

15          Awaiting either another note from the jury or the

16   return of a verdict, counsel, we stand in recess.

17          COURT SECURITY OFFICER:  All rise.

18          (Recess.)

19          (Jury out.)

20          COURT SECURITY OFFICER:  All rise.

21          THE COURT:  Be seated, please.

22          Counsel, we've received a second note from the

23   jury.  I'll read it to you and read it into the record.

24          It says:  Judge Gilstrap, the following evidence is

25   being requested.

1              And there are eight items listed one at a time

2      below that.  They are:

3              Toshiba Mizuno patent;

4              Toshiba Hieda patent;

5              Toshiba Inaba patent;

6              PX-0671;

7              DX-336;

8              IBM patent;

9              PX-0843;

10             PX-0853.

11             As with the first note, it is signed by Taylor

12     Mobberly -- Mobley, as the jury foreperson, and it's dated

13     with today's date.

14             I will mark this note as Item 2 in the upper

15     right-hand corner and hand it to the courtroom deputy to be

16     included in the papers of this cause.

17             I understand that the courtroom deputy has already

18     in advanced met with counsel in regard to these requested

19     items.  And my understanding from that interaction is that

20     the, quote, IBM patent, close quote, is not in evidence, nor

21     is DX-336, but the other items are, and the various Toshiba

22     patents requested have been identified with appropriate

23     exhibit numbers.

24             Consequently, I have prepared a proposed response

25     to the parties.  Each side may approach.  I have two copies

```
 1   of this response for each side.

 2          This -- the Court's proposed response to Jury Note

 3   No. 2 is as follows:

 4          Members of the jury, in response to your second

 5   note, please find the following exhibits which you

 6   requested:

 7          PX-0671;

 8          PX-0843;

 9          PX-0853;

10          DX-272;

11          DX-277;

12          And DX-279.

13          The, quote, IBM patent, close quote, which you

14   requested was not an exhibit admitted into evidence, and

15   neither was DX-336.  Consequently, I cannot send these to

16   you.  Accordingly, you should focus on your memory of the

17   testimony that was given in regard to the IBM patent and

18   DX-336.

19          Is there any objection to this proposed response

20   from the Court to the jury's second note from the Plaintiff?

21          MR. BUNT:  No, Your Honor.

22          THE COURT:  Is there objection from the Defendants?

23          MS. SMITH:  No, Your Honor.

24          THE COURT:  And without objection, I'll sign the

25   note.
```

1         The courtroom deputy will hand me the exhibits.

2    I'll hand the signed note with the exhibits to the Court

3    Security Officer and direct that he deliver the same to the

4    jury in the jury room.

5         Again, counsel, awaiting either another note or the

6    return of a verdict, we stand in recess.

7         COURT SECURITY OFFICER:  All rise.

8         (Recess.)

9         (Jury out.)

10        COURT SECURITY OFFICER:  All rise.

11        THE COURT:  Be seated, please.

12        Counsel, we have received a third note from the

13   jury.  I'll read it for the record, and then I'll hand it to

14   the courtroom deputy.

15        It simply says as follows:  Judge Gilstrap, may we

16   request Dr. Kuhn's FinFET model?

17        Signed Taylor Mobley, 6/15/18.

18        I'll mark it as Note 3 and hand it to the courtroom

19   deputy.

20        I have prepared a proposed response in light of

21   that request, and I have two copies for each side, if you

22   want to approach.

23        I'll read it and then see if there are any

24   objections from either side.

25        Response to Jury Note No. 3:  Members of the jury,

1  in response to your third note, Dr. Kuhn's FinFET model was

2  presented as a demonstrative only and was not introduced as

3  an exhibit in the trial.  Consequently, it is not evidence,

4  and I cannot send it to you.

5         However, the testimony of the witnesses about this

6  demonstrative is evidence, and you should consider and focus

7  on your memory of that testimony in this regard.

8         Are there objections from Plaintiff to this

9  response to the jury's third note?

10         MR. BUNT:  No, Your Honor.

11         THE COURT:  Are there objections from Defendants?

12         MS. SMITH:  No, Your Honor.

13         THE COURT:  Then I'll sign the note and deliver it

14  to the Court Security Officer and direct him to deliver it

15  to the jury.

16         And barring another note or the return of a

17  verdict, we stand in recess.

18         COURT SECURITY OFFICER:  All rise.

19         (Recess.)

20         (Jury out.)

21         COURT SECURITY OFFICER:  All rise.

22         THE COURT:  Be seated, please.

23         The Court's received another note from the jury.

24  I'll read the note.  And I have prepared a suggested

25  response.  I'll then read that and take comments from

```
 1    counsel.

 2            I'll mark this as Note No. 4 in the upper

 3    right-hand corner, and after I've read it, I'll deliver the

 4    original note to the courtroom jury.

 5            Judge Gilstrap, may we reward a lump sum plus

 6    royalty payment for future sales?

 7            Signed Taylor Mobley -- Mobley, foreperson.

 8            I'll hand it to the courtroom deputy.

 9            I'll read you, counsel, what I've prepared as a

10    tentative response, and then I'll take any comments from the

11    parties that you care to offer.

12            I have two proposed copies for each side if you

13    want to approach and look at it as I read it.

14            The Court's proposed response to Juror Note

15    No. 4 -- Jury Note No. 4 is as follows:  Members of the

16    jury, as the Court instructed you in its final jury

17    instructions, see Pages 22 and 23, if you find KAIST is

18    entitled to damages, you must decide whether the parties

19    would have agreed to a running royalty or a fully paid-up

20    lump sum at the time of the hypothetical negotiation.

21            As a result, if you award monetary damages, they

22    must be designated as either a lump sum or a running

23    royalty.  You may not award both.

24            Are there objections to this proposed response from

25    Plaintiff or Defendant?
```

1          MR. SHEASBY:  Your Honor, I must confess that I --

2     I do think I have an objection.

3          THE COURT:  Well, once you make up your mind, why

4     don't you tell me?

5          MR. SHEASBY:  I have an objection, and my concern

6     is -- and I've just had five seconds to think about this,

7     but I think under the law, the answer is the jury can award

8     whatever they want.

9          There certainly was evidence in the record for

10    future -- counsel talked about paid-up through the life,

11    and they put that into the record, and so I do believe that

12    the appropriate answer is that you can award whatever you

13    want.

14         THE COURT:  Well, we have a verdict form that they

15    have in their hands that clearly provides on the question

16    about damages an amount of money or a blank for an amount of

17    money.  Underneath it, it says, indicate whether this is a

18    lump sum or a running royalty.  And per the structure of the

19    verdict form, they're put to an election.

20         And neither the Plaintiff nor the Defendants

21    objected to that structure at the time of the charge

22    conference.  I'm trying to respond in a way that's

23    consistent with both the instructions I've given them and

24    the verdict form that they are trying to answer.

25         MR. SHEASBY:  Your Honor --

1          THE COURT:  But that's the rationale for the

2    response that I've read, Mr. Sheasby.

3          MR. SHEASBY:  Your Honor, I would think we would

4    request that -- the problem is I don't know -- here's my

5    concern.  They could be saying, can we award Samsung a lump

6    sum, GlobalFoundries a running royalty, or Qualcomm a lump

7    sum?  In other words, my request is that we continue -- that

8    the response be that you are entitled to be awarded to

9    damages that are due under the statute.  I do think that is

10   the appropriate response.  Because the way it's written

11   right now is --

12         THE COURT:  Please make sure I can hear you clearly

13   as you talk.

14         MR. SHEASBY:  I'm sorry.  The way it's written

15   right now, it seems to be suggesting that they can award --

16   they have to do it the same for everyone.  And so I would

17   just urge that we give a neutral response saying you can

18   award the reasonable royalty that are due under the license.

19         I do think there are facts in the record of a

20   running royalty because Mr. Becker talked about it.  There

21   are facts in the record for liability through the lifetime

22   of the patent.  I know their intention of talking about lump

23   sum was to get a verdict that would exhaust future

24   14-nanometer sales.  So when I balance everything, I do

25   believe the correct response would be to say you can award

 1   what you believe is reasonable.

 2          THE COURT:  All right.  Let me hear from the

 3   Defendants.

 4          MR. KINNAIRD:  Well, Your Honor, I think as far as

 5   counsel's point about confusion between the parties, I

 6   don't think there's any confusion possible with the verdict

 7   form.

 8          I think this would create a real possibility of a

 9   double recovery if you -- if the jury is going to award both

10   lump sum and royalty, and I think the opposing party had the

11   opportunity to object to either the jury instructions or the

12   verdict form and did not.

13          THE COURT:  What's the Defendants' reaction

14   specifically to the proposed response that I've read? Do you

15   have problems or suggested changes with it?

16          MR. KINNAIRD:  Yes, we're fine with it, Your Honor.

17          MR. SHEASBY:  Your Honor, if you're going to rule

18   against me, may I make an alternative suggestion as to how

19   to clarify?

20          THE COURT:  If you have an alternative, I'll be

21   happy to hear it.  I would ask that you go to the podium so

22   that --

23          MR. SHEASBY:  Yes, Your Honor.

24          THE COURT:  -- you're clear.

25          MR. SHEASBY:  And it's disrespectful of me, and I

1   apologize.

2          THE COURT:  It's not disrespectful.  I just want to

3   make sure that both the Court and the court reporter hear

4   what you say.

5          MR. SHEASBY:  For any one Defendant, you should

6   choose between -- you would choose either a lump sum or a

7   running royalty.  But for different Defendants, one

8   Defendant can receive a lump sum, one Defendant can receive

9   a reasonable royalty.  That's the only request I'm making.

10  I don't want them to feel compelled to give a lump sum to

11  all three or compelled to give a reasonable royalty to all

12  three.

13         THE COURT:  Well, that's why when -- to be candid

14  with you, Mr. Sheasby, that's why when the Court drafted the

15  verdict form, rather than putting three blanks with dollar

16  signs in that particular question and then underneath saying

17  is this a running royalty or a lump sum, I specifically and

18  intentionally put the choice and the designation of either a

19  lump sum or a running royalty underneath each group of

20  Defendants and each dollar sign that would be filled in.  So

21  by the form of the verdict itself, they should clearly know

22  that they're not compelled to do it all one way or the

23  other.

24         MR. SHEASBY:  Your Honor, I believe that the note

25  that I read suggested that they may be asking the question

1   about whether they can give different amounts to each -- to

2   different Defendants.  And I believe -- respectfully that

3   that would be an appropriate clarification to give them, if

4   my interpretation of their note is appropriate -- is

5   correct.

6        THE COURT:  Well, I'm not sure I agree with your

7   interpretation.  We have the note that we have.  It says

8   what it says.  And the jury's been out four hours now, and I

9   think it's important that I get them some kind of a prompt

10  response.

11       MR. SHEASBY:  I understand.

12       THE COURT:  I'm going to sign the response that

13  I've read and that you've commented on.  To the extent the

14  Plaintiffs have an objection, I'll overrule it, and I'll

15  direct the Court Security Officer to deliver this response

16  to the jury.

17       MR. SHEASBY:  Thank you, Your Honor.

18       THE COURT:  And pending either another note or the

19  return of a verdict, the Court stands in recess.

20       COURT SECURITY OFFICER:  All rise.

21       (Recess.)

22       (Jury out.)

23       COURT SECURITY OFFICER:  All rise.

24       THE COURT:  Be seated, please.

25       Counsel, I've received the following note from the

 1   jury:

 2           Judge Gilstrap, we have reached a verdict.

 3           Signed by Taylor Mobley, as jury foreperson, and

 4   dated today's date.  I'll hand this note to the courtroom

 5   deputy.

 6           I'm about to bring in the jury and receive the

 7   verdict.  This goes without saying, but I expect an unbroken

 8   continuation of appropriate decorum no matter what the

 9   results are.

10           All right.  Let's bring in the jury, Mr. McAteer.

11           COURT SECURITY OFFICER:  Yes, sir.

12           All rise for the jury.

13           (Jury in.)

14           Be seated, please.

15           Ms. Mobley, I understand you are the foreperson of

16   the jury; is that correct?

17           THE FOREPERSON:  Yes, Your Honor.

18           THE COURT:  Has the jury reached a verdict?

19           THE FOREPERSON:  Yes, we have.

20           THE COURT:  Would you hand the completed verdict

21   form to the Court Security Officer who will bring it to me?

22           Ladies and gentlemen of the jury, I'm going to

23   announce the verdict at this time.  And I'd like to ask each

24   of the members of the jury to listen very carefully because

25   after I have announced the verdict, I'm going to ask each

1   one of you if this is your verdict so that we can confirm on

2   the record that it is the unanimous verdict of all eight

3   members of the jury.

4          Turning to the verdict form, beginning on Page 3,

5   wherein Question 1 is located:  Did KAIST prove by a

6   preponderance of the evidence that any Defendant named below

7   infringed any of the asserted claims?

8          Answers are for the Samsung Defendants, yes.

9          For the GlobalFoundries Defendants, yes.

10         For the Qualcomm, yes.

11         Question 2, which is located on Page 4 of the

12  verdict form:  Did the Defendants prove by clear and

13  convincing evidence that any of the following asserted

14  claims of the '055 patent are invalid?

15         The answer for all of the claims, Claims 1, 2, 3,

16  4, 5, 6, 11, 12, 13, 15, 16, and 17, the answer for each of

17  those is no.

18         Turning next to Question 3 of the verdict form

19  located on Page 6:  Did KAIST prove by a preponderance of

20  the evidence that the infringement you found in Question 1

21  was willful as to any of the Defendants listed below?

22         The answers are for the Samsung Defendants, yes.

23         The GlobalFoundries Defendants, no.

24         Qualcomm, no.

25         Turning to Question 4 on Page 8 of the verdict

1  form:  What sum of money, if any, if paid now cash do you

2  find by a preponderance of the evidence would fairly and

3  reasonably compensate KAIST for any infringement by a

4  Defendant who you have found to be infringing?  Only award

5  damages for those asserted claims that you have found to be

6  both infringed by a Defendant and not invalid as to each

7  Defendant listed below.  Answer in dollars and cents.

8           The answers are for the Samsung Defendants,

9  $400 million.  That award is indicated to be a lump sum

10  award.

11          For the GlobalFoundries Defendants, the answer is

12  zero.

13          For Qualcomm, the answer is zero.

14          The final page, being the 9th page of the verdict

15  form, is dated with today's date, and it is signed by

16  Ms. Mobley, as the foreperson of the jury.

17          Ladies and gentlemen of the jury, let me poll you

18  and make sure that this is, in fact, the unanimous verdict

19  of all eight members of our jury.  If this is your verdict

20  as I have read it, would you please stand?

21          (Jury polled.)

22          THE COURT:  Thank you very much.  You may be

23  seated.

24          Let the record reflect that all eight members of

25  the jury immediately rose and stood in response to the

1   Court's question to poll the jury.  And the Court does find

2   that this is the unanimous verdict of all eight members of

3   the jury.

4        I'll hand the original verdict form to the

5   courtroom deputy.  The Court accepts the verdict as rendered

6   by the jury.

7        Ladies and gentlemen, this now completes the trial

8   of this case.  From the very beginning, when you showed up

9   here on Monday, I have instructed you repeatedly about not

10  to discuss anything about this case with anyone, including

11  each other until such time as you retired to deliberate on

12  your verdict.

13       I'm -- I'm releasing you from that obligation and

14  all the other obligations imposed on you as members of this

15  jury.  That means you're now free to talk about this case

16  and your experience as jurors in any way that you would like

17  to.  That also means that you're absolutely under no

18  obligation whatsoever to talk with anyone about this case or

19  your experiences as a juror.

20       I want you to understand the practice and custom in

21  the Marshall Division of the Eastern District of Texas.  It

22  has been this way since I got out of law school a very long

23  time ago.  The practice is that when a jury such as

24  yourselves returns a verdict in this court and they're

25  discharged, they are free to initiate a conversation with

1   anyone they would like to about their service.

2         No one outside the members of the jury is allowed

3   to initiate a conversation with you about your service as

4   jurors.  And I can promise you because I did it for many

5   years, a good number, if not all of these lawyers, are

6   probably going to position themselves on the front steps of

7   this building so that when you get ready to leave, you'll

8   have an ample opportunity to stop and talk with them if you

9   want to.

10         They are not going to initiate a conversation with

11   you.  They are not going to hinder you in any way.  They are

12   not going to block you or get in front of you.  They are

13   simply going to be available.

14         If you want to talk, stop and talk.  I promise you

15   they want to listen.  If you don't want to talk, simply

16   smile and walk right on by.  You're under no obligation.

17   The decision is yours and yours alone.  But I want you to

18   understand that's the way it works.

19         Also, ladies and gentlemen, on behalf of the Court,

20   I want you to know how much I appreciate your service in

21   this case.  This has been a difficult case.  And you have

22   paid as close of attention to the evidence as any jury I can

23   remember in my almost seven years on the bench in this

24   court.  You've taken a big sacrifice to be away from your

25   homes and your families and your work, and that is important

1    public service.  And it is worthy of recognition and

2    gratitude and appreciation.

3            This -- this Court, as an institution of our

4    national government provided for in Article III of the

5    Constitution could not function -- could not function

6    without ordinary citizens such as yourself being willing to

7    make the sacrifice that you've made in serving as jurors in

8    a case like this.

9            Everyone associated with the Court, and I speak for

10   the lawyers as officers of the Court and the parties,

11   appreciate your service in this case.

12           And in that regard, I'd like to ask a personal

13   favor of you.  It's been my practice since I've been on the

14   bench when a jury has returned a verdict and I've accepted

15   it and discharged them, rather than them immediately

16   existing the building, I'd like to ask you as a personal

17   favor to take just a couple minutes, go back in the jury

18   room, and let me come in.  I'd like to shake each one of

19   your hands, I'd like to look you in the eye and thank you

20   personally for the service that you've rendered as a part of

21   this jury.  I think what you've done warrants that.

22           And it would be a personal privilege on my part if

23   you'd allow me to do that.  You are not be obligated to do

24   that.  You are discharged, and you can leave, but if you

25   would give me just a few minutes -- I know it's -- I know

1    it's in the late afternoon on a Friday before father's day

2    weekend.  I promise I won't keep you.  But I would like that

3    privilege if you'd be willing to extend that to me.

4         That completes your service as jurors in this case.

5    You are discharged from your position as jurors.  And if you

6    will give me just a couple minutes, I will meet you in the

7    courtroom (sic), ladies and gentlemen.

8         The jury is excused.

9         COURT SECURITY OFFICER:  All rise.

10        (Jury out.)

11        THE COURT:  Counsel, that completes the trial of

12   this case.  The Court accepts the verdict as rendered by the

13   jury.  You are excused.

14        (Court adjourned.)

1                    <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                        6/15/18
     SHELLY HOLMES, CSR, TCRR                Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25