# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| KAIST IP US LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-01314-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD., | § | |
| SAMSUNG ELECTRONICS AMERICA, | § | [FILED UNDER SEAL] |
| INC, SAMSUNG SEMICONDUCTOR, | § | |
| INC., SAMSUNG AUSTIN | § | |
| SEMICONDUCTOR, LLC, | § | |
| GLOBALFOUNDRIES, INC., | § | |
| GLOBALFOUNDRIES U.S. INC., | § | |
| QUALCOMM INC., | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

The above-captioned case was referred to United States Magistrate Judge Roy S. Payne pursuant to 28 U.S.C. § 636. Before the Court is the Report and Recommendation (the "Report") (Dkt. No. 508) by Magistrate Judge Payne, which recommends that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 229) be denied. Defendants have timely filed their objections to the Report (Dkt. No. 525), and Plaintiff KAIST IP US LLC ("Plaintiff" or "KAIST") responded to those objections. (Dkt. No. 545.) Having considered the Report and the Parties' arguments, and for the reasons set forth below, the Court **ADOPTS** the Report in its entirety and **DENIES** Defendants' Motion.

### I. BACKGROUND

#### A. Standing

The facts at issue in this case and relevant to this Motion have been previously set forth in the Report. (*See* Dkt. No. 508 at 2–4.) While a brief synopsis is presented here for the reader's

convenience, reference to the Magistrate Judge's presentation of the complete background is recommended. Of note, Defendants did not object to any of the background facts in the Report. (*See generally* Dkt. No. 508.)

Professor Jong-Ho Lee ("Professor Lee") began working on the research that led to the asserted patent, U.S Patent No. 6,885,055 (the "'055 Patent"), while he was a professor at Wonkwang University ("WKU"). (Dkt. No. 508 at 2.) According to Professor Lee, in 2001, he offered the rights to his research on a particular type of transistor to WKU but was told there was no budget or organization that could assist him with his patent application. (*Id.*, Dkt. No. 221-4 at 177:8–23.) He then assigned the subject matter to the Korea Advanced Institute of Science and Technology, who filed a Korean patent application directed to the transistor in January 2002 that named Professor Lee as the sole inventor. (Dkt. No. 508 at 2.)

In February 2002, Professor Lee left WKU to work for Kyungpook National University ("KNU"), and while working there, he built the first working embodiment of the transistor. (*Id.*) In August 2002, the Korea Advanced Institute of Science and Technology assigned its rights in related foreign applications back to Professor Lee. In February 2003, Professor Lee filed U.S. Application No. 10/358,981 (the "'981 Application"), which is the application that led to the '055 Patent. (*See id.* at 2–3.) The specifications of the two applications—the Korean application filed in January 2002 and its U.S. counterpart, the '981 Application—are virtually identical in substance even though the '981 Application does not claim priority to the Korean application. (*Id.* at 5.)

### B. Procedural History

To fully appreciate the extensive record before the Court, a brief background of the filings related to standing is warranted. On March 16, 2018, the Parties filed competing motions on standing. (*See* Dkt. Nos. 221 (KAIST's Motion for Summary Judgment Against Defendants Based

on Standing and Inventorship), Dkt. No. 229 (Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) for Lack of Standing).) On May 11, 2018, and after the Parties fully briefed both motions (Dkt. Nos. 233, 297, 299, 344, 356, 394, 397), KAIST filed a supplemental brief in support of its Motion for Summary Judgment (Dkt. No. 421) and Defendants filed a response (Dkt. No. 426).

Defendants then filed a Notice of Supplemental Evidence (Dkt. No. 424) on May 14, 2018, which included three "corrected" expert translations of disputed language that Defendants argued should be applied to the certain documents related to standing. (*See* Dkt. No. 424 at 1.) On June 25, 2018, Defendants filed another Notice of Supplemental Evidence, attaching an English translation of a Korean news article supposedly related to the standing issue. (*See* Dkt. No. 509.) Five days later, Defendants filed *yet another* Notice of Supplemental Evidence, attaching the new declaration of Jo-Won Lee.[1] (Dkt. No. 518.) Following that notice, this Court ordered the Parties to request leave prior to filing any subsequent supplemental evidence. (*See* Dkt. No. 527 at 1 n.1.)

On September 6, 2018, this Court denied-in-part and granted-in-part Defendants' Motion for Leave to Admit New Evidence and for Reconsideration of Order on Post-Trial Briefing (Dkt. No. 529). More specifically, the Court allowed the 2001 Frontier R&D Project Collaboration Agreement between WKU and the head of the Tera-Level Nano Devices Development Project (the "2001 Agreement") (Dkt. No. 529-2) into evidence. (*See generally* Dkt. No. 560.)

## II.   LEGAL STANDARD

"The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the **legal title** to the patent **during the**

---

[1] Despite Defendants' contentions that this declaration is "new" evidence, this is not Defendants' first mention of Jo-Won Lee. At a hearing on February 26, 2018, Defendants' counsel stated that "Samsung contacted the chairman of this TND project, which is Chairman Jo-Won Lee," and that Samsung had received some documents from Chairman Lee. (Dkt. No. 216 at 104:19–20, 107:11–17 (describing more contact with Chairman Lee).)

3

**time of the infringement**." *See Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) (emphasis in original); *see also Moore v. Marsh,* 74 U.S. 515, 522 (1868) ("[T]he right of action is given to the person or persons owning the exclusive right at the time the infringement is committed."). "The entity to whom the grant of a patent is made by the PTO [or that entity's successor in title] holds the 'legal title' to the patent." *See Arachnid*, 939 F.2d at 1578 n.2; *see also H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1384 (Fed. Cir. 2002) ("In order to have standing, the plaintiff in an action for patent infringement must be a 'patentee' pursuant to 35 U.S.C. 100(d) and 281."); *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993) ("Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property."); *TM Patents, L.P. v. Int'l Bus. Machines Corp.*, 121 F. Supp. 2d 349, 368 (S.D.N.Y. 2000) ("A patentee has presumptive title to an invention."). "[T]he key distinction in whether a court allows the defendants to contest standing based on ownership is whether the relevant statute or contract constitutes a present assignment of future legal title or merely creates an equitable interest." *Aerotel, Ltd. v. IDT Corp.*, 486 F. Supp. 2d 277, 282 (S.D.N.Y. 2007).

"The issuance of a patent by the PTO is prima facie proof of the patentee's legal title." *Aerotel*, 486 F. Supp. 2d at 281; *accord Arachnid*, 939 F.2d at 1578 n.2. Thus, the party challenging standing must rebut the patentee's prima facie showing of ownership. *See Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 531 F. Supp.2d 591, 594 (S.D.N.Y. 2008) ("Because [the inventor] has a patent issued by the PTO, defendants must, to successfully challenge plaintiff's standing, rebut plaintiff's prima facie showing."); *but see Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 778 n.3 (Fed. Cir. 1996) ("[T]he mere fact that an assignment was recorded in the PTO does not, without more, prove that a valid assignment actually took place.").

**III.   ANALYSIS**

The Court has analyzed the entirety of the evidence before it[2] and, without limiting the analysis herein, the Court considers the following in its analysis: Presidential Decree No. 17429 of the Republic of Korea (the "Presidential Decree"), Regulation on the Management of Intellectual Property Rights ("WKU IP Policy") (Dkt. No. 528-4), Rules on Kyungpook National University's Intellectual Property Rights (the "KNU IP Policy"), Regulations by the Ministry of Science and Technology in the Republic of Korea (the "MOST Regulations"), the 2001 Agreement with WKU (Dkt. No. 529-2), the 2002 Collaboration Agreement with KNU (the "2002 Agreement") (Dkt. No. 421-2), the 2003 Collaboration Agreement with KNU (the "2003 Agreement") (Dkt. No. 342-2), Dkt. Nos. 221, 229, 233, 287, 297, 299, 342, 344, 356, 358, 394, 397, 421, 422, 424, 426, 509, 518, 523, 524, 525, 528, 529, 533, 545, 546, and 553.

In the Report, the Magistrate Judge considered the KNU IP Policy, the Presidential Decree, the Technology Development Promotion Act, the MOST Regulations, and the various research reports, and determined that none of these documents contained an express assignment from Professor Lee to either WKU or KNU. (Dkt. No. 508 at 6–8.) In response, Defendants argue that (1) the MOST Regulations require automatic vesting in collaboration agreements like the 2001 Agreement and 2002 Agreement, Dkt. No. 525 at 1–4, and (2) the university IP policies are irrelevant to the standing analysis because the 2001 Agreement and 2002 Agreement are the controlling documents. (*See* Dkt. No. 525 at 8, Dkt. No. 546 at 11.) As to the MOST Regulations, the Magistrate Judge found, and this Court agrees, that the "MOST Regulations simply define the necessary steps for carrying out government-funded research," and do not require the vesting of industrial property rights in either university as Defendants contend. (Dkt. No. 508 at 6.) Since

---

[2] The Court considers the additional evidence submitted by both Parties under Fed. R. Civ. P. 72(b)(3), which allows a district court to "receive further evidence" when resolving objections to the Report and Recommendation.

Defendants argue that the 2001 Agreement and 2002 Agreement (collectively, the "Agreements") are the controlling agreements for the standing issue, and this Court has addressed the other documents, the Court will focus its analysis on the Agreements.

### A. The Inventor-Employee Retains Rights to the Invention

As a preliminary matter, both Korean law and United States law adopt the underlying principle that it is the inventor—not the employer—who retains the rights to an invention conceived during the course of employment. The Parties' experts agree, under Korean law, the inventor is the sole owner of the rights to the invention absent an express assignment. (*Compare* Dkt. No. Dkt. Nos. 221-11 ¶ 43 (Declaration of KAIST's Expert Yon-Taek Chong) ("[U]nless an affirmative action, as prescribed or permitted by statute, is taken by the employer, the inventor retains ownership of the invention."), *with* Dkt. No. 553-2 at 49:22–23 (Deposition of Defendants' Expert Jeong-Kyu Choe) ("Obviously the inventor would be the owner of the invention, absent an assignment.")). United States patent law recognizes this same principle. *See Bd. Of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 786 (2011) ("[A]n inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights."); *see also Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007) ("It is a bedrock tenet of patent law that 'an invention presumptively belongs to its creator.'") (quoting *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 406 (Fed. Cir. 1996)).

As applied here, two undisputed facts are critical to the standing analysis: (1) Professor Lee is the sole inventor of the '055 Patent, Dkt. No. 387, Hr'g Tr. at 9:20–21 (withdrawing contention that "the '055 Patent is invalid because it failed to name all of the actual inventors"), and (2) KAIST IP US is the record ***assignee*** and ***owner*** of the '055 Patent. (Dkt. No. 323 at 12

(list of uncontested facts) (emphasis added).)[3] Legal title to the '055 Patent presumptively rests with KAIST as the named assignee and uncontested owner of the patent, and Defendants must overcome this presumption to defeat KAIST's standing. *See Beech Aircraft*, 990 F.2d at 1248; *Arachnid*, 939 F.2d at 1578 & nn. 2–3 ("The entity to whom the grant of a patent is made by the PTO [or that entity's successor in title] holds the 'legal title' to the patent.").

### B. The Parties Agree that Federal Law, not Korean law, Applies to Interpretation of an Assignment

When determining whether the language of a contract creates an assignment of future rights, federal law—as opposed to state law—controls. *See DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1289–90 (Fed. Cir. 2008) ("Although state law governs the interpretation of contracts generally the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases. We have accordingly treated it as a matter of federal law.") (internal citations omitted); *Bd. Of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011) ("[T]he question of whether contractual language effects a present assignment of patent rights, or an agreement to assign rights in the future, is resolved by Federal Circuit law."). The Parties appear to agree that federal law controls the interpretation of the purported assignment, and Defendants concede that it is a contract that controls the standing analysis. (*See* Dkt. No. 525 at 4, 8 (Defendants' Objections) (arguing that the agreements govern automatic vesting and the regulations merely required automatic vesting of industrial property rights in those types of agreements), Dkt. No. 546 at 6–8 (Defendants' brief) (relying on United States law to support arguments that vesting is automatic),

---

[3] The Court notes in passing that "[e]stablishing ownership of a patent that has been infringed satisfies the requirements of Article III standing." *See Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1368 (Fed. Cir. 2003). The uncontested fact that KAIST is the owner of the '055 Patent could by itself be fatal to Defendants' standing argument.

Dkt. No. 553 at 10 (KAIST's brief) (arguing that applying Korean law would be "serious legal error" because this is a matter of federal law).)

There are two seminal cases arising out of the Federal Circuit's body of law on whether a contractual provision constitutes a present assignment of patent rights. The first distinguishes a present assignment from a promise to assign by looking to whether the contract requires some future action. *See Arachnid*, 939 F.2d at 1580–81. The second interprets "to grant and does hereby grant" as an express grant of rights to any future invention because those words signify that "no further act would be required once the invention came into being; the transfer of title would occur by operation of law." *See Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1570, 1573 (Fed. Cir. 1991). Consistent with the *Filmtec* language, in cases where the Federal Circuit has found an express assignment of future rights, the contract-at-issue included some present-tense form of assign (or convey or transfer or grant). *See Filmtec*, 939 F.2d at 1570, 1573 ("agrees to grant and does hereby grant"); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1326 (Fed. Cir. 2010) ("employee assigns"); *Roche Molecular*, 583 F.3d at 841 ("will assign and do hereby assign"); *DDB Techs.*, 517 F.3d at 1290 ("agrees to and does hereby grant and assign"); *Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 986 (Fed. Cir. 2008) ("agrees to grant and does hereby grant"); *IMATEC, Ltd. v. Apple Computer, Inc.*, 15 F. App'x 887, 893 (Fed. Cir. 2001) ("agree to assign and hereby do assign"); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) ("hereby conveys, transfers, and assigns"); *cf. Arachnid*, 939 F.2d at 1580–81 (rejecting interpretation that "will be assigned" conveys "present assignment of an expectant interest"); *Gellman v. Telular Corp.*, 449 F. App'x 941, 943–45 (Fed. Cir. 2011) (finding "shall be and remain the exclusive property" and "agrees to execute any and all assignments" is merely an agreement to assign); *IpVenture, Inc. v. ProStar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007)

(holding "agree to assign" is merely an agreement to assign).

Moreover, in cases where the contract included a provision that inventions "shall be" the property of the employer, the Federal Circuit did not rely on that provision when determining whether the agreement contained a present assignment of future rights. *See Arachnid*, 939 F.2d at 1576, 1580–81 (ignoring "[a]ny inventions conceived by IDEA or its employees . . . shall be the property of CLIENT" in its analysis) (alteration in original); *Gellman*, 449 F. App'x at 944–45 (finding language that any inventions "shall be and remain the exclusive property of Cellular Alarm" required that the inventions "necessarily had to have been fully conveyed previously"). Rather, the Federal Circuit focused solely on the provision directed towards assignments and rejected an argument that the provision stating the rights were merely the property of the employer was sufficient to establish an automatic assignment. *See Arachnid*, 939 F.2d at 1580–81 (analyzing "all rights thereto will be assigned"); *Gellman*, 449 F. App'x at 944–45 (analyzing "agrees to execute any and all assignments or transfer documents which are necessary"). With these guiding principles in mind, the Court turns to the contractual language at issue.

### C. Neither Agreement Automatically Vests Rights in the Universities

In their objections, Defendants argue that the "2001 and 2002 Collaborative Agreements govern vesting of industrial property rights." (Dkt. No. 525 at 8.) While the 2001 Agreement differs in some aspects from the 2002 Agreement, as it relates to the standing analysis, the agreements largely overlap. Importantly, absent some translation inconsistencies, the disputed "vesting" language is the same for both agreements. (*Compare* Dkt. No. 529-2, Art. 13 (2001 Agreement), *with* Dkt. No. 523-2, Art. 13 (2002 Agreement) (Defendants' translation), *and* Dkt. No. 421-2, Art. 13 (2002 Agreement) (KAIST's translation).)[4] Thus, the Court focuses on the

---

[4] Defendants appear to agree and go so far as to state that their arguments regarding the 2002 Agreement apply to the 2001 Agreement. (*See* Dkt. No. 437, Hr'g Tr. at 197:18–21 ("[MR SOOBERT:] It turns out it does, but the language

disputed language and notes that the analysis applies equally to both Agreements.

The crux of Defendants' arguments is that the present-tense "belong" language of Article 13 in the Agreements automatically vests rights in the supervisory institute, which for the 2001 Agreement is WKU and for the 2002 Agreement is KNU. (Dkt. No. 546 at 2–5.) For example, Article 13 of the 2001 Agreement provides that:

> The tangible outcomes, including the research equipment and materials, facilities, and prototypes, acquired as an outcome of the R&D project belong to (B) (research equipment, materials and facilities in Appendix 4 that were paid for by a participating enterprise in order to own them belong to the participating enterprise upon conclusion of the project), and the portions corresponding to the share of government contribution in intangible outcomes, such as industrial property rights and publication rights to research reports, **belong** to (B).

(Dkt. No. 529-2 at 9, Art. 13 (emphasis added), Dkt. No. 523-2 (same for the 2002 Agreement).)[5] As such, Defendants contend that Professor Lee never owned any rights to convey to KAIST and KAIST therefore lacks standing to assert patent infringement. (*Id.*)

Neither translation of the 2001 Agreement,[6,7] "belong" as Defendants propose or "shall belong" as KAIST proposes, connotes an automatic vesting of Professor Lee's invention that led to the '055 Patent. First, unlike the language in *Filmtec* and its progeny, the Agreements lack some present-tense form of assign, convey, transfer, or grant. By contrast, the verb "belong" does not

---

[in the 2002 Agreement] is generally the same that we were looking at the last hearing [from the 2003 Agreement], and that language, the Defendants believe, actually puts the ownership in the possession of the university."); Dkt. No. 529 at 6 n.3 ("To the extent the Court decides not to allow further briefing, the arguments that Defendants have made with respect to the MOST Regulations and the 2002 Collaboration Agreement apply to the 2001 Collaboration Agreement.").)

[5] According to the agreement, (B) is "WKU." (Dkt. No. 529-2 at 3, Cover Sheet.)

[6] While KAIST has not provided its own certified translation of the 2001Agreement, KAIST argues that the translation of the 2001 Agreement should be "shall belong" and "shall be owned." (*See* Dkt. No. 533 at 2–8.)

[7] While the Court need not determine which translation is accurate, the Court questions Defendants' translation which omits "shall" especially because most of the other articles in Defendants' own translation of the 2001 Agreement use "shall," including a later provision in the key article-at-issue, Article 13. (*See, e.g.*, Dkt. No. 529-2, Art. 2 ("shall faithfully perform" and "shall make"), Art. 3 ("shall pay," "shall forward," "shall be transferred," "shall observe"), Arts. 4–20 (using some form of "shall").)

rise to an affirmative transfer of patent rights. Read in context, this language merely creates an equitable interest in the "portions [of industrial property rights] corresponding to the share of government contribution." (Dkt. No. 529-2, Art. 13); *see Gellman*, 449 F. App'x at 944–45 (finding the phrase "shall be and remain the property of" indicated that the inventor's contributions remained in equitable status until he assigned them). Defendants do not cite—and the Court is not aware of—binding precedent holding that "belong" or "shall belong"—without more—effects an automatic transfer of future rights.

Additionally, the Court finds that use of "shall" implies a requirement of some future action. The Federal Circuit and courts in this district have found contracts with provisions using "shall" require a transfer at some future date. *See Abraxis*, 625 F.3d at 1365 ("shall purchase and accept . . . all of the right, title, and interests"); *Gellman*, 449 F. App'x at 944–45 ("shall be and remain the property of"); *Sycamore IP Holdings, LLC, v. AT&T Corp., et al.*, No. 2:16-cv-588, 2018 WL 929691, at *4–5 (E.D. Tex. Feb. 16, 2018) (Bryson, C.J.) ("shall, as a condition of employment with the University, assign all rights, title, and interest"). Simply put, that future patent rights "belong" or "shall belong" to either university does not rise to the level of an operative conveyance or assignment.

Second, it is notable that while Professor Lee is the undisputed sole inventor and as the sole inventor he retains all of the rights to the invention absent an assignment, he is not a party to the Agreements. (*See* Dkt. No. 529-2, Cover Sheet (listing "Parties to the agreement" as "Head of Tera-Level Nano Devices Development Project" and "Wonkwang University"), Dkt. No. 523-2 (same except listing "Head of Tera-Level Nano Devices Development Project" and "Kyungpook National University").) While the Court recognizes that both Agreements list Professor Lee as "Lead Supervisory Researcher (C)," the preamble expressly omits (C) and states that "(A) and (B)

agree to the following on performing the above Frontier R&D Project." (Dkt. Nos. 529-2, 523-2.) To the extent that other provisions reference any obligation of the Lead Supervisory Researcher (C), which for both Agreements is Professor Lee, those provisions do not relate to potential ownership of the patent rights. (*See, e.g.*, Dkt. No. 529-2, Arts. 2, 4, 5, 6, 7, 15, and 16). The 2001 Agreement, for example, does not even require that the "Lead Supervisory Research (C)" retain a copy of the agreement. (*See* Dkt. No. 529-2 at Art. 20 ("The Agreement shall be executed in three (3) sets and each of the Minister of Science and Technology, (A) and (B) shall retain a set.").) Importantly, the key article-at-issue, Article 13, does not mention the Lead Supervisory Researcher (C) whatsoever. (Dkt. No. 529-2, Art. 13 (2001 Agreement), Dkt. No. 523-2, Art. 13 (2002 Agreement).)

In cases finding an express assignment of future rights, the contract provision was specific to the inventor or inventor-employee assigning (or conveying or transferring or granting) his rights. *See Filmtec Corp.*, 939 F.2d at 1570 ("MRI agrees to grant and does hereby grant to the Government"); *DDB Techs.*, 517 F.3d at 1287 ("Employee agrees to and does hereby grant and assign"); *Roche Molecular*, 583 F.3d at 842 ("I will assign and do hereby assign to CETUS"); *IMATEC, Ltd. v. Apple Computer, Inc.*, 15 F. App'x at 890 ("I agree to assign, and hereby do assign, to FONAR"); *see also Arachnid*, 939 F.2d at 1576 ("[a]ny inventions conceived by IDEA or *its employees*") (alteration in original) (emphasis added). Here, not only was it true that Professor Lee was not a party to the Agreements—making it impossible for Professor Lee to transfer *his* rights—but also the alleged "automatic vesting clause" lacks specificity as to what rights, if any, belong to the university.

Third, the only mention of a potential assignment uses "may assign ownership," which is more indicative of an option to assign ownership under certain conditions and "in the interest of

12

preservation of the original and consideration of utility" than an express assignment. (*See* Dkt. No. 529-2, Art. 13; *see also* Dkt. No. 523-2, Art. 13.) Specifically, the Court rejects Defendants' argument that "this assignment authority makes sense only if [the university] presently owns the IP rights in the first place; if the assignment were not automatic, there would be no need for a mechanism for [the university] to assign ownership to another institute with MOST's permission." (Dkt. No. 546 at 4.) Contrary to Defendants' assertion, that the supervisory institute merely has the option to assign ownership, without more, does not mean that it automatically owns the underlying industrial property rights.

Other provisions of the Agreements make it clear that the Agreements merely govern the relationship between the project manager and the supervisory research institute, not the relationship between the inventor-employees and the supervisory research institute. The Agreements explicitly state that they are an "agreement between the Project and the Supervisory Research Institute" and do not address employees of the university. (Dkt. No. 523-2, Cover Sheet (2002 Agreement), Dkt. No. 529-2, Cover Sheet (2001 Agreement).) Most provisions detail how the supervisory research institute should report expenses and outcome to the project manager. (*See* Dkt. No. 523-2, Arts. 4–6 (2002 Agreement), Dkt. No. 529-2, Arts. 4–6 (2001 Agreement).) Furthermore, the 2001 Agreement expressly directs Professor Lee to execute additional contracts—external to the agreement-at-issue—that allocate research responsibility to the joint research institute, a separate institution from WKU. (*See* Dkt. No 529-2, Art. 3.) That the 2001 Agreement contemplated a separate institution playing a potential inventorship role in research projects necessarily means that the 2001 Agreement does not expressly transfer all rights to any and all inventions resulting from such research projects. As a whole, the Agreements describe the responsibilities and managerial duties of the project manager and the supervisory research institute

but they do not expressly address the transfer of rights from the employee-inventors to the employer-university.

Defendants cite *James v. J2 Cloud Servs., LLC* to support their proposition that "the Agreement 'conveys rights in future inventions.'" (Dkt. No. 546 at 4 (citing 887 F.3d 1368, 1373 (Fed. Cir. 2018)). There, the Federal Circuit determined that the contract provisions in the Software Development Agreement were not specific enough to the underlying patentable methods or systems and thus the contract was "amenable to the construction that it [did] not assign, or promise to assign, patent rights that would otherwise accrue to Mr. James as an inventor." *J2 Cloud*, 887 F.3d at 1374. Here, the central issue is whether "shall belong" or "belong" connotes automatic assignment—not whether the contract provisions encompass underlying patent rights. That case is inapposite.

All other cases cited by Defendants are also distinguishable. For example, to argue that courts have rejected similar arguments in construing assignment language, Defendants cite *C.R. Daniels, Inc. v. Naztec Int'l Group, LLC,* No. ELH-11-01624, 2012 WL 1268623, at *11–12, 16 (D. Md. Apr. 13, 2012). However, the focus in that case was not the phrase "shall become" but rather the phrase "without further consideration." *See id.* at *11. Relying on the consideration phrase *alone*, the court found that "the [employment] agreements contemplated that 'no further act would be required once an invention came into being; the transfer of title would occur by operation of law.'" *Id.* (quoting *FilmTec*, 939 F.2d at 1568). Here, no such phrase exists.

Defendants also rely on *Speedplay* to argue that "[t]he Federal Circuit likewise held that 'shall belong' considered with the rest of the agreement conveyed an automatic transfer of rights," and the phrase "hereby conveys, transfers, and assigns" "simply confirmed (and necessarily followed from) the present vesting accomplished by 'shall belong.'" (Dkt. No. 546 at 7 & n.3.)

14

Defendants' characterization misses the mark. The Federal Circuit in *Speedplay* was explicit that the holding of *Filmtec* applied to the agreement-at-issue because the *Speedplay* agreement "provide[d] that inventions 'shall belong' to Speedplay, and that Bryne 'hereby conveys, transfers and assigns' the inventions to Speedplay." 211 F.3d at 1253 (emphasis omitted). Contrary to Defendants' assertion, the presence of *both* of these phrases—rather than just "shall belong"—was found to be the equivalent of the present assignment of *Filmtec*, which provided that "the contractor agreed 'to grant and does hereby grant' to the client the rights and title to any invention, whether patentable or not." *Id.* (Bryson, C.J.); *see also Sycamore IP Holdings*, 2018 WL 929691, at *4 ("same for 'shall belong' and 'hereby conveys, transfers, and assigns'") (citing *Speedplay*, 211 F.3d at 1253) (Bryson, C.J).

Indeed, it is not the precise words that define the boundary between "an agreement to assign or an assignment," *Arachnid*, 939 F.2d at 1580, but rather as *Filmtec* noted, a finding that "no further act would be required once an invention came into being; the transfer of title would occur by operation of law." *Filmtec*, 939 F.2d at 1573. That is not to say that the use of precise words does not make a court's job easier in discerning that boundary. While the underlying law of patent assignments is concerned with the clear *effect* of the words selected, the *Filmtec* language has nonetheless been given a specific meaning by the Federal Circuit (*i.e.*, that no future action is required to effectuate assignment) to enable district courts to determine whether an agreement is one or the other. Absent controlling precedent, this Court declines to expand the *Filmtec* language.

Finally, Defendants argue that Dr. Jon-Won Lee's interpretation of the contractual language is controlling based on the late-breaking declaration of Dr. Lee, which was submitted on June 30, 2018, *see* Dkt. No. 518, and Article 20 of the 2001 Agreement, which provides that "[i]f issues on the interpretation of the Agreement arise, [Head of Tera-Level Nano Devices

15

Development Project]'s interpretation shall take precedence." (Dkt. No. 529-2, Art. 20.) This is not persuasive. First, this Court is not bound by Dr. Lee's legal interpretation of the 2001 Agreement and to hold otherwise would effectively eliminate this Court's ability and duty to interpret contracts. Second, Article 20 is not specific as to what Dr. Lee's interpretation should take precedence over. (*See* Dkt. No. 529-2, Art. 20.) Importantly, Article 20 does not say that Dr. Lee's interpretation is binding or controlling on this Court as Defendants argue.

Moreover, Dr. Lee describes situations involving "secret filings." Dr. Lee states that he "recall[s] a few incidents in which researchers . . . secretly filed patent applications in their own names. These secret filings had the appearance that these patent applications were the researchers' own personal property." (*See* Dkt. No. 518-1 at ¶ 12.) As the Director of the Tera-Level Nano Devices Development Project, Dr. Lee would "conduct[] investigations" of these secret filings and "instruct[] the researchers that they should assign the rights in question to the supervisory research institute to correct the wrongdoing." (*See id.*) Here, by contrast, it was no secret to WKU or KNU that Professor Lee applied for and obtained the Korean patent. (*See* Dkt. Nos. 297-4 (WKU), 229-13 at 3, 16 (KNU).) Moreover, neither university attempted to assert rights in the United States application or patent—at least not until KAIST obtained a substantial verdict in its favor. The situation Dr. Lee describes was simply not applicable here.

At best, the Agreements could support a finding that WKU or KNU retained an equitable interest in the invention. *See Arachnid*, 939 F.2d at 1580 ("Although an agreement to assign in the future inventions not yet developed may vest the promisee with *equitable* rights in those inventions once made, such an agreement does not by itself vest *legal* title to patents on the inventions in the promisee.") (emphasis in original). However, since an equitable interest cannot defeat standing— and neither university is a party to this lawsuit—the Court declines to determine whether WKU or

16

KNU hold an equitable interest in the '055 Patent.

The Court thus concludes that the rights to the '055 Patent were not expressly assigned by operation of either of the Agreements, and that Professor Lee, as the sole named inventor, was fully entitled to assign his interest in the patent. Accordingly, KAIST has standing to bring this lawsuit.

KAIST also argues that it is protected as a bona-fide purchaser for value because 35 U.S.C. § 261 "extinguishes unrecorded but earlier title transfers," such as the 2001 and 2002 Agreements. (Dkt. No. 533 at 12–15, Dkt. No. 553 at 14–15.) Although KAIST's argument appears meritorious given that § 261 is "intended to cut off prior legal interests, which the common law rule did not," *see Filmtec*, 939 F.2d at 1573–74, the Court need not reach it based on the above findings and conclusions; *i.e.* that the Agreements on their face do not constitute an express assignment of rights in the '055 Patent to either WKU or KNU.

The Court reiterates its previous order that the Parties must move for leave to file any supplemental evidence of standing. (*See* Dkt. No. 527 at n.1.) While the Court is mindful that standing cannot be waived, *see Pandrol*, 320 F.3d at 1367, the Court is becoming increasingly wary of the repeated attempts to muddy the record with piecemeal filings of supplemental evidence and duplicative motion practice. The Court's docket is not an open-ended file within which the Parties are free to insert and store supplement after supplement of briefing, affidavits, and declarations to spring upon the Court in "new" arguments raised at the Parties' convenience. When the Court has addressed an argument, and it *has* addressed all arguments before it and does so *again* in this Order, adding an allegedly "late-breaking and undiscovered document" to the argument and filing yet another round of briefing regarding the standing issue does not advance the Parties' interests or conserve this Court's limited judicial resources.

17

This case has been before this Court for over a year and a half. This case has gone through thorough discovery, complete pretrial preparation, trial before a jury with their verdict returned, and is now undergoing post-trial briefing. The standing issue has been fully addressed; indeed, it has been addressed multiple times. That any uncertainty supposedly remains as to the proper standing of the Plaintiff to bring this suit is unfathomable. It is, of course, axiomatic that "a court must assure itself that the plaintiff has standing, such that there exists a case or controversy as required by Article III of the Constitution." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Here, the Court is so assured.

In sum, the Court finds that WKU or KNU **do not have an interest** based on the Agreements or other supporting documents that would alter or overturn the jury verdict rendered in this case on June 15, 2018. (Dkt. No. 499-1.) The Court further finds that as the record assignee of the '055 Patent, **KAIST has standing to assert patent infringement.**

IV. **CONCLUSION**

Having considered the Report and Defendants' objections, the Court concludes that the Magistrate Judge's Report and Recommendation is correct. Defendants' objections are **OVERRULED** and the Report and Recommendation (Dkt. No. 508) is hereby **ADOPTED** in its entirety and in accordance with the additional analysis provided herein. Accordingly, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 229) is **DENIED**.

Additionally, to the extent, if any, that KAIST's underlying Motion for Summary Judgment Based on Standing and Inventorship (Dkt. No. 221) remains unaddressed, it is **DENIED AS MOOT**, in light of this Order.

Defendants' Motion for Hearing on the Parties' Arguments on Standing (Dkt. No. 555) is

also **DENIED**.

It is further **ORDERED** that this ruling will remain **PROVISIONALLY SEALED** until the Parties file joint proposed redactions. Such proposed redactions should include specific explanations for the necessity of such redactions as balanced against the Public's interest in open judicial proceedings. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 592 (1980) ("[O]pen trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous 'checks and balances' of our system, because 'contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.'") (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)). The proposed redactions shall be filed within seven (7) days of this Order. Failure to submit timely proposed redactions will result in the complete unsealing of the Order, which, in such case, may not be redacted upon later motion made by the Parties.

**So ORDERED and SIGNED this 6th day of September, 2018.**

*/s/ Rodney Gilstrap*
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE