**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| KAIST IP US LLC, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | NO. 2:16-cv-01314-JRG-RSP |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD.; | § | JURY TRIAL DEMANDED |
| SAMSUNG ELECTRONICS AMERICA, | § | |
| INC.; SAMSUNG SEMICONDUCTOR, | § | |
| INC.; SAMSUNG AUSTIN | § | |
| SEMICONDUCTOR, LLC; | § | |
| GLOBALFOUNDRIES INC.; | § | |
| GLOBALFOUNDRIES U.S. INC.; and | § | |
| QUALCOMM INC., | § | |
| | § | |
| Defendants. | § | |

**SAMSUNG DEFENDANTS' RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW
<u>FOR DAMAGES OF NO MORE THAN $6.2 MILLION</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................................. 1

II.   BACKGROUND .................................................................................................................. 2

III. LEGAL STANDARD ........................................................................................................ 4

IV. ARGUMENT ...................................................................................................................... 5

     A.   Samsung Is Entitled to JMOL on Damages Beyond $6.2 Million. ...................................5

         1.   Plaintiff's running royalty evidence cannot as a matter of law support the lump sum verdict. ...............................................................................................5

         2.   The damages award must be reversed or vacated because it failed to take account of the highly comparable Intel license. ..........................................................6

         3.   There is no proper apportionment of damages in the record to support the jury's award. ...................................................................................................9

             a.   Plaintiff did not apportion the damages to the improvements in bulk FinFET technology represented by the invention........................................................... 10

             b.   Plaintiff did not apportion the damages to exclude power-and-speed benefits and costs savings attributable to process technology improvements and investments in new fabs. .................................................................................. 12

             c.   Plaintiff failed to tie damages to the smallest salable unit. .............................. 15

         4.   Plaintiff's evidence of damages was based on improper assumptions and methods and contrary to the rules of the hypothetical negotiation established by the Federal Circuit. ..........................................................................................17

             a.   Plaintiff's damages analysis erroneously rested on an unsupported assumption that Plaintiff would receive 12% of profits supposedly conferred by the '055 Patent................................................................................................................. 17

             b.   Plaintiff's damages analysis erroneously rested on alleged, later profits and cost savings, not on evidence of those that were anticipated at the time of the hypothetical negotiation. .................................................................................. 19

             c.   Plaintiff's analysis rested on an unreliable regression model. ......................... 21

         5.   Exhaustion applies to mobile products with Snapdragon chips. ..............................21

     B.   The only proper remedy for the lack of any evidence to support the damages verdict is JMOL for $6.2 million. ................................................................................................22

V.   CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Alpha Chi Omega*,
   708 F.3d 614 (5th Cir. 2013) ...............................................................................4

*Apple Inc. v. WiLAN Inc. et al.*,
   3:14-cv-02 Dkt. No. 548 ......................................................................................11

*Aqua Shield v. Inter Pool Cover Team*,
   774 F.3d 766 (Fed. Cir. 2014)............................................................................20

*Cellular Commc'ns Equip. LLC v. Apple Inc.*,
   No. 6:14-cv-251 (E.D. Tex. Aug. 26, 2016) ......................................................22

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015)............................................................................9

*Cont'l Circuits LLC v. Intel Corp.*,
   2017 U.S. Dist. LEXIS 23842 (D. Ariz. Feb. 21, 2017)....................................17

*Eli Lilly & Co. v. Aradigm Corp.*,
   376 F.3d 1352 (Fed. Cir. 2004)............................................................................4

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)............................................................................9

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods Grp. LLC*,
   879 F.3d 1332 (Fed. Cir. 2018)..........................................................................21

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018).....................................................................9, 15

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983)..........................................................................20

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010).......................................................................5, 21

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001)..........................................................................20

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)...............................................................6, 8, 9, 15

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).............................................................................5, 9

*In re Nintendo of Am., Inc.*,
  756 F.3d 1363 (Fed. Cir. 2014)...............................................................................22

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018)......................................................................... *passim*

*Promega Corp. v. Life Techs. Corp.*,
  875 F.3d 651 (Fed. Cir. 2017)..................................................................................23

*Riles v. Shell Expl. & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002)...............................................................................20

*Sinclair Refining Co. v Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933)..................................................................................................20

*TGIP, Inc. v. AT&T Corp.*,
  527 F. Supp. 2d 561 (E.D. Tex. 2007) ......................................................................4

*Tronzo v. Biomet, Inc.*,
  236 F.3d 1342 (Fed. Cir. 2001)..........................................................................22, 23

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)................................................................................18

*Unisplay, S.A. v. American Elec. Sign Co.*,
  69 F.3d 512 (Fed. Cir. 1995)..................................................................................5, 6

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)..................................................................................9

*Whitserve, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012)......................................................................................9

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010)...........................................................................5, 13

**Rules**

Fed. R. Civ. P. 50(a) ...................................................................................................4

## I.      INTRODUCTION

The Samsung Defendants[1] (together, "Samsung") move for judgment as a matter of law ("JMOL") on damages of no more than $6.2 million.

No evidence supports the jury verdict of $400 million in lump-sum damages against Samsung.  At trial, Plaintiff argued for $321 million in running-royalty damages from Samsung. In contrast, Samsung presented evidence that any damages against Samsung should be a fully paid-up lump sum of no more than $6.2 million.  The jury's award of lump sum damages of $400 million—an amount far exceeding even Plaintiff's demand, which no witness had advocated and was *nearly 60 times* the amount of a highly comparable license to industry leader Intel just two years before the hypothetical negotiation—wildly overinflates the value of the patent.

Not only is the $400 million an arbitrary figure untethered to *any* evidence, but the Federal Circuit has long held that running-royalty evidence cannot support a lump-sum award without expert testimony enabling the jury to make the conversion.  None was presented here. Moreover, Plaintiff's expert testimony on damages did not take into account the highly comparable Intel license.  It also failed to apportion damages to the patent or tie them to the smallest salable unit, instead assuming—contrary to the undisputed evidence—that the '055 Patent was responsible for all the benefits of bulk FinFET and that there was no unit smaller than the phone or tablet.  Plaintiff's expert testimony further used a number of arbitrary assumptions to inflate damages and violated the well-established conditions of the hypothetical negotiation by assuming perfect foreknowledge of future sales, revenues, and profits, both in clear conflict with

---

[1] The Samsung Defendants are Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), Samsung Semiconductor, Inc. ("SSI"), and Samsung Austin Semiconductor, LLC ("SAS").  Samsung joins the motion of all Defendants for JMOL on liability and invalidity, filed concurrently, and separately files for JMOL on willfulness.

Federal Circuit precedent.  For Snapdragon chips, the calculations improperly extracted a royalty from both the Samsung manufacturer of the chip and the Samsung seller of the end device containing the same chip.  Finally, his opinions were derived from an improper regression model based on untenable assumptions.  Because Dr. Becker's testimony of a lump-sum royalty of up to $6.2 million is the only legally acceptable evidence of damages, this Court should enter JMOL that Plaintiff is not entitled to damages above that amount.

## II.   BACKGROUND

KAIST IP US LLC, now KIPB LLC ("Plaintiff"), requested $321 million in damages against Samsung for infringement of U.S. Patent No. 6,885,055 ("the '055 Patent") based on two running royalty components calculated by its expert, Mr. Weinstein.

*First*, Mr. Weinstein opined that the jury should award a total of $220 million for alleged speed and power efficiency benefits flowing to Samsung, calculated based on per-smartphone, per-tablet, and per-chip running royalties.  6/12/18 PM 167:22-168:4, 208:1-7, 209:10-16.  Mr. Weinstein assumed that the '055 Patent provided a 20% increase in processor speed, and an additional 12% increase in processor speed due to power efficiency for Exynos chips and 22% for Snapdragon chips, for a total increase in processor speed of 32% for Exynos chips and 42% for Snapdragon chips, relying entirely on Mr. Witt.  *Id.* at 189:5-19; 197:2-21.  Using regression analysis, Mr. Weinstein opined that a 1% increase in processor speed results in an additional $1.06 in smartphone profits, $0.92 in tablet profits, and $0.18 in chip profits.  *Id.* at 188:5-18. He calculated total alleged profits for each category, *Id.* at 189:20-191:3, and opined that Plaintiff was entitled to 12% of these alleged profits.  6/12/18 PM 208:8-14.  Based on these calculations, Mr. Weinstein testified that Plaintiff was entitled to damages of $4.74 per smartphone, $3.74 per tablet, and $0.71 per Exynos SoC sold by Samsung.  6/12/18 PM 206:4-

20; PDX 6.49.  Based on the total numbers of smartphones, tablets, and chips actually sold during the relevant period, this running royalty component amounted to $220 million.  *Id.*

**Second**, Mr. Weinstein opined that the jury should also award $101 million for alleged manufacturing cost savings flowing to Samsung, calculated essentially as a per-wafer running royalty.  6/12/18 PM 207:5-20.  Mr. Weinstein assumed that use of the '055 Patent has provided Samsung a 25% cost savings for each 14 nm bulk FinFET wafer it manufactured.  6/12/18 PM 192:4-22; 206:25-207:4.  Based on the total number of wafers Samsung actually manufactured during the relevant period (November 29, 2016 through May 14, 2018), he calculated the total alleged cost savings, and opined that Plaintiff was entitled to 12% of that.  *Id.* 206:25-207:20.  This running royalty component amounted to $101 million.  *Id.*

Mr. Weinstein testified that both running royalty components were for the post-lawsuit period of November 29, 2016 (filing of the Complaint) to May 14, 2018 (initial date for jury selection and trial).  *Id.* 167:22-168:4, 208:1-7, 209:10-16.  Thus, all of the evidence that Plaintiff and its expert presented to the jury on damages was directed to a running royalty over that period.  Plaintiff expressly confirmed this in its closing argument, asking the jury to select the running royalty box on the verdict form.  6/15/18 83:23-84:2.

Using the same methodologies, Mr. Weinstein also proposed that the jury award $98.5 million in manufacturing "cost savings" damages against the Globalfoundries Defendants and $297 million in "speed and power efficiency" damages against Qualcomm, Inc.  6/12/18 PM 209:17-210:1.

In contrast to Plaintiff, Samsung introduced evidence showing that any damages should only be in the form of a fully paid-up lump sum.  Under *Georgia-Pacific* Factor 1, Samsung emphasized the **sole** license to the '055 Patent, where industry leader Intel paid a lump sum of

just $6.8 million.  DX-526.  Samsung introduced evidence that the Intel license was remarkably similar to the license that would have resulted from the hypothetical negotiation (except the Intel license was broader), that Samsung was in essentially the same situation as Intel (except Samsung was smaller), and that Plaintiff's predecessor P&IB would have accepted a low seven-figure lump sum license fee from Samsung.  6/12/18 PM 212:1-225:4; 6/14/18 PM 59:23-61:14.  Samsung also introduced a *Georgia-Pacific* Factor 2 agreement where Samsung purchased a comparable FinFET patent for a lump sum of only $3 million.  DX-329; 6/14/2018 PM 61:15–62:21.  Based on these highly relevant agreements and other evidence, Samsung's expert Dr. Becker testified that a reasonable royalty for Samsung would be a fully paid-up lump sum of no more than $6.2 million.  6/14/18 PM 54:4–55:8; 79:14–80:25.

At the close of the parties' cases, Defendants moved for JMOL under Rule 50(a) on damages, among other issues, and the Court denied that motion.  6/14/18 PM 203:7–12; 215:8–216:8; 217:24–218:8.  The jury found that Samsung willfully infringed and awarded lump sum damages, as Samsung had proposed, but in the amount of $400 million, exceeding even Plaintiff's request.  Dkt. No. 481.  The jury found that the Globalfoundries Defendants and Qualcomm also infringed, but awarded no damages against them.

## III.    LEGAL STANDARD

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"  *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)).  The non-movant must identify "substantial evidence" to support its positions.  *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007).  "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Eli*

*Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).  Damages "determined by

the trier of fact must be supported by relevant evidence in the record," *Unisplay, S.A. v.*

*American Elec. Sign Co.,* 69 F.3d 512 (Fed. Cir. 1995), and on a JMOL motion, the court

determines whether there was "a sufficient evidentiary basis" for the jury's damages award.  *i4i*

*Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856–57 (Fed. Cir. 2010).

## IV.   ARGUMENT

### A.   Samsung Is Entitled to JMOL on Damages Beyond $6.2 Million.

#### 1.   Plaintiff's running royalty evidence cannot as a matter of law support the lump sum verdict.

Running royalty evidence cannot support the jury's lump sum verdict.  Running royalty

and lump sum approaches to damages are fundamentally different, such that there must be some

evidentiary basis to convert one to the other.  In the absence of that evidence, the damages award

fails as a matter of law.

> For a jury to use a running-royalty agreement as a basis to award
> lump-sum damages [] some basis for comparison must exist in the
> evidence presented to the jury. In the present case, the jury had
> almost no testimony with which to recalculate in a meaningful way
> the value of any of the running royalty agreements to arrive at the
> lump-sum damages award.

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326-30 (Fed. Cir. 2009); *see also*

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)

(running royalty licenses could not support lump-sum damages award).

Just as in *Lucent*, "[t]his is not an instance in which the jury chose a damages award

somewhere between maximum and minimum lump-sum amounts advocated by the opposing

parties."  580 F.3d  at 1332.  Instead, Plaintiff offered no evidence or expert testimony about

converting its proposed running royalty to a lump sum.  *See* 6/12/2018 PM 167:10–225:12;

6/13/2018 AM 7:25–44:2.  Thus, Plaintiff's running royalty evidence cannot support the $400

million lump sum damages award.  As discussed above, the only lump-sum evidence supports an award of no more than $6.2 million.

### 2. The damages award must be reversed or vacated because it failed to take account of the highly comparable Intel license.

Comparable licenses must, as a matter of law, be considered in determining damages for patent infringement.  "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Comput., Inc.* 694 F.3d 51, 79 (Fed. Cir. 2012).  Thus, such prior agreements "carry considerable weight in calculating a reasonable royalty rate." *Unisplay*, 69 F.3d at 519.  In *Laser Dynamics,* the Federal Circuit expressly held that a damages award cannot stand where there are comparable licenses that the plaintiff's experts disregarded.  694 F.3d at 79-81.  In that case, "the licenses to the patents-in-suit were all for lump sum amounts not exceeding $1 million." *Id.* at 80.  The Federal Circuit held that the plaintiff's "6% running royalty theory cannot be reconciled with the actual licensing evidence, which is highly probative of the patented invention's economic value in the marketplace, and of the form that a hypothetical license agreement would likely have taken." *Id.* at 79; *see also id.* at 81 ("[T]he 6% royalty rate was untethered from the patented technology at issue and the many licenses thereto and, as such, was arbitrary and speculative.").

Here, there is an extremely comparable license: an arms' length, non-litigation license to the '055 Patent taken just two years earlier by Intel, an even larger player in the bulk FinFET market than Samsung, for a fully paid-up lump sum of $6.8 million.  6/12/18 PM 212:1-225:4. Yet, Mr. Weinstein completely disregarded the Intel license—the ***sole*** *Georgia-Pacific* Factor 1 license—giving it lip service but failing to incorporate it into his analysis.  As Mr. Weinstein

acknowledged, the Intel license "is certainly relevant here and should be considered with respect to damages in this case" as "the only actual real-world license to the '055 Patent." *Id.* 212:18-21. Indeed, the Intel license was remarkably similar to the license that Samsung would have taken at the hypothetical negotiation.  As Mr. Weinstein admitted, both had "the same licensors," the "same patent" and no others, the "same claimed invention," were "non-exclusive," and were only "about two years" apart. *Id.* 212:10-213:12; 214:14-17; 217:17-23.  In fact, the license rights granted to Intel for $6.8 million were ***more*** valuable than what Samsung would have received, because the license to Intel was for a significantly longer period (11 versus 8 years) and covered significantly more products (all nodes, not just 14 nm). *Id.* 219:10-220:1, 223:4-8.  And Mr. Weinstein also agreed that the $6.8 million represented fair market value for the license at the time. *Id.* 214:9-12.

While Mr. Weinstein did use the Intel license ***negotiations*** tangentially in manufacturing a hypothetical 12% split of the supposed benefits of the patent, *see infra* at 18, he did not use the $6.8 million license amount ***in any way whatsoever*** in his *Georgia-Pacific* analysis, not even as a (presumably downward) adjustment to the per-unit royalty rates he manufactured using his regression analysis.  Rather, as discussed above, Mr. Weinstein came up with an amount based entirely on the supposed per-unit benefits of the patent and Samsung's total unit sales, then gave 12% of that amount to Plaintiff. *Id.* 204:22-208:7.

Plaintiff attempted to distinguish the Intel license by arguing that Samsung's hypothetical negotiation, even though barely two years later than the Intel license, occurred when the entire industry had committed to bulk FinFET and rejected other alternatives. *Id.* 195:9-18.  But this is a distinction without a difference.  The relevant inquiry is whether Samsung, at its hypothetical negotiation, was similarly-situated to ***Intel***, at the time of its license, and the answer is clearly

yes.  It is undisputed (as Mr. Weinstein admitted) that *Intel*, at the time of its license to the '055

Patent, was fully committed to bulk FinFET, as the "parties knew ***with certainty*** that Intel had

***already launched*** its 22-nanometer FinFET products."  *Id.* at 220:16-20 (emphasis added).  As

Dr. Becker explained, and Plaintiff did not dispute, "[a]t the time that Intel sat down, they had

already announced their next generation of FinFET chips.  So in a sense there's ***no going back***

***for Intel***," 6/14/18 PM 65:19-21 (emphasis added).  Indeed, Intel had "already built or at least

converted a number of their manufacturing facilities to use the FinFET."  *Id.* 66:6-11.  Fully

committed to bulk FinFET at the time it negotiated its license, Intel was in the same position as

Samsung under the conditions of the hypothetical negotiation, with no option other than to take a

license, and the only question being at what price.  The supposed commitment of others in the

industry over the next two years provides no basis to distinguish the hypothetical license to

Samsung, much less to entirely disregard the Intel license as Mr. Weinstein did.  Notably, the

Federal Circuit in *LaserDynamics* dismissed an attempt to distinguish actual licenses entered

three to eight years before a hypothetical negotiation because the market was supposedly "more

established" later.  694 F.3d at 80-81.  Mr. Weinstein's utter disregard of the highly comparable

Intel license, entered just two years before the hypothetical negotiation, is even more egregious.

Plaintiff also sought to distinguish the Intel license based on the assumption that in the

hypothetical negotiation, unlike in real-world licenses, validity and infringement are assumed.

6/12/2018 PM 194:3-10.  But Plaintiff offered no evidence to show that this assumption could

account for the extreme divergence between the Intel license amount of $6.8 million and the

asserted damages against Samsung of $321 million, much less the $400 million that the jury

awarded—***nearly 60 times*** the amount of the Intel license.  With respect to the Intel license, Mr.

Weinstein made no attempt to determine the risk of invalidity and non-infringement and adjust

the $6.8 million accordingly, instead simply ignoring it.  As noted above, this directly conflicts

with Federal Circuit precedent.  If Plaintiff's approach were acceptable, actual licenses to patents

asserted could be ignored in every case because the hypothetical negotiation is always different

in assuming validity and infringement.  Indeed, the Federal Circuit has rejected a multiple of just

three times an actual license amount, much smaller than the ***60X multiple*** here.  *Whitserve, LLC*

*v. Comput. Packages, Inc.*, 694 F.3d 10, 30-31 (Fed. Cir. 2012) (vacating a jury's damages award

because "[a]s in *Lucent*, where the award was a multiple of the average license amounts

presented, here, there is 'little evidentiary basis under Georgia–Pacific Factor 2 for awarding

roughly three to four times the average amount in the lump-sum agreements in evidence.'").

### 3. There is no proper apportionment of damages in the record to support the jury's award.

It is a bedrock principle that damages must be tied directly to the ***incremental value*** of

the asserted patent.  "'[T]he patent holder should only be compensated for the approximate

incremental benefit derived from his invention." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d

1201, 1233 (Fed. Cir. 2014).  The Federal Circuit has therefore repeatedly reversed or vacated

unapportioned damages awards.  *See, e.g.*, *id.* at 1235; *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879

F.3d 1299, 1311-12 (Fed. Cir. 2018); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed.

Cir. 2014); *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1304

(Fed. Cir. 2015); *LaserDynamics*, 694 F.3d at 69.

The Federal Circuit reaffirmed the importance of apportionment recently in *Power*

*Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965 (Fed. Cir. 2018).  The

Court underscored the well-established rule requiring attribution:  "A patentee is only entitled to

a reasonable royalty attributable to the infringing features.  The patentee must ***in every case*** give

evidence tending to separate or apportion the defendant's profits and the patentee's damages

between the patented feature and the unpatented features[,]" and thus damages must "be apportioned between the infringing and non-infringing features of the product." *Id.* at 977 (emphasis added). Applying these principles, the Federal Circuit rejected the plaintiff's reliance on the "entire market value rule," holding that "[i]f the product has other valuable features that also contribute to driving consumer demand—[whether] patented or unpatented—then the damages for patent infringement ***must be apportioned to reflect only the value of the patented feature. This is so whenever the claimed feature does not define the entirety of the commercial product***." *Id.* at 978 (emphasis added). Because "Power Integrations did not meet its burden to show that the patented feature was the sole driver of consumer demand, *i.e.*, that it alone motivated consumers to buy the accused products[,]" its damages analysis failed to apportion based on the value of the infringing feature, thus requiring vacatur of the damages award. *Id.* at 979-80.

Here, Plaintiff's damages analysis conflicts directly with *Power Integrations* and many other Federal Circuit cases requiring apportionment, because Plaintiff attributed ***all*** the benefits of 14 nm FinFET technology solely to the '055 Patent despite the many unpatented features of that technology, thus failing to tie its damages to the claimed invention of the '055 Patent.

> a.   **Plaintiff did not apportion the damages to the improvements in bulk FinFET technology represented by the invention.**

The undisputed evidence shows that Plaintiff's assumption that the '055 Patent was alone responsible for ***all*** benefits of moving from the prior planar node to the 14 nm bulk FinFET node was wrong. Dr. Kuhn conceded that Prof. Lee did not invent the bulk FinFET, and that the bulk FinFET was disclosed in prior art such as Inaba. 6/12/18 PM 42:12-43:4. Further, the prosecution history of the '055 Patent shows that it was initially rejected as being anticipated by Inaba, and was granted only by adding certain numerical constraints on the thickness of the gate

oxide and first oxide layers (*see* Dkt. 391-3), which shows that this was the only alleged advance over the prior art.  Plaintiff's failure to apportion lacks any basis in fact or law.  *See Apple Inc. v. WiLAN Inc.* , No. 3:14-cv-02235 DMS (BLM),  Dkt. No. 548 (S.D. Cal. Jan. 3, 2019) (granting damages remittitur where Plaintiff's damages expert began analysis with VOLTE technology that was admittedly broader than the asserted claim).

This fundamental error infected Mr. Weinstein's entire damages analysis.  Specifically, Mr. Weinstein relied on Mr. Witt's opinion quantifying a 20% increase in processor speed and a 12-22% increase in processor speed due to power efficiency in comparison to the prior node. 6/12/18 PM 189:14–190:24; 197:9-14.  Mr. Weinstein further relied on Dr. Kuhn's opinion that the '055 Patent provides a 25% manufacturing cost savings to a chip foundry in comparison to the prior node.  *Id*. 28:5–19, 206:23–207:25.  He then used those figures as the basis for determining the alleged value of the patent to consumers.

But Mr. Witt and Dr. Kuhn, by their own admissions, did not consider the ***incremental*** advancement of the '055 Patent in trying to quantify these supposed improvements.  Instead, they treated ***all*** of the benefits in the shift to the 14 nm bulk FinFET node as attributable to the patent.  Dr. Kuhn admitted she did not apportion for the incremental advance of the '055 Patent over the prior art (Inaba and Mizuno).  *Id*. 88:8-14.  Nor did she consider the investment or advances made after the '055 Patent, including "the benefit of any High-k material in those [14-nanometer] devices."  *Id*. 90:17-91:25.  Instead, her estimate of 25% cost savings was based on a general industry change from the prior planar node to the 14 nm bulk FinFET node, ***not*** tied to the claims of the '055 Patent at all.  *Id*. 87:11-91:3.

Likewise, Mr. Witt admitted that he did not account for the '055 Patent's advance over the prior art, *id.* 15:1-152:24; he hadn't "done any apportionment of any value of the benefits that

may be attributed to the '055 patent versus any other patents that may have contributed to the shift from 28 nanometer to 14 nanometer, *id.* 152:20-24;  and he "assume[d] contribution from those other device improvements," *id.* 161:7-9.

Despite these failures, Mr. Weinstein relied exclusively on the opinions of Dr. Kuhn and Mr. Witt.  He agreed that his opinions as to the benefits of the '055 Patent depended entirely on their opinions being correct, and if not, then "my damages results would also be incorrect."  *Id.* 211:4-19.   Given that Dr. Kuhn and Mr. Witt made no attempt at all to apportion the supposed benefits attributable to the patent, this is fatal as a matter of law.  *See, e.g.*, *Power Integrations*, 904 F.3d at 979-80.

Plaintiff's failure to consider the incremental improvement over Inaba, *i.e.*, the specific numerical constraints that were the basis for granting the patent—or the improvement over *any* prior art—is legally erroneous.  Plaintiff's response to this flaw seems to be that the inventions claimed in the '055 Patent were necessary for the accused products, but as *Power Integrations* explained, that is no excuse for Plaintiff's failure to apportion:  "[I]t is not enough to merely show that the patented feature is viewed as essential, that a product would not be commercially viable without the patented feature, or that consumers would not purchase the product without the patented feature."  904 F.3d at 978-79.

> **b.**    **Plaintiff did not apportion the damages to exclude power-and-speed benefits and costs savings attributable to process technology improvements and investments in new fabs.**

Even if the '055 Patent were one but-for cause of the benefits of moving to the 14 nm bulk FinFET, it is not a plug-and-play invention; none of the speed and power efficiency benefits would have been realized without Samsung's massive investments in the accused technology. Plaintiff's experts improperly ignored crucial advancements that indisputably came after the '055

Patent and were incorporated into Samsung's accused products.  For example, it is undisputed that Samsung added a hafnium oxide layer, which is not mentioned in the patent (6/12/18 AM 26:2-17) and which Prof. Lee conceded he thought would not be used (6/11/18 PM 86:23-25).  When Dr. Kuhn was asked:  "Whatever benefit that High-k Hafnium oxide material provides, it's not provided by the '055 patent.  You agree with that?," she replied:  "Yes, sir."  6/12/18 PM 92:1-4.  And Dr. Kuhn further admitted that the invention of the '055 Patent "couldn't be commercially viable" without that hafnium oxide layer.  *Id*. 72:22-23; *see also id*. 72:10-12 ("Q. Right. And you need a High-k stack if you're getting down to 14 nanometers, don't you?  A. That's the general consensus, sir.").  There is no basis for Plaintiff's failure to account for "other valuable features," *Power Integrations*, 904 F.3d at 978, especially where one of those features is so valuable that the patented invention is commercially non-viable without it.

It is also undisputed that it cost Samsung more than $300 million in research and development costs to realize a manufacturable version of the bulk FinFET transistor.  6/13/18 AM 99:18-22.  Samsung also invested billions in building the fabrication facilities necessary to mass produce 14 nm bulk FinFET chips.  6/13/18 AM 41:24-42.  The Federal Circuit has rejected damages claims where, like here, the plaintiff failed to take account of a defendant's invested costs in technology in determining the supposed benefit of the claimed invention.  *Wordtech*, 609 F.3d at 1321 ("According to Wordtech, claims 13 and 14 of the '298 patent cover INSC's software; therefore, INSC's entire profit corresponded to the inventions. . . . *This assumes, however, that INSC incurred zero costs*.") (emphasis added).

Mr. Weinstein's calculations assumed, without any substantial evidence, that all costs saved in moving from the prior planar node to a 14 nm bulk FinFET node are attributable solely to the '055 Patent.  Dr. Kuhn merely estimated that the 25% cost decrease was in the "die cost."

6/12/18 PM 28:11-19.  However, Dr. Kuhn admittedly excluded from her analysis the multi-

billion dollar investments Samsung needed to make both in advanced process technology to

make the accused devices and in building the fabs required to manufacture them:

> Q.  The -- the investment of the resources and the time and the sweat equity and
> the money that went into building that 14-nanometer device at Samsung, you
> didn't apportion any of that value to the benefits that are achieved, did you?
>
> A.  The node would have happened anyway.
>
> Q.  So the answer to my question is no?
>
> A.  No, sir.  The node would have happened anyway, sir.

*Id*. 90:17-24.  Dr. Kuhn speculated that rather than moving to 14nm bulk FinFETs, Samsung

would have gone ahead with some indeterminate planar design—either "FDSOI and the magic

wafer" that she had testified was not competitively viable—or "some wonderful new transistor

technology" to avoid exiting the business.  *Id*. 35:21-36:11, 108:21-109:10.

Dr. Kuhn's reasoning is nonsensical, conflicts with her opinion that Samsung had no non-

infringing alternative, and does not constitute substantial evidence.  Samsung would not have

spent vast sums to develop an inferior product that was not competitively viable.  Even if Dr.

Kuhn's position that the node "would have happened anyway" is accepted, Mr. Weinstein and

Dr. Kuhn were not entitled to make the blithe assumption that the investment necessary to make

a 14 nm *planar* device is the same to make a 14 nm ***bulk FinFET*** device, a completely different

technology.  There was no evidence that Samsung would have to build a completely new fab to

build a smaller planar device, much less any evidence that any such planar fab would require the

same billions of dollars of investment that a new bulk FinFET fab entailed.  *See* 6/13/18 AM

41:24-42:1 (Weinstein agreeing that making a bulk FinFET fab "costs billions of dollars").  Dr.

Weinstein's assumption that no part of the cost savings of moving from a planar device to a 14

nm bulk FinFET device should be apportioned to the investments in bulk FinFET process technology and fab construction is unfounded.

In sum, there were critical steps before and after the alleged one step contributed by the '055 Patent towards faster and more efficient transistors. Plaintiff's assumption that Samsung is nonetheless liable for *all* of the benefits of those transistors conflicts with well-established law and warrants JMOL in Samsung's favor.

### c.     Plaintiff failed to tie damages to the smallest salable unit.[2]

The Federal Circuit has held that, "in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit ("SSU"), without showing that the demand for the entire product is attributable to the patented feature." *LaserDynamics,* 694 F.3d at 67-68. Here, the '055 Patent claims cover only a single FinFET (many millions of which are present on each chip). 6/12/18 AM 52:22-53:16; 55:15-56:6; 64:14-18; 72:6-15; 6/12/18 126:5-12. Plaintiff also did not present any evidence showing that demand for Samsung's smartphones and tablets is attributable to the claimed invention. Thus, the smallest salable unit is at most the chip sold by Samsung's LSI division (6/12/18 PM 162:2-14; 6/13/18 AM 95:7-10, 96:16-20). The smallest salable unit is certainly not the much more complex and expensive end consumer product—the smartphone or tablet—sold by Samsung's mobile division. 6/12/18 PM 96:10–97:5.

---

[2]   As discussed below, there is a further error in failing to tie damages to the smallest salable unit, but Plaintiff's failure to apportion is an independent basis for reversal because "[e]ven when a damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *Power Integrations*, 904 F.3d at 977; *accord Finjan*, 879 F.3d at 1311.

Despite this, Mr. Weinstein calculated all of his purported speed and power efficiency damages using the retail prices of smartphones and tablets, rather than tying damages to the smallest salable unit.  *See* PX0470.4 ("The dependent variable in the smartphone regression model is retail market price . . . ."); PX0470.10 ("The dependent variable in the tablet regression model is retail market price . . . ."); 6/12/18 PM 202:15-204:11 (tallying the total units including smartphones and tablets); *id*. 204:22–205:9 (calculating incremental speed profits per unit); *id*. 206:4-8 (accounting for the "total speed and power efficiency damages rate for smartphones").  Mr. Weinstein not only ***ignored*** the SSU principle, but actually applied it ***backwards*** by using the regression results for retail smartphones and tablets to calculate his damages for stand-alone chips.  *Id*. 187:4-188:18 (testifying that he performed his regressions only for "tablets and smartphones" and that "with respect to SoCs not sold in phones, I apportioned that down to the chip level"); *see also* PX 0470.4 (confirming that regressions were only performed with respect to "smartphones and tablets," not chips).  He did not perform a separate regression analysis for stand-alone chips, even though they account for more than $174 million—***79%***—of his $220 million in "speed and power efficiency damages."  6/12/18 PM 203:22-204:21; PDX 6.49.

These errors resulted in Mr. Weinstein increasing his royalty for an accused chip ***more than six fold*** for the same accused technology if the chip was incorporated into an accused smartphone or tablet.  *Id.* at 206:4-20; PDX 6.49.  There is no reason Samsung should pay a different royalty for the ***same transistor technology*** depending on the device in which it is incorporated: $4.74 per smartphone, $3.74 per tablet, and $0.71 per Exynos chip sold by Samsung, *id.*  These differentials further prove that Mr. Weinstein improperly captured value not in any way attributable to the '055 Patent in his royalty analysis.  His opinions in violation of the SSU principle warrant JMOL in favor of Samsung.

4.     **Plaintiff's evidence of damages was based on improper assumptions and methods and contrary to the rules of the hypothetical negotiation established by the Federal Circuit.**

a.     **Plaintiff's damages analysis erroneously rested on an unsupported assumption that Plaintiff would receive 12% of profits supposedly conferred by the '055 Patent.**

Mr. Weinstein calculated damages based on a "profit-share" ratio of 12%: he concluded that Plaintiff was entitled to 12% of the incremental speed, power efficiency, and cost savings profits allegedly conferred by the '055 Patent.  *See supra* at 3.

Mr. Weinstein purported to derive this profit-share ratio from the P&IB negotiations with Intel, but he never calculated any ratio of the Intel license amount to Intel's anticipated profits due to speed and power efficiency gains or anticipated manufacturing cost savings from using the patented technology.  Instead, his 12% ratio is the ratio of the Intel license amount to P&IB's initial license demand: *i.e.*, he divided the $8.5 million P&IB ultimately accepted from Intel for licenses to both the '055 Patent and its Korean counterpart by the much higher $70 million that P&IB originally asked from Intel for those licenses (*i.e.*, 8.5/70 = 0.12).  *See* 6/12/18 PM 201:20–202:14.

This 12% "profit-share" ratio is entirely arbitrary, speculative, and devoid of reason, and provides yet another basis to conclude that there is not substantial evidence to support the jury's verdict.  The ratio of the amount P&IB originally asked from Intel versus the amount P&IB ultimately accepted from Intel has no connection whatsoever to what Samsung would have been willing to give up and P&IB would have been willing to accept as a profit-share ratio in the hypothetical negotiation.  Indeed, Mr. Weinstein's ratio does not even indicate the share of incremental benefit ***Intel*** would have been willing to give up and P&IB would have been willing

to accept.  The $70 million initial license demand represented  only what P&IB unilaterally deemed to be adequate compensation for the alleged benefits of the '055 Patent to Intel.

If Mr. Weinstein had attempted to calculate a profit-share ratio from the Intel negotiations, he would have arrived at a much lower percentage.  Assume that Intel would have reaped at least the $2.7 billion in profits related to the '055 patent that Mr. Weinstein alleged for Samsung, *id.* 197:2-21, a conservative assumption since Intel is a larger industry player.  P&IB's demand of $70 million represented only a mere 2.6% profit share to P&IB ($70 million/$2.7 billion = 0.026).  But Intel refused to pay the $70 million; the ratio of the actual $8.5 million actual license price to such profits represented a scant ***0.25% share to P&IB*** ($8.5 million/$2.7 billion = 0.0025).[3]  Mr. Weinstein failed to offer any such calculation or related analysis.  The 12% profit-share ratio is woven from whole cloth, and bears absolutely no connection—legal, economic, common sense, or otherwise—to what Samsung and P&IB would have agreed to in a hypothetical negotiation as a profit-sharing ratio.  Such ill-founded guesswork cannot support the jury's award.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313 (Fed. Cir. 2011) (rejecting the "25 percent rule of thumb" to approximate a reasonable royalty that a licensee would be willing to pay, because "the rule is essentially arbitrary and does not fit within the model of the hypothetical negotiation within which it is based.").

---

[3] Both the $70 million initial demand and the $8.5 million ultimate price for Intel were for licenses to both the '055 Patent and also the Korean counterpart. The profit-share ratios would be even smaller if the demand or ultimate price were adjusted to account only for the value of the '055 patent (*e.g.*, 80% of 2.6% or 0.25%).

**b.      Plaintiff's damages analysis erroneously rested on alleged, later profits and cost savings, not on evidence of those that were anticipated at the time of the hypothetical negotiation.**

Mr. Weinstein testified that one of his foundational assumptions for his analysis of the hypothetical negotiation was that "[the parties] have access in a sense to information about the future, to the future sales, the future profits associated with using the technology."  6/12/18 PM 176:16-177:9.  Mr. Weinstein admitted he did not base his opinion on any contemporaneous financial projections the parties could actually have considered in the hypothetical negotiation, but instead on hindsight evaluation of actual financial data generated long afterwards:

> Q.  And so under your assumption, the hypothetical negotiator -- the hypothetical negotiators in that – in that situation would know the exact number of units of each accused chip or system on a chip and each accused phone or tablet that were sold until the end of your damages window; is that fair?
>
> A.  Yes.
>
> Q.  So they would know the -- the price at which – which each unit were sold in that future time period?
>
> A.  They could.
>
> Q.  And they would know the profits earned on those future sales?
>
> A.  Yes, sir.
>
> Q.   They would know the cost savings, if any, in manufacturing the accused FinFET products through the end of your damages period?
>
> A.  True.

6/13/18 AM 20:11-21:2.

In particular, the regression analysis on which Mr. Weinstein based his opinion regarding alleged incremental "profits" flowing to Samsung from use of the '055 Patent was based entirely on after-the-fact sales and pricing data.  *Id*. 18:8-21:23.  Further, Mr. Weinstein applied his per-unit "profits" derived from his after-the-fact regression analysis to the precise number of

smartphones, tablets, and chips that Samsung actually sold in the relevant period (November 29, 2016 through May 14, 2018) in reaching his ultimate damages opinion. *Id.* As the hypothetical negotiation occurred in late 2014 or early 2015, *id.*, the **entirety** of Mr. Weinstein's opinion rests on after-the-fact information that could not have been known to the parties at the time.

This is a classic illustration of using hindsight knowledge that is not permitted. *See Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) ("A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment."); *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("The issue of the infringer's profit is to be determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations.").

Under the "book of wisdom" doctrine, actual profits earned in the infringement period "may be relevant, but only in an indirect and limited way—as some evidence bearing on a directly relevant inquiry into anticipated profits." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014). The "book of wisdom" does not allow for Mr. Weinstein's false assumption of foreknowledge. The Supreme Court merely established that post-infringement evidence is discoverable as it can be relevant to establishing the value of the technology that existed from the beginning. *Sinclair Refining Co. v Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933). A hypothetical negotiation takes place under conditions of uncertainty as to the future, and must be based on projections that would have been known at the time. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (approving the "rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales"). As Mr. Weinstein's

testimony violated well-established conditions of the hypothetical negotiation construct, it cannot

support a reasonable or reliable damages award.  6/13/18 AM 22:2–23:16.

> **c.**     **Plaintiff's analysis rested on an unreliable regression model.**

The lion's share of Mr. Weinstein's damages relied on a regression model that he created.

6/14/18 PM 84:23-88:25.  However, his model was unreliable.  Mr. Weinstein did not explain his

methodology for selecting the few variables he used or, more critically, for omitting hundreds of

other features from his model (including features that he admitted were important to consumers).

6/13/18 AM 24:5-31:17.  For example, Mr. Weinstein did not include "sound quality," "amount

or size of RAM," "storage capacity," "LTE capability," or "secondary camera."  *Id.* 28:19-29:21,

30:14-22.  Thus, Mr. Weinstein's model improperly failed to account for ***any*** non-patented

features impacting demand for the accused products and thus the sales and profits for the accused

products.  *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods Grp. LLC*, 879 F.3d 1332,

1350 (Fed. Cir. 2018) (vacating damages award where expert failed to account for non-patented

elements affecting sales and profits).  Mr. Weinstein further failed to test his model to determine

the impact of omitting those variables, a known issue with hedonic regressions of this type.

6/14/18 PM 115:25-116:5.  He also improperly used reported retail prices of smartphones and

tablets instead of Samsung's actual wholesale prices.  PX0470.4.  Any award resting on such an

arbitrary analysis is "based only on speculation or guesswork," which the Federal Circuit has

condemned.  *i4i Ltd. P'ship*, 598 F.3d at 856–57.

> **5.**     **Exhaustion applies to mobile products with Snapdragon chips.**

Plaintiff effectively sought both a first royalty from SAS for making Snapdragon chips

and also a second royalty from SAS's downstream customer SEA for selling devices including

Snapdragon chips.  In particular, Mr. Weinstein calculated alleged cost savings damages for all

14 nm bulk FinFET chips, including Snapdragon chips made by SAS.  6/12/18 PM 206:21-208:14.  Mr. Weinstein also calculated alleged speed and power efficiency damages for Samsung smartphones and tablets containing those same chips, which products were sold by SEA.  6/12/18 PM 202:15–205:16, 206:4-8.  Thus, Plaintiff included in its damages calculation both the SAS chips and also the SEA mobile products containing those same chips.

Mr. Weinstein's testimony requesting a second royalty from SEA violates the rule against double recovery from a downstream customer.  *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1366 (Fed. Cir. 2014)  ("[I]f Secure Axcess were to collect royalties from Nintendo, this would preclude suit against the Retailers."); *Cellular Commc'ns Equip. LLC v. Apple Inc.*, No. 6:14-cv-251, 2016 WL 6884648, at *3 (E.D. Tex. Aug. 26, 2016) ("[I]f [the manufacturer] is found liable and [the patentee] does collect damages from [the manufacturer], [the patentee] cannot then in turn collect damages from the [customer-reseller], because [the patentee] cannot receive a double recovery for the same sales.").  Mr. Weinstein impermissibly double counted by seeking both a first royalty from SAS and also a second royalty from SAS's downstream customer SEA.  Mr. Weinstein did not allocate specific damages amounts for SAS or SEA (and the jury rejected Mr. Weinstein's running royalty anyway), so it is impossible to determine the amount by which the jury's award must be reduced to fix this error.  Nevertheless, Samsung is entitled to JMOL of no second damages award for Samsung mobile products with Snapdragon chips.

### B. The only proper remedy for the lack of any evidence to support the damages verdict is JMOL for $6.2 million.

The Federal Circuit holds that a new trial is not appropriate, and reduction of the damages award as a matter of law is required, where the plaintiff has produced no evidence in support of a legally viable damages theory that could allow for an award greater than what the defendant proposed.  For instance, in *Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed. Cir. 2001), the Federal

-22-

Circuit upheld the reduction of a damages award from $7,134,000 to $520, and held that it should not be treated as a remittitur or otherwise allow for a new trial on damages.  The court in *Tronzo* explained that "the district court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award[,]" and instead "awarded the maximum damages possible given the lack of competent evidence" for an award greater than $520.  *Id.* at 1351. While the plaintiff argued for more based on "lost business opportunities," the evidence "that Dr. Tronzo attempted to rely on was too remote and inconclusive to reflect the actual injury incurred by Dr. Tronzo or to measure his damages."  *Id.*

This case falls squarely within the rationale of *Tronzo*.  Plaintiff made a choice to pursue a damages theory that is unsupportable as a matter of law and eschewed any alternative damages theory that could be supported by the law and the evidence.  There is no legal or logical basis to allow Plaintiff a second bite at the apple.  *See also Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651 (Fed. Cir. 2017) (Plaintiff is not necessarily entitled to damages or a new trial where it fails to put on a legitimate damages case).  The only evidence of damages that considers a lump-sum amount, properly takes into account the highly comparable Intel license, and properly conforms to Federal Circuit law, and thus the only evidence that is based on a legally permissible theory of damages for a lump-sum award, is Samsung's evidence.

## V.    CONCLUSION

For the foregoing reasons, Samsung respectfully requests that the Court grant this motion for judgment as a matter of law for damages of no more than $6.2 million.

Dated:  February 8, 2019                    Respectfully submitted,

                                             */s/ Allan M. Soobert*
                                             Allan M. Soobert
                                             Blair M. Jacobs
                                             Stephen B. Kinnaird (*pro hac vice*)
                                             PAUL HASTINGS LLP
                                             875 15th Street, N.W.
                                             Washington, DC 20005
                                             Telephone:  (202) 551-1700
                                             Facsimile:  (202) 551-1705
                                             allansoobert@paulhastings.com
                                             blairjacobs@paulhastings.com
                                             stephenkinnaird@paulhastings.com

                                             Christopher W. Kennerly
                                             Joseph J. Rumpler, II
                                             PAUL HASTINGS LLP
                                             1117 S. California Avenue
                                             Palo Alto, CA 94304
                                             Telephone:  (650) 320-1800
                                             Facsimile:  (650) 320-1900
                                             chriskennerly@paulhastings.com
                                             josephrumpler@paulhastings.com

                                             Jeffrey D. Comeau
                                             Ariell Bratton (*pro hac vice*)
                                             PAUL HASTINGS LLP
                                             4747 Executive Drive, 12th Floor
                                             San Diego, CA 92121
                                             Telephone: (858) 458-3000
                                             Facsimile: (858) 458-3005
                                             jeffreycomeau@paulhastings.com
                                             ariellbratton@paulhastings.com

                                             Soyoung Jung (*pro hac vice*)
                                             PAUL HASTINGS LLP
                                             515 South Flower Street, 25th Floor
                                             Los Angeles, CA 90071
                                             Telephone: (213) 683-6000
                                             Facsimile: (213) 627-0705
                                             soyoungjung@paulhastings.com

                                             Melissa R. Smith
                                             Texas State Bar No. 24001351

Harry L. Gillam, Jr.
Texas State Bar No. 07921800
GILLAM & SMITH, LLP
303 S. Washington Ave.
Marshall, TX 75670
Telephone:  (903) 934-8450
Facsimile:  (903) 934-9257
melissa@gillamsmithlaw.com
gil@gillamsmithlaw.com

COUNSEL FOR DEFENDANTS SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
ELECTRONICS AMERICA, INC.;
SAMSUNG SEMICONDUCTOR, INC.;
SAMSUNG AUSTIN SEMICONDUCTOR,
LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5 on this 8th day of February, 2019.  As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A) and by email.

*/s/ Allan M. Soobert*
Allan M. Soobert

## CERTIFICATE OF AUTHORIZATION TO SEAL

I hereby certify that under Local Rule CV-5(a)(7), the foregoing document is filed under seal pursuant to the Court's Protective Order entered in this matter.

*/s/ Allan M. Soobert*
Allan M. Soobert