# KAIST IP US LLC
## v.
# Samsung Electronics Co., LTD., et al.

## Samsung Defendants' Motions For JMOL On Damages And New Trial

July 25, 2019

# The Verdict

## QUESTION #1:

Did KAIST prove by a preponderance of the evidence that any Defendant named below infringed **ANY** of the Asserted Claims?

**Answer "Yes" or "No" for each Defendant listed below:**

The Samsung Defendants _Yes_

The GlobalFoundries Defendants _Yes_

Qualcomm _Yes_

# The Verdict

## QUESTION #4:

What sum of money, if any, if paid now in cash, do you find by a preponderance of the evidence would fairly and reasonably compensate KAIST for any infringement by a Defendant whom you have found to be infringing?  Only award damages for those Asserted Claims that you have found to be both infringed by a Defendant and not invalid as to each Defendant listed below.

**Answer in Dollars and Cents, if any:**

The Samsung Defendants          $ 400,000,000

As to the sum(s) you have awarded against the Samsung Defendants, if any, indicate below if that amount is intended to represent:

√ A Lump Sum          OR          _____ A Running Royalty

# The Verdict

The GlobalFoundries Defendants    $_____0_____

As to the sum(s) you have awarded against the GlobalFoundries Defendants, if any, indicate below if that amount is intended to represent:

_____A Lump Sum        OR        _____A Running Royalty

Qualcomm        $_____0_____

As to the sum(s) you have awarded against Qualcomm, if any, indicate below if that amount is intended to represent:

_____A Lump Sum        OR        _____A Running Royalty

# The $400M Damages Award Exceeded Plaintiff's Request

Plaintiff requested damages of only:

- $321,438,451 against Samsung
- $296,851,609 against Qualcomm
- $98,541,744 against GlobalFoundries

Plaintiff's expert Roy Weinstein testified that these amounts were "adequate to compensate for infringement."

# Damages Are 60x The Intel License



# The Evidence Is Legally Insufficient To Support The Damages Award

1. Running royalty evidence cannot support the lump sum verdict.

2. The damages are 60x the comparable Intel license.

3. The damages were not apportioned to the incremental value of the patent.

4. The damages were not apportioned to the smallest saleable unit.

5. Plaintiff arbitrarily assumed a 12% profit share.

6. Plaintiff's damages model improperly relied on perfect future knowledge of sales and profits.

7. Plaintiff's analysis rested on an unreliable regression model.

8. Plaintiff double-counted damages for products with Snapdragon chips.

## Ground 1:

Running royalty evidence cannot support the jury's lump sum damages award

# Plaintiff's Running Royalty Evidence Cannot Support The Lump Sum Verdict



"[C]ertain fundamental differences exist between lump-sum agreements and running-royalty agreements."

"Compared to a running royalty analysis, a lump-sum analysis involves different considerations."

"For a jury to use a running-royalty agreement as a basis to award lump-sum damages, ... <u>some basis for comparison must exist</u> in the evidence presented to the jury. "

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326, 1330 (Fed. Cir. 2009)

# Plaintiff's Running Royalty Evidence Cannot Support The Lump Sum Verdict



"In this case, [the expert] cited to the two lump sum payments, ... <u>but he did not offer any testimony to explain how those payments could be converted to a royalty rate</u>. ... [T]he lump-sum agreements are not substantial evidence in support of the jury's verdict."

*Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012)

# Plaintiff's Running Royalty Evidence Cannot Support The Lump Sum Verdict

Plaintiff's expert Mr. Weinstein based damages on profit per unit sold:

## Speed and Power Efficiency Damages - Summary

**SAMSUNG**

November 29, 2016 – May 14, 2018

| Accused Product Unit Sales | Speed and Power Efficiency Damages Rate | Damages |
|---|---|---|
| Smartphones 8,315,112 | $4.74 per unit | $39,413,631 |
| Tablets 1,632,820 | $3.74 per unit | $6,106,747 |
| Exynos SoCs 245,656,852 | $0.71 per unit | $174,416,365 |
| **Total Damages** | | $219,936,743 |

Supplemental Report, Exhibits 20.1S, 20.2S, 20.3S, 20.4S, and 20.5S.

PDX

# Plaintiff's Running Royalty Evidence Cannot Support The Lump Sum Verdict

Mr. Weinstein thus performed solely a running royalty analysis.

Mr. Weinstein did not perform a lump sum analysis.

Mr. Weinstein proposed no alternative lump sum figures.

Mr. Weinstein presented no basis to convert the running royalty into a lump sum.

- Did not discount future royalty payments to present value
- Did not factor in uncertainty of future sales

Ground 2:

The damages are 60x the comparable Intel license

# The Damages Are 60x The Comparable Intel License



# Comparable Licenses Are Highly Probative



"Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such <u>actual licenses most clearly reflect the economic value of the patented technology</u> in the marketplace."

*LaserDynamics, Inc. v. Quanta Computer, Inc.* 694 F.3d 51, 79 (Fed. Cir. 2012)



"[W]here the award was a multiple of the average license amounts presented, here, there is 'little evidentiary basis under *Georgia-Pacific* Factor 2 for awarding roughly <u>three to four times</u> the average amount in the lump-sum agreements in evidence.'"

*Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 30-31 (Fed. Cir. 2012)

# The Intel License Was Highly Comparable

- Licensed the same '055 Patent
- License negotiated outside of litigation
- Non-exclusive license
- Intel an even larger player than Samsung
- License for a longer period (over 11 years)
- License covered more products (all nodes, not just 14 nm)

# The Intel License Was Highly Comparable

It is undisputed that Intel, at the time of its license,
was already committed to bulk FinFET.

## Roy Weinstein

Q. ... [A]t the time of the Intel agreement between P&IB, Professor Lee, and Intel, all those parties knew with certainty that Intel had already launched its [bulk] FinFET products?

A. I believe so, yes.

## Defendants' Expert Stephen Becker

A. At the time that Intel sat down, they had already announced their next generation of FinFET chips.  So in a sense there's no going back for Intel...

Q. What about manufacturing facilities?

A. ... [W]hen they signed the license, they had already built or at least converted a number of their manufacturing facilities to use the FinFET –– bulk FinFET.

# Plaintiff Did Not Account For The Comparable Intel License

Mr. Weinstein recognized that the Intel license is "the only actual real-world license to the '055 Patent."

- But Mr. Weinstein did not actually consider the amount of the Intel license in his Georgia Pacific analysis.

- And Mr. Weinstein gave no explanation of why his damages opinion was 60x the license.

# Plaintiff Did Not Account For The Comparable Intel License

## Plaintiff

"Mr. Weinstein testified that the Intel License was a downward predicate on his analysis." (citing 6/12/18 pm at 193:9–201:12, 201:14–202:14).



Wrong:

Mr. Weinstein mentioned other downward predicates (at 200:2-16):

- Geographic scope
- Parties not competitors

Did **not** mention $6.8M amount of Intel license as a downward predicate.

# Ground 3:

# Damages were not apportioned to the value of the patent

# Damages Were Not Tied To The Incremental Value Of The Patent

**Kelin Kuhn**



**Dr. Kuhn attributed <u>all</u> of the benefit of bulk FinFET <u>to the '055 Patent</u>, despite admitting '055 Patent did not invent bulk FinFET:**

Q. ... Now, all those benefits that you just summarized, you're attributing solely to the '055 patent, aren't you?

A. I'm attributing to the transistor design in the '055 patent, that's correct.

Q. [T]here's no question, is there, that <u>Professor Lee didn't invent the concept of tying a Fin to the bulk substrate</u>; isn't that right?

A. That's fair, sir.

Q. Okay.  So to say that in a short version, <u>Professor Lee didn't invent the bulk FinFET</u> generally; isn't that correct?

A. Yes, sir.

# Damages Were Not Tied To The Value Of The Patent



"[T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the market place."

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)



"It is not enough to merely show that the [patented feature] is viewed as valuable … or even essential to the use of the [product].'"

*VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1326-27 (Fed. Cir. 2014)



"[W]hen the product contains multiple valuable features, it is not enough to merely show that the patented feature is viewed as essential, that a product would not be commercially viable without the patented feature, or that consumers would not purchase the product without the patented feature."

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 979 (Fed. Cir. 2018)

# Damages Were Not Tied To The Incremental Value Of The Patent Over The Prior Art


The damages inquiry concerns "the added usefulness of an innovation over the prior art," and "the royalty ... should reflect the approximate value of that technological contribution."

*Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014)

# Damages Were Not Tied To The Incremental Value Of The Patent Over The Prior Art

- The prosecution history of the '055 Patent shows that the patent was initially rejected as anticipated by Inaba.

- The patent was granted <u>only</u> because it added certain numerical constraints on the thickness of the gate oxide and first oxide layers.

- Plaintiff's experts made <u>no</u> attempt to separate out the incremental benefit of the thickness constraints that were the sole basis for granting the patent despite Inaba.

# Damages Were Not Tied To The Incremental Value Of The Patent Over The Prior Art

Mr. Weinstein's damages calculation depended on the attribution opinions of Kelin Kuhn and David Witt

**Roy Weinstein**



Q. Would you agree if Dr. Kuhn is incorrect that the incremental benefits of the accused 14-nanometer FinFETs are solely attributable to the '055 patent, that your damages opinion is overstated?

A. I would agree that if her opinion is incorrect, my damages results would also be incorrect.

\* \* \* \* \*

Q. And similarly, if Mr. Witt has overstated the percentage improvements that he testified about, would you agree that your damages are overstated?

A. I would.

# Damages Were Not Tied To The Incremental Value Of The Patent Over The Prior Art

But Dr. Kuhn and Mr. Witt assumed no benefit from prior art

**Kelin Kuhn**



**David Witt**



Q. Your analysis didn't include the incremental advance of the '055 Patent over, for example, Inaba in your benefits analysis, did it?

A. No, sir.

Q. Your benefits analysis didn't apportion for the incremental advance of the '055 Patent over Mizuno, did it?

A. No, sir.

Q. Is it also correct that you didn't do any analysis to determine what the advance of the '055 patent is over the prior art?

A. That is true.

Trial Testimony on 6/12/18 pm at 88:8-15; 42:22-43:4

Trial Testimony on 6/12/18 pm at 151:12-15; 152:20-24; 161:7-9

# Damages Did Not Factor Out Non-Infringing Features

## Kuhn ignored the Hafnium layer, which was necessary to commercial viability

Q.  [Y]ou didn't attribute the benefit of any High-k material in those devices, did you?

A.  No, sir.

Q.  Whatever benefit that High-k Hafnium oxide material provides, it's not provided by the '055 Patent.  You agree with that?

A.  Yes, sir.

\*   \*   \*   \*   \*

Q. Right.  And you need a High-k stack if you're getting down to 14 nanometers, don't you?

A. That's the general consensus, sir.

...

Q. Okay.  [Without the Hafnium oxide, i]t couldn't be commercially viable, would it?

A. No, sir.

**Kelin Kuhn**



# Damages Did Not Factor Out The Cost To Commercialize The Patent

**Kelin Kuhn**



Q. Did you attribute any of the _perspiration in actually building that 14-nanometer FinFET_, what went into that vis-a-vis the '055 Patent?

A. It wasn't necessary in this case.

**Dr. Kim**



Q. How much money did Samsung invest into research and development activities relating to its FinFET technology?

A. If you're asking about the investment up until now, it's rather difficult for me, but if you're talking about as of 2012, what—which was when it—after the completion of our product definition, so that we can provide that to our first customers, _we're talking about $300 million._

## Ground 4:

Damages were not tied to the smallest saleable unit

# Damages Were Not Tied To The Smallest Saleable Unit



"[T]he patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features."

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018)

# Damages Were Not Tied To The Smallest Saleable Unit

Mr. Weinstein calculated the benefit of the '055 Patent based on the retail prices of phones and tablets, not the prices of chips:

A. ... With respect to smartphones, what I found is that a 1 percent increase in speed leads to a $1.06 increase in the <u>retail price of smartphones</u>, holding other things constant.  With respect to <u>tablets</u>, a 1 percent increase in speed leads to a price increase of 92 cents ....

A.  ...  [T]he increased profit associated with a 1-percent increase in speed, [shows]... the total increase in profit ....  <u>with respect to the Galaxy phone</u> is $33.92.

# Damages Were Not Tied To The Smallest Saleable Unit

Clearly not based on the smallest saleable unit given differences in supposed benefit for smartphones, tablets, and chips.



PDX 6.49 (highlighting added)

32

Ground 5:

Plaintiff arbitrarily assumed a 12% profit share

# Plaintiff Arbitrarily Assumed A 12% Profit Share



# Plaintiff Arbitrarily Assumed A 12% Profit Share

Weinstein's testimony is based only on the fact that, in the Intel negotiation, P&IB accepted 12% of its initial demand.

- But no evidence P&IB's initial demand of $70M represents Intel's profit

- And no evidence $8.5 million license represents the share of that profit that the parties decided would go to P&IB

# The 12% Assumption Was Critical To Plaintiff's Damages Proposal



**Speed and Power Efficiency Damages Rates - Smartphones**

November 29, 2016 – May 14, 2018

1.  Incremental Speed Profit Per Unit — $21.22 per unit
2.  Share to P&IB — 12%
3.  **Speed Damages Rate** — **$2.55 per unit**
    **(Line 1 x Line 2)**

4.  Incremental Power Efficiency Profit Per Unit — $18.23 per unit
5.  Share to P&IB — 12%
6.  **Power Efficiency Damages Rate** — **$2.19 per unit**
    **(Line 4 x Line 5)**

Opening Report, p. 98 and 100, paragraphs 169 and 175.
Supplemental Report, Exhibits 11.2S, 20.2S, and 20.3S, footnote 1.

PDX6.47

**Combined Speed and Power Efficiency Damages Rate - Smartphones**

November 29, 2016 – May 14, 2018

1.  Speed Damages Rate — **$2.55 per unit**

2.  Power Efficiency Damages Rate — **$2.19 per unit**

3.  **Combined Speed and Power Efficiency Damages Rate** — **$4.74 per unit**
    **(Line 1 + Line 2)**

Supplemental Report, Exhibits 20.2S and 20.3S.

PDX6.48

# The 12% Assumption Was Critical To Plaintiff's Damages Proposal



# The 12% Assumption Was Critical To Plaintiff's Damages Proposal

## Damages Due Because Of Infringement

|  | Defendants<br>Keep **88%**: | Plaintiff<br>Receives **12%**: |
|---|---|---|
| **SAMSUNG** | $2,384,641,900 | $321,438,451 |
| **QUALCOMM** | $2,173,719,843 | $296,851,609 |
| **GLOBAL FOUNDRIES** | $722,639,459 | $98,541,744 |

PDX7.71

## Remedy on Damages:

JMOL of $6.2 million or a new trial

# The Proper Remedy For Plaintiff's Failure Of Proof On Damages Is JMOL For $6.2 Million

The *only* evidence of a lump-sum award is Samsung's evidence that such an award here would be $6.2 million.

The *only* evidence that takes into account the Intel license is likewise Samsung's evidence.

Plaintiff did *not* request a new trial in the event that this Court finds the evidence insufficient to support the damages award.

– Any such request now is therefore waived.  *See Promega Corp. v. Life Techs. Corp.*, 874 F.3d 651, 661-62 (Fed. Cir. 2017).

# The Proper Remedy For Plaintiff's Failure Of Proof On Damages Is JMOL For $6.2 Million

## Plaintiff

"[I]f Defendants are correct, the lower amount in the record is a *running royalty* with past damages solely for the period from November 29, 2016 to May 14, 2018 for Samsung at a 'minimum' of $321,438,451."



## Response

Wrong:

The jury found that the hypothetical license would be in the form of a lump sum.

Plaintiff did not challenge that jury finding as unsupported by the record, and it is, therefore, binding.

Thus, Plaintiff's only proposed alternative to the jury's award is unavailable as a matter of law.

## Alternative Remedy on Damages:

## A new trial

# $400 Million Verdict Is Against The Great Weight Of The Evidence

All of the grounds supporting JMOL also support a new trial:

1. Running royalty evidence cannot support the jury's lump sum damages award.

2. Plaintiff failed to account for the highly comparable Intel license.

3. Damages were not tied to the incremental value of the patent.

4. Damages were not tied to the smallest saleable unit.

5. Plaintiff arbitrarily assumed 12% of the patent's supposed profits would go to P&IB in the hypothetical negotiation.

6. Plaintiff's damages model improperly relied on perfect future knowledge of sales and profits in the hypothetical negotiation.

7. Plaintiff's analysis rested on an unreliable regression model.

8. Plaintiff engaged in double-counting of damages for products with Snapdragon chips.

# There Is *No Evidence* Of Any Kind To Support Damages Of Greater Than $321 Million

- Weinstein conceded that $321 million was adequate to compensate for the infringement.

- Plaintiff never produced any evidence for a greater damages amount for Samsung.

# The Verdict Reflects Passion And Prejudice

- The jury awarded more than Plaintiff requested.

- The jury awarded damages only against only Samsung, not other Defendants, even though they were found to infringe.

- Plaintiff improperly villainized Samsung.

# The Verdict Reflects Passion And Prejudice

Plaintiff's improper comments in closing:

```
 3              So I told you guys that I spent my whole life in
 4    California.  And there's this great basketball player in
 5    California named Steph Curry.  And when Steph Curry first
 6    joined the NBA, he was really thin, and people didn't think
 7    he was actually going to be that good of a player.  His
 8    rookie contact with Golden State was incredibly low.  Golden
 9    State got this incredible deal, but his next contract, when
10    people knew how amazing he was, was incredibly large.
11              Intel, the American company, who did the -- who
12    followed the law -- Intel, the American company --
13              THE COURT:  One minute left.
14              MR. SHEASBY:   -- who took a license to this patent
15    voluntarily, got an incredible deal.  No one disputes that.
16    These multi-national companies that are the biggest in the
17    world, they don't get a rookie deal.  Rookie deals were in
18    2011.  Today, they get what is due.
```

# Issues To Resolve In The Event Of A Damages Retrial

If there is a damages retrial, the jury's finding that the award would be a lump sum must be respected as a matter of law and cannot be retried.

- "[N]o fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of common law." U.S. Const. amend. VII.

Samsung respectfully requests that this Court address all of the noted deficiencies in the damages analysis even though any one of them is sufficient for JMOL or a new trial.

## New Trial on Liability For Improper Exclusion of Evidence Ground 1:

Exclusion of Dr. Subramanian's testimony that the $SiO_2$ layer and HfO layer are not a single "layer"

# '055 Patent: The Claims Require A "first oxide layer"

'055 PATENT, CLAIM 1

1. A double-gate FinFET device, comprising:

a bulk silicon substrate;

a Fin active region which is a wall-shape single crystalline silicon on a surface of the bulk silicon substrate and connected to said bulk silicon substrate;

a second oxide layer which is formed up to a certain height of the Fin active region from the surface of bulk silicon substrate;

a gate oxide layer which is formed on both side-walls of the Fin active region protruded from said second oxide layer;

a first oxide layer which is formed on the upper surface of said Fin active region with a thickness greater or equal to that of the gate oxide;

a gate which is formed on said first and second oxide layer;

a source/drain region which is formed on both sides of the Fin active region except where said gate overlaps with the Fin active region; and

a contact region and a metal layer which are formed at said source/drain and gate contact region,

wherein the thickness of said gate oxide layer is between 0.5 nm and 10 nm, and the thickness of said first oxidation layer is between 0.5 nm and 200 nm.



'055 Patent, Claim 1                    '055 Patent, Figure 7                    49

# Magistrate Judge Payne Found Dr. Subramanian's Opinion Created A Fact Issue As To Whether The SiO$_2$ And HfO Layers Are a Single Layer

Defendants present evidence that the accused devices have a silicon dioxide layer (SiO$_2$) formed around the entire surface of the fin. Subramanian Rep. [Dkt. # 228-10] ¶ 110. "Well after" formation of that SiO$_2$ layer, a different process forms a hafnium dioxide (HfO) layer over the SiO$_2$ layer. *Id.* ¶ 111. The gate electrode is then formed on the HfO layer. *Id.* ¶ 121. *See* GF_KAISTIP00000239 *supra.*

Plaintiff contends the SiO$_2$ and HfO layers together compose a broader layer formed completely around the fin. Pl.'s Mot. [Dkt. # 228] at 14. The SiO$_2$ part of this broader layer . . .

This presents a fact issue for the jury to resolve—whether the SiO$_2$ and HfO layers are a single layer formed on the sidewalls and upper surface of the fin active region. The answer to *that* question, in turn, relates to whether the gate is formed on the "first oxide layer" as recited by the claims. Thus, because Defendants have presented evidence from which a jury might return a verdict in their favor, Plaintiff's Motion for Summary Judgment of Infringement [Dkt. # 228] should be **DENIED**.

# Dr. Subramanian Opined In His Report That The SiO$_2$ And HfO Layers Are Different Layers And Not The Claimed "first oxide layer"



# Dr. Subramanian Opined In His Report That The SiO$_2$ And HfO Layers Are Different Layers And Not The Claimed "first oxide layer"

112. There is no difference between the interfacial SiO$_2$'s composition and structure on the vertex (or fin) of this parabolically-shaped fin and its composition and structure at points further down from the vertex of the fin. The interfacial SiO$_2$ is formed at all locations on the surface of the parabolically-shaped fin at the same time using the same process. The interfacial SiO$_2$ layer cannot correspond to the claimed "first oxide layer" because the gate electrode is not formed on the interfacial SiO$_2$ as required by the claims. See '055 Patent at independent claims 1, 7, and 13 ("a gate which is formed on said first and second oxide layer").

113. There is no difference between the HfO's composition and structure on the interfacial SiO$_2$ on the vertex (or tip) of this parabolically-shaped fin and its composition and structure at points further down from the vertex of the fin. The HfO is formed at all locations on the interfacial SiO$_2$ at the same time using the same process. The HfO layer is not formed on the surface of the semiconductor fin. Instead, the HfO layer is formed on the surface of the interfacial SiO$_2$ layer. As such, the HfO layer cannot correspond to the claimed "first oxide layer" which is required to be "formed on the upper surface of said Fin active region" '055 Patent at independent claims 1, 7, and 13.

## interfacial

**ADJECTIVE**

1 Included between two faces of a crystal or other solid.
   + Example sentences

2 Relating to or forming a common boundary between two portions of matter or space.
   + Example sentences

Oxford Dictionary definition of "interfacial"

# Plaintiff Erroneously Represented That Dr. Subramanian's "Two Different Layers" Testimony Went Beyond His Report

| | |
|---|---|
| **Dr. Subramanian:** | The Hafnium oxide layer is formed by a dif – it's a separate layer formed by a different technique at a different time in a different tool.  And that layer I show in black, and you'll notice something important out of it. |
| **Mr. Sheasby:** | Your Honor, now it's clearly outside the scope of the report. I reurge my objection. |
| **Mr. Soobert:** | Your Honor, he's talking about the Hafnium oxide layer. It's in his report. |
| **The Court:** | Approach the bench, counsel.<br>(Bench conference.) |

Trial Testimony on 6/14/18 AM at 20:20-21:6

# The Court Precluded Dr. Subramanian's "Two Different <u>Layers</u>" Testimony

| | |
|---|---|
| **The Court:** | It's clear from what happened in our discussion in chambers that the Hafnium oxide layer and the silicon dioxide layer together form a single layer.  ==And he's not going to say that both of them together are not a single oxide <u>layer</u>.== |
| | \* \* \* \* |
| **Dr. Subramanian:** | So not only is the Hafnium oxide over the blue, it's also over the gray.  ==So you can see that the requirements, therefore, cannot be met by the Hafnium oxide <u>layer</u>, because <u>the Hafnium oxide layer breaks up that sequence</u>.==  You never have orange, blue, green, or gray, green.  Hafnium oxide cannot meet the requirements, and as I pointed out earlier, neither can silicon dioxide." |
| **Mr. Sheasby:** | Your Honor, I move to strike that last answers. |
| **The Court:** | I'm going to sustain that objection.  ==And I do believe the witness has exceeded the scope of his report with that last statement.== |

# Magistrate Judge Payne Did Not Preclude Dr. Subramanian's "Two Different Layers" Testimony

'055 Patent:



First Oxide

Gate Oxide       Fin       Gate Oxide

Judge Payne excluded:

The continuous oxide around the Fin means that there is <u>no distinction between the first oxide and gate oxide</u>, as required by the claims.

The Court excluded at trial:

The <u>HfO and SiO$_2$ are different layers</u>, and <u>neither satisfies the first oxide layer</u> requirement of the claims.

# Dr. Subramanian Opined That There Is One Gate <u>Oxide</u>

100.    All claims of the '055 Patent require both "a gate oxide layer which is formed on both side-walls of the Fin active region" and "a first oxide layer which is formed on the upper surface of said Fin active region." *See* '055 Patent at independent claims 1, 7 and 13.

101.    The Accused Devices do not satisfy this claim requirement because the Accused Devices do not have both of these required oxide layers.  Instead, the Accused Devices have one gate oxide which wraps around the surface of a parabolically-shaped semiconductor fin underneath the gate electrode.

# Dr. Subramanian Opined In His Report That the Accused Products Have A <u>Gate Oxide</u> Comprised Of Two Distinct Layers

102.    This gate oxide, which wraps around the surface of a parabolically-shaped fin, comprises two layers—an interfacial $SiO_2$ layer and an HfO high-k dielectric layer. As described in more detail below, the interfacial $SiO_2$ layer is first formed around the surface of the exposed fin.  Then, at a later time, the HfO high-k dielectric layer is formed on the surface of the interfacial $SiO_2$ layer.



$SiO_2$ layer
(white layer)

HfO layer
(black layer)

# But Dr. Subramanian Opined That The SiO$_2$ And HfO Layers Were Two Separate Layers

109.   As mentioned above, the gate oxide in the Accused I/O Devices comprises two layers—an interfacial SiO$_2$ layer and an HfO high-k dielectric layer.

117.   The Accused Logic Devices have one gate oxide which wraps around the surface of the parabolically-shaped semiconductor fin underneath the gate electrode.   This oxide comprises two layers—an interfacial SiO$_2$ layer ("IL") and a high-k dielectric layer ("HK").

118.   As mentioned above, the gate oxide in the Accused Logic Device comprises two layers—an interfacial SiO$_2$ layer and an HfO high-k dielectric layer.



Globalfoundries (GF_KAISTIP00000239) (annotated).

## New Trial For Improper Exclusion of Evidence Ground 2:

Exclusion of Dr. Subramanian's testimony that the $SiO_2$ layer and HfO layer could not be both the "first oxide layer" and "gate oxide layer"

# '055 Patent: The Plain Language Of The Claim Requires A "gate oxide layer" And A "first oxide layer"

1. A double-gate FinFET device, comprising:

a bulk silicon substrate;

a Fin active region which is a wall-shape single crystalline silicon on a surface of the bulk silicon substrate and connected to said bulk silicon substrate;

a second oxide layer which is formed up to a certain height of the Fin active region from the surface of bulk silicon substrate;

a gate oxide layer which is formed on both side-walls of the Fin active region protruded from said second oxide layer;

a first oxide layer which is formed on the upper surface of said Fin active region with a thickness greater or equal to that of the gate oxide;

a gate which is formed on said first and second oxide layer;

a source/drain region which is formed on both sides of the Fin active region except where said gate overlaps with the Fin active region; and

a contact region and a metal layer which are formed at said source/drain and gate contact region,

wherein the thickness of said gate oxide layer is between 0.5 nm and 10 nm, and the thickness of said first oxidation layer is between 0.5 nm and 200 nm.

• Neither term was construed during claim construction.

# Dr. Subramanian Opined That No "layer" In The Accused Products Could Be Both The "gate oxide layer" And "first oxide layer"

("a gate which is formed on said first and second oxide layer").   In addition, to the extent one

would argue that the interfacial SiO$_2$ layer corresponds to the claimed "gate oxide layer," the

interfacial SiO$_2$ layer cannot also correspond to the claimed "first oxide layer" for an additional

reason.   Specifically, the Plaintiff cannot point to the same layer as corresponding to both

features of the claimed structure.                          . . .

See '055 Patent at independent claims 1, 7, and 13.   In addition, the Plaintiff cannot point to the

HfO layer as corresponding to both "gate oxide layer" and "first oxide layer" features of the

claimed structure.

# Dr. Subramanian Should Have Been Allowed To Present To The Jury His Opinion Based On The Plain Language



"The district court did not err in concluding that these terms have plain meanings that do not require additional construction.  …

It was up to the jury to determine from the evidence presented at trial whether the ActiveVideo system satisfied the plain and ordinary meaning of the 'superimposing' limitations."

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012)

# But The Magistrate Judge's Ruling Erroneously Treated The Issue As One Of Claim Construction Rather Than Infringement

The '055 Patent's specification makes this a straight-forward issue. The patent shows an embodiment of the invention with a continuous layer of material in contact with the fin active region (4). '055 Patent fig.3a, 3b. The specification identifies part of that continuous layer as the gate oxide layer (12) formed on the sidewalls of the fin, a second part as the first oxide layer (6) formed on the fin's upper surface, and a third part as the second oxide layer (10) formed on the underlying bulk substrate (2b). *Id.* at 5:35–52. Contrary to Defendants' contention, this describes the first oxide layer and gate oxide layer as different regions of one continuous layer that surrounds the fin active region. Thus, Subramanian's statement that "the Plaintiff cannot point to the same layer as corresponding to both features of the claimed structure" is an incorrect construction of the claim, and the Court will **preclude** Defendants and Subramanian from advancing that position before the jury.

Dkt. 440 at 4

63